# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KING-DEVICK TEST INC.,<br><br>        Plaintiff,<br><br>      v.<br><br>NYU LANGONE HOSPITALS, NEW YORK UNIVERSITY, STEVEN L. GALETTA, and LAURA J. BALCER,<br><br>        Defendants. | Case No. 1:17-cv-09307 (JPO) |

## DEFENDANTS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT, DEFENSES, AND AMENDED COUNTERCLAIMS

Defendants NYU Langone Hospitals, New York University, Steven L. Galetta, and Laura J. Balcer (collectively, "Defendants"), by and through their undersigned counsel, hereby respond to Plaintiff King-Devick Test, Inc.'s Second Amended Complaint. Defendants deny each and every allegation in the Second Amended Complaint unless expressly admitted herein.

## INTRODUCTORY STATEMENT

This case is about the fair use of a vision test in academic research. Defendants spent many years and countless hours conducting free academic research that ultimately validated Plaintiff's simple vision test—known as the King-Devick Test—as a scientifically useful tool in many contexts, including for the identification of concussions in high-school and college sports. This research was conducted using copies of the King-Devick Test, which were given by Plaintiff "free of charge" to Defendants and many others, without condition, restriction or any expectation that these copies would ever be returned. This is not surprising, as the Defendants were at all times acting as independent academic researchers, without any contractual, fiduciary,

or financial relationship of any kind with the Plaintiff.  The Defendants were then, as now, simply interested in the progress of science including the diagnosis of concussions.  The Plaintiff originally shared this interest, or so Defendants thought.

The truth has been revealed by this lawsuit.  With it, Steve Devick and his company seek monetary damages and an injunction on any further research involving the King-Devick Test. Why?  Because that further research may soon help to validate a new, complementary test (called the MULES test), which engages more neural pathways than the King-Devick Test and thus has the potential to add to the practice of "on-the-field" detection of concussions.  With this new test on the horizon, the Plaintiff seeks to turn its test from a simple but useful scientific tool into a litigation weapon to obstruct Defendants' research and the advancement of neuro-ophthalmology, which examines complex systemic diseases that have manifestations in the visual system.  As Defendants will show, Devick is a bully who has tried both to intimidate and to pay off Defendants.  His company's proprietary claim to this test is unjustified, and the allegations in the complaint are meritless.

## ANSWER TO THE SECOND AMENDED COMPLAINT

### Parties

1.      Plaintiff King-Devick Test Inc. ("KDT Inc.") is a corporation organized under the state of Delaware. The CEO and Chairman of KDT Inc. is Steven Devick.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and therefore deny them.


2.      Defendant New York University ("NYU") is an education corporation organized under the laws of the State of New York.

ANSWER:  Admitted.

2

3.       Defendant NYU Langone Hospitals ("NYU Langone") is a corporation organized under the laws of the State of New York and is a subsidiary of NYU.

ANSWER:  Admitted.

4.       Defendant Steven L. Galetta ("Galetta") is an employee of NYU.  He is a faculty member at NYU's New York University School of Medicine and a member of NYU Langone's medical staff.  Galetta works for NYU and NYU Langone (collectively, the "NYU Defendants") in this district. He is a citizen of the State of Pennsylvania.

ANSWER:  Admitted.  Defendant Steven L. Galetta ("Dr. Galetta") further responds that he is an

employee of New York University School of Medicine ("NYUSOM").

5.       Defendant Laura J. Balcer ("Balcer") is an employee of NYU.  She is a faculty member at NYU's New York University School of Medicine and a member of NYU Langone's medical staff.  Balcer works for the NYU Defendants in this district. She is a citizen of the State of Pennsylvania.

ANSWER:  Admitted.  Defendant Laura J. Balcer ("Dr. Balcer") further responds that she is an

employee of NYUSOM.

**Jurisdiction and Venue**

6.       There is subject matter jurisdiction over the matter under 28 U.S.C. § 1331, § 1338(a) and 15 U.S.C. § 1121 because the claims arise under the laws of the United States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

ANSWER:  Paragraph 6 contains conclusions of law to which no answer is required.  To the

extent an answer is required, Defendants admit that this Court has subject matter jurisdiction

over the action under 28 U.S.C. § 1331, § 1338(a), and 15 U.S.C. § 1121 because the claims

arise under the laws of the United States and that this Court has supplemental jurisdiction over

the state law claims pursuant to 28 U.S.C. § 1367(a), but denies that there is any basis for

Plaintiff's claims.

7.       There is personal jurisdiction over the defendants because each is located or resides within the State of New York.

ANSWER:  Drs. Galetta and Balcer deny the allegations of Paragraph 7.  NYU Langone and

New York University admit that they are located in the State of New York.  Defendants do not

contest personal jurisdiction for purposes of this litigation.

8.      Venue is proper under 28 U.S.C. §1391 and §1400(a) because the defendants are residents of the State of New York, or could otherwise be found in the district. Venue is proper under §1391 for the additional reason that a substantial part of the events or omissions took place in this judicial district.

ANSWER: Defendants do not dispute that venue is proper in this judicial district.

**Facts**

9.      In 1976, Steven Devick ("Devick") and Alan King developed the King-Devick Test ("KDT") to measure saccadic performance as a way to assess reading ability as it relates to eye movement efficiency. Saccadic movement is a type of eye movement whereby the eye makes an abrupt change in its point of fixation. Saccadic movement takes place during reading when the eyes move across the page from word to word during the process.

ANSWER: Defendants admit that saccadic movement is a type of eye movement whereby the

eye makes an abrupt change in its point of fixation and that saccadic movement takes place

during reading when the eyes move across the page from word to word.  Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remainder of the

allegations in Paragraph 9, and therefore deny each and every remaining allegation contained

therein.

10.      KDT is a rapid, eye movement test. It involves reading aloud a series of single digit numbers from left to right as quickly and accurately as possible without making errors. KDT is used worldwide as a screening tool to detect impairments to eye movement as it relates to reading difficulties, dyslexia and other disabilities.

ANSWER: Defendants admit that the King-Devick Test (the "K-D Test") may be described as a

rapid, eye movement test and that it involves reading aloud a series of single digit numbers from

left to right as quickly and accurately as possible without making errors.  Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remainder of the

allegations in Paragraph 10, and therefore deny each and every remaining allegation contained

therein.

11.     KDT Inc. owns all rights to KDT. On August 23, 1983, KDT was registered with the United States Copyright Office, which assigned it Registration No. TXu000134747; another version was registered on February 10, 2011, and assigned Registration No. TXu001742358. (Printouts from the United States Copyright Office website showing the copyright catalog record for Registration Number Nos. TXu000134747 and TXu001742358 are attached hereto as Exhibit A.)

ANSWER: Denied.  Defendants admit that Exhibit A purports to be printouts from the United

States Copyright Office website showing the copyright catalog record for Registration Nos.

TXu000134747 and TXu001742358.  But because Plaintiff's predecessors-in-interest, King and

Devick, copied the Pierce Saccade Test, which was previously created and published, and, upon

information and belief, registered by third-party Cook Incorporated in or around 1972, and, upon

information and belief, also copied the previously created Gilbert test, which was created and

published by a third party in 1953, there was no additional copyrightable authorship created by

King and Devick in the K-D Test.  Thus, King and Devick were not entitled to a copyright

registration for the K-D Test.  Additionally, to the extent King and Devick did create

copyrightable authorship, the K-D Test fell into the public domain when it was published in 1976

as part of the senior paper *The Proposed King-Devick Saccade Test and its Relation to the Pierce*

*Saccade Test and Reading Levels*, under the 1909 Copyright Act.  Moreover, King and Devick

knowingly failed to disclose their copying, lack of authorship, and the prior publication of the K-

D Test in 1976, and knowingly failed to disclaim any third-party created, previously published

material.  Their failure to disclose these material facts and the consequent inability of the

Copyright Office to make an informed decision on their application for the K-D Test render Reg.

No. TXu000134747 invalid.  But for Plaintiff's predecessors-in-interests' fraudulent omission of

these material facts from their copyright application, the Copyright Office would have rejected

King and Devick's application for lack of copyrightability and/or because the material sought to

be registered, including the K-D Test, was in the public domain.  Defendants further deny the

allegations in Paragraph 11 because, on information and belief, neither Plaintiff nor its

predecessors-in-interest has ever registered its claim of authorship in the selection and

arrangements of unprotectable elements in the K-D Test, which Plaintiff alleges comprises the

original authorship in the K-D Test (*see* Plaintiff's Memorandum of Law In Support of

Plaintiff's Partial Motion to Dismiss Defendants' Counterclaims (Dkt. 36) at 5–6, 9, 12–13).


12.     KDT Inc. also owns all rights to the scoresheet and instructions used in
connection with KDT. KDT and the KDT scoresheet and instructions were registered together on
March 17, 2010, with the United States Copyright Office under Registration No.
TX0007217960. (A printout from the United States Copyright Office website showing the
copyright catalog record for Registration No. TX0007217960 is attached hereto as Exhibit B.)

ANSWER:  Defendants admit that Exhibit B purports to be a printout from the United States

Copyright Office website showing the copyright catalog record for Registration No.

TX0007217960.  Defendants are without knowledge or information sufficient to form a belief as

to the truth of the remainder of the allegations in Paragraph 12, and therefore deny each and

every remaining allegation contained therein.


13.     KDT Inc. also owns all rights to iPad app versions of KDT. The following are
registrations before the United States Copyright Office that cover iPad app versions of KDT:
Registration No. TX0007400950, registered on May 25, 2011 (version 1); Registration No.
TX0007458996, registered on November 9, 2011 (version 1.1); and Registration No.
TX0008341913, registered on March 30, 2016 (version 3.92). (Printouts from the United States
Copyright Office website showing the copyright catalog record for Registration Nos.
TX0007400950, TX0007458996, and TX0008341913 are attached hereto as Exhibit C.)

ANSWER: Defendants admit that Exhibit C purports to be printouts from the United States

Copyright Office website showing the copyright catalog record for Registration Nos.

TX0007400950, TX0007458996, and TX0008341913.  Defendants are without knowledge or

information sufficient to form a belief as to the truth of the remainder of the allegations in

Paragraph 13, and therefore deny each and every remaining allegation contained therein.

14.    KDT Inc. is the successor in interest and owner of the aforementioned copyright registrations relating to KDT, its scoresheet, instructions, and iPad app versions (collectively, the "KDT Copyright Registrations").

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 14, and therefore deny each and every allegation

contained therein.

15.    Since at least as early as 1983, KDT Inc. itself or through its predecessors in interest, has used and continues to use the mark KING-DEVICK TEST in U.S. interstate commerce in connection with saccadic movement performance tests for medical examination use.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 15, and therefore deny each and every allegation contained

therein.

16.    Since at least as early as 2011, KDT Inc. itself or through its predecessors in interest, has also used and continues to use the mark K-D TEST in commerce in connection with its saccadic movement performance tests for medical examination use.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 16, and therefore deny each and every allegation contained

therein.

17.    In addition to using the marks KING-DEVICK TEST and K-D TEST (collectively, the "KDT Marks") in connection with saccadic movement performance tests, since 2011 KDT Inc. itself or through its predecessors in interest, has used and continues to use the KDT Marks in commerce in connection with saccadic performance testing software for use on electronic devices and related software distribution and hosting services featuring the software.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore deny each and every allegation contained therein.

18.      KDT Inc. is the owner by assignment of the U.S. Trademark Registrations 3,897,227, 4,189,908, 4,025,581, and 4,189,907 for the KDT Marks (collectively, the "KDT Trademark Registrations) covering saccadic movement performance tests, mobile software and web hosting services featuring its software. (Copies of the KDT Trademark Registrations are attached hereto as Exhibit D.) The KDT Trademark Registrations are valid, subsisting, and incontestable, and therefore constitute *prima facie* evidence of KDT Inc.'s exclusive right to use the KDT Marks.

ANSWER: Defendants admit that Exhibit D purports to be copies of U.S. Trademark Registrations 3,897,227, 4,189,908, 4,025,581, and 4,189,907.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 18, and therefore deny each and every remaining allegation contained therein.

19.      KDT Inc. has used its KDT Marks prominently and consistently in connection with the promotion and sale of its saccadic movement performance tests, mobile software and web hosting services featuring its software.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore deny each and every allegation contained therein.

20.      As a result of KDT Inc.'s extensive use and promotion, the KDT Marks are well known and widely associated with KDT Inc.'s products and services, and have acquired significant and valuable goodwill.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore deny each and every allegation contained therein.

21.     Beginning in 2010, Devick sought to have KDT evaluated for use in concussion screening. Because rapid and precise eye movements require multiple parts of the brain to work together to control saccades, Devick hypothesized that a concussion-disrupted brain would not be able to control saccades as accurately as a normal brain, thus resulting in an increased number of errors and a longer time to complete the test.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 21, and therefore deny each and every allegation

contained therein.

22.     In 2010, Devick first contacted Galetta and Balcer, who at the time were researchers at University of Pennsylvania, to solicit their interest in evaluating data collected by KDT, Inc. concerning a study of the use of KDT in boxers in Boston, MA. Prior to this time, neither Galetta nor Balcer had conducted any research on tools to detect concussions, nor did they study delayed saccadic eye movement as an indicator of concussion. Galetta and Balcer agreed to work with KDT Inc. to evaluate and validate the use of KDT as a screening tool for concussions.

ANSWER:  Defendants admit that, in 2010, Drs. Galetta and Balcer were highly respected

neuro-ophthalmologists conducting medical research trials and studies at the University of

Pennsylvania and that, prior to this time, they had not conducted research on tools to test

concussions.  Paragraph 22 is otherwise denied.

23.     Galetta and Balcer began a research collaboration with KDT Inc. starting in 2010. In consultation with KDT Inc., Galetta and Balcer began preparing testing protocols, and using proprietary information and intellectual property provided by KDT Inc., including vinyl "flip chart" versions of KDT to Galetta and Balcer. Galetta and Balcer used KDT flip charts with test subjects in some of the earliest studies.

ANSWER:  Defendants admit the third sentence of Paragraph 23.  Defendants deny the

remainder of the allegations in Paragraph 23.

24.     KDT Inc. normally charged $45 for flip chart versions of KDT. However, KDT Inc. provided approximately 400 flip chart versions of KDT to Galetta and Balcer without cost, with an understanding between the parties that they would be used solely in connection with testing to evaluate and validate KDT and not for any other purpose.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegation that KDT Inc. normally charged $45 for flip chart versions of KDT,

and therefore deny this allegation.  Defendants deny the remainder of the allegations in

Paragraph 24.


25.     KDT Inc. also provided Galetta and Balcer with an electronic version of KDT, which is used by installing it as an application on an iPad device. KDT Inc. also supplied iPad devices to Galetta and Balcer for the limited use of testing to validate KDT. These devices were labeled, "Property of King Devick Test LLC."

ANSWER:  Defendants admit the first sentence of Paragraph 25 and admit that KDT Inc.

supplied Drs. Galetta and Balcer with iPad devices labeled "Property of King Devick Test LLC."

Defendants deny the remainder of the allegations in Paragraph 25.


26.     Users of the KDT iPad version are typically required to obtain access to use KDT through an online subscription account purchased from KDT Inc. KDT Inc. typically chargers[sic] those users an annual subscription fee of $20 per subject.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 26, and therefore deny each and every allegation

contained therein.


27.     KDT Inc. provided free online accounts to Balcer for use with research subjects under the username nyumc@kingdevicktest.com. At one point in 2014, Galetta and Balcer had an account with access for 1000 subjects. KDT Inc. has provided these accounts to Defendants without cost for the sole purpose of testing and validating KDT as an indicator for concussions, multiple sclerosis, sleep deprivation, and other neurological function measures of disease.

ANSWER: Defendants admit the first sentence of Paragraph 27.  Defendants are without

knowledge or information sufficient to form a belief as to the truth of the allegation that "[a]t one

point in 2014, Galetta and Balcer had an account with access for 1000 subjects," and therefore

deny this allegation.  Defendants deny the remainder of the allegations in Paragraph 27.

28.     KDT Inc. granted Galetta and Balcer a limited, royalty free license to use its flip chart and iPad versions of KDT, together with an online subscription account and KDT Inc. owned iPads (collectively, the "KDT Materials"), for the limited purpose of testing and validating KDT.

ANSWER:  Denied.

29.     Galetta and Balcer understood that KDT Inc. provided the KDT Materials to them to have them conduct testing to support KDT Inc.'s goal of establishing KDT as a reliable test for screening for concussions.

ANSWER:  Denied.

30.     From 2010 up to now, KDT Inc., Galetta and Balcer worked together to publish 37 peer-reviewed papers evaluating KDT for use to screen concussions and for use with a number of other neurological indications. Of those 37 peer reviewed articles, twenty-five peer-reviewed published articles were related to studying KDT's use in screening for and diagnosing concussions, five papers related to multiple sclerosis, three related to attention deficit hyperactivity disorder, two related to Parkinson's disease, one related to sleep study and one related to Alzheimer's disease.

ANSWER:  Defendants deny the allegations in Paragraph 30 except admit that Drs. Galetta and

Balcer have worked on twenty-one peer-reviewed published articles relating to studying the K-D

Test's use in screening for and diagnosing concussions, including two papers related to multiple

sclerosis, one paper related to Parkinson's disease, and one paper related to neurology resident

sleep deprivation, and one paper related to Alzheimer's disease.

31.     As a result of this joint research, KDT Inc., Balcer and Galetta determined that KDT is an accurate and reliable method for identifying head trauma and is a reliable tool that can be administered to athletes on the sidelines of sporting activities and events to aid in the detection of concussions.

ANSWER: Denied.

32.     KDT Inc. sells KDT concussion screening tests comprised of KDT Inc.'s copyrighted-protected works and bearing the KDT Marks, to medical professionals, parents of athletes, coaches, athletic trainers, high schools, colleges and other institutions and organizations with athletic programs.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 32, and therefore deny each and every allegation

contained therein.


33.     In 2012, Galetta and Balcer accepted offers to become Chair and Vice Chair,
respectively, of the Department of Neurology at NYU's New York University School of
Medicine. Galetta and Balcer received these offers in part on the strength of the research in
collaboration with KDT Inc., which they conducted using KDT Inc.'s proprietary tests.

ANSWER:  Defendants admit the first sentence of Paragraph 33.  Drs. Galetta and Balcer deny

the remaining allegations of Paragraph 33, and further respond that they accepted offers to

become Chair and Vice Chair, respectively, of NYUSOM's Department of Neurology after

receiving several offers of employment from NYUSOM beginning in 2007, which was several

years prior to meeting Devick in 2010.


34.     The information shared by KDT Inc. with Defendants was provided with an
expectation of confidentiality and KDT Inc. reasonably relied on this expectation that
Defendants would keep that information secret. This information includes, but is not limited to
the following trade secrets: unpublished test data; information on the identities of previous,
current, and potential users of KDT; feedback given to KDT Inc. by users, correlated with the
identities of individual users and potential users on the pros and cons of KDT; methods to
improve the testing process; user acquisition plans; product development plans; and pricing
information.

ANSWER:  Denied.


35.     The KDT trade secrets were developed by KDT Inc. over several years through
substantial effort and kept in confidence.

ANSWER:  Denied.


36.     KDT trade secrets are comprised of novel information that is used continuously
by KDT Inc. to develop and market KDT in commerce.

ANSWER:  Denied.

37.     KDT trade secrets shared with Galetta and Balcer in confidence with the understanding that it be used by them solely in connection with their testing of KDT and not for a separate commercial purpose. Galetta and Balcer could not have duplicated the KDT trade secrets without substantial effort and it was not readily ascertainable through public sources.

ANSWER:  Defendants deny that KDT Inc. shared any trade secrets with Drs. Galetta and

Balcer and therefore deny the allegations in Paragraph 37.


38.     KDT Inc. took reasonable steps to protect the KDT trade secrets. In addition to maintaining the confidentiality of information exchanged during the course of the confidential relationship with Galetta and Balcer, KDT Inc. took appropriate measures to guard the secrecy of their trade secrets. For example, KDT Inc.'s employee handbook includes instructions on the handling of confidential and proprietary information and all employees sign non-disclosure agreements. KDT Inc.'s computers are password protected and data from the KDT iPad app is encrypted. KDT Inc.'s office is not accessible to the public without possessing a keycard or checking in at the front desk during business hours.

ANSWER:  Defendants deny that KDT Inc. shared any trade secrets with Drs. Galetta and

Balcer and therefore deny the allegations in the first sentence of Paragraph 38.  Defendants are

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 38 and therefore deny them.


39.     The understanding that the parties were in a confidential relationship extended to information moving in either direction. Galetta or Balcer would provide Devick or others at KDT Inc. confidential information with the understanding that it not be shared. For example, on one occasion, Galetta provided non-published information to Devick for his consideration and reaction, understanding that Devick would not disseminate the results of the analysis in public meetings.

ANSWER:   Defendants deny that the parties were in a confidential relationship.  Defendants

admit that, occasionally, Drs. Galetta or Balcer would share information with Devick that he or

she would specify as non-published medical research data.  Defendants deny the remainder of

the allegations in Paragraph 39.


40.     With this understanding, Devick and others at KDT Inc. would provide confidential and proprietary information to Galetta and Balcer as a matter of course. Devick provided confidential commercial information that he gathered concerning the National Football

League's views on the testing with Galetta. He also shared confidential, proprietary information that KDT Inc. collected on concussion testing during private discussions with representatives from the U.S. Military and the National Hockey League.

ANSWER:  Denied.

41.     Devick provided confidential testing data that KDT Inc. collected to Galetta. On one occasion, Galetta asked for certain internal testing data that he was aware KDT Inc. had been collecting, and he sought to have KDT Inc. provide the data to a colleague. Galetta was privy to the fact that this unpublished information existed and he was given access to it.

ANSWER:  Defendants admit that Devick provided to Dr. Galetta de-identified testing data that

he or KDT Inc. collected and state further that KDT Inc. regularly displays internal testing data

at industry conferences and meetings, such as the North American Neuro-Ophthalmology

Society ("NANOS") Annual Meeting.  Defendants admit that, on one occasion, a colleague of

Dr. Galetta's asked Dr. Galetta for certain age-specific data related to the K-D Test that had been

publicly presented at a NANOS Annual Meeting, but because Dr. Galetta was not in possession

of that data he asked Devick to provide the data to this colleague, which, on information and

belief, Devick or someone from KDT Inc. did.  Defendants deny the remainder of the allegations

in Paragraph 41.

42.     KDT Inc. also conducted studies on its own and shared the results with Galetta and Balcer so that they might incorporate it into their research commission by KDT Inc.

ANSWER:  Defendants deny that they were commissioned by KDT Inc. to do any research and

therefore deny the allegations in Paragraph 42.

43.     Under the protection of the parties' agreement to maintain the confidentiality of information, KDT Inc. also disclosed to Galetta and Balcer its plans for future projects. During one such exchange, Galetta referred to a medical services delivery project planned by KDT Inc., and offered to introduce his son to Devick to discuss the plan.

ANSWER:  Defendants admit that Dr. Galetta offered to introduce his son to Devick to discuss a

potential project that, without solicitation, Devick has disclosed.  Defendants deny the remainder

of the allegations in Paragraph 43.


44.     In early 2016, Galetta announced to Devick that he intended to examine picture
naming as a potential test for concussions, which Defendants ultimately branded as MULES,
which stands for "Mobile Universal Lexicon Evaluation System." Devick noted that KDT Inc.
already used picture naming for young children and others who did not recognize numbers. At
the time of this correspondence, Galetta referred to this testing as "complementary" to KDT.

ANSWER:  Defendants admit that in early 2016, Dr. Galetta told Devick via e-mail that

Defendants were going to examine picture naming as a potential test to detect concussions.

Defendants admit that Dr. Galetta stated that Defendants think that colored picture naming could

be complementary to the K-D Test, since it almost certainly uses other areas of brain to process.

Defendants admit that the picture naming test was ultimately named MULES, which stands for

"Mobile Universal Lexicon Evaluation System."  Defendants admit that Devick responded to Dr.

Galetta's e-mail by stating that "we have been working on that with pre-schoolers who don't

know their numbers with sufficient/efficient automaticity."  Defendants further state that Devick

said that it "sounds interesting" and offered to have his employees help with Defendants' testing.

Defendants deny the remainder of the allegations in Paragraph 44.


45.     On information and belief, Defendants have used and are currently using KDT
trade secrets and KDT Materials comprised of KDT Inc.'s copyrights and trademarks in
connection with developing a competing test known as the "MULES" test. The MULES test
comprises a test card with symbols spaced in a similar arrangement as the spacing arrangement
used on the KDT, uses instructions to conduct the MULES test in the same manner as KDT and
attempts to measure inter-saccadic intervals like KDT. MULES is similar to KDT but with
pictures substituted for numbers.

ANSWER: Denied.


46.     Galetta and Balcer are endorsing MULES as a "supplement" to KDT, and towards
that end are publishing studies of KDT that attempt to link KDT with the MULES test.

15

ANSWER:  Denied.


47.    On information and belief, in 2016, Galetta and Balcer began to conduct tests on MULES. They did this work by copying, using, and publicly displaying the copyrighted materials bearing the KDT Marks provided by KDT Inc.

ANSWER:  Drs. Galetta and Balcer began to conduct tests on MULES in or around late 2015

and early 2016.  Otherwise denied.


48.    KDT Inc.'s copyrighted materials which are being used by Defendants in connection with MULES include flip charts and iPad versions of KDT, together with the KDT scoresheets and instructions, all bearing the KDT Marks.

ANSWER:  Denied.


49.    Without KDT Inc.'s authorization and beyond the scope of the limited license granted to Galetta and Balcer, Defendants are distributing and publicly displaying flip chart and iPad app versions of KDT bearing the KDT Marks, including in the testing of subjects, as part of Defendants' development and promotion of their competing MULES product, which Defendants endorse as a "supplement" for KDT.

ANSWER:  Denied.


50.    Balcer and Galetta approach users of KDT and subjects of prior KDT evaluations to participate in the MULES studies, whereby Defendants unlawfully distribute and publicly display KDT and KDT instructions bearing the KDT Marks to those test subjects in order to validate MULES, and to use MULES as supplement to KDT. Defendants are using KDT Inc.'s copyright protected works beyond the scope of their license and creating a false association and affiliation between KDT and MULES. These test subjects are aware of Balcer's and Galetta's prior association with evaluating KDT under the KDT Marks.

ANSWER:  Denied.


51.    Without KDT Inc.'s authorization and beyond the scope of the limited license granted to Galetta and Balcer, Defendants are also copying iPad app versions of KDT. Defendants create unlawful digital copies of KDT each time that they access the iPad app version of KDT to administer the test to subjects outside the scope of their limited license.

ANSWER:  Denied.

52.     Since 2016, Defendants continue to use, copy, distribute, and publicly display KDT tests, together with the KDT scoresheet and instructions, all bearing the KDT Marks, as a control to measure against the results of MULES. Galetta and Balcer hoped to obtain a strong enough correlation between the results of KDT and the results of MULES to allow them to use the prior KDT validation studies as a proxy for validating MULES, instead of validating the test from first principles, as was done with KDT.

ANSWER:  Denied.


53.     In addition to Defendants' using, distributing, public displaying and copying of KDT without authorization, the instructions to MULES are also an indication of the extent to which Defendants copied information from KDT for their own use. The KDT instructions state, "you will be reading a series of numbers aloud as quickly as you can without making any mistakes." The instructions for the MULES test state, "The participant names the pictures out loud from left to right as rapidly as possible without making errors," mirroring the syntax and substituting "out loud" for "aloud, "rapidly" for "quickly" and "errors" for "mistakes." Other similarities can be found in comparing the instructions for the two tests.

ANSWER:  Denied.


54.     Balcer and Galetta published the results in the Journal of Neurological Sciences under the title, "Mobile Universal Lexicon Evaluation System (MULES) test: A new measure of rapid picture naming for concussion." The article became available on November 4, 2016. This publication was KDT's first notice that Balcer and Galetta were seeking to establish a competing test.

ANSWER:  Defendants admit that Drs. Balcer and Galetta, in collaboration with nine other

researchers, published the results of their study on the MULES test in an article titled "Mobile

Universal Lexicon Evaluation System (MULES) test: A new measure of rapid picture naming for

concussion," which was published in the *Journal of Neurological Sciences*.  Defendants admit

that the article became available on November 4, 2016.  Defendants deny the remainder of the

allegations in Paragraph 54.


55.     Balcer and Galetta had expressed a desire to have a "non-proprietary" test available for use, an alternative to KDT. In an article by Galetta and Balcer (with others) published in the Journal of Sports Medicine and Therapy entitled, "Parents Take-On Concussion: Advances in Sideline Research and Culture in Youth Sports," the authors describe their investigation of the Advanced Concussion Recognition Initiative. They then discuss the use of KDT as part of that process. Galetta and Balcer note that, "rapid sideline tests designed to be

non-proprietary may offer an alternative and are under investigation in youth, collegiate and professional athlete populations."

ANSWER:  Defendants admit that in an article published in the *Journal of Sports Medicine and Therapy* titled "Parents Take-On Concussion: Advances in Sideline Research and Culture in Youth Sports," the authors, who included Dr. Galetta, Dr. Balcer, and ten other researchers, described their investigation of the Advanced Concussion Recognition Initiative.  Defendants admit that the article discusses the use of the K-D Test, the Symptom Evaluation from the Sport Concussion Assessment Tool, 3rd Edition (SCAT3 or Child-SCAT3), and the timed tandem gait test as part of their investigation.  Defendants admit that the article states that "rapid sideline tests designed to be non-proprietary may offer an alternative and are under investigation in youth, collegiate and professional athlete populations."  Defendants deny the remainder of the allegations in Paragraph 55.

56.     Defendants announced in a NYU Langone publication their hopes for the MULES test to supplant KDT as a sideline concussion screening test:

> Unlike the rapid number naming King-Devick test currently used to detect concussion, the MULES test requires an individual to identify objects in a series of photos as quickly as possible. Within their current working framework, investigators suspect concussion if athletes take even one additional second to complete the series compared with their pre-season baseline performance. "We moved toward image naming with this tool because it engages significantly more neural pathways than number identification," explains Dr. Galetta. "At the same time, like the King-Devick test, the MULES test can be quickly administered on the sideline by any adult." [2016 Annual Report at 22]

ANSWER:  Defendants deny the allegations in Paragraph 55 and further respond that the quoted text in Paragraph 56 is an excerpt from a 2016 publication by NYU Langone Medical Center (with underlining added by Plaintiff).

57.     In that same publication, NYU Langone notes that it will have the proprietary rights to the MULES test:

> NYU Langone has applied for a copyright for the MULES test, and Dr.
> Balcer and colleagues recently published a description of MULES testing
> in adult research volunteers in the Journal of the Neurological Sciences.
> They have further investigated applications of the MULES test through a
> field trial with local youth leagues, college athletes, and professional
> women's hockey players. "Once it's validated, we plan to make this
> powerful test available online, so a greater number of people will be able
> to detect concussion," says Dr. Balcer. [2016 Annual Report at 22]

ANSWER:  Defendants deny the allegations in Paragraph 56 and further respond that the quoted

text in Paragraph 57 is an excerpt from a 2016 publication by NYU Langone Medical Center

(with underlining added by Plaintiff).


58.    NYU Langone also discusses how it is developing its own digital version of
MULES using KDT as a comparator:

> A digital version of the MULES test is also being used in the Department
> of Neurology Vision Research Eye Movement Testing Lab, which was
> established two years ago under the leadership of Janet C. Rucker, MD,
> the Bernard A. and Charlotte Marden Professor of Neurology and director
> of the Division of Neuro- Ophthalmology, and John Ross Rizzo, MD,
> assistant professor of rehabilitation medicine and neurology. In the lab,
> Todd E. Hudson, PhD, research assistant professor of rehabilitation
> medicine, and signal processing experts Ivan W. Selesnick, PhD, professor
> of electrical and computer engineering, and WeiWei Dai, PhD candidate at
> the NYU Tandon School of Engineering, use state-of-the-art Eye Link
> high-resolution video cameras with infrared illuminators to track subtle
> eye movements related to neurological function. In 2016, the lab published
> research showing that people with slower scores on the King-Devick
> test—indicating a concussion—display longer intervals between saccades,
> the fast movements that eyes make when shifting focus from one number
> or object to another.[Id.]

ANSWER:  Defendants deny the allegations in Paragraph 57 and further respond that the quoted

text in Paragraph 58 is an excerpt from a 2016 publication by NYU Langone Medical Center

(with underlining added by Plaintiff).


59.    Defendants did not have permission to copy or publicly display KDT, its
scoresheet and instructions bearing the KDT Marks, use KDT as a comparative product in order
to conduct its competing research to validate their MULES test, and then publicly market their
MULES test as a supplement to or replacement of KDT.

ANSWER:  Denied.

60.     Defendants' actions have exceeded the scope of their limited license to use KDT Inc.'s copyright protected works, trademarks, trade secrets, KDT confidential data and KDT Materials. Defendants' actions constitute misappropriation of trade secrets, copyright infringement and trademark infringement.

ANSWER:  Denied.

61.     Due to Defendants' unlawful actions, KDT Inc. has withdrawn its license and has requested that Galetta and Balcer return the KDT Materials to KDT Inc. and cease their continued unlawful use of KDT Inc.'s copyright protected works, trademarks and KDT confidential data. However, Defendants have refused to return the KDT Materials to KDT Inc. or cease their unlawful conduct.

ANSWER:  Denied.

62.     Defendants admit to continued, ongoing use of KDT Inc.'s copyrighted material without permission. (Dkt. 25, note 4). Their use is not non- infringing fair use. The current purpose and character of the use is of a commercial nature and has the effect of diluting the potential market for and value of KDT Inc.'s copyrighted work.

ANSWER:  Denied.

63.     As a result of KDT's demonstrated effectiveness for concussion detection, Mayo Clinic executed a co-branding and licensing agreement with KDT Inc., the first of its kind with a third party in Mayo Clinic's 150-year history. Defendants are using KDT, Inc.'s copyrighted test to create a competitive co-branded product with NYU, using KDT Inc.'s trade secrets to build their client base in detriment to KDT Inc.

ANSWER:  Defendants deny the last sentence of Paragraph 63.  Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remainder of the

allegations in Paragraph 63, and therefore deny each and every remaining allegation contained

therein.

64.     To make matters worse, Defendants have also recently decided to smear KDT Inc.'s reputation in retaliation for commencing the instant lawsuit.

ANSWER:  Denied.

65.     In connection with a two-day medical conference jointly presented by NYU Langone and Mayo Clinic on February 15 to 17, 2018, called the "5th Annual Concussion Across the Spectrum of Injury," NYU Langone decided to include the following text in the conference program, which appeared online for several weeks:

> Steven L. Galetta, MD and Laura J. Balcer, MD, originally scheduled to give presentations, will not present. After years of conducting free academic research validating the King-Devick test, King-Devick Test, Inc. has sued NYU – as well as Drs. Galetta and Balcer personally –in federal court for their academic use of the King-Devick test, seeking monetary damages and an injunction on further research. While NYU, Galetta and Balcer reject King-Devick's allegations, in light of the pending litigation NYU has directed Drs. Galetta and Balcer not to present at this conference.

ANSWER:  Defendants deny the allegations in Paragraph 65 and further respond that, in connection with a two-day medical conference jointly presented by the NYU Langone Concussion Center and Mayo Clinic on February 15 to 17, 2018, called the "5th Annual Concussion Across the Spectrum of Injury," NYUSOM included the text quoted in Paragraph 65 in the conference program, which appeared online for several weeks.


66.     NYU Langone eventually removed the offending and misleading statements from the conference program at Mayo Clinic's insistence. Contrary to the Defendants' assertion, the instant lawsuit is not about Defendants' use of KDT for academic research to validate KDT. The instant lawsuit seeks to stop Defendants from further use of KDT's trade secrets, copyrights and trademarks in connection with developing and offering a competing test.

ANSWER:  Defendants deny the allegations in Paragraph 65 and further respond that the NYUSOM's Continuing Medical Education Office removed the text quoted in Paragraph 65 from the conference program at Mayo Clinic's request.


67.     In another act of retaliation, on or about February 16, 2018, NYU sent a takedown notice to Twitter, Inc. ("Twitter") pursuant to Section 512(c) of the Digital Millennium Copyright Act ("DMCA)", 17 U.S.C. §512(c), claiming that an image tweeted from KDT Inc.'s Twitter account on July 12, 2014, infringed NYU's copyrights (the "Takedown Notice").

ANSWER:  Defendants deny the allegations in Paragraph 67 and further respond that New York University, through its attorneys, sent a takedown notice to Twitter pursuant to Section 512(c) of

the DMCA, 17 U.S.C. § 512(c), reporting that an image tweeted from Plaintiff's

@kingdevicktest Twitter account on July 12, 2014, infringed New York University's copyrights

(the "Takedown Notice").


68.     The image in KDT Inc.'s July 12, 2014, tweet was comprised of a poster titled
"Vision-Based Performance Testing as a Complement to SCAT3/Child-SCAT3 in Youth and
Collegiate Athletes." The poster summarized the results of a study conducted by Galetta and
Balcer using KDT and other materials and data provided to them by KDT Inc. The poster also
contained a copy of KDT and KDT Inc.'s trademark.

ANSWER:  Defendants admit the allegations of Paragraph 68, except deny that the poster

summarized other materials and data provided to the Doctors by KDT Inc., and further note that

the poster was created by Dr. Balcer and other NYUSOM researchers and featured material and

data obtained through their research.


69.     At the time that KDT Inc. posted the July 12, 2014, tweet, Galetta and Balcer
were operating within the scope of their limited license with KDT Inc. and the parties were
working together to validate KDT for concussion screening.

ANSWER:  Denied.


70.     KDT Inc.'s public display of the poster in its July 12, 2014, tweet did not
constitute copyright infringement. The poster contained KDT Inc.'s own copyright protected
material and KDT Inc. had every right to post the tweet at the time and today. Additionally, KDT
Inc. had implicit permission from Galetta and Balcer to issue the tweet as part of their then-
ongoing cooperative relationship with KDT Inc.

ANSWER:  Denied.


71.     Nonetheless, NYU stated the following in its Takedown Notice:

        The reported tweet contains a photograph of the entire poster titled
        "Vision-Based Performance Testing as a Complement to SCAT3/Child-
        SCAT3 in Youth and Collegiate Athletes" owned by NYU. The
        photograph was posted by @kingdevicktest without NYU's permission
        and is an infringement of NYU's copyrights. . . I have good faith belief
        that use of the material in the manner complained of is not authorized by
        the copyright owner, its agent, or the law.

ANSWER:  Defendants admit that the quoted text in Paragraph 71 was contained in the

Takedown Notice submitted by New York University, through its attorneys.  Otherwise denied.


72.     On information and belief, NYU sent its Takedown Notice to Twitter in retaliation, knowing full well that KDT Inc.'s tweet was non-infringing, contained KDT's intellectual property, and that the Takedown Notice contained materially false statements.

ANSWER:  Denied.


73.     In reliance on the Takedown Notice, Twitter removed the poster image from KDT Inc.'s July 12, 2014, tweet. KDT Inc. also expended staff time to remove the July 12, 2014, Twitter post, as well as time and resources locating and removing other posts on KDT Inc.'s Twitter account that contained poster images similar to the poster image set forth in the July 12, 2014, post.

ANSWER:  Defendants admit that Twitter removed the poster image from KDT Inc.'s July 12,

2014, tweet.  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 73, and therefore deny each and every allegation

contained therein.


## CAUSES OF ACTION

## Misappropriation of Trade Secrets under DTSA and State Law

74.     Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.


75.     KDT Inc. possesses data and information related to, *inter alia*, potential users of the KDT, that KDT Inc. uses continuously to market the KDT and gain an advantage over competitors.

ANSWER:  Denied.


76.     KDT Inc. has implemented various reasonable measures to protect its trade secrets and confidential information from unauthorized use or disclosure.

ANSWER:  Denied.

77.     There was a mutually recognized relationship of confidence and trust as Galetta and Balcer received from KDT Inc., and provided to KDT Inc., confidential information pursuant to a confidential relationship that extended as far back as 2010.

ANSWER:  Denied.

78.     Galetta and Balcer understood that information provided to them by KDT Inc. was provided by the company pursuant to this relationship of confidence and trust.

ANSWER:  Denied.

79.     Galetta and Balcer understood that the information provided to them by KDT Inc. was in support of KDT Inc.'s mission to evaluate KDT as a concussion screening test, as well as for neurodegenerative diseases like MS.

ANSWER:  Denied.

80.     Galetta and Balcer understood that the information provided to them by KDT Inc. was not to be provided to any competitor in the market for providing concussion screening examinations.

ANSWER:  Denied.

81.     Galetta and Balcer understood that the information provided to them by KDT Inc. was not to be used by them to create an NYU-branded concussion screening examination based on KDT that was to compete with KDT as a preferred method to screen for concussions.

ANSWER:  Denied.

82.     Defendants have used KDT Inc.'s trade secrets to develop and market a competing test they are offering for free, the MULES test. This use was in breach of the confidential relationship established between KDT Inc. and Galetta and Balcer.

ANSWER:  Denied.

83.     In violation of its confidentiality obligations to KDT, and knowing that they were the property of KDT Inc., Galetta and Balcer disclosed KDT Inc.'s trade secrets to the NYU Defendants.

ANSWER:  Denied.

84.     The NYU Defendants knew or should have known that the subject matter disclosed and used in the NYU-branded concussion screening belonged to KDT Inc., and was obtained in violation of Galetta and Balcer's confidentiality obligations.

<u>ANSWER</u>:  Denied.


85.     This information derives independent economic value by not being generally known to, and not being readily ascertainable by, competitors such as the NYU Defendants. KDT Inc. has continued to use this information in the development and maintenance of KDT.

<u>ANSWER</u>:  Denied.


86.     Defendants have intentionally, willfully and maliciously misappropriated, misused, revealed and disclosed trade secret and/or confidential or proprietary information or knowledge of KDT Inc., and continues and will continue to do so, in violation of a confidential relationship between Galetta, Balcer, and KDT Inc.

<u>ANSWER</u>:  Denied.


87.     As a consequence of the foregoing, KDT Inc. has suffered damages in an amount to be proven at trial as well as irreparable harm and loss.

<u>ANSWER</u>:  Denied.


### **Copyright Infringement – Copying, Publicly Displaying and Distributing**

88.     Plaintiff reasserts and realleges the foregoing paragraphs.

<u>ANSWER</u>:  Defendants reassert and reallege their answers to the foregoing paragraphs.


89.     KDT Inc. is the owner of the KDT Copyright Registrations for KDT, including iPad versions, KDT scoresheets and instructions.

<u>ANSWER</u>:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 89, and therefore deny each and every allegation contained therein.


90.     Since 2016, Defendants have infringed, and continue to infringe, the copyright-protected materials covered by the KDT Copyright Registrations by copying, publicly displaying, and distributing KDT, including iPad versions, KDT scoresheets and instructions, as

part of its program to develop a competing test. This copying, distributing, and publicly displaying exceeds the scope of the limited license granted to Defendants, and continued after KDT Inc. terminated the license and asked Defendants to return KDT Inc.'s materials.

ANSWER:  Denied.


91.     There is a copyright notice on published copies of KDT.

ANSWER:  Defendants deny the allegation in Paragraph 91, except admit that they have seen a

copyright notice on certain published copies of the K-D Test.


92.     The purpose for which Defendants are copying, publicly displaying, and distributing KDT is to create an NYU-branded concussion screening exam to compete with KDT as a preferred method to screen for concussions.

ANSWER:  Denied.


93.     The use of KDT in this manner to validate the MULES test as another way to test for concussions and to distribute it through NYU channels on-line has the effect of reducing the commercial value of KDT in the marketplace.

ANSWER:  Denied.


94.     Upon information and belief, at the time that Defendants copied, publicly displayed, and distributed KDT, KDT scoresheets and instructions, they knew or should have known that those materials were protected by copyright.

ANSWER:  Denied.


95.     Upon information and belief, Defendants knew or should have known at all relevant times that KDT Inc. owns all rights to KDT, KDT scoresheets and instructions, and that Defendants would need to obtain permission from KDT to copy, distribute copies, and/or publicly display those materials. Defendants intentionally usurped KDT Inc.'s rights in KDT, KDT scoresheets and instructions.

ANSWER:  Denied.


96.     Defendants' appropriation of the KDT does not qualify as a fair use under 17 U.S.C. § 107.

ANSWER:  Denied.

97.     The infringement has been willful and intentional.

ANSWER:  Denied.

### Infringement of Registered Trademarks Under the Lanham Act, 15 U.S.C. § 1114(1)

98.     Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.

99.     Plaintiff possesses valid and enforceable rights in the KDT Marks by virtue of its extensive use, registration, promotion, and advertisement of the marks, and has possessed such rights at all times material hereto.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the remainder of the allegations in Paragraph 99, and therefore deny each and every

allegation contained therein.

100.     Defendants' unauthorized use of the KDT Marks in connection with researching, testing and offering its competing concussion screening exam constitutes a use in commerce of a reproduction, counterfeit, copy, or colorable imitation of the trademarks identified in the KDT Trademark Registrations that is likely to cause confusion, or to cause mistake, or to deceive.

ANSWER:  Denied.

101.     Defendants' conduct is willful, intentional, deliberate, in bad faith, and undertaken with knowledge of Plaintiff's prior rights, and with full knowledge that Defendants have no right, license, or authority to use the KDT Marks in the manner complained of herein.

ANSWER:  Denied.

102.     Defendants' acts are intended to reap the benefit of the goodwill that Plaintiff has built up in the KDT Marks. Defendants' acts constitute infringement of Plaintiff's federally registered trademark rights in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(l).

ANSWER:  Denied.

103.     Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' conduct as described above, and unless such conduct is enjoined by the Court,

Plaintiff will suffer further harm to its registered trademarks, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

ANSWER:  Denied.


### Trademark Infringement, Unfair Competition, and False Designation of Origin Under the Lanham Act, 15 U.S.C. § 1125(a)

104.    Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.


105.    Defendants' unauthorized use of the KDT Marks constitutes a use in commerce of a word, term, name, symbol, or device, or some combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association among and between the parties and their respective goods and services, or confusion or mistake as to the origin, sponsorship, or approval among and between the parties and their respective goods and services.

ANSWER:  Denied.


106.    Defendants' conduct is willful, intentional, deliberate, in bad faith, and undertaken with knowledge of Plaintiff's prior rights, and with full knowledge that Defendants have no right, license, or authority to use the KDT Marks in the manner complained of herein.

ANSWER:  Denied.


107.    Defendants' acts are intended to reap the benefit of the goodwill that Plaintiff has built up in the KDT Marks. Defendants' acts constitute infringement of Plaintiff's trademarks, unfair competition, and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

ANSWER:  Denied.


108.    Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' conduct as described above, and unless such conduct is enjoined by the Court, Plaintiff will suffer further harm to its trademark, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

ANSWER:  Denied.

**Common Law Unfair Competition – Likelihood of Confusion and Misappropriation**

109.    Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.

110.    Defendants misappropriated KDT Inc.'s proprietary information, and used the fruits of the company's labor and expenditure, to establish a competing test that would be controlled through NYU.

ANSWER:  Denied.

111.    It used the KDT Marks in ways that exceeded any actual endorsement or relationship with KDT Inc., including by using them to obtain test subjects, and to establish and promote a competing test. In doing so, Defendants caused or are likely to cause confusion among consumers, including the affiliation between KDT Inc. and Defendants.

ANSWER:  Denied.

112.    Defendants undertook these actions in bad faith, including because Galetta and Balcer violated a confidential relationship, and because Defendants led Plaintiffs to believe that they were evaluating KDT rather than planning to create a test that would compete with KDT.

ANSWER:  Denied.

113.    Defendants have thereby gained a commercial benefit and advantage for themselves, and have caused financial loss and damages to KDT Inc.

ANSWER:  Denied.

**Misrepresentation Under 17 U.S.C. § 512(f)**

114.    Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.

115.    NYU's Takedown Notice contains misrepresentations about KDT Inc.'s July 12, 2014, tweet.

ANSWER:  Denied.

116.    The misrepresentations contained in NYU's Takedown Notice were material to Twitter's decision to remove and disable the image set forth in KDT Inc.'s July 12, 2014, tweet.

<u>ANSWER</u>:  Denied.


117.    NYU knew at the time that it sent its Takedown Notice to Twitter that it materially misrepresented that the reported material in KDT Inc.'s July 12, 2014, tweet was infringing.

<u>ANSWER</u>:  Denied.


118.    KDT Inc. suffered damages as a result of Twitter relying upon such misrepresentation in removing or disabling the material claimed to be infringing.

<u>ANSWER</u>:  Denied.


## **<u>Breach of Contract</u>**

119.    Plaintiff reasserts and realleges the foregoing paragraphs.

<u>ANSWER</u>:  Defendants reassert and reallege their answers to the foregoing paragraphs.


120.    The Parties entered into a contract implied in fact.

<u>ANSWER</u>:  Denied.


121.    Defendants were approached with an offer to use KDT Inc.'s proprietary and copyright-protected materials bearing the KDT Marks and to have access to KDT's trade secrets for the limited purpose of testing and validating the KDT.

<u>ANSWER</u>:  Denied.


122.    Defendants agreed and ultimately did accept KDT Inc.'s proprietary and copyright-protected materials bearing the KDT Marks as well as KDT's trade secrets to conduct research for the limited purpose of testing and validating KDT.

<u>ANSWER</u>:  Denied.


123.    The Parties evidenced their mutual assent to the agreement in their actions and conduct through the course of their relationship.

ANSWER:  Denied.


124.    Defendants breached the contract by using KDT Inc.'s proprietary and copyright-protected materials beyond the limited, royalty free license granted and by using it to create a competing test.

ANSWER:  Denied.


125.    As a consequence of the foregoing, KDT Inc. has suffered damages in an amount to be proven at trial.

ANSWER:  Denied.


### Conversion

126.    Plaintiff reasserts and realleges the foregoing paragraphs.

ANSWER:  Defendants reassert and reallege their answers to the foregoing paragraphs.


127.    Plaintiff has a possessory right and interest in KDT and KDT Materials loaned to Defendants.

ANSWER:  Denied.


128.    Defendants refused Plaintiff's demand to return all copies of KDT and KDT Materials to KDT Inc.

ANSWER:  Defendants admit that they have thus far refused Plaintiff's demand to return all copies of the K-D Test and KDT Materials to Plaintiff because those materials were given to Defendants as gifts for free, without restraint, and without any expectation that they must be returned to Plaintiff.


129.    By refusing to return all copies of KDT and KDT Materials to KDT Inc., Defendants deliberately and intentionally interfered with KDT Inc.'s rights with knowledge and reckless disregard thereof.

ANSWER:  Denied.


130.    KDT Inc. has suffered damages in an amount to be determined at trial.

ANSWER:  Denied.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief sought in the Second

Amended Complaint or to any relief whatsoever.

## DEFENDANTS' DEFENSES

Defendants allege the following affirmative and other defenses to Plaintiff's Second

Amended Complaint as set forth below.  By alleging the defenses set forth below, Defendants do

not agree or concede that they bear the burden of proof or the burden of persuasion on any of

these issues, either in whole or in part.  Defendants reserve the right to amend their Answer to

add additional defenses consistent with the facts discovered over the course of this litigation.

### FIRST DEFENSE
### (Failure to State a Claim)

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to state a claim

upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### SECOND DEFENSE
### (Invalid Copyright Registration)

Plaintiff's copyright infringement claims are barred because one or more of Plaintiff's

copyright registrations are invalid as a result of Plaintiff's knowing failure to disclose material

facts to the U.S. Copyright Office.  But for Plaintiff's omission of these material facts from its

copyright applications, the Copyright Office would have rejected Plaintiff's applications for lack

of copyrightability and/or because the K-D Test was in the public domain.

### THIRD DEFENSE
### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

**FOURTH DEFENSE**
**(No Copyrightability)**

Plaintiff's asserted copyrighted works are not sufficiently original or creative to

constitute copyrightable work due to Devick's copying, and failure to create original,

copyrightable authorship to the K-D Test, and/or because the K-D Test was placed in the public

domain when it was published without notice in 1976.

**FIFTH DEFENSE**
**(No Standing for Copyright Infringement Claim)**

Plaintiff does not have standing to bring a copyright infringement claim because it lacks

copyright ownership and/or a copyright registration for the K-D Test.

**SIXTH DEFENSE**
**(Equitable Defenses)**

Plaintiff is not entitled to relief by virtue of the doctrines of estoppel, waiver,

acquiescence, and/or additional equitable doctrines.

**SEVENTH DEFENSE**
**(Copyright Fair Use – 17 U.S.C. § 107)**

Defendants' alleged use of Plaintiff's asserted copyrighted works is, and has always been,

non-infringing fair use for the purposes of research, comment, and scholarship under 17 U.S.C.

§ 107.

**EIGHTH DEFENSE**
**(First Sale Doctrine – 17 U.S.C. § 109)**

Defendants' alleged use of Plaintiff's asserted copyrighted works is non-infringing

because Defendants have used only the particular copies they own after Plaintiff transferred them

to Defendants for free and without restraint.

## NINTH DEFENSE
### (Implied License)

In the alternative, should the Court find that there is a license,  Defendants' alleged actions were and are within the scope of that license, and, to the extent that there is an implied license, Plaintiff has breached it by bringing this action.

## TENTH DEFENSE
### (Nominative Fair Use)

Any use of the KING-DEVICK TEST and K-D TEST marks by Defendants is non-trademark use and constitutes fair use and/or nominative fair use.

## ELEVENTH DEFENSE
### (No Protectable Trade Secrets)

Plaintiff's alleged trade secrets are not protectable trade secrets under the Defense of Trade Secrets Act or the common law of New York.

## TWELFTH DEFENSE
### (No Trade Secret Misappropriation)

Defendants have not committed any acts of trade secret misappropriation under the Defense of Trade Secrets Act or the common law of New York.  The parties never agreed to enter a confidential relationship to use Plaintiff's purported trade secret information and therefore Defendants have not used any of Plaintiff's purported trade secret information in breach of such a relationship or agreement.

## THIRTEENTH DEFENSE
### (Rightful Possession)

Defendants are rightfully in possession of the K-D Test flip charts, copies of the K-D Test instructions and scoresheets, iPads, and copies of the iPad versions of the K-D Test that Plaintiff provided to Defendants as gifts for free and without any conditions on their use or expectation that they be returned to Plaintiff.

## FOURTEENTH DEFENSE
### (No Punitive Damages)

Plaintiff is not entitled to recover punitive damages for its conversion claim because, at all relevant times, Defendants have acted in good faith, including in maintaining possession of the materials that Plaintiff gave to Defendants for free, without restraint, and without any expectation that they be returned to Plaintiff.  Defendants' alleged acts of conversion were not malicious and do not amount to wanton or reckless disregard of Plaintiff's alleged rights.

## FIFTEENTH DEFENSE
### (Adequate Remedy at Law)

Plaintiff is not entitled to injunctive relief, as Plaintiff has no irreparable injury.

## SIXTEENTH DEFENSE
### (No Willful Conduct)

Should Defendants be found to have infringed any copyrighted work or trademark owned by Plaintiff, such conduct was not willful.

## SEVENTEENTH DEFENSE
### (No Economic Harm)

Plaintiff cannot establish actual economic harm.

## EIGHTEENTH DEFENSE
### (Abandonment)

To the extent that Plaintiff owned copyrights and trademarks, such rights have been abandoned through uncontrolled third party use.

## RESERVATION OF ADDITIONAL DEFENSES

Defendants reserve any and all additional defenses available to them in law or equity, now existing or later arising, as may be discovered.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants demands a trial by jury on all claims and issues triable to a jury.

## PRAYER FOR RELIEF

Defendants pray for relief and the request the Court to:

1.     Dismiss Plaintiff's Second Amended Complaint in its entirety, with prejudice;

2.     Enter judgment in Defendants' favor on all counts of the Second Amended Complaint;

3.     Declare that Plaintiff's asserted copyright in the K-D Test is invalid;

4.     Order Plaintiff to cancel Reg. No. TXu000134747 by submitting a written voluntary cancellation request to the U.S. Copyright Office using the procedure described in Section 1807.4(E) of the Compendium of U.S. Copyright Office Practices;

5.     Deny Plaintiff's request for injunctive relief;

6.     Deny Plaintiff's request for monetary relief;

7.     Find this case an exceptional case, under 15 U.S.C. § 1117(a) or otherwise, and award Defendants' their reasonable attorneys' fees and costs in defending against Plaintiff's claims brought under the Lanham Act;

8.     Award Defendants their reasonable attorneys' fees and costs, under 17 U.S.C. § 505 or otherwise; and

9.     Any further relief as the Court deems just and equitable.

## AMENDED COUNTERCLAIMS

1.    Defendants / Counterclaim-Plaintiffs New York University Langone Hospitals ("NYU Langone"), New York University, Steven L. Galetta, and Laura J. Balcer (collectively, "Counterclaim-Plaintiffs"), by and through their undersigned attorneys, assert these Counterclaims against Plaintiff / Counterclaim-Defendant King-Devick Test, Inc. ("KDT Inc.") as follows:

## NATURE OF THE ACTION

2.    At the heart of this dispute is a simple vision test that requires the patient to read single-digit numbers from left to right as fast as they can.  KDT Inc. alleges that this test, known as the King-Devick test (the "K-D Test"), was created in 1976 by Steve Devick, the founder of KDT Inc., and Alan King while they were students at the Illinois College of Optometry.  This allegation, however, and KDT Inc.'s other claims against Counterclaim-Plaintiffs are baseless.

3.    The K-D Test is not a copyrighted work because it is a copy of the Pierce Saccade Test, which was created and published by third parties in 1972, and because it is also a copy, upon information and belief, of the Gilbert Test, which was created by Luther C. Gilbert and published in 1953.  Even if the K-D Test contains any original authorship—which it does not— KDT Inc. has not owned a copyright in the K-D Test since 1976, when the test was published without notice and therefore fell into the public domain.

4.    Despite the lack of copyright ownership, King and Devick applied to register the K-D Test with the U.S. Copyright Office in 1983 while knowingly and intentionally failing to disclose material information to the Copyright Office in order to obtain a federal copyright registration.

5.      Drs. Galetta and Balcer (together sometimes referred to herein as the "Doctors")
are highly accredited neurology and neuro-ophthalmology specialists.  Dr. Galetta has been
practicing medicine for 30 years.  Prior to working at the New York University School of
Medicine ("NYUSOM"), Dr. Galetta was the Ruth Wagner Van Meter and J. Ray Van Meter
Professor of Neurology at the University of Pennsylvania ("Penn"), where he was vice chairman
of the department, director of the division of neuro-ophthalmology, and led the neuro-
ophthalmology fellowship program.  Dr. Galetta has received nearly 50 awards, including the
Christian R. and Mary F. Lindback Distinguished Teaching Award, Penn's highest teaching
award.  He was the recipient of the Louis Duhring Outstanding Clinical Specialist Award at Penn
in 1998 and the Master Clinician Award from NYU Langone Medical Center in 2014.  Dr.
Galetta's areas of expertise include research and advances in the treatment of double vision,
neuro-ophthalmology, and optic nerve disorders.  He has written more than 300 original papers
and serves on the editorial boards of *Neurology* and the *Journal of Neuro-Ophthalmology*.  Dr.
Balcer was one of the first epidemiologists within the field of neuro-ophthalmology.  She is an
established clinical investigator whose research has focused on the development of visual
outcome measures for multiple sclerosis (MS).  Dr. Balcer's studies, through collaborative
efforts with investigators from several other academic and medical institutions, first identified
structure-function correlations in the visual pathway that now allow the measuring of axonal and
neuronal loss in patients with MS and optic neuritis.  Prior to working at NYUSOM, Dr. Balcer
was a professor of neurology and epidemiology at Penn.  Dr. Balcer is a member of the Ivy
League Concussion Committee and the NCAA Concussion Task Force.  She is also co-director
of a collaborative concussion research effort between the Ivy League and Big 10.

6.      As just one, small aspect of their long and distinguished careers of researching neuro-ophthalmology, Drs. Galetta and Balcer have designed and conducted scientific research to evaluate the K-D Test using copies of the test that Devick gave to them free of charge, without any condition, restrictions, or agreement.  Indeed, as independent researchers who are employed by NYUSOM, the Doctors could not have agreed to any condition, restriction, or other term, even if it had been proposed by KDT Inc., as that could create a conflict of interest with respect to their research.  They did not and do not work for KDT Inc., and have not been paid or commissioned by KDT Inc. or Devick, who is not a medical researcher, does not have the expertise to conduct credible medical research studies, and who merely copied prior tests to create an unoriginal derivative test for a senior project over thirty years ago.

7.      Now, simply because they have developed a rapid picture naming test that may also play a role in sideline concussion screening, are in the process of evaluating it, and intend to provide it to the public free of charge, KDT Inc. has sued them, alleging a myriad of infringement claims, among other baseless claims.  Counterclaim-Plaintiffs therefore seek a declaratory judgment that Plaintiff's asserted copyrights are invalid, and, because there is a continuing controversy between them concerning the Doctors' past, present, and future use of KDT Inc.'s alleged copyrights and trademarks, Counterclaim-Plaintiffs also seek a declaratory judgment of non-infringement, so that they can continue their research in the days and years that follow this dispute.

## THE PARTIES

8.      Counterclaim-Plaintiff NYU Langone is a non-profit hospital corporation organized under the laws of the State of New York.

9.      Counterclaim-Plaintiff New York University is an education corporation organized under the laws of the State of New York.

10.     Counterclaim-Plaintiff Dr. Galetta is a neuro-ophthalmologist and Philip K. Moskowitz Professor and Chair of the Department of Neurology at NYUSOM.  He resides in the County of Philadelphia, Pennsylvania.

11.     Counterclaim-Plaintiff Dr. Balcer is a neuro-ophthalmologist, professor and Vice Chair of the Department of Neurology at NYUSOM, and the Co-Director of the Concussion Center at NYUSOM.  She resides in the County of Montgomery, Pennsylvania.

12.     Counterclaim-Defendant KDT Inc. is a corporation organized under the laws of the State of Delaware.  On information and belief, Steven Devick ("Devick") is the CEO and Chairman of KDT Inc.

## JURISDICTION AND VENUE

13.     This is a declaratory judgment action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Copyright Act of 1976, as amended, 17 U.S.C. § 501 *et seq*., the 1909 Copyright Act, Pub. L. No. 60-349, 35 Stat. 1075 (Mar. 4, 1909), and the Lanham Act, 15 U.S.C. § 1051 *et seq*.

14.     An actual controversy exists between the parties in that KDT Inc. has brought this suit alleging, among other things, that Counterclaim-Plaintiffs have infringed copyrights and trademarks allegedly owned by KDT Inc.  A continuing controversy exists because KDT Inc.'s asserted copyright in the K-D Test is invalid and because Drs. Galetta and Balcer will continue to fairly use and refer to such asserted copyrighted works, as well as KDT Inc.'s asserted trademarks, in their scientific research and as part and parcel of their, as well as their fellow researchers', careers as medical researchers at NYUSOM.

15.     Subject matter jurisdiction over these Counterclaims arises under Section 39(a) of the Lanham Act, 15 U.S.C. § 1121(a); and Sections 1331 (federal question jurisdiction), 1338(a)

(copyright and trademark), and 1338(b) (unfair competition) of the Judicial Code, 28 U.S.C. §§ 1331, 1338(a), and 1338(b).

16.     This Court has personal jurisdiction over KDT Inc. because it brought suit in this Court asserting claims against Counterclaim-Plaintiffs that are substantially related to these counterclaims and because, on information and belief, KDT Inc. transacts business within the State of New York.

17.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1391 and 1400(a) because a substantial portion of the events giving rise to this action occurred in this District and because KDT Inc. is subject to personal jurisdiction in this District and is therefore deemed to reside in this District under 28 U.S.C. § 1391(c) and found in this District under 28 U.S.C. § 1400(a).  In addition, subject to the answers above, venue for these counterclaims is proper in this judicial district at least because KDT Inc. has consented to the propriety of this Court by filing its claims in this Court, in response to which these counterclaims are asserted.

## FACTUAL ALLEGATIONS

### Origins of the King-Devick Test

18.     The K-D Test is a rapid eye movement screening test that requires the patient to read single-digit numbers displayed on test cards and screens for impairments of eye movement, attention, language, concentration and other symptoms of abnormal brain function.

19.     The K-D Test was the subject of a senior project submitted by two students— Devick and Alan J. King— around 1976 at the Illinois College of Optometry ("ICO"), that opined on the correlation between eye movement and reading ability.  As part of that senior project, King and Devick studied two existing tests that screened for saccadic fixations, the Pierce Saccade Test and the Vincett Saccade Test, focusing on the former.  The Pierce Saccade Test, which was developed in or around 1972 by John R. Pierce and, on information and belief,

published and owned by Cook Incorporated, is a simple vision test composed of a demonstration card and three test cards with single-digit numbers to be read from left to right.

20.     King and Devick copied the Pierce Saccade Test, making only slight modifications, to create what they named the King-Devick Test.  They copied substantial portions of the Pierce Saccade Test, including its selection of single-digit numbers (as opposed to multiple-digit numbers), its arrangement and coordination of numbers and lines, and the labeling of the demonstration and test cards.  The K-D Test, just like the Pierce Saccade Test, is composed of a Demonstration Card and three test cards, which are administered successively.

21.     In both tests, the Demonstration Card consists of five rows of single-digit numbers that are connected by straight arrow lines to show the subject how to read the numbers from left to right to the bottom of the card.  Also, in both tests, the Test I card consists of more rows of single-digit numbers than the Demonstration Card, which are arranged with less vertical space between each row, and with each row of numbers connected by a single, horizontal line. Moreover, in both tests, the Test II card consists of the same number of rows of single-digit numbers with the same vertical spacing between each row as the Test I card, but without any horizontal lines connecting the numbers.  Finally, in both tests, the Test III card has the same number of rows of single-digit numbers as the Test II card, but with less vertical spacing between each row.  The Pierce Saccade Test (left) and the K-D Test (right) are displayed below:[1]

---

[1] In the Pierce Saccade Test, the Demonstration, Test I, Test II, and Test III cards are displayed beginning from the top-left corner moving counter-clockwise.  In the KD Test, the Demonstration, Test I, Test II, and Test III cards are displayed beginning from the top-left corner moving clockwise.

| **Pierce Saccade Test** | **King-Devick Test** |
|---|---|



*See* Exhibit 1, which is a true and correct copy of Michael K. H. Oride, *et al*., *Reliability Study of the Pierce and King-Devick Saccade Tests*, 63 AM. J. OF OPTOMETRY & PHYSIOLOGICAL OPTICS, 419, 421 (1986) displaying the Pierce Saccade Test on p. 420 and Exhibit 2, which is a true and correct copy of the King-Devick Test.  *See also* Exhibit 5 at KDT0000027–30.

22.     As shown above, King and Devick merely changed the number of rows of single-digit numbers in each of the Pierce Saccade Test cards, but not the Demonstration card, and added single-digit numbers to each card.

23.     Upon information and belief, King and Devick also derived the K-D Test from the Gilbert Test, an ocular test that examines reading speeds and was created and published by a third party in 1953.  As shown below, the Test III card of the K-D Test (as well as the Test II card) resemble the Digit Card 3 from the Gilbert Test, including the vertical lines of numbers at the beginning and the end of the card.

**<u>Gilbert Test, Digit Card 3</u>**          **<u>King-Devick Test, Test III Card</u>**



*See* Exhibit 3, which is a true and correct copy of an excerpt from Luther C. Gilbert, *Functional Motor Efficiency of the Eyes and Its Relation to Reading*, *in* 11 UNIVERSITY OF CALIFORNIA PUBLICATIONS IN EDUCATION 159, 165–66 (1953).

24.     In light of King and Devick's copying of the Pierce Saccade Test, and, upon information and belief, the Gilbert Test, both of which were created and published by third parties, the K-D Test is a mere copy, which does not embody any additional copyrightable authorship of King or Devick that is afforded copyright protection.

25.     On information and belief, in or around 1976, King and Devick conducted a study with 137 student subjects at a public school in the Chicago metropolitan area in which they administered both the K-D Test and the Pierce Saccade Test.  They then compared their data to Pierce's data from a prior study on the Pierce Saccade Test and analyzed the tests' ability to predict poor reading ability.  They concluded that there was a correlation between eye movement and reading ability.

26.     King and Devick presented the results of their research in a senior paper titled *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*, which they submitted in March 1976.  They received a "B" on the paper.

27.     The Illinois College of Optometry Press published the senior paper in 1976, making at least four bound copies available at the ICO Library.  *See* Exhibit 4, which is a true

and correct copy of the ICO Library's electronic records for Alan J. King & Steven Devick, *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*, Illinois College of Optometry Press (1976).

28.     Neither the paper nor Appendix II of the paper, which contains a copy of the K-D Test, contained a copyright notice as required by the Copyright Act of 1909 to preserve copyright ownership.  *See* Exhibit 5, which is a true and correct copy of Alan J. King & Steven Devick, *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*, Illinois College of Optometry Press (1976) produced to Defendants by KDT Inc.

29.     King and Devick's act of permitting the Illinois College of Optometry Press to publish their senior paper without a copyright notice and make copies available at the ICO Library constitutes a divestive publication under the Copyright Act of 1909.

30.     Thus, in 1976, the contents of *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*, including the K-D Test itself, and to the extent the K-D Test embodied any copyrightable authorship (which it did not), fell into the public domain.

**The K-D Test Is Adopted by the NYSOA and Renamed the NYSOA K-D Test**

31.     In or around 1979, a group of optometrists and researchers associated with the State College of New York ("SUNY") and the New York State Optometric Association ("NYSOA") were developing a comprehensive screening program to identify school children with visual imparities.  While looking for a simple vision test to add to the screening program, they came across King and Devick's senior paper describing the K-D Test and its relation to the Pierce Saccade Test.  They reviewed the K-D Test along with three other available tests that purported to evaluate visual tracking and which laypersons could administer without significant training, including the Pierce Saccade Test, and ultimately chose to use the K-D Test along with

other tests in the proposed school screening program.  In 1979, the researchers conducted a trial of the proposed school screening program with the K-D Test on over 1,200 students from a public school in Queens, New York.

32.     On information and belief, King and/or Devick did not object to the NYSOA's use and distribution of the K-D Test, including its contemporaneous evaluation with other tests, and permitted the NYSOA to brand the test as the "NYSOA K-D Test."

33.     In 1983, the SUNY researchers published the results of their research in an article titled *NYSOA K-D Test* in the July 1983 issue of the *Journal of American Optometric Association* ("JAOA").  Attached as Exhibit 6 is a true and correct copy of the article, Steven Lieberman, Allen H. Cohen & Jeffrey Rubin, *NYSOA K-D Test*, 54 J. AM. OPTOMETRIC ASS'N 631 (1983), including the front and back covers and table of contents of the July issue of the JAOA.

34.     In the JAOA article, the authors described the K-D Test as "a modification of the Pierce Saccade Test," compared it with the Pierce Saccade Test, then compared the results of their 1979 study to King and Devick's data from their 1976 study in Chicago.  The authors found that the K-D Test could be administered in a school setting and opined that it would be valuable to optometrists when used in conjunction with a complete visual analysis.  *See* Exhibit 6, pp. 634, 636.

35.     The entire contents, including text and illustrations, of the JAOA are copyrighted by the American Optometric Association.  *See id.*, p. 582.

36.     The NYSOA also claims ownership of the copyright in the NYSOA K-D Test, which is identical to the K-D Test allegedly owned by KDT Inc.  *See id.*, pp. 631 at endnote a and 637.

46

**Devick and KDT Inc.'s Predecessors Fraudulently Register the K-D Test**

37.     On information and belief, on or around August 23, 1983, after the publication of

"NYSOA K-D Test," King and Devick, despite their copying of prior tests, not having created

any copyrightable authorship themselves, having forfeited any copyright that may have existed

in the K-D Test in 1976, and the NYSOA's claim to own the NYSOA K-D Test in July 1983,

King and Devick applied to register the K-D Test with the U.S. Copyright Office as an

unpublished work.

38.     To obtain a copyright registration, King and Devick intentionally concealed from

the Copyright Office that they had already published *The Proposed King-Devick Saccade Test

and Its Relation to the Pierce Saccade Test and Reading Levels*, including the K-D Test in its

entirety, without a copyright notice in 1976 and also knowingly failed to disclaim from their

copyright claim any elements of the K-D Test that they had not created, which had existed before

their development of the K-D Test, including those from the Pierce Saccade Test and the Gilbert

Test, which they had copied.

39.     King and Devick clearly were aware that they had copied the Pierce Saccade Test,

and of the fact that the Pierce Saccade Test had been previously published, given their research

and discussion of the Pierce Saccade Test in their senior paper *The Proposed King-Devick

Saccade Test and Its Relation to the Pierce Saccade Test and Reading Levels*.

40.     In light of these material omissions and the consequent inability of the Copyright

office to make an informed decision on King and Devick's application, the Copyright Office

issued Reg. No. TXu000134747 for the K-D Test.

41.     On information and belief, had King and Devick truthfully disclosed that the K-D

Test was published without notice in 1976, and that it was heavily derived from third-party

47

material, and disclaimed all previously published and registered material, as the Copyright Office required, the Copyright Office would not have issued Reg. No.  TXu000134747.

### Devick Seeks to Monetize the King-Devick Test

42.     After the "NYSOA K-D Test" was published by the SUNY researchers and the NYSOA in 1983, other researchers conducted studies on the K-D Test as a vision screening test and the K-D Test was adopted as part of the vision screening process in schools in New York.

43.     On information and belief, during the 1980s and 1990s, Devick did not pursue further research on the K-D Test, nor did he restrain anyone from using the test or calling it the K-D Test or NYSOA K-D Test, and retired from practicing as an optometrist in the early 1990s.

44.     Devick paid little attention to the K-D Test until he saw a potential opportunity to monetize it in 2009 while reading about a New Zealand study that found a connection between concussion patients with extended symptoms and defects in their saccadic eye movement.  After discussing the article with Len Messner, an optometrist and Director of the Illinois Eye Institute at Devick's alma matter, Devick considered the possibility that the K-D Test, which measures saccadic eye movement, could be used in concussion screening.

45.     Thus, after a nearly two-decade hiatus from optometry, Devick sought to have medical researchers evaluate the K-D Test to see if it could be validated for screening concussions and, ultimately, be licensed or sold as a tool for determining when injured athletes should be taken out of play.

46.     Devick, having been out of the field for many years, asked Messner who he believed were the preeminent neuro-ophthalmologists in the country.  Messner identified Drs. Galetta and Balcer, who were then highly accredited researchers and professors of neurology at the Penn.

47.     Prior to meeting Devick, Drs. Balcer and Galetta had long conducted visual exams using colors, numbers, and letters, and had each co-authored hundreds of peer-reviewed research articles on vision.

48.     Around 2010, Messner told the Doctors about the K-D Test and asked if they would be interested in studying its potential use as a rapid sideline screening test for concussions. Interested in the science behind measuring saccadic eye movement and the potential for a simple vision exam, the Doctors agreed to evaluate the K-D Test.

**Drs. Galetta and Balcer Evaluate the King-Devick Test**

49.     Drs. Galetta and Balcer met Devick at the 2010 North American Neuro-Ophthalmology Society Annual Meeting, after which the Doctors decided it would make sense for them to undertake two studies to see if the K-D Test could accurately screen for head trauma.

50.     Excited that two of the country's top neuro-ophthalmologists were interested in the K-D Test, Devick gave Drs. Balcer and Galetta dozens of copies of a spiral-bound flipchart of the K-D Test as well as copies of the K-D Test scoresheet and instructions.  These materials were provided to Drs. Balcer and Galetta on multiple occasions, as gifts for use in their research without any agreements, restrictions or conditions on their use, without any promise of validation by the Doctors, and without any expectation that they be returned to Devick.

51.     For the first of the K-D Test studies, Devick provided Drs. Galetta and Balcer with de-identified data collected by Devick and his colleagues on the use of the K-D Test on boxers and mix martial artists for evaluation.  Next, Drs. Galetta and Balcer and other NYUSOM researchers performed a study of the K-D Test in collegiate athletes from the Penn.  Both studies provided initial evidence in support of the K-D Test as a strong candidate for an accurate and reliable sideline screening tool for concussion.

52.     After the initial two studies, Drs. Balcer and Galetta prepared their own clinical studies using the copies of the testing material that Devick eagerly provided as without question or restriction.

53.     Drs. Balcer and Galetta have always been insistent that their research remain objective and free from even the appearance of any influence by Devick or his company.  In fact, they offered to pay Devick for copies of the K-D Test and related materials since they regularly asked for additional copies, but Devick replied that he was "happy to provide them at no charge." *See* Exhibit 7, which is a true and correct copy of an email chain between Dr. Balcer and Devick.

54.     Drs. Balcer and Galetta never accepted any compensation, monetary or otherwise, from Devick or KDT Inc. in exchange for their research on the K-D Test.  They have never accepted as much as a free meal from Devick or KDT Inc.  They rebuffed Devick's offer of "royalties" and declined his request to sell the K-D Test as "co-branded" with New York University.

55.     They continued evaluating the K-D Test out of their interest in the advancement of medical research and to help those suffering from undiagnosed concussions, as well as other medical issues they historically and regularly studied as neuro-ophthalmologists.

56.     Drs. Balcer and Galetta never entered into any written or oral agreement with Devick or KDT Inc. (or any of its predecessors), either personally or on behalf of Penn or NYUSOM or any other entity.

57.     Neither Devick nor KDT Inc. placed any restrictions on the Doctors' use of the K-D Test or related materials.  While there was an understanding that Drs. Galetta and Balcer were using the K-D Test for research purposes, that was the extent of the understanding between them.

58.     The decisions made over the years to evaluate the efficacy of the K-D Test with other neurological disorders—in which Drs. Balcer and Galetta specialize—were made by the Doctors.  For nearly a decade, Drs. Galetta and Balcer, along with other third-party researchers, studied the K-D Test's application to concussions, multiple sclerosis, Alzheimer's disease, Parkinson's disease, attention deficit hyperactivity disorder, sleep deprivation, and other neurological conditions.  Devick did not dictate how the K-D Test was used and studied and the Doctors used the material that Devick provided freely to them in whatever research they deemed appropriate and worthy of scientific inquiry.

59.     In order to evaluate the K-D Test, the Doctors drafted significant and numerous submissions to the Institutional Review Boards of Penn or NYUSOM, which set forth their objectives, as well as the testing variables; characteristics of the study population; and study design, duration, and procedures; among other things.  Devick took no part in these submissions.  When the Doctors realized, through their own clinical studies, that the test and score instructions did not work well, they—not KDT Inc.—rewrote them and amended the testing forms.

60.     Devick was aware that Drs. Balcer and Galetta distributed copies of the K-D Test and K-D Test scoresheet and instructions to third parties, such as high school athletes' parents, in connection with their clinical trials and studies.  He also was aware that the Doctors involved other medical researchers and institutions in evaluating the K-D Test and never objected to their distribution of copies of the K-D Test and related materials.  In fact, Devick often gave free copies of the K-D Test to these other researchers without any restrictions, license, or expectation that they be returned, just as he had done with Drs. Balcer and Galetta.  *See* Exhibit 8, which is a collection of true and correct copies of email chains between Drs. Galetta and/or Balcer, other researchers, and Devick and his colleagues.

61.     Since 2010, the Doctors have been evaluating the K-D Test in conjunction with other formal sports cognitive tests such as the ImPACT test, and the Military Acute Concussion Evaluation ("MACE"), which were unwieldy and lengthy to administer.  At the time, the Doctors opined that these tests might be replaced or supplemented by the K-D Test, which was quicker to administer.  The Doctors also evaluated the K-D Test with the other vision-based performance tests for sideline screening of concussions in athletes such as the SCAT3/Child-SCAT3.  Devick was aware of such testing by the Doctors and by others on these competitive tests and never objected.

62.     The Doctors authored dozens of articles explaining their test methodologies and results.  A number of these articles scientifically validated the use of the K-D Test as a rapid vision test to test for concussion, particularly in contact sports at the high school and college level.  KDT Inc. used these articles to promote the K-D Test to other scientists, the public-at-large, and certain organizations, by displaying them on its website, and disclosing the testing methodologies, data, and results of Drs. Galetta and Balcer during speaking engagements and media interviews to generate further interest in the test, and licensing royalties.  Representative examples of KDT Inc.'s prominent and public use of the Doctors' methodologies and data to promote the K-D Test are shown below and in Exhibit 9:

 

### The Doctors Develop MULES

63.     In 2015, Drs. Galetta and Balcer had the idea to create a timed rapid picture naming test to measure saccadic eye movement and potentially detect concussions.  They were inspired by the book *The Age of Insight* by Eric Kandel, which describes the anatomy and physiology of how humans interpret art and objects.  Drs. Galetta and Balcer thought that the use of pictures and different backgrounds and colors would activate greater areas of the brain than rapid number naming tests.

64.     With this in mind, in late 2015 and early 2016, Drs. Galetta and Balcer developed a rapid picture naming test called the Mobile Universal Lexicon Evaluation System ("MULES").  MULES is a visual-verbal task that includes 54 original photographs of fruits, objects, and animals, as shown below.

## MULES



*See* Exhibit 10, which is a true and correct copy of MULES.

65.     On January 24, 2016, Dr. Galetta noted to Devick that he and Dr. Balcer were going to examine rapid picture naming to see whether it could be used for sideline concussion screening.  As shown in the true and correct copies of emails between Dr. Galetta and Devick below and in Exhibit 11, Devick responded that this "sounds interesting" and offered to have his employees assist with the research.  Although he mentioned that he had been working on something similar, he did not voice any objections, nor did he describe or furnish a copy of what he had been working on.

> **From:** Steve Devick <​███████████████████>
> **Date:** January 24, 2016 at 3:54:30 PM CST
> **To:** "Galetta, Steven" <​███████████████████>
> **Subject: Re: Picture naming**
>
> Sounds interesting. We have been working on that with pre-schoolers who don't know their numbers with sufficient/efficient automaticity.
>
> If you need any help with it I can offer Danielle and Alex's time. They love it when I do that-seriously.
>
> Sent from my iPhone
>
> On Jan 24, 2016, at 3:41 PM, Galetta, Steven <​██████████████████████> wrote:
>
> Steve- On another note, we are going to examine picture naming on the sidelines this year. We want to see how athletes name various colored pictures. We think it could be complementary to the KD and almost certainly uses other areas of brain to process. We have to first validate it in normals and then take it to the sidelines. It will take years of course but I wanted to mention it to you.
>
> Steve.
> Sent from my iPhone

66.     In early 2016, Drs. Galetta and Balcer began a pilot test of MULES on non-concussed adult volunteers to determine its feasibility.

67.     Drs. Galetta and Balcer and their co-authors concluded that MULES may engage more extensive neural systems than more commonly used rapid picture naming tasks.  Their research was published in November 2016 in the peer-reviewed Journal of the Neurological Sciences.  The article, "Mobile Universal Lexicon Evaluation System (MULES) test: A new measure of rapid picture naming for concussion," provides commentary on the respective performance and use of the K-D Test and MULES.

68.     In and around February and March 2017, Devick insisted that MULES infringed his intellectual property.

69.     Devick advised the doctors of his prior litigation success and tried to intimidate them with a story of how he had sued Napster and "repossessed" the home of Sean Parker,

Napster's founder, and Mr. Parker's parents.  Unsurprisingly, in the midst of his threats, Devick never mentioned trade secrets or concerns of confidentiality.

70.     The Doctors' use and testing of the K-D Test contemporaneously with their use and testing of MULES is no different from their use of the K-D Test in prior research studies before the development of MULES; for example, when they evaluated both the K-D Test and the SCAT3/Child-SCAT3 tests, in parallel.

71.     KDT Inc. brought this suit against Counterclaim-Plaintiffs because it is threatened that MULES—once it is scientifically validated—will affect KDT Inc.'s sales of the K-D Test. KDT Inc. has not, and cannot, however, claim in good faith that MULES infringes the K-D Test, so it contrived an assortment of other property-based claims with its lawyers as a further act of intimidation.

72.     The Doctors have used, continue to use, and will use the K-D Test to continue to evaluate the efficacy of the K-D Test in assessing neurological disorders.  As part of their work, the Doctors will also evaluate the MULES test and inevitably other tests, such as those previously tested in parallel to the K-D Test, and new tests, to determine their efficacy in identifying neurological disorders.  And as part of their work, they will compare the studies of these respective and distinct tests, and refer to these tests by their names.  For example, they will discuss the K-D Test (and other tests) and refer to it by name at speaking engagements, in their research and teaching, and in publications, such as in the article *The New Mobile Universal Lexicon Evaluation System (MULES): A Test of Rapid Picture Naming for Concussion Sized for the Sidelines*, which was co-authored by Drs. Galetta and Balcer along with other NYUSOM researchers and has been accepted for publication in the April 2018 printed issue of the *Journal of the Neurological Sciences*.  The Counterclaim-Plaintiffs will also continue to refer to the K-D

Test by its name on NYU Langone webpages that describe various diagnostic tests for

concussion and the Doctors' investigations involving the K-D Test.  *See, e.g.*,

https://nyulangone.org/conditions/concussion/diagnosis.  As such, there is a continuing

controversy between the parties concerning the Doctors' ongoing and future use of KDT Inc.'s

alleged copyrights and trademarks, causing Counterclaim-Plaintiffs to seek a declaratory

judgment of invalidity and non-infringement, so that they can continue and expand upon their

research going forward.

## CLAIMS FOR RELIEF

## COUNT I

## Declaratory Judgment for Invalid Copyright

73.    Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in

the preceding paragraphs of the Counterclaims as if fully set forth herein.

74.    A justiciable and actual controversy exists before this Court with respect to the

validity of KDT Inc.'s alleged copyright in the K-D Test, which is registered as Reg. No.

TXu000134747 and asserted against Counterclaim-Plaintiffs in this action.

75.    The Copyright Act of 1909 governs the copyrightability and registrability of the

K-D Test.

76.    KDT Inc.'s alleged copyright in the K-D Test is invalid because King and Devick,

KDT Inc.'s predecessors-in-interest, copied the Pierce Saccade Test, and, upon information and

belief, the Gilbert Test.

77.    After excluding the preexisting third-party authorship copied from the Pierce

Saccade Test, and, upon information and belief, the Gilbert Test, only a *de minimis* amount of

material remains, which is not sufficiently creative and original to be eligible for copyright protection and registration.

78.     To the extent that King and Devick did create any original, copyrightable authorship, the alleged copyright is invalid because the K-D Test fell into the public domain in 1976 when they permitted the Illinois College of Optometry Press to publish the K-D Test in its entirety as part of their senior paper *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels* without a copyright notice.  King and Devick forfeited all common law and federal statutory copyright protection of the K-D Test and the senior paper and injected the K-D Test and senior paper into the public domain by making a divesting publication without observance of the requisite statutory formalities under the Copyright Act of 1909.

79.     Further, and assuming, *arguendo*, that the K-D Test embodies authorship from King and Devick, and did not fall into the public domain in 1976, KDT Inc.'s asserted Reg. No. TXu000134747 is invalid and unenforceable because King and Devick, KDT Inc.'s predecessors-in-interest, committed fraud on the Copyright Office by intentionally withholding material information from the Copyright Office.

80.     In order to obtain a registration for the K-D Test, Devick intentionally failed to disclose to the Copyright Office that the K-D Test had been previously published in its entirety in 1976.

81.     In addition, in order to obtain a registration for the K-D Test, King and Devick intentionally failed to disclose to the Copyright Office that the K-D Test was substantially copied and derived from the previously published Pierce Saccade Test, and upon information and belief,

the previously published Gilbert Test, and also knowingly failed to disclaim this previously published material owned by third parties.

82.     When King and Devick applied to register the K-D Test in 1983, they were well aware that the Pierce Saccade Test had been previously published, as shown by their discussion of the Pierce Saccade Test in their 1976 senior paper *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*.  *See* Exhibit 5.

83.     Upon information and belief, King and Devick also were aware that the Gilbert Test had been previously published when they applied to register the K-D Test in 1983.

84.     Upon information and belief, if KDT Inc.'s predecessors-in-interest had been truthful in their application to register the K-D Test, the Copyright Office would not have issued Reg. No. TXu000134747.

85.     Accordingly, Counterclaim-Plaintiffs seek a declaration that KDT Inc.'s alleged copyright in the K-D Test is invalid and unenforceable, and that the Court order KDT Inc. to cancel Reg. No. TXu000134747 by submitting a written voluntary cancellation request to the U.S. Copyright Office using the procedure described in Section 1807.4(E) of the Compendium of U.S. Copyright Office Practices, U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 101 (3d ed. 2017), a true and correct copy of which is attached hereto as Exhibit 12.

## COUNT II

## Declaratory Judgment of Non-Infringement of Copyrights

86.     Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of the Counterclaims as if fully set forth herein.

87.     A justiciable and actual controversy exists before this Court with respect to whether Counterclaim-Plaintiff's use of the KDT Test and related materials in conducting medical research infringes KDT Inc.'s alleged copyrights.

88.     KDT Inc.'s copyright infringement claims are baseless because the K-D Test is not protected by copyright, and because the copyright registration of the K-D Test is invalid and unenforceable.

89.     As medical researchers, professors, and editors of academic journals, Drs. Balcer and Galetta are continuing to evaluate the K-D Test, which necessarily includes opining on it, and comparing its results and efficacy to other tests, including but not limited to MULES and other more sophisticated tools being developed by third parties.  In connection with their work, the Doctors will continue to use the K-D Test and its accompanying materials like instructions, some of which they—and not Devick—authored, for comment and research.  Such use is a transformative and fair use for the purposes of comment and research as expressly provided in the preamble of Section 107 of the Copyright Act.

90.     Because of this continuing and future use, there is a present and continuing controversy regarding whether Counterclaim-Plaintiffs infringe KDT Inc.'s asserted copyrights.

91.     Accordingly, Counterclaim-Plaintiffs seek a declaration that their use of KDT Inc.'s asserted copyrighted material for comment and research constitutes fair use under 17 U.S.C. § 107.

## COUNT III

### Declaratory Judgment of Non-Infringement of Trademarks

92.     Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of the Counterclaims as if fully set forth herein.

93.     A justiciable and actual controversy exists before this Court with respect to whether Counterclaim-Plaintiffs' use of the marks K-D TEST and KING DEVICK TEST (the "KDT Marks") in conducting medical research infringes upon the KDT Marks under the Lanham Act and the state common laws for trademark infringement, false designation of origin, and unfair competition.

94.     As medical researchers, professors, and editors of academic journals, Drs. Balcer and Galetta are continuing to evaluate the K-D Test, which necessarily includes opining on it, and comparing its results and efficacy to other tests, including but not limited to MULES and other more sophisticated tools being developed by third parties.  In connection with their ongoing and future research and commentary, Counterclaim-Plaintiffs will continue to use the KDT Marks to refer to the K-D Test, as such use is necessary to accurately refer to the K-D Test.

95.     Because of this continuing and future use, there is a present and continuing controversy regarding whether Counterclaim-Plaintiffs infringe the KDT Marks.

96.     Accordingly, Counterclaim-Plaintiffs seek a declaration that their use of the KDT Marks to accurately refer to the K-D Test is nominative fair use and does not constitute trademark infringement, false designation of origin, or unfair competition.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counterclaim-Plaintiffs pray that the Court:

A.     Enter judgment in favor of Counterclaim-Plaintiffs and against KDT Inc. on all claims for relief asserted in these Counterclaims;

B.     Declare that KDT Inc.'s alleged copyright in the K-D Test is invalid;

C.      Order KDT Inc. to cancel Reg. No. TXu000134747 by submitting a written voluntary cancellation request to the U.S. Copyright Office using the procedure described in Section 1807.4(E) of the Compendium of U.S. Copyright Office Practices;

D.      Declare that Counterclaim-Plaintiff's alleged use of KDT Inc.'s copyrighted works is fair use under the Copyright Act, 17 U.S.C. § 107;

E.      Declare that Counterclaim-Plaintiffs' alleged use of the KDT Marks is nominative fair use and does not give rise to any liability under the Lanham Act, 15 U.S.C. §§ 1114(1), the common law, or any other applicable law;

F.      Award to Counterclaim-Plaintiffs their costs of suit and reasonable attorneys' fees; and

G.      Award to Counterclaim-Plaintiffs such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Counterclaim-Plaintiffs demand a trial by jury on all issues so triable.


Respectfully submitted,


Dated:  May 31, 2018                          By:  */s/ Kristen McCallion*
                                              FISH & RICHARDSON P.C.
                                              Kristen McCallion (KM5593)
                                              mccallion@fr.com
                                              John Goetz (JG8271)
                                              goetz@fr.com
                                              Elizabeth Brenckman (EB8264)
                                              brenckman@fr.com
                                              Vivian Cheng (VC6321)
                                              cheng@fr.com
                                              601 Lexington Avenue, 52nd Floor
                                              New York, NY 10022
                                              Telephone: (212) 765-5070
                                              Facsimile: (212) 258-2291

                                              Attorneys for Defendants /
                                              Counterclaim-Plaintiffs
                                              NYU LANGONE HOSPITALS,
                                              NEW YORK UNIVERSITY, STEVEN
                                              L. GALETTA, and LAURA J. BALCER

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 31st day of May 2018, a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

<u>*/s/ Kristen McCallion*            </u>
Kristen McCallion