UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------
KING-DEVICK TEST INC.,
                              Plaintiff,

                -v-

NYU LANGONE HOSPITALS, et al.,
                             Defendants.

17-CV-9307 (JPO)

OPINION AND ORDER

---------------------------------------------------------------

J. PAUL OETKEN, District Judge:

Plaintiff and Counterclaim-Defendant King-Devick Test Inc. ("King-Devick") has filed the instant lawsuit against Defendants and Counter Claimants New York University, NYU Langone Hospitals, Steven L. Galetta, and Laura J. Balcer (collectively, "Defendants"), claiming among other things that Defendants have infringed its registered copyright in an eye-movement test that can aid in detecting concussions. (Dkt. No. 41 ("Compl.") ¶¶ 88–97.) Defendants, in turn, have asserted several counterclaims, one of which seeks a declaration that King-Devick's copyright is invalid. (Dkt. No. 52 ("CC") ¶¶ 73–85.) King-Devick now moves to dismiss that counterclaim for failure to state a claim. (Dkt. No. 35.) For the following reasons, the motion is denied.

I. Background

    A. Factual Background

For purposes of resolving King-Devick's partial motion to dismiss, the Court assumes the truth of the factual allegations in Defendants' counterclaim complaint.[1] *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174–75 (1965).

---

[1] Technically, King-Devick's partial motion to dismiss is directed at the counterclaims asserted at Docket Number 30 in connection with Defendants' Answer to the First Amended Complaint. While King-Devick's motion was pending, however, King-Devick filed a Second

In 1976, two students at the Illinois College of Optometry, Alan King and Steve Devick, developed an eye-movement test, known as the King-Devick test (the "K-D Test"), as part of a senior project. (CC ¶¶ 2, 19.) The K-D Test, which asks a participant to read strings of single-digit numbers from left to right off a series of three successively administered test cards as rapidly and accurately as possible, can be used to detect eye-movement impairments linked to dyslexia or abnormal brain function. (CC ¶¶ 2, 18–20; *see also* Compl. ¶¶ 9–10.)

While creating the K-D Test, King and Devick studied the Pierce Saccade Test, an earlier eye-movement test developed in 1972. (CC ¶¶ 19, 25.) Like the K-D Test, the Pierce Saccade Test consists of: (1) a demonstration card containing five rows of single-digit numbers joined by arrows that direct the participant to read from left to right and top to bottom; (2) one test card that contains multiple rows of single-digit numbers, with the digits in each row connected by a horizontal line; (3) a second test card that is similar to the first, but that has no horizontal lines connecting the digits in each row; and (4) a third test card that is similar to the second, but in which the horizontal rows of unconnected digits are vertically spaced closer together. (CC ¶ 21.)

The K-D Test, though, differs in some ways from the Pierce Saccade Test. For example, the K-D Test changes the Pierce Saccade Test by changing the number of horizontal rows contained on each test card and by increasing the number of digits contained within each row. (CC ¶ 22.) A side-by-side visual comparison of the two tests is reproduced below[2]:

---

Amended Complaint (Dkt. No. 41), and Defendants have responded with a superseding Answer and Amended Counterclaims (Dkt. No. 52). Given that all of the arguments King-Devick has asserted in support of its partial motion to dismiss apply in full to the Amended Counterclaims, the Court treats the currently operative Answer and Amended Counterclaims at Docket Number 52 as the target of King-Devick's motion.

[2] The test-card sequence for the Pierce Saccade Test begins at the top-left corner and runs down the first column before moving to the top of the second column, whereas the test-card sequence for the K-D Test begins at the top-left corner and runs across the first row before moving down to the left side of the second row.



(CC ¶ 21.)

According to Defendants, King and Devick also drew inspiration from a reading-speed test, known as the Gilbert Test, which was developed in 1953. (CC ¶ 23.) The spatial arrangement of single-digit numerals on one of the Gilbert Test's test cards resembles the arrangement of the numbers in the K-D Test's second and third test cards. (*Id.*) A comparison of the relevant Gilbert Test card and the K-D Test's third test card is reproduced below:




(*Id.*)

After King and Devick completed their senior project in March 1976, they allowed the Illinois College of Optometry Press to publish their final paper—with the K-D Test attached as

an appendix—and to place at least four copies in the school library. (CC ¶¶ 26–29.) Over the next few years, the K-D Test drew attention from New York–based researchers as a possible tool for detecting visual impairments in schoolchildren (CC ¶¶ 31–34), and on or around August 23, 1983, King and Devick successfully registered the K-D Test with the United States Copyright Office. (CC ¶¶ 37–40; Dkt. No. 41-1 at 2.) In doing so, Defendants contend, King and Devick intentionally failed to disclose their reliance on the Pierce Saccade and Gilbert Tests, as well as their prior publication of the K-D Test without a notice of copyright in 1976. (CC ¶ 38.)

Thereafter, Devick pursued no further research associated with the K-D Test until 2009, when he read an article about a New Zealand study that connected head concussions to certain eye-movement impairments. (CC ¶¶ 43–44.) After discussing the article with Len Messner, Director of the Illinois Eye Institute, Devick grew interested in the K-D Test's potential as a screening tool for detecting concussions in injured athletes. (CC ¶¶ 44-45.) Messner identified Defendants Dr. Steven Galetta and Dr. Laura Balcer (together, the "Doctors")—both at that time neurology professors at the University of Pennsylvania—as two of the nation's leading neuro-ophthalmologists, and in 2010 Messner approached the Doctors about the possibility of their studying the K-D Test. (CC ¶¶ 46, 48.)

After meeting Devick, the Doctors agreed to conduct two studies to assess the K-D Test's ability to screen for head trauma. (CC ¶ 48–49.) To facilitate these studies, Devick provided the Doctors with free copies of the K-D Test and related materials, along with raw data that he and his colleagues had previously collected. (CC ¶¶ 50–51, 53.) The Doctors' initial studies showed the K-D Test to be potentially useful in concussion detection, and over the next few years the Doctors began to study the K-D Test's possible applications to other neurological disorders. (CC

¶¶ 51, 58.) During the course of these studies, the Doctors continued to use and distribute the materials Devick had provided. (CC ¶ 60.)

As their studies proceeded, the Doctors started to develop their own eye-movement test, known as the Mobile Universal Lexicon Evaluation System ("MULES"). (CC ¶¶ 63–64.) Rather than asking a participant to read numbers off a series of test cards, as the K-D Test does, MULES asks the participant to name a series of colored images. (CC ¶¶ 64–65.) The Doctors began to test MULES in 2016, and toward the end of that year they published an article assessing the test as an alternative to the K-D Test for use in concussion screening. (CC ¶¶ 66–67.)

### B. Procedural History

On November 28, 2017, King-Devick, a Delaware company that now holds the copyright in the K-D Test, initiated this lawsuit against the Doctors and their present employers, New York University and NYU Langone Hospitals.[3] (Dkt. No. 1; *see also* Compl. ¶¶ 1, 4–5, 11.) After Defendants moved to dismiss certain of King-Devick's claims (Dkt. No. 24), King-Devick mooted the motion by filing a First Amended Complaint (Dkt. No. 27; Apr. 2, 2018 Minute Entry). The case proceeded to discovery, and King-Devick amended the complaint once more to ensure that it named the proper institutional defendants. (Dkt. Nos. 40–41.) The resultant, presently operative Second Amended Complaint raises a number of claims against Defendants, including a claim that Defendants have infringed King-Devick's copyright in the K-D Test by using and distributing the test in the course of developing MULES. (Compl. ¶¶ 88–97.)

On May 31, 2018, Defendants answered the Second Amended Complaint and asserted three counterclaims, one of which seeks a declaratory judgment that King-Devick's registered

---

[3] New York University was not initially named as a defendant (Dkt. No. 1), but it was added by consent in a subsequent amendment to the complaint (Dkt. Nos. 40–41).

copyright in the K-D Test is invalid. (CC ¶¶ 73–85.) King-Devick has moved to dismiss this counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. No. 35.) The motion has been fully briefed and is fit for resolution. (Dkt. Nos. 36, 38–39.)

## II. Legal Standard

To survive a motion to dismiss, Defendants' counterclaim complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Defendant's allegations, in other words, must "allow[] the court to draw the reasonable inference" that King-Devick's copyright is invalid. *Id.* To determine whether Defendants have cleared this hurdle, the Court may consider not only the counterclaim itself but also any "documents attached to the [counterclaim] as exhibits, and any documents incorporated in the [counterclaim] by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)). In doing so, however, the Court is "mindful that a motion to dismiss does not involve consideration of whether 'a [claimant] will ultimately prevail' on the merits, but instead solely 'whether the claimant is entitled to offer evidence' in support of his claims." *Id.* at 65 (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

## III. Discussion

Under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, King and Devick's 1983 registration of a copyright in the K-D Test (*see* Dkt. No. 41-1 at 2) creates a rebuttable presumption that the copyright is valid, *see* 17 U.S.C. § 410(c); *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997). The counterclaim presently at issue, though, alleges that the copyright is invalid notwithstanding that presumption for three reasons. First, Defendants allege that the K-D Test is insufficiently original to merit copyright protection. (CC ¶ 77.) Second,

6

Defendants allege that the K-D Test is ineligible for copyright protection due to its publication without notice of copyright in 1976. (CC ¶ 78.) And third, Defendants allege that King and Devick secured their registered copyright fraudulently, by withholding material information from the Copyright Office in connection with their application. (CC ¶¶ 79–84.) King-Devick responds that Defendants have not plausibly alleged any of these theories of invalidity and that the counterclaim must be dismissed as a result. (Dkt. Nos. 36, 39.)

### 1. Originality

To be eligible for copyright protection, a creative work "must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). In particular, the work must have been "independently created by the author (as opposed to copied from other works)," and it must "possess[] at least some minimal degree of creativity." *Id.* But even where a work's "written expression" is not original in and of itself because, for example, it consists entirely of unadorned facts, the work can satisfy the originality requirement "if it features an original selection or arrangement" of its unprotectable elements. *Id.* at 348.

Here, Defendants have plausibly alleged that the K-D Test is a "mere copy" of the Pierce Saccade and Gilbert Tests, and that its deviations from these predecessors are insufficiently creative to "embody any additional copyrightable authorship of King or Devick." (CC ¶ 24.) As explained above, both the K-D Test and the Pierce Saccade Test consist of four cards that contain rows of single-digit numerals. (CC ¶ 21.) And the visual layout of at least the K-D Test's demonstration and first test cards bears a strong resemblance to the layout of the Pierce Saccade Test's counterparts. (*See id.*) To be sure, King-Devick correctly points out that the K-D Test differs from the Pierce Saccade Test, most notably in that the numerals displayed in its second and third test cards appear at sporadic intervals within each row and are not lined up exclusively along the far edges, as in the Pierce Saccade Test. (Dkt. No. 36 at 11–12.) But to

7

the extent that this innovation evinces the "minimal degree of creativity" necessary to establish originality, Defendants have plausibly alleged that it was not "independently created" by King and Devick, *Feist*, 499 U.S. at 345, but was instead lifted from the Gilbert Test (CC ¶ 23).

King-Devick counters that the K-D Test is indeed sufficiently original to merit copyright protection because the precise selection and arrangement of its numbers meaningfully distinguishes it from its predecessors. (Dkt. No. 36 at 11–13.) This merits-based argument, though, is premature. Typically, "[w]hen the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve." *Tin Pan Apple, Inc. v. Miller Brewing Co.*, No. 88 Civ. 4085, 1994 WL 62360, at *4 (S.D.N.Y. Feb. 24, 1994). And while a court may resolve the question of originality as a matter of law at the *summary-judgment* stage if the evidence is such that no reasonable juror could disagree as to whether or not the work in question is "sufficiently creative to warrant copyright protection," *id.*, the question here is whether Defendants have made sufficiently plausible allegations to justify the creation of an evidentiary record on the question of originality in the first place. As the Court has just explained, Defendants have done so.

Undaunted, King-Devick contends that resolution of the K-D Test's originality requires no evidence beyond the K-D, Pierce Saccade, and Gilbert Tests, which are all already included in the present record. (Dkt. No. 39 at 2.) The Second Circuit, after all, has held that "no discovery or fact-finding is typically necessary" in an infringement action to assess whether an allegedly infringing work is "substantially similar" to a previously copyrighted work "because 'what is required is only a visual comparison of the works.'" *Peter F. Gaito*, 602 F.3d at 64 (quoting *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991)). This rule, King-Devick maintains, should apply to the "analogous situation" presented here. (Dkt. No. 39 at 2.)

8

King-Devick's argument, however, overlooks the difference between the substantial-similarity inquiry, which is used to assess whether a given work infringes the copyright of a specific earlier work, and the originality inquiry implicated here, which considers whether a given work is worthy of copyright protection in the first place. The former inquiry entails a "side-by-side comparison" of two specific works for purposes of "analyz[ing] how alike or different" they are. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001). In the context of such an undertaking, access to the works in question may often be "all that is necessary" to perform the requisite comparison. *Peter F. Gaito*, 602 F.3d at 64; *see also, e.g., Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 290–91 (S.D.N.Y. 2012).

The question of a work's eligibility for copyright protection, in contrast, does not necessarily turn on the degree of resemblance between that work and any one comparator. Rather, a court must ask whether the work "display[s] some modicum of originality" in a more abstract sense. *Victor Lalli Enters., Inc. v. Big Red Apple, Inc.*, 936 F.2d 671, 674 (2d Cir. 1991) (per curiam); *see also Feist*, 499 U.S. at 362–63 (holding that a novel compilation of preexisting data was insufficiently original to merit copyright protection where the compilation's organizing principle was so "firmly rooted in tradition" as to be "not only unoriginal, [but] practically inevitable"). And that assessment, in turn, generally "require[s] discovery and a . . . developed record." *We Shall Overcome Found. v. Richmond Org., Inc.*, 221 F. Supp. 3d 396, 407 (S.D.N.Y. 2016); *see Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 413–14 (S.D.N.Y. 2004) (finding it "improper . . . on a motion for summary judgment" to make a determination as to "the presence or absence of the degree of originality required to confer copyrightability" in light of competing expert reports and other evidence regarding the level of innovation exhibited by a particular musical composition).

Because Defendants have plausibly alleged that the K-D Test is insufficiently original to be eligible for copyright protection, they are entitled to assemble the evidentiary record that might ultimately allow them to prove it.

### 2. Prior Publication

A creative work is typically divested of its common-law copyright protection upon publication by, or with the authorization of, its author. *See Kramer v. Newman*, 749 F. Supp. 542, 548 (S.D.N.Y. 1990). Thus, unless such a work enjoys *statutory* copyright protection, it enters the public domain upon publication and is thereafter vulnerable to unauthorized use. *See id.* The currently effective Copyright Act of 1976 affords no statutory protection to works that entered the public domain prior to its January 1, 1978 effective date, *see Brown v. Tabb*, 714 F.2d 1088, 1090 (11th Cir. 1983), and the statutory regime in effect prior to that date provided that a published work could avoid falling into the public domain only if the author "affixed the proper [copyright] notice" to the publication, *Kramer*, 749 F. Supp. at 548. Accordingly, any work published by or with the authorization of the author prior to January 1, 1978, typically enjoys no copyright protection unless it bears a notice of copyright. *See id.* at 548–49.

Here, Defendants have alleged that King and Devick allowed the Illinois College of Optometry Press to publish the K-D Test without a copyright notice in 1976 as an appendix to King and Devick's senior paper, and that at least four copies of the paper—with test attached—were put in the school library. (CC ¶¶ 27–29.) Thus, Defendants argue, they have plausibly alleged that the K-D Test entered the public domain prior to January 1, 1978, and so enjoys neither statutory nor common-law protection. (Dkt. No. 38 at 16–19.)

King-Devick points out, however, that not every publication threatens to bring a work into the public domain. Rather, this harsh result attaches only to a work's "general publication," *i.e.*, publication that makes the work "available to members of the public regardless of who they

10

are or what they will do with it." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 288 F. Supp. 2d 544, 555 (S.D.N.Y. 2003) (quoting *Acad. of Motion Picture Arts & Scis.*, 944 F.2d 1446, 1452 (9th Cir. 1991)). In contrast, publication "to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution, or sale" represents only a "limited publication" that "does not result in the loss of the author's commonlaw copyright." *Kramer v. Newman*, 749 F. Supp. 542, 549 (S.D.N.Y. 1990) (quoting *White v. Kimmell*, 193 F.2d 744, 746–47 (9th Cir. 1952)). Even if Defendants' allegations plausibly allege the K-D Test's *limited* publication in 1976, King-Devick argues, they do not contain facts sufficient to plausibly allege the test's *general* publication in that year. (Dkt. No. 36 at 15–18.)

The Court agrees that Defendants' allegations regarding the K-D Test's 1976 publication are thin. But at the motion-to-dismiss stage, the Court is constrained to "draw[] all reasonable inferences in favor of" Defendants. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). While the Court doubts that the deposit of four copies of a student paper in a school library would under most circumstances constitute general publication capable of divesting that paper of copyright protection, Defendants here have alleged that a group of out-of-state researchers accessed, utilized, distributed, and reproduced the K-D Test without objection from King or Devick soon after its alleged publication.[4] (CC ¶¶ 31–34.) It is thus at least plausible that discovery could, by shedding light on the "access . . . scholars [have] had" to the K-D Test and the "use [to which] those scholars [have] put" the test, *Kramer*,

---

[4] Defendants further allege that these researchers, in connection with their research, reproduced the K-D Test in a 1983 *Journal of American Optometric Association* article. (CC ¶¶ 32–33; Dkt. No. 52-7 at 632–33.) Defendants make no claim, however, that this publication bears on the validity of King-Devick's copyright. The Court therefore need not address King-Devick's argument that the 1983 article is of no legal significance. (Dkt. No. 36 at 18–20.)

11

749 F. Supp. at 551, provide evidence that the 1976 publication was effected in such a way as to make the K-D Test "available to members of the public regardless of who they [were] or what they [would] do with it," *Penguin Books U.S.A.*, 288 F. Supp. 2d at 555.[5]

The Court concludes, then, that Defendants have pleaded sufficient facts to entitle them to proceed to discovery on this admittedly doubtful theory of copyright invalidity as well.

### 3. Fraud

Where an author has procured a copyright registration by fraud, the registration confers no presumption of validity. *See Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000). A party seeking to establish such a fraud must show at a minimum that the author's "application for copyright registration [was] factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations." *Id.* (citations omitted).

Here, Defendants allege that King and Devick's 1983 application for copyright registration deliberately failed to mention either the K-D Test's relationship to the Pierce Saccade and Gilbert Tests, or the test's prior publication without notice of copyright in 1976. (CC ¶¶ 80–83.) Defendants further allege that these omissions would have influenced the Copyright Office's ultimate decision to issue a registration. (CC ¶ 84.) King-Devick, for its part, never disputes the sufficiency of Defendants' allegations that King and Devick failed to tell the Copyright Office about the K-D Test's relationship to earlier eye-movement tests or prior

---

[5] The Court acknowledges dicta in *Kramer v. Newman*, 749 F. Supp. 542 (S.D.N.Y. 1990), suggesting at the summary-judgment stage that the "mere presence of an otherwise unpublished work in an academic library is not the legal equivalent of publication" as a matter of law, *id.* at 551. Without offering any view on that suggestion, the Court concludes at this early stage in the litigation that it is possible to reasonably infer from Defendants' allegations that the 1976 publication of King and Devick's senior paper consisted of more than the paper's "mere presence" in the school library.

12

publication and that these omissions were willful.[6] (Dkt. No. 36 at 13–15.) King-Devick instead argues only that Defendants have failed to plausibly allege that information about the K-D Test's relationship to its predecessor tests would have been material to the Copyright Office. (*Id.*)

Where an applicant for a registered copyright "fails to advise the Copyright Office of the reliance upon the work of another, the [applicant] does not afford the Office the fair opportunity to pass upon the question of originality in relation to the prior work." *Santrayall v. Burrell*, 993 F. Supp. 173, 176 (S.D.N.Y. 1998). Accordingly, such an omission can be material if disclosure would have "cause[d] the Copyright Office to consider rejecting the application" for want of originality. *Id.* Here, though, King-Devick argues that because "the K-D Test on its face contains original expression" that sets it apart from its predecessors, it "would have been granted copyright protection whether or not" the copyright application had disclosed the K-D Test's reliance on the Pierce Saccade and Gilbert Tests. (Dkt. No. 36 at 15.)

Yet again, King-Devick's argument comes too soon. As the Court has already concluded, Defendants have alleged facts that plausibly suggest that the K-D Test was insufficiently original to merit copyright protection. It is therefore necessarily plausible to infer that knowledge of those facts would have caused the Copyright Office to consider rejecting King and Devick's application for a registered copyright or, put another way, that King and Devick's failure to disclose those facts was material. *See We Shall Overcome Found.*, 221 F. Supp. 3d at 408 (deeming allegations that a copyright application had omitted "all reference" to the antecedents of the work for which protection was sought to be "sufficiently specific . . . to survive a motion to dismiss" despite the copyright holders' claims of immateriality). Until the

---

[6] To the extent that Defendants' fraud allegations must satisfy the heightened pleading standards set out in Federal Rule of Civil Procedure 9(b), King-Devick makes no argument that the allegations fail to do so. The Court therefore assumes their sufficiency in this regard.

record is developed further on the question of the K-D Test's originality, there is simply no basis for assessing the materiality of the omissions King and Devick are alleged to have made.[7]

## IV. Conclusion

For the foregoing reasons, King-Devick's partial motion to dismiss is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 35.

SO ORDERED.

Dated: January 2, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[7] Although King-Devick neglects to address Defendants' fraud theory insofar as it pertains to King and Devick's failure to notify the Copyright Office of the K-D Test's 1976 publication, the Court concludes that because Defendants have plausibly alleged that this publication inserted the K-D Test into the public domain, Defendants have likewise plausibly alleged that the fact of publication would have been material to the Copyright Office.