## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KING-DEVICK TEST INC.,

        Plaintiff,

      v.

NYU LANGONE HOSPITALS, NEW YORK
UNIVERSITY, STEVEN L. GALETTA, and
LAURA J. BALCER,

        Defendants.

Case No. 1:17-cv-09307 (JPO)


### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### THEIR MOTION FOR THE ISSUANCE OF A REQUEST TO THE
### <u>REGISTER OF COPYRIGHTS PURSUANT TO 17 U.S.C. § 411(b)(2)</u>


REDACTED – PUBLIC VERSION

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ...............................................................................................1

II.   FACTUAL BACKGROUND ................................................................................2

      A.    King and Devick's Senior Project.........................................................2

      B.    The Publication of the Senior Paper and the K-D Test.........................6

      C.    The Inaccurate Copyright Application..................................................9

III.  LEGAL STANDARD...........................................................................................10

IV.   ARGUMENT .......................................................................................................12

      A.    Devick Knew That the Applied-for-Work Was Published But
           Told the Copyright Office It Was Not ................................................12

      B.    Devick Knew the K-D Test Was Based On and Incorporated
           Preexisting Materials But Actively Sought To Hide This Fact
           from the Copyright Office ...................................................................15

V.    CONCLUSION.....................................................................................................20

**Cases**

*Argento v. Santiago*,
　　No. 16-CV-6172-FPG-MWP, 2017 WL 6452392 (W.D.N.Y. Dec. 18, 2017) .....................11

*DeliverMed Holdings, LLC v. Schaltenbrand*,
　　734 F.3d 616 (7th Cir. 2013) ...........................................12

*Durham Indus., Inc. v. Tomy Corp.*,
　　630 F.2d 905 (2d Cir. 1980)............................................20

*GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*,
　　782 F. Supp. 763 (W.D.N.Y. 1991) ..................................18

*Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*,
　　No. LA CV16–00339 JAK (FFMx), 2017 WL 2903180 (C.D. Cal. Mar. 24,
　　2017), *reconsideration denied*, No. LA CV 16–00339 JAK (FFMx), 2017 WL
　　3477746 (C.D. Cal. May 12, 2017) ...............................13, 14

*Martin v. Cuny*,
　　887 F. Supp. 1390 (D. Colo. 1995)...................................19

*Palmer/Kane LLC v. Rosen Book Works LLC*,
　　188 F. Supp. 3d 347 (S.D.N.Y. 2016)............................11, 14

*Past Pluto Prods. Corp. v. Dana*,
　　627 F. Supp. 1435 (S.D.N.Y. 1986)..............................18, 20

*Reed Elsevier, Inc. v. Muchnick*,
　　559 U.S. 154 (2010) ........................................................10

*Russ Berrie & Co. v. Jerry Elsner Co.*,
　　482 F. Supp. 980, 987 (S.D.N.Y. 1980) ...........................18

*Ross Prods. v. N.Y. Merch. Co.*,
　　233 F. Supp. 260 (S.D.N.Y. 1964) ..............................13, 14

*Stewart v. Abend*,
　　495 U.S. 207 (1990) .......................................................14

**Statutes**

17 U.S.C. § 101 (2010).....................................................13

17 U.S.C. § 411(a) (2008).................................................10

**Page(s)**

17 U.S.C. § 411(b)(1) ........................................................................................11

17 U.S.C. § 411(b)(1)(A) ..............................................................................14, 17

17 U.S.C. § 411(b)(2) ........................................................................................11

**Other Authorities**

U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE
PRACTICES (1st ed. 1973) .................................................................................13

# I.    INTRODUCTION

A *valid* registration (or a final refusal of registration) by the U.S. Copyright Office is a threshold requirement for filing a copyright infringement suit.  But an infringement plaintiff cannot meet this threshold by duping the Copyright Office into issuing a certificate of registration based on false information.  To prevent plaintiffs from abusing the registration process in this way, the Copyright Act allows for the invalidation of registrations obtained by knowing misrepresentations.  Such invalidation is appropriate here.

In 1983, Steve Devick sought to register with the Copyright Office what he styled the King-Devick Test (also known as the "K-D Test").  But what he actually submitted was an incomplete copy of a 1976 senior paper he authored with Alan King, titled *The Proposed King-Devick Saccade Test and Its Relation to the Pierce Saccade Test and Reading Levels* (the "Senior Paper").

That Senior Paper originally included a two-page Abstract explaining that the authors developed a new vision test that "was a modification of the Pierce and Vincet[t] tests"—two commercially available vision tests.  Thus, the Senior Paper made it clear that the K-D Test is a derivative copy, based on and incorporating aspects of these previous works.  But in Devick's submission to the Copyright Office in 1983, Devick removed the Abstract.  King and Devick's Senior Paper also originally included a copy of the Pierce Saccade Test in Appendix I.  Devick also removed that appendix from the Senior Paper in his submission to the Copyright Office in 1983.

Devick made additional omissions in Plaintiff's copyright filing.  ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████  And in fact, by the time Devick submitted the application for

Plaintiff's copyright registration in 1983, the Senior Paper had been widely distributed and available to others also researching vision. The K-D Test had even been used in a New York study of over 1,500 kids in 1979, ███████████████████████. Yet, despite all of these copies made, sold, and distributed, Devick claimed in his copyright application in 1983 that the work he sought to register had never been published:

```
DATE AND NATION OF FIRST PUBLICATION:
Date    No Publication
             (Month)        (Day)         (Year)
Nation
                        (Name of Country)
        (Complete this block ONLY if this work has been published.)
```

In light of these material omissions and misstatements, we do not know how the Copyright Office would have treated Devick's application had it known the truth. But we suspect that Copyright Office would have acted differently. For example, would the Copyright Office have registered only the text of the senior paper, excluding form the scope of registration the K-D Test as a mere copy of preexisting material, not sufficiently creative to warrant copyright protection? Would it have refused registration entirely as an unpublished work if it had known that the work deposited was published? Based on the Register of Copyrights' advisements in other cases, the answer to these questions is yes.

In sum, based on a string of inaccuracies made by Devick to the Copyright Office in 1983, which are so blatant and deliberate that there can be no doubt they were made knowingly, the law permits, and in fact requires, this Court to seek advice from the Register of Copyrights on the invalidity of the copyright registration Plaintiff has asserted in this case.

## II.    FACTUAL BACKGROUND

### A.    King and Devick's Senior Project

In or around 1975, Alan King and Steve Devick, while students at the Illinois College of Optometry ("ICO"), learned about two existing eye movement tests, the Pierce Saccade Test and

the Vincett Test.[1]  The Pierce Saccade Test is a simple vision test composed of a demonstration card and three test cards with single-digit numbers read from left to right.[2]  It was developed in or around 1972 by John R. Pierce, and is owned by Cook, Inc.[3]  The Vincett Test is also a simple vision test that, among other things, included a test card with rows of multiple single letters read from left to right.[4]  It was published in 1973 and owned by PerCon, Inc.[5]

At the prompting of their professor and faculty advisor, Darrell Schlange, King and Devick embarked on a senior research project to study the correlation between eye movement and reading ability.[6]  They researched and evaluated prior tests with the hope that they could make a more useful test and, by the fall of 1975, King and Devick had developed a test they titled the "King-Devick Test" (the "K-D Test").  Their test is based on the Vincett Test, "follows the same basic format as the Pierce Saccade Test," and embodies only minor functional changes from these prior tests that, in their view, would more accurately simulate a person's normal reading process.[7]  An excerpt from both the Pierce Saccade Test and the K-D Test is shown below:

---

[1] Declaration of Kristen McCallion ("McCallion Decl."), Ex. A (Transcript of the Deposition of Alan King ("King Tr.")) 16:08–13, 18:02–08; Ex. B (Transcript of the Deposition of Steven Devick ("Devick Tr.")) 109:16–18, 212:16–22, 214:06–09; Ex. C (Transcript of the Deposition of Darrell G. Schlange ("Schlange Tr.")) 40:04–16, 44:04–47:10, 48:03–15.

[2] *See* Ex. D (Senior Paper) at KDT0298330–33.

[3] *Id.* (Pierce Saccade Test cards showing "Copyright © 1972" and the address of "Cook, Inc.").

[4] Ex. E (Excerpt of *Optometric Perceptual Testing and Training Manual* by William K. Vincett) at NYU00469236–38.

[5] *Id.* at NYU00469224 (excerpt showing copyright dates), NYU00469237 (excerpt of Vincett Test showing "© Copyright 1973, PerCon, Inc.").

[6] Ex. C (Schlange Tr.) 49:14–54:14 (Schlange testifying about his discussions with King and Devick that led to their senior project).

[7] Ex. D (Senior Paper) at KDT0298306, KDT0298315–16 (describing in detail the designs of the Pierce Saccade Test and the Vincett Test and explaining that King and Devick propose a test "that will better simulate the normal reading process" before providing the first description of the K-D Test); Ex. A (King Tr.) 20:16–21:05 ("we decided to design something that would more accurately test reading ability in children rather than what was on the Pierce Saccade Test"), 35:15–37:08 (testifying that the K-D Test follows the same basic format as the Pierce Saccade Test, that "[b]ecause of the fact that we used more numbers, more randomly spaced numbers, it actually tested saccadic function," and that he studied Pierce before beginning to develop the K-D Test); Ex. C (Schlange Tr.) 57:16–59:20

| **Pierce Saccade Test** | **King-Devick Test** |
|---|---|
|  |  |

As part of their project, King and Devick administered the K-D Test and the Pierce Saccade Test on 137 school aged children in the Chicago area in 1975.[8]  In or around the second week of March 1976, King and Devick submitted their Senior Paper that published their research and included copies of both K-D Test and the Pierce Saccade Test, among other things.[9]  The Senior Paper includes a title page noting 1976:



THE PROPOSED KING-DEVICK SACCADE TEST
AND ITS RELATION TO THE PIERCE SACCADE TEST
AND READING LEVELS


Independent Student Research Study

by

Alan J. King

Steven Devick


Submitted March, 1976

ADVISOR:  Dr. Darrell Schlange

---

("Q: So the spacing [in the K-D Test] serves an important function, right?  A: Yes.  Q. And it's because it better measures how people read?  A: "The eye movements involved are closer to what reading eye movements are.").

[8] Ex. D (Senior Paper) at KDT0298306; Ex. B (Devick Tr.) 133:02–08.

[9] Ex. D (Senior Paper); Ex. B (Devick Tr.) 177:09–178:20.

It also includes a two-page Abstract explaining King and Devick's reliance on, and modification of, the Pierce Saccade Test and Vincett Test:

ABSTRACT

There are two tests currently in use in visual screening for saccadic fixations, the Pierce Saccade Test and the Vincet Saccade Test. The Pierce Test is a standardized test that has been widely accepted as a normative study; however, we feel it has two important shortcomings. First of all, since the saccades involved in the test are widely and equally spaced, it manifests the two constant errors of habituation and anticipation. Secondly, since the Pierce Test does not incorporate standard deviations into its normative data, it is hard to judge whether or not a subject has passed or failed the test.

With this in mind, we designed a test which was a modi-fication of the Pierce and Vincet tests which we administered to 137 school aged children in the Chicago area. The Pierce Test was also administered. After gathering and normalizing the data, we predicted from failures in our study which students would be poor readers.
[10]

In addition, the Senior Paper includes Appendix I, which is a copy of a paper titled *The Pierce Saccade Test,* authored by Pierce, as well as a copy of the Pierce Saccade Test, graphs showing Pierce's normative data on the test, and Pierce's scoresheet.[11] Appendix II is a copy of the K-D Test followed by charts and graphs of normative data collected by King and Devick.[12] The Senior Paper does not (and never did) contain any copyright notice,[13] although the Pierce Saccade Test

---

[10] Ex. D (Senior Paper) at KDT0298304, KDT0298306–07.

[11] *Id.* at KDT0298326–338.

[12] *Id.* at KDT0298339–KDT0298368.

[13] *See generally id.* As the Court is aware, Defendants believe that the Senior Paper was published without a copyright notice in 1976, and thereby entered into the public domain.

does contain a copyright notice that attributes ownership to Cook, Inc. and notes the test's prior publication in 1972.[14]

## B. The Publication of the Senior Paper and the K-D Test

████████████████████████████████████ King and Devick mailed a copy of it—which included the K-D Test shown in Appendix II—to Dr. John Pierce, the author of the Pierce Saccade Test, in Alabama.[15] ████████████████████████████████

████████████████████████ ████████████████████████████

████████████████████████████████████████████████████

████████████████ ████████████████████████ ████████████████

████████████████████████████████████ As Plaintiff admits, the copy provided to Pierce did not contain a copyright notice:

> REQUEST FOR ADMISSION NO. 35: Admit that the copy of King and Devick's senior paper, *The Proposed King-Devick Saccade Test and its Relation to the Pierce Saccade Test and Reading Levels*, that Devick mailed to John Pierce in March of 1976 did not include a copyright notice.
>
> RESPONSE: Admitted.[20]

████████████████████████████████████████████████

████████████████████████████████ This copy was in addition

---

[14] *Id.* at KDT0298330–33.

[15] *Id.* 115:19–116:09, 135:18–20, 136:04–10, 146:03–148:07 (████████████████████████████████████████████████████████).

[16] *See id.* 147:13–148:07 (██████████████████████████).

[17] *Id.* 135:18–20.

[18] *Id.* 113:10–14,

[19] *Id.* 146:15–147:12.

[20] Ex. F (Excerpt of Plaintiff's Response to Defendants' First Set of Requests for Admission (Nos. 1–39)).

[21] *See* Ex. B (Devick Tr.) 297:16–21 (████████████████████████████

to the copy sent to Pierce. It is undisputed that the library copy did not have a copyright notice, as was required under copyright law at that time. 



No such copy of the K-D Test has been produced.

).
It was routine for the ICO library to retain a copy of all senior papers at the time. *See* Ex. C (Schlange Tr.) 78:10–17 ("[w]e would do that with all of them").

[22] Ex. B (Devick Tr.) 150:06–18 , 161:12–163:12 ().

[23] *Id.* 162:19–163:04 (emphasis added).

[24] *Id.* 116:11–18 (), 148:19–20, 176:18–178:20 (Devick discussing his first sale of the K-D Test); Ex. G (March 18, 2018 email from Devick to FDA); *see also* Ex. F (Plaintiff's Response to Request for Admission Nos. 37, 38) ("KDT Inc. admits that copies of the King-Devick Test containing a copyright notice were sold by Steve Devick prior to the registration of the copyright."; Plaintiff admitting that Devick sold copies of the K-D Test prior to filing the copyright application).

[25] Ex. B (Devick Tr.) 153:21–154:12 () (emphasis added).



[redacted] [28] due in part to Devick's exploitations of it. In the late 1970s and early 1980s, King and Devick's Senior Paper, including the K-D Test, were so well-known that out-of-state researchers and doctors were using it to conduct research and numerous academic papers published in the early 1980s cited to the Senior Paper.[29] In fact, as early as 1978, researchers at the State University of New York ("SUNY") who were developing a vision screening battery for the New York State Optometric Association ("NYSOA") obtained the Senior Paper and used the K-D Test in a study involving at least 1,500 children in 1979.[30] [redacted]

[redacted]

---

[26] *Id.* 117:01–18, 151:13–20, 160:12–17. After graduation, while Devick was busy selling his copies of the K-D Test, King also immediately exploited the K-D Test, by using it in his optometry practice around June of 1976. Ex. A (King Tr.) 61:02–12. Like Devick, King "made copies of the [K-D Test] cards" and used them to test patients he thought might be poor readers. *Id.* 61:13–17. King also made copies of the K-D Test to give to patients to use as a remediation tool, and had patients "use the test over and over again" to help improve their saccadic functions. *Id.* 62:04–63:08. The K-D Test copies that King gave to his patients were made and given out "definitely . . . before 1980." *Id.* 62:13–14.

[27] Ex. B (Devick Tr.) 148:19–151:09, 157:02–161:02 ([redacted]
[redacted]
[redacted]); *see also id.* 178:02–179:03 ([redacted]
[redacted]), 182:02–17; Ex. H ([redacted]
[redacted]).

[28] Ex. B (Devick Tr.) 163:06–12, 259:03–09.

[29] *See, e.g.,* Ex. I (Declaration of Allen H. Cohen (the "Cohen Decl.")), ¶ 4; Ex. J (NYSOA K-D Test); Ex. C (Schlange Tr.) 77:07–78:03 (Schlange testifying that the Senior Paper was discussed at industry meetings and "people would check it out and like it"), 89:21–91:17, 95:08–17.

[30] Ex. I (Cohen Decl.), ¶¶ 3–5.

██████████████████████████████ ██ █████

████████████████████████████████████████

████████ The NYSOA study was published along with the entire K-D Test (called the "***NYSOA***

K-D Test***"***) in July 1983 in the *Journal of the American Optometric Association*, a national

publication, and included an author's note referring readers to Bernell for more information.[32]

## C. The Inaccurate Copyright Application

On or around August 23, 1983, Devick filed an application with the U.S. Copyright Office,

which ultimately resulted in U.S. Copyright Registration No. TXu000134747 under the title "*King-*

*Devick saccade test*" (the "'747 Registration").[33]  Generally, copyright applications must be

submitted with a "deposit" that is a complete copy of the work in existence sought to be registered.

Here, Devick submitted as his deposit an incomplete copy of the Senior Paper, as shown in the

deposit copy submitted to the Copyright Office.[34]  At least four aspects of Plaintiff's copyright

registration are relevant to this motion.

***First***, in the registration form location where the applicant is supposed to identify the date

and nation of first publication, Devick's application falsely states "No Publication":



---

[31] *Id.*; Ex. J (NYSOA K-D Test); Ex. B (Devick Tr.) 331:16–332:10 (████████████████████████
██████████████████████████████████ ).

[32] Ex. J (NYSOA K-D Test).

[33] Ex. K (Certificate of Registration for the '747 Registration).  Although both Devick and King were disclosed as the copyright owners/claimants in the '747 Registration, Defendants generally refer to Devick only in discussing the copyright application, since King, a third party, testified that he does not recall being involved in the application process.

[34] Ex. L (Deposit Copy for the '747 Registration).

**Second**, in the section of the registration form inquiring whether the applied-for-work is a compilation or a derivative work, Devick's application falsely states that there is no preexisting material, despite his copying of the Pierce Saccade Test and Vincett Test, and despite the embodiment of the Pierce Saccade Test in the K-D Test, which makes the K-D a derivative copy.[35] **Third**, in that same location on the form, Devick's application falsely states that there was no material added to the work, again ignoring the Pierce Saccade Test and Vincett Test. Below is another snippet of the form that shows these inaccuracies:[36]



**Fourth**, and finally, the deposit that Devick submitted with the copyright application was an incomplete copy of the Senior Paper. Devick removed the title page that shows the 1976 year of submission, which is also the first year of publication. He removed the Abstract, along with its clear explanation that the K-D Test is a derivative work. He also removed the Pierce Saccade Test. These removals, combined with the inaccuracies shown above, deprived the Copyright Office from the opportunity of conducting the appropriate examination of originality and copyrightability and thus, registrability.

## III. LEGAL STANDARD

In order to bring a claim for copyright infringement, the plaintiff alleging copyright ownership must own a valid registration as a threshold matter. 17 U.S.C. § 411(a) (2008); *Reed*

---

[35] By using the word "derivative" herein, Defendants do not concede that the K-D Test is a "derivative work" as defined by the statute, because that would imply that it embodies copyrightable subject matter, which it does not.

[36] Notably, these two spaces go "hand-in-hand." Once an applicant identifies the existence of preexisting material, it must then provide a statement explaining the new material added to that preexisting material. Alternatively, answering "none" to the first question inevitably leads the applicant to also saying "none" in response to the second question, which was the route taken by Devick.

*Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) ("[T]he Copyright Act . . . requires copyright holders to register their works before suing for copyright infringement.").  Under the Prioritizing Resources and Organization for Intellectual Property Act of 2008 (the "PRO IP Act") Congress amended § 411 to provide that a certificate of registration satisfies this requirement "regardless of whether the certificate contains inaccurate information, unless—

> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."

17 U.S.C. § 411(b)(1).  As such, an infringement plaintiff cannot satisfy this registration precondition by duping the Copyright Office into issuing a certificate of registration based on false information.  To prevent plaintiffs from abusing the registration process in this way, the Copyright Act allows for the invalidation of registrations obtained by knowing misrepresentations.

"In any case in which inaccurate information described under paragraph (1) is alleged, the court ***shall*** request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(2) (emphasis added).  While courts have treaded carefully when deciding to act under § 411 due to its potential to cause delays, all agree that once the movant has made a threshold showing under subsection (A), the Court is required to invite the Copyright Office to advise on (B).  *See Argento v. Santiago*, No. 16-CV-6172-FPG-MWP, 2017 WL 6452392, at *4 (W.D.N.Y. Dec. 18, 2017) (stating that the court may answer the first question of whether the inaccurate information was included on the application with knowledge that it was inaccurate on its own, but must solicit the Register's advice before resolving the materiality question); *Palmer/Kane LLC v. Rosen Book Works LLC*, 188 F. Supp. 3d 347, 348 (S.D.N.Y. 2016) (advising that "courts are in agreement that the provision is mandatory in nature, requiring district courts to solicit the advice

of the Copyright Office when the statutory conditions are satisfied"); *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 623 (7th Cir.2013) ("[T]he statute obligates courts to obtain an opinion from the Register. . .").

## IV.    ARGUMENT

Given the information discovered before and during fact discovery, it is clear that Devick knowingly provided inaccurate information to the Copyright Office. Devick's inaccuracies resulted from affirmative acts of concealment, selected removal of pages and entire sections of the Senior Paper to hide the existence of the Pierce Saccade Test and the 1976 publication year, and omissions of pertinent facts. As further discussed below, the inaccuracy of the information, if known to the Copyright Office, would have caused the Register of Copyrights to refuse registration. As a result, this case is ripe for referral to the Register under § 411 of the Copyright Act.

### A.    Devick Knew That the Applied-for-Work Was Published But Told the Copyright Office It Was Not

The registration inaccurately represents the applied-for-work as *unpublished*, even though copies had been distributed, sold, and even licensed over the seven-year period leading up to the filing of the application in the Copyright Office. *Supra* Section II(B). As shown in the below excerpt of the '747 Registration, Devick falsely stated "No Publication" in the space that specifically requests whether, where, and when the applied-for-work was first published:

| 3 Creation and Publication | YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED: | DATE AND NATION OF FIRST PUBLICATION: |
|---|---|---|
| | Year  1976 | Date  No Publication (Month) (Day) (Year) |
| | (This information must be given in all cases.) | Nation (Name of Country) (Complete this block ONLY if this work has been published.) |

It is undisputed that the K-D Test was published when the copyright application was filed. Devick admitted as much in his deposition and the facts discovered make this plain as day. Devick sold and distributed copies of the Senior Paper and the K-D Test ▮▮▮▮▮▮▮▮▮▮▮▮▮

12

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ *Supra* Section II(B).

Publication is the distribution of copies of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.[37] This definition has not changed materially since the 1970s, when Devick started selling the K-D Test "commercially." *See e.g.*, *Ross Prods. v. N.Y. Merch. Co.*, 233 F. Supp. 260, 261 (S.D.N.Y. 1964) ("It cannot be disputed that putting [an] article on sale to the general public constituted a general publication."). Simply stated, publication of a work has always occurred "by means of a sale, an offering for sale, or a public distribution."[38] All of these events occurred well before 1983.

Further, the copy of the Senior Paper that resided in the ICO library without a copyright notice is also relevant to this motion because, at the time Devick filed Plaintiff's copyright application, the Copyright Office publicly advised that "[t]he deposit of a manuscript in a public library . . . for unrestricted access by the public will be accepted as constituting publication."[39]

Plainly then, the application contained "inaccurate information" insofar as it indicated that the material deposited, *i.e.*, the Senior Paper and the K-D Test, had not been published, when they in fact had been copied, sold, and/or distributed to the general public. *See Gold Value Int'l Textile,*

---

[37] 17 U.S.C. § 101 (2010).

[38] U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES (1st ed. 1973) (hereinafter "Compendium I"), Section 3.1.1(II) (emphasis added); *see also id.*, Section 3.1.1(III) (emphasis added) ("[t]he statutory definition of the 'date of publication' (17 U.S.C. § 26) indicates that the placing on sale, or public distribution of copies will normally be regarded as publication.").

[39] Compendium I, Section 3.1.1(III)(e)(1); *see also id.*, Section 3.1.1(III)(e)(2) ("When an applicant asserts that a work was published by deposit in a public library, it will be assumed that the deposit was unrestricted unless information to the contrary exists.").

*Inc. v. Sanctuary Clothing, LLC*, No. LA CV16–00339 JAK (FFMx), 2017 WL 2903180, at *5 (C.D. Cal. Mar. 24, 2017), *reconsideration denied*, No. LA CV 16–00339 JAK (FFMx), 2017 WL 3477746 (C.D. Cal. May 12, 2017) (holding that plaintiff's sales to customers constituted publication as a matter of law and that plaintiff's characterization of its work as an *unpublished* collection was an inaccuracy under § 411(b)(1)(A)); *Palmer/Kane LLC*, 188 F. Supp. 3d at 353 (granting defendant's motion to issue a request to the Register of Copyrights to advise the Court on whether knowledge that the works registered had been published prior to filing would have caused the Register to refuse registration).

The knowledge requirement of § 411(b)(1)(A) is also easily satisfied given Devick's personal knowledge of his own copying, sales, and distribution of the Senior Paper and K-D Test ████████████████ *Gold Value Int'l Textile, Inc.*, 2017 WL 2903180, at *8–9 (holding that plaintiff's knowledge that it sold samples of the work at issue before applying to register it as part of an unpublished collection satisfied the knowledge requirement of § 411(b)(1)(A) and issuing request to the Register to advise on the materiality of the inaccuracy).[40]

In addition—and as further addressed immediately below—the copy of the Senior Paper deposited with the Copyright Office was submitted without the title page, which was the only portion of the work suggesting that the year of first publication was likely 1976.[41]  There were strict legal notice requirements at the time,[42] and the Copyright Office surely would have

---

[40] Devick's claim that he did not know the legal definition of "publication" at the time he filed the copyright application is of no moment because "the knowledge requirement of 17 U.S.C. § 411(b)(1)(A) does not mean knowledge of the law that applies to the underlying facts about which Plaintiff was fully informed." *Gold Value Int'l Textile, Inc.*, 2017 WL 2903180, at *9 (rejecting plaintiff's "ignorance of the law" argument that it did not know that, as a matter of law, the sale of samples to customers constituted "publication" under the Copyright Act).

[41] Ex. D (Senior Paper) at KDT0298304.

[42] *See Stewart v. Abend*, 495 U.S. 207, 233 (1990) ("Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright. Publication of a work without proper notice automatically sent a work into the public domain."); *see, e.g.*, *Ross Prods.*, 233 F.Supp. at 264 ("[I]t is clear that where there is a substantial variation in the

questioned Devick on the details of any publication if it had been properly informed that the applied-for-work was published in 1976, and when faced with a deposit lacking any notice. It might, for example, have required Devick to submit a copy of the K-D Test cards he sold ██████ ████████████—cards that have not been produced by Devick in this case—to ensure the strict notice requirements were followed.

**B.    Devick Knew the K-D Test Was Based On and Incorporated Preexisting Materials But Actively Sought To Hide This Fact from the Copyright Office**

In addition, the application falsely claimed that the material for which Devick sought registration—which included the K-D Test itself—was not "based on" and did not "incorporate" any preexisting works. As shown below, this information is requested expressly on the application form. Rather than provide accurate information in response to this inquiry, and identify—at the very least—the prior Pierce Saccade Test on which the K-D Test is based, Devick said "None":



But, in Devick's own words, and as recorded in the Abstract of the paper, the K-D Test is a "modification of the Pierce and Vincet[t] tests."[44]  It is thus undisputed that the K-D Test is based on these preexisting tests. The K-D Test heavily incorporates the Pierce Saccade Test, as shown in the comparisons below:

form of such notice, and surely where there is no notice whatsoever, the fact that the defendant knew that there was a copyright will not prevent the item from falling into the public domain.").

[43] Ex. K (Certificate of Registration for the '747 Registration) at KDT0031756.

[44] Ex. D (Senior Paper) at KDT0298306.

## Pierce Saccade Test          King-Devick Test

 

 

**Pierce Saccade Test**　　　　　　　　**King-Devick Test**



Here too, the knowledge requirement of § 411(b)(1)(A) is easily satisfied. Devick's own words in the Abstract clearly establish that he knew his own test was based on the Pierce Saccade Test. But the deposit submission is even more telling. The deposit copy of the Senior Paper for the '747 Registration was missing all of the pages that (i) referred to King and Devick's copying of previously published tests; (ii) included any reference to the existence of the Pierce Saccade Test; and (iii) showed the visually similar appearance between the Pierce Saccade Test and the K-

D Test.[45]  To reiterate, one of the sections removed from the deposit was the Abstract, authored by King and Devick, that notes their copying of Pierce and Vincett:

```
    With this in mind, we designed a test which was a modi-
fication of the Pierce and Vincet tests which we administered
to 137 school aged children in the Chicago area.  The Pierce
Test was also administered.  After gathering and normalizing
the data, we predicted from failures in our study which students
would be poor readers.
```
[46]

In addition, King and Devick were well aware that the Pierce Saccade Test had been previously published, given their use of the test, which Devick testified was a "commercial product," and their knowledge that the test included a 1972 copyright notice attributed to Cook, Inc.[47]  They were also aware that the Vincett test was previously published in a book and contained a copyright notice.[48]

The physical removal of this pertinent information made it impossible for the Copyright Office to see what existed prior to the K-D Test that was not owned by King or Devick, and to determine whether there was sufficient original authorship in the K-D Test to warrant registration, particularly in the K-D Test.  *See GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co*., 782 F. Supp. 763, 774–75 (W.D.N.Y. 1991) (citing *Past Pluto Prods. Corp. v. Dana*, 627 F. Supp. 1435, 1440 n.5 (S.D.N.Y. 1986) and *Russ Berrie & Co. v. Jerry Elsner Co*., 482 F. Supp. 980, 987 (S.D.N.Y. 1980)) ("[A]lthough the court would ordinarily defer to the judgment of the Copyright

---

[45] *Cf. Ex. D (Senior Paper) to Ex. L (Deposit Copy for the '747 Registration).

[46] Ex. D (Senior Paper) at KDT0298306.

[47] Ex. B (Devick Tr.) 155:13–156:03 (███████████████████████████████████████████ █████████), 220:02–03; Ex. A (King Tr.) 37:09–38:03 (King confirming that each page of the Pierce Saccade Test cards shown in the Senior Paper contained a copyright notice); *see* Ex. D (Senior Paper) at KDT0298330–33.

[48] Ex. B (Devick Tr.) 155:13–156:03 (████████████████████████████████████████ ███████████); 215:04–12.

Office when the question of originality is a close one, that is impossible to do when the Copyright Office has not had a fair opportunity to pass on the question because of the copyright claimant's failure to advise the Office of the existence of a prior work"); *see Martin v. Cuny*, 887 F. Supp. 1390, 1393–94 (D. Colo. 1995) (holding plaintiff's copyright registration invalid where plaintiff submitted false information in the application, including by claiming to be the author of the entire copyrightable expression contained in the work, and withheld disqualifying information by doctoring the deposit copy to delete preexisting material).

These material omissions are all relevant to a separate and independent inaccuracy that was also made with the required knowledge. By failing to disclose any preexisting material, Devick also falsely claimed that King and Devick co-authored the "entire work" and inaccurately stated that there was no (i.e., "None") "MATERIAL ADDED TO THIS WORK."

[49] Ex. K (Certificate of Registration for the '747 Registration) at KDT0031755.

[50] *Id.* at KDT0031756.

In other words, contrary to the plain instructions on the application to "[g]ive a brief general statement of the material that has been added to this work and in which copyright is claimed," King and Devick failed to identify *their* own alleged authorship and instead claimed everything. This claim is false given that K-D Test uses the Pierce Saccade Test as a template. The import of this cannot be understated. When the Copyright Office is not accurately informed of what as copied, it does not know what the applicant authored and thus is prevented from examining the question of authorship. *Past Pluto Prods. Corp.*, 627 F. Supp. at 1440 n.5 ("When a copyright claimant fails to advise the Copyright Office of the existence of a prior work . . . , the Office is not afforded fair opportunity to pass upon the question of originality in relation to the prior work.").

Furthermore, by 1983, it was well established that "the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980). In other words, the only aspects of a derivative work entitled to copyright protection "are the non-trivial, original features, if any, contributed by the author or creator of [the] derivative work[]." *Id.* With the material misstatements and deposit omissions here, the Copyright Office was simply unable to pass judgment on this important issue. The Court should fix that problem, and ask the Copyright Office to do it now.

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court issue a request to the Register to advise on registration invalidity.

Respectfully submitted,

FISH & RICHARDSON P.C.

Dated:  January 25, 2019

By:  */s/ Kristen McCallion*
    Kristen McCallion (KM5593)
    mccallion@fr.com
    John S. Goetz (JG8271)
    goetz@fr.com
    Elizabeth Brenckman (EB8264)
    brenckman@fr.com
    Vivian Cheng (VC6321)
    cheng@fr.com
    601 Lexington Avenue, 52nd Floor
    New York, NY 10022
    Telephone: (212) 765-5070
    Facsimile: (212) 258-2291

    Attorneys for Defendants
    NYU LANGONE HOSPITALS,
    NEW YORK UNIVERSITY,
    STEVEN L. GALETTA and
    LAURA J. BALCER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 25, 2019, a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

/s/ Kristen McCallion
Kristen McCallion