## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KING-DEVICK TEST INC.,<br><br>Plaintiff,<br><br>vs.<br><br>NEW YORK UNIVERSITY, NYU LANGONE HOSPITALS, STEVEN L. GALETTA, and LAURA J. BALCER<br><br>Defendants. | Civil Action No. 17-cv-9307<br><br>Honorable J. Paul Oetken, U.S.D.J<br><br>Honorable Debra C. Freeman, U.S.M.J |

### DECLARATION OF DAVID KLUFT IN SUPPORT OF OPPOSITION TO MOTION FOR ISSUANCE OF REQUEST TO REGISTER OF COPYRIGHTS PURSUANT TO 17 U.S.C. § 411(b)(2)

I, David A. Kluft, swear and state as follows:

1.      I am an attorney with the firm of Foley Hoag LLP and counsel to Plaintiff King-Devick Test Inc. the above-captioned matter. I submit this declaration in support of Plaintiff's Opposition to Defendant's Motion for Issuance of Request ot Register Of Copyrights Pursuant to 17 U.S.C.§ 411(b)(2).

2.      Attached hereto as **Exhibit 1** are true and correct excerpts of the transcript from the deposition of Dr. Alan King.

3.      Attached hereto as **Exhibit 2** are true and correct excerpts of the transcript from the deposition of Dr. Steven Devick.

4.      Attached hereto as **Exhibit 3** are true and correct excerpts of the transcript from the deposition of Professor Darrell Schlange.

5.      Attached hereto as **Exhibit 4** are true and correct excerpts of the transcript from the deposition of Christine Weber.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the Supplemental Declaration of Allen H. Cohen, O.D.

7.      On September 25, 2018, Defendants issued a subpoena for deposition testimony from Herbert J. Bell, a lawyer who filled out the 1983 copyright application for the King-Devick Test.  I subsequently spoke with Mr. Bell, who confirmed that he was served with the subpoena. Defendants did not take this deposition.

I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge, and that this declaration was executed by me on February 8, 2019 in Boston, Massachusetts.

_____

David A. Kluft
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
*Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 8, 2019, a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

<u>/s/ David A. Kluft</u>

B4948368.1

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

_____

KING-DEVICK TEST, INC.,

　　　　　　Plaintiff,


V.　　　　　　　　　　　　Civil No:1:17-cv-09307


NYU LANGONE HOSPITALS, NEW YORK

UNIVERSITY, STEVEN L. GALETTA, and

LAURA J. BALCER,

　　　　　　Defendant.

_____


VIDEOTAPED DEPOSITION

OF

DR. ALAN KING

October 19, 2018

1:47 p.m.

LOCATION: Radisson Hotel Bismarck

　　　　Empire Conference Room

　　　　605 East Broadway Avenue

　　　　Bismarck, North Dakota 58501


REPORTER: KAYLA A. RICHMOND

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

1   A. I guess, yes, I did look at documents with him.

2   Q. When did you look at documents with your

3 attorney?

4   A. Last night.

5   Q. And did any of those documents refresh your

6 recollection about any facts about this case or about --

7   A. Not really.

8   Q. Did you speak with anyone other than your

9 attorney about this case?

10   A. No.

11   Q. Have you spoken to Mr. Devick about this case?

12   A. Yes.

13   Q. When did you speak to him?

14   A. He called me a couple of weeks ago and told me

15 he was going to be here.

16   Q. Did you speak to him before you were subpoenaed

17 for a deposition about this case?

18   A. No.

19   Q. Did you speak with anyone else other than your

20 attorney and Mr. Devick?

21   A. No.

22   Q. When you spoke to Mr. Devick a few weeks ago,

1 what did you speak about?

2   A. He told me was going to be here today.

3   Q. And Was that all that you discussed in that

4 call?

5   A. Basically.

6   Q. Was there anything else that you discussed?

7   A. He told me that we -- I asked him what the case

8 was about and he told me we were getting screwed. That

9 was the end of the conversation.

10   Q. You didn't -- did he tell you anything about the

11 defendants in the case?

12   A. No.

13   Q. Did he tell you about what the claims were in

14 the case?

15   A. No.

16   Q. Dr. King, are you employed?

17   A. Yes.

18   Q. What company do you work for?

19   A. Visionary Eye Clinic in Dickinson, North Dakota.

20   Q. How long have you worked there?

21   A. Well, I owned the business for 42 years or 40

22 years. I sold it three years ago and I work for them

1 now.

2   Q. And what's your role in the company?

3   A. I'm an optometrist.

4   Q. And have you always been an optometrist in the

5 practice?

6   A. Yes.

7   Q. Have you worked for any other companies before

8 you worked for Visionary Eye Care?

9   A. I've always been a solo practitioner.

10   Q. Do you have a college degree?

11   A. Yes.

12   Q. What degree do you have?

13   A. I have a bachelor of science from the University

14 of North Dakota.

15   Q. And what year did you graduate from the

16 University of North Dakota?

17   A. 1972.

18   Q. Do you have any graduate degrees?

19   A. I have an OD Degree. I graduated from the

20 Illinois College of Optometry in 1976.

21   Q. What's an OD degree?

22   A. Doctor of optometry.

1   Q. And does that mean that you're an eye doctor?

2   A. Yes.

3   Q. And you said you graduated in 1976?

4   A. Yes.

5   Q. Were you in the same graduating class as Steve

6 Devick?

7   A. Yes.

8   Q. When did you first meet Mr. Devick?

9   A. 1972.

10   Q. How did you meet him?

11   A. In school. We were in the same class.

12   Q. What class were you in together?

13   A. Well, all your classes when you're in optometry

14 school -- everybody takes the same classes at the same

15 time. So we were in all of our classes together.

16   Q. Do you recall how many students were in your

17 class?

18   A. 150.

19   Q. Did you do any research while you were at

20 optometry school?

21   MR. KLUFT: Object to the form. You can

22 answer.

1    A. Yes.

2    Q. What type of research did you do?

3    A. Well, most of the research we did was when Steve

4  and I decided to develop the King-Devick Test.

5    Q. When did you start that research?

6    A. I don't recall.

7    Q. Was this research for a class?

8    A. It was for our senior research project.

9    Q. What's a senior research project?

10    A. Everybody who graduates from optometry school

11  has to do a doctoral thesis and it's called a senior

12  research project. And so Steven and I decided to

13  corroborate on this test.

14    Q. Is it -- is it something that you have to do

15  field research or is it writing a paper?

16    A. Both.

17    Q. And who decided to work with the other? Did you

18  decide to work with Mr. Devick or did he approach you to

19  work with him on this research?

20    MR. KLUFT: Object to the form.  You can

21  answer.

22    A. I have no idea. I don't really remember. It was

Page 14

1  42 years ago.

2    Q. Was there a professor that advises you for your

3  senior research project?

4    A. Yes.

5    Q. Who was that professor?

6    A. Dr. Darrell Slangy.

7    Q. And was he your professor for any other classes?

8    A. Yes.

9    Q. What classes?

10    A. No recollection.

11    Q. Did everyone in your class do a senior research

12  project in a pair?

13    A. No.

14    Q. Can you just tell me generally what your

15  research, the senior research paper was about?

16    A. Detecting reading disabilities by testing

17  saccadic functions of the eye.

18    Q. What is a saccadic function?

19    A. It's the eye movements that you use when you --

20  when you go from -- when you're reading a line of paper,

21  your eyes go in saccadic fixations, not continual

22  pursuits, but they go in saccadic, sporadic saccadic

Page 15

1  functions where your eyes jump from one spot to another.

2    Q. So how is that different from the continuous

3  pursuit?

4    A. Well, you don't use continuous pursuit in

5  reading you -- that's -- that's something that you like

6  following a baseball. But if you're reading, you're

7  using saccadic fixations.

8    Q. Where did you first learn about saccadic

9  fixations?

10    A. In class.

11    Q. And what did you learn in class?

12    A. There was a test called the Pierce Saccade Test

13  that we -- that was being taught at the school.

14    Q. What is a saccade?

15    A. I just told you. Saccade is going from one spot

16  to another.

17    Q. So is a saccades the same as a saccadic

18  fixation?

19    A. Yes.

20    Q. Before you started your research project, did

21  you research other eye movement exams?

22    A. Do not recall.

Page 16

1    Q. Did you review the literature in that area of

2  research?

3    A. Yes.

4    Q. Do you recall what -- what books or papers that

5  you reviewed?

6    A. I don't recall.

7    Q. You mentioned the Pierce Saccade Test, what is

8  the Pierce Saccade Test?

9    A. It was a -- a paper produced by a professor of

10  optometry and not sure where he was that he developed

11  the Pierce Saccade Test which he thought tested saccadic

12  functions.

13    Q. And why do you say he thought?

14    A. Because he was wrong.

15    Q. Why was he wrong?

16    A. He didn't -- how do I go about this explaining

17  it. His test was designed so you just go from one point

18  to another, it didn't really test the saccadic function.

19  It actually tested pursuits more than it did that. So it

20  didn't mimic the reading process.

21    Q. So to mimic the reading process, would you need

22  to be looking at more than two items on a line?

Page 17

Pages 14 to 17

1  A. Yes.
2  Q. Do you recall when you first learned about the
3  Pierce Saccade Test?
4  A. I don't remember.
5  Q. Do you recall if you learned about it in class?
6  MR. KLUFT: Objection. Asked and
7  answered. You can answer.
8  A. I believe it was in class, yes.
9  Q. Do you recall who the professor was?
10 A. No.
11 Q. Were there any similar saccadic tests that you
12 studied in class?
13 A. Not that I know of.
14 Q. Are you familiar with a test called the Vincett
15 Test?
16 A. No.
17 Q. Dr. King, I'm handing you what's marked as
18 exhibit two. And this has on the bottom right, a bates
19 number. This is just an identifier that shows, you know,
20 what number this document is. This is - this document
21 has bates number NYU00469222. So just take a look at
22 this document and obviously it's -- it's got multiple

1  pages, but I can tell you which -- which pages we're
2  going to be focusing on, but just take a look and let me
3  know if you've seen this before?
4  A. I do not recall seeing this before.
5  Q. So I'll represent that this is a photocopy of a
6  publicly available book by William K. Vincett. If you
7  can turn, please, to the page number at the bottom that
8  ends with four six, nine, two, three, seven?
9  A. Yeah.
10 Q. Take a look at the pages that are marked page 33
11 and 34 at the bottom. That's actually the page that you
12 were on.
13 A. Pardon me?
14 MR. KLUFT: And by 33 and 34, just for the
15 record, you don't mean the bates numbers, but the
16 records of the articles.
17 Q. Yeah, no. The number at the center in the
18 bottom, so the two pages that you have.
19 A. These two?
20 Q. Yes. Have you seen these before?
21 A. No.
22 Q. Okay. You can set that aside. Are you familiar

1  with a vision test called the Gilbert Test?
2  A. No.
3  Q. Are you familiar with an optometrist named
4  Luther Gilbert?
5  A. No.
6  Q. When you were working on your research, your
7  senior research project with Mr. Devick, were there any
8  other tests that involved reading numbers or letters
9  that you studied?
10 A. No.
11 Q. So after you studied the Pierce Saccade Test,
12 what did you do next for your research study?
13 MR. KLUFT: Object to the form. I think it
14 mischaracterizes testimony, but you can answer.
15 A. I'm not sure what you're asking.
16 Q. Sure. I'll rephrase the question. Well, describe
17 for me what the beginning steps were of your senior
18 research project with Mr. Devick?
19 A. When we looked at the Pierce Saccade Test, we
20 decided it didn't really test saccadic functions and it
21 didn't mimic the reading process and our whole -- our
22 whole basis of research was to try to be able to

1  identify reading difficulties in children, so we decided
2  to design something that would more accurately test
3  reading ability in children rather than what was on the
4  Pierce Saccade Test because it didn't predict any -- it
5  didn't mimic the reading process at all.
6  Q. And what's the -- what is the connection between
7  your reading ability and the saccadic function?
8  A. In order to be a good reader, if you're -- you
9  have to have accurate saccades, if you don't have
10 accurate saccades, a lot of times, just for an example,
11 when you're taking our test, you might overshoot a
12 number and then have to come back because you -- the
13 saccadic fixation wasn't accurate, so it takes somebody
14 with poor saccadic functions longer to read our pages
15 than someone who has accurate saccadic functions.
16 Q. So somebody who has inaccurate saccadic function
17 would take longer to read a page than somebody who did
18 have accurate saccadic function?
19 A. Yes.
20 Q. Dr. King, I'm gonna hand you what's marked as
21 exhibit three and this has the bates number KDT zero,
22 two, nine, eight, three, zero, four and the -- this is

1 the bates number that's on the bottom right. KDT means
2 that it was produced by your counsel and I'll just
3 represent to you that this was a document that your
4 counsel produced on your behalf. So, obviously, again,
5 this is a long document, but just please flip through it
6 and let me know if you know what it is?
7     A. This is our senior research project.
8     Q. Who wrote this paper?
9     A. Steve and I.
10    Q. And so we'll get back to the paper, but I'll
11 have you flip to a specific page in this document. If
12 you can find the page that has the bates number ending
13 with two, nine, eight, three, three, nine. This is
14 appendix two?
15    A. Yes.
16    Q. So looking at the next four pages which end in
17 four, zero through four, two, you can just take a look
18 and let me know what this is?
19    A. That's our actual test.
20    Q. And when you say actual test, what test are you
21 referring to?
22    A. King-Devick Saccade Test.

1     Q. Who developed the test?
2     A. We did. Steve and I.
3     Q. Were there parts of the test that you created
4 and then parts that Mr. Devick created?
5     A. My recollection I created this document.
6     Q. You created the appendix, these first four pages
7 of the text?
8     A. Yes.
9     Q. When did you create it?
10    A. I have no idea. When we started the project.
11 1975.
12    Q. Do you recall when in 1975 you started the
13 project?
14    A. No.
15    Q. When you say that you created the test, do you
16 mean that you created these particular pages or you
17 created these hard demonstration card test one, test two
18 and test three?
19    A. Yeah, I created this.
20    MR. KLUFT: I'm sorry, the witness was
21 pointing only at one page when he said that.
22    A. I created of all of the pages.

1     Q. Okay. How long did it take to create the
2 King-Devick test?
3     A. I couldn't tell you.
4     Q. When you were creating -- when you were
5 developing this test, were there prior drafts or
6 different versions of it?
7     A. Yes.
8     Q. Do you recall how many different versions there
9 were?
10    A. I do not recall.
11    Q. Do you recall any of the changes that you made
12 from the prior versions to this version that we're
13 looking at?
14    A. I do not.
15    Q. Do you recall whether there was always a
16 demonstration card as the first?
17    A. There was always a demonstration card.
18    Q. Do you recall whether there were -- there was
19 always a test card one?
20    A. There was always a test card one.
21    Q. And do you recall if the test card one always
22 had straight lines going across it?

1     A. Yes.
2     Q. Do you recall whether there was always a test
3 card two?
4     A. There was.
5     Q. Do you recall whether there were no lines
6 between the numbers on test card two?
7     MR. KLUFT: Object to the form. You can
8 answer.
9     A. There were never lines.
10    Q. And do you recall if there -- was there always
11 was a test card three in the King-Devick Test?
12    A. Yes, there was.
13    Q. And then test card three, did the numbers --
14 were the numbers always closer together vertically than
15 they were on the prior cards?
16    MR. KLUFT: Object to the form. Lacks
17 Foundation. You can answer if you know.
18    A. Yes.
19    Q. So just going back to the demonstration card on
20 the page -- that ends in three, four, zero. On this
21 demonstration card was there always lines that went
22 across and then diagonally with arrows?

1    A. Yes.

2    Q. And whose idea was it to include those lines?

3    A. I believe it was mine.

4    Q. When you were developing this test, did you have

5    input from anyone else?

6    A. No.

7    Q. Did you ever discuss with Mr. Devick how you

8    would set up the King-Devick Test?

9    A. Yes.

10    Q. What did you discuss?

11    A. I don't know how to answer that question.

12    Q. Did you discuss how many numbers to use on each

13    card?

14    A. I'm sure we did. I don't recall.

15    Q. Did you discuss whether to use the lines between

16    numbers on the demonstration card?

17    A. Again, I'm sure we did. I don't recall any of

18    the conversations.

19    Q. Do the lines on this demonstration card have

20    some purpose for this card?

21    MR. KLUFT: Object to the form. Could you

22    -- I want to make sure we have the right bates number.

1    That's all.

2    Q. Sure I'm on the demonstration card bates number

3    ending in eight, three, four, zero.

4    A. Would you repeat your question?

5    Q. Sure. Is there a purpose for the lines that are

6    between the numbers on the demonstration card?

7    A. Yes.

8    Q. What is that purpose?

9    A. Purpose is to show a person taking the test so

10    you give them an idea of exactly what's going to happen

11    on the next three cards, so they follow the line and

12    move down to the next line and follow that line, move

13    down to the next line so that they understand that's

14    exactly what's going to happen.

15    Q. When you say follow the line, do you mean

16    reading across the line?

17    A. Yes.

18    Q. So looking at test card one, which is on bates

19    number eight, three, four, one, do the lines on this

20    test one page have a function?

21    A. Yes.

22    Q. What is that function?

1    A. I have to think how to answer this correctly for

2    you. Similar to the demonstration card, it just aids the

3    participant to follow the line straight across. It makes

4    it easier for them to start with because as you see, the

5    test gets harder as you go on.

6    Q. Why do you say the test gets harder as you go

7    on?

8    A. Because we lose the lines. It's easy to follow

9    lines. So the next page there's no lines. It's harder to

10    do.

11    Q. And so when you say the next page, you're

12    talking about test card two on bates number three, four

13    two?

14    A. Yes.

15    Q. What's the purpose of the King-Devick Test?

16    A. I guess you're going to have to give me -- I

17    don't quite understand what you want me to tell you.

18    Q. Sure. I can clarify my question. What was --

19    what was -- what did you intend to be the purpose of the

20    King-Devick Test when you developed it for your senior

21    research paper?

22    A. We wanted to be able to find it that -- we hoped

1    to develop a test that we could identify poor readers in

2    a very simple way so that we could help those students

3    that had poor saccadic functions. Obviously poor readers

4    aren't always because of poor saccadic functions, but if

5    they have poor saccadic functions, they are not going to

6    be a good reader. So what our purpose was to test

7    children that showed poor saccadic ability so that we

8    could train them to become better readers.

9    Q. How could you tell that someone who took the

10    King-Devick Test had poor saccadic abilities?

11    A. Don't understand the question.

12    Q. What would be the difference between someone who

13    did well on the King-Devick Test versus somebody who

14    showed that they had poor saccadic abilities?

15    Q. Most of the time, people who passed the test and

16    within the standards that we set up afterwards had

17    accurate saccadic functions and could finish the test in

18    a lot better time than people who had poor saccadic

19    function.

20    Q. How do you grade the King-Devick Test?

21    A. Pardon me?

22    Q. How do you grade the King-Devick Test for a

| | |
|---|---|
| 1 subject who's taking it? | 1 the way they're spaced? |
| 2     A. Well, you'd have to really go to Dr. Devick on | 2     A. I did. |
| 3 that because that was his specialty in that he set up a | 3     Q. And why did you space in this way? |
| 4 -- after we -- after we examined a great number of | 4     A. Again, I'm not really sure what you're asking |
| 5 students, Dr. Devick put the numbers together and came | 5 me. I spaced them randomly so that I could test the |
| 6 up with a standard per age with a standard deviation and | 6 saccadic function rather than having equal spacing. |
| 7 when we tested them, we did a double blind study saying | 7 Unequal spacing tests saccadic function. |
| 8 that if we went back and predicted which students were | 8     Q. So if the numbers were equally spaced on each |
| 9 poor readers based on how they did on our test and we | 9 row, that would not be able to test saccadic function? |
| 10 were 95 percent accurate. | 10     A. Not accurately. |
| 11     Q. So I'll go back to the research and the testing | 11     Q. Why do you say that? |
| 12 that you just mentioned, but just to clarify for my last | 12     A. Because then you use a habituation and that's a |
| 13 question, when you're -- when you administer the | 13 lot easier to develop a habit of going from one space to |
| 14 King-Devick Test, do you keep a score sheet as the | 14 another where if they had unequal spaces, you can't |
| 15 person who's administering the test? | 15 develop a habit. You have to actually make the actual |
| 16     A. Yes. | 16 saccadic movement to read the test properly. |
| 17     Q. What does that score sheet look like? | 17     Q. So if you had evenly spaced the numbers and use |
| 18     A. Should be in here. | 18 that for -- to test saccadic function, it would not be |
| 19     MR. KLUFT: Well, she's not asking you to | 19 an accurate -- |
| 20 look at the document. So if you remember. | 20     A. It would not be accurate. |
| 21     A. Yes, there was this -- we had all the numbers | 21     Q. Who decided to use the specific numbers on each |
| 22 there and we circled the numbers they missed or lines | 22 row in the King-Devick Test? |
| Page 30 | Page 32 |

| | |
|---|---|
| 1 they missed. | 1     A. That was me. |
| 2     Q. So when you say you circled the number, those | 2     Q. Is there a particular reason why you chose these |
| 3 are the numbers reading across on each card? | 3 numbers? |
| 4     A. Right. | 4     A. Random. |
| 5     Q. And so what -- when someone misses a number or | 5     Q. Could you have used consecutive numbers on each |
| 6 they read the wrong number -- | 6 row? One, two, three? |
| 7     A. We circled it. So then we'd find out how many | 7     A. No. |
| 8 errors they did per card and how long it took them to | 8     Q. Why not? |
| 9 read the card. | 9     A. Because that wouldn't test anything. That would |
| 10     Q. So you would time how long it takes someone to | 10 just be rote memorization. |
| 11 read each card separately? | 11     Q. So I'm turning to a different page on exhibit |
| 12     MR. KLUFT: Objection. You can answer. | 12 three. If you can turn to the page ending in two, nine, |
| 13     A. Yes. And then time them and how many errors they | 13 eight, three, one, six? |
| 14 made. | 14     A. Okay. |
| 15     Q. Who decided how many numbers to put on each row | 15     Q. I'm sorry I misread the page number. If you can |
| 16 in the King-Devick Test? | 16 please turn to the page ending in two, nine, eight, |
| 17     A. I believe I did. | 17 three, three, zero. Take a look at that page and let me |
| 18     Q. Why are there -- so I'm looking at test card one | 18 know if you recognize this. |
| 19 on bates number ending with eight, three, four, one. Why | 19     A. I do recognize this. |
| 20 are there five numbers on each row going across? | 20     Q. What is it? Does the Pierce Saccade Test on this |
| 21     A. I do not recall. | 21 page have similar arrows to the demonstration card of |
| 22     Q. Do you recall who decided to space the numbers | 22 the King-Devick Test? |
| Page 31 | Page 33 |

A. Similar.

Q. How is it similar?

A. They have the arrows and lines.

Q. And what are the arrows and lines for?

A. Again, to show whoever is taking the test how to follow.

Q. And then flipping to the next page, ending in bates number eight, three, three, one, what are the lines on this page for?

MR. KLUFT: Objection. Lack of foundation, you can answer.

A. The same way just to follow -- to go from one number to the next.

Q. Then flipping to the next page ending with eight, three, three, two. Are there any lines on this page?

A. No.

Q. Do you know why not?

A. No.

Q. On this page would the reader read the numbers from left to right?

MR. KLUFT: Objection. You can answer.

A. Yes.

Q. Flipping to the next page ending in two, nine, eight, three, three, three. Would the reader read the numbers from left to right on this page as well?

A. Yes.

Q. Is the King-Devick Test a modification of the Pierce Saccade Test?

A. No.

Q. Why do you say that?

A. Because the Pierce Saccade Test did not test saccades.

MR. KLUFT: I'm sorry, I'm just gonna object to the form of the question as vague, but you already answered.

Q. Does the King-Devick Test follow the same basic format as the Pierce Saccade Test?

MR. KLUFT: Object to the form. You can answer.

A. Basic format, possibly.

Q. How does it follow the same basic format?

A. Well, we have a demonstration card and we have three tests to test the candidate.

Q. What else is similar?

A. The lines and then no lines.

Q. When you say the lines, do you mean the lines on the demonstration card?

A. Yes.

Q. And on the test one card?

A. Yes.

Q. And when you say no lines, do you mean on test two and test three cards?

A. Yes.

Q. Is there anything else that's similar between the two tests?

A. No.

Q. What's different between the King-Devick Test and the Pierce Saccade Test?

MR. KLUFT: Objection. You can answer.

A. Because of the fact that we used more numbers, more randomly spaced numbers, it actually tested saccadic function. Whereas this did not because it just, it was just smooth pursuits and habituation. There were a lot of things wrong with this that didn't test saccadic function.

Q. Did you refer to the Pierce Saccade Test when you were developing the King-Devick Test?

MR. KLUFT: Objection. Vague.

A. I think they gave it to us. I don't remember.

Q. Did you study the Pierce Saccade Test in your classes before you began developing the King-Devick Test?

A. Yes.

Q. So flipping back to the page demonstration card with the bates number ending in eight, three, three, zero?

A. Yes.

Q. Do you see on the bottom left of the page where it says Pierce Saccade Test Copyright 1972?

A. I see that.

Q. And you see at the bottom right of that page where it says Cook Inc, PO Box four, nine eight in Indiana, four seven, four, zero, one?

A. Yes.

Q. Do you see -- do you see similar references to the Pierce Saccade Test copyright and the Cook Inc address on the next three page ending in eight, three,

three, one, eight, three, three, two, and eight, three,
three, three?

A. Yes.

Q. Did you ever discuss with anyone whether you
would need to get permission to use the Pierce Saccade
Test in your research?

A. No.

Q. Why not?

A. I have no idea. Because it wasn't the same test.

Q. Did you ever try to contact Cook Inc. At this
address on the Pierce Saccade Test?

A. Nope.

Q. Did Mr. Devick try to contact Cook Inc., at that
address?

A. I have no idea.

Q. Did you ever consider getting a license to use
the Pierce Saccade Test in your paper?

MR. KLUFT: Objection. Lack of foundation.

A. Don't recall.

Q. How did you get this copy of the Pierce Saccade
Test?

A. I don't remember. I don't remember.

Page 38

Q. Did you have this copy of -- or a copy of the
Pierce Saccade Test when you were developing the
King-Devick Test?

A. Yes.

Q. Did you refer to that copy of the Pierce Saccade
Test while you were developing the King-Devick Test?

MR. KLUFT: Objection. Asked and answered.
You can answer.

A. Not really. We developed our own.

Q. You had mentioned earlier that there were
different drafts or versions of the King-Devick Test
while you were working on the senior research. Is that
right?

A. Yes.

Q. Were there any drafts that had fewer than five
numbers on a row?

A. I do not remember.

Q. Do you know who created the Pierce Saccade Test?

A. Dr. Jack Pierce.

Q. Who's Dr. Jack Pierce?

A. He's a professor of optometry that taught at
some of the schools. I'm not even sure where he was.

Page 39

Q. Did you know Dr. Pierce personally?

A. No.

Q. Did you ever meet Dr. Pierce?

A. Yes.

Q. When did you meet him?

A. I met him right after I graduated, I believe.
One time.

Q. Where did you meet him?

A. At a meeting in Minneapolis.

Q. Do you recall what meeting that was?

A. North Central Conference.

Q. What's the North Central Conference?

A. It was just a conference -- a regional
conference with several states education.

Q. And how did you meet him at that conference?

A. Just by chance meeting.

Q. What did -- what did the two of discuss?

A. Nothing. He asked me if I was the King from the
King-Devick. I said yes.

Q. Did you talk about the King-Devick Test with Mr.
Pierce?

A. The only thing he said to me was, I wish I had

Page 40

thought of that. And that was the end of the
conversation.

Q. Did you respond when he said he wished he had
thought of that?

A. No.

Q. Did you know Mr. Pierce before you developed the
King-Devick Test?

A. No.

Q. Do you know Mr. Pierce came to know about the
King-Devick Test?

A. I do not.

Q. Did you ask him?

A. No.

Q. So if you can please turn to page in the same
exhibit ending in bates number two, nine, eight, three
zero, six? So the very beginning?

A. Yes.

Q. See in the second full paragraph where it says
with this in mind, we designed a test which was a
modification of the Pierce and Vincett test, which we
administered to 137 school aged children in the Chicago
area. Do you see where it says that?

Page 41

1    Q. Did you test any other tests other than the
2 King-Devick Test?
3    A. I believe we also tested them with the Pierce
4 Saccade Test.
5    Q. Did you do that on the same day or, you know,
6 around the same time you tested them with the
7 King-Devick Test?
8    A. Around the same time.
9    Q. Why did you do that?
10    A. We wanted to compare to see if we were more
11 accurate at predicting poor readers than the Pierce
12 Saccade Test was.
13    Q. Was it more accurate?
14    A. Definitely.
15    Q. Why do you say definitely?
16    A. Because I -- as I told you earlier, we did a
17 double blind study and we went back and predicted who
18 were poor readers using both tests and the Pierce
19 Saccade Test didn't come close to being as accurate as
20 we were.
21    Q. How did you know that one of the students was a
22 poor reader? Was it something that was self-reported?

1    A. I don't -- no, it was reported by the school
2 when we went back and like I said, it was a double blind
3 study. So we went back and we said this child is a poor
4 reader and then they -- the school told us whether or
5 not we were correct.
6    Q. What does it mean when a study is a double blind
7 study?
8    A. Well, we don't know the outcome or we don't know
9 anything about the subjects until we come up with our
10 diagnosis and then we'd go back to see if we were
11 correct. We have no prior knowledge whether they're a
12 poor reader or not.
13    Q. Is it customary to test two tests together for a
14 research project like this?
15       MR. KLUFT: Objection. You can answer.
16    A. I would imagine.
17    Q. Why do you say that?
18    A. Well, you want to test the accuracy of the two
19 tests.
20    Q. When you say you want to look at the accuracy of
21 the two tests, do you mean that you would compare the
22 results from the two tests?

1    A. Yes.
2    Q. How were the cards shown to the children at the
3 school, the King-Devick test cards?
4    A. What do you mean?
5    Q. Did you show them one by one or did you show
6 them the demonstration card first you mentioned? Did you
7 have them do the demonstration card first and then grade
8 that and then move onto the next card?
9       MR. KLUFT: Objection. Asked and answered.
10 You can answer if you understand the question.
11    A. I think what you're asking is we always showed
12 them the demonstration card first and then card -- then
13 the next three cards in order with everybody.
14    Q. And when you're showing them the cards, are you
15 holding up the card or is it placed on the table?
16    A. They're holding it.
17    Q. The children -- the child is holding the card?
18    A. Mm-hmm.
19    Q. What size were the cards that were shown to the
20 children?
21    A. Same size as what's in here.
22    Q. So is the King-Devick Test that was shown in

1 that senior paper we looked at, are those the cards that
2 you actually showed the children in that school?
3    A. Yes.
4    Q. And you had mentioned that there were several
5 people that were helping you test this and that you may
6 have made copies to have them help you; is that right?
7    A. Correct.
8    Q. Do you recall roughly how many copies you had to
9 make?
10    A. I don't.
11    Q. Do you recall whether you gave these -- these
12 other students the copies or if you asked for them back?
13    A. No, we took them back.
14    Q. When did you take the back?
15    A. Right after we did the test -- after we finished
16 this -- the testing on the students, Steve and I
17 collected the tests and kept them for ourselves.
18    Q. How did you -- so when you tested the students
19 with the Pierce Saccade Test was that also on paper?
20    A. Yes.
21    Q. And was that using the version of the Pierce
22 Saccade Test we saw on your senior paper?

1    A. Yes.

2    Q. Did you also make copies of the Pierce Saccade

3 Test to have these other students help you test at the

4 school?

5    A. Yes.

6    Q. Did you ask for those copies back after they

7 were finished testing?

8    A. Yes.

9    Q. Did you provide the other students that helped

10 you with the testing with instructions?

11    A. Yes.

12    Q. Were they written instructions or oral

13 instructions?

14    A. Both.

15    Q. Do you still have the written instructions?

16    A. No.

17    Q. Do you recall who wrote the instructions?

18    A. No.

19    Q. Would it have been either you or Mr. Devick?

20    A. It would've been one of us, yes.

21    Q. Did you make any changes to the King-Devick Test

22 while you were testing the students at the school?

1    A. No.

2    Q. Did you make any changes to the instructions

3 while you were testing the students at the school?

4    A. No.

5    Q. Did you make any changes to the King-Devick Test

6 after you had finished the testing of the students at

7 the school?

8    A. No.

9    Q. So we've been going for about an hour. Would you

10 like to take a break?

11    A. I could use a restroom break.

12    Q. Okay.

13    VIDEOGRAPHER: We are now going off the

14 record at 2:44 p.m.

15    (Recess taken.)

16    VIDEOGRAPHER: We are going back on the

17 record at 2:54 p.m.

18    Q. Dr. King, who was involved in the writing

19 process for that senior paper?

20    A. Steve Devick and me.

21    Q. Was there anybody else that helped edit the

22 paper?

1    A. No.

2    Q. Did you have a faculty advisor that helped with

3 the paper?

4    A. We had a faculty advisor. He did not help with

5 the paper.

6    Q. Who is the faculty advisor?

7    A. Dr. Darrell Slangy.

8    Q. What was his role as the faculty advisor?

9    A. That's a good question. I'm not real sure.

10    Q. Did he review the paper before you submitted it?

11    A. No.

12    Q. Did you show him the King-Devick Test before you

13 wrote the paper?

14    A. I believe we did, not sure. I don't remember.

15    Q. If you did show him the King-Devick Test, do you

16 have an idea of why you would have shown it to him?

17    MR. KLUFT: Objection. You can answer if

18 you know.

19    A. I'm not sure. I don't remember if we needed the

20 permission to do the research project. I just don't

21 remember. It's too long ago.

22    Q. Generally, when you do research as a student at

1 the Illinois College of Optometry, do you know whether

2 you would need to get permission to do research?

3    MR. KLUFT: Objection. Vague and lacks

4 foundation. You can answer if you understand.

5    A. No idea.

6    Q. Did you write multiple drafts of the senior

7 paper before this final version that was exhibit three?

8    A. Don't believe so.

9    Q. So exhibit three is the only draft that you

10 worked on?

11    A. Yes.

12    Q. Did you and Mr. Devick edit the draft before you

13 printed it?

14    A. No recollection.

15    Q. When -- when did you submit the final paper?

16    A. March of 1976.

17    Q. Who did you submit the paper to?

18    A. Dr. Darrell Slangy.

19    Q. Did you submit to him the original copy?

20    A. Yes.

21    Q. And is that the original copy that you produced

22 to your counsel?

A. Yes. This one.

Q. When you say this one, do you mean it was the same as exhibit three or was it the actual physical copy that you provided to your counsel?

A. I provided him the exact physical copy.

Q. And that was the same copy that you gave to your faculty advisor?

A. Yes.

Q. Was that the only copy you had to submit?

MR. KLUFT: Objection. You can answer.

A. That was the only copy I had. I think Steve had one.

Q. Do you know whether Mr. Devick had to submit his copy as well?

A. We submitted one copy.

Q. Did you make any copies of the final senior paper?

A. I don't understand your question. They're right there.

Q. So before you submitted your one original copy of the senior paper, did you make any photocopies to keep for yourself?

MR. KLUFT: Objection.

A. No.

Q. Do you know whether Mr. Devick made any photocopies for himself?

A. No idea.

Q. When did your faculty advisor give you that original copy back?

A. I don't remember.

Q. Was it --

A. Before I graduated.

Q. So that was before 1976.

MR. KLUFT: Objection.

A. Before? I don't remember when he gave it back to us.

MR. KLUFT: I think the witness testified that he handed it in in 1976. So it couldn't possibly be before 1976.

Q. Right. But -- so when did you graduate from the Illinois College of Optometry?

A. June of 1976 -- or May of 1976, I believe.

Q. So your faculty advisor gave you back that original senior paper between March and May of 1976?

A. Yes.

Q. What grade did you receive for the senior paper?

A. A B.

Q. Why do you think that is?

MR. KLUFT: Objection.

A. You don't even want to get me started on that one. I do not know why he gave us a B.

Q. Did you ask your advisor why he gave you that grade?

A. I did.

Q. And what did he say?

A. I don't remember. We didn't have a very pleasant conversation.

Q. Why do you say it wasn't very pleasant?

A. Because we deserved an A.

Q. Did you tell him that you deserved an A?

A. Yes.

Q. What was his response to that?

A. I don't remember.

Q. Did he give you your grade in person?

A. I don't remember.

Q. Did he give you any critiques on the senior

paper?

A. No.

Q. Do you know whether your faculty advisor made any copies of the senior paper?

A. I don't know.

Q. When you submitted the senior paper, did you expect him to show it to anyone else?

MR. KLUFT Objection. You can answer.

A. No.

Q. Did you expect him to show it to any other students at the school?

A. No.

Q. Do you know whether he did show the senior paper to any other students?

A. I have no idea.

Q. Do you know whether he showed any copies of the King-Devick Test to anyone else at the school?

A. I have no idea.

Q. Do you recall whether any of the faculty at the Illinois College of Optometry taught their students about the King-Devick Test around the time you graduated?

1    A. I have no idea.
2    Q. When you submitted your senior paper, did you
3  expect that your senior advisor would give it back to
4  you?
5    A. Yes.
6    Q. And he did give it back to you?
7    A. Yes.
8    Q. Did you expect that the college's library would
9  receive a copy?
10   A. No.
11   Q. Do you know whether the library did receive a
12  copy?
13   A. I believe they did. I'm not sure.
14   Q. Do you know who provided that copy to the
15  library?
16   MR. KLUFT: Objection.
17   A. No. I don't.
18   Q. Do you know whether the library made any copies
19  of the senior paper that it had?
20   A. I do not know.
21   Q. Do you know who had access to the copies to the
22  senior paper at the Illinois College of Optometry

Page 58

1  paper, did you look at any other -- any prior senior
2  papers from other students?
3    A. No.
4    Q. After you submitted your senior paper, did you
5  have to present your research in class?
6    A. I don't recall.
7    Q. Do you recall whether there was any other work
8  product other than the paper itself that came out of
9  your research?
10   A. I don't understand your question.
11   Q. Were there any other physical materials, any
12  other presentations that you created based on your
13  senior research?
14   A. No.
15   Q. Did you give any presentations about the
16  King-Devick test to anyone, whether they were at the
17  college or not?
18   MR. KLUFT: Objection. Vague as to time
19  period.
20   A. Exactly. I don't know when.
21   Q. Did you give any presentations about the
22  King-Devick Test to anyone in the 1970s?

Page 60

1  library?
2    MR. KLUFT: Objection. There's almost no
3  foundation for any of these questions. So my continuing
4  objection, but you can answer if you know.
5    A. No.
6    Q. Do you know how other researchers who were
7  interested in vision tests would be able to get a copy
8  of the senior paper?
9    MR. KLUFT: Objection.
10   A. I do not know how.
11   Q. Do you know whether any researchers learned
12  about the King-Devick Test in the 1970s?
13   MR. KLUFT: Objection. Vague. You can
14  answer.
15   A. Nope.
16   Q. Are you aware of any research articles published
17  in the 1970s that referenced the King-Devick Test?
18   A. I do not.
19   Q. Do you know whether the Illinois College of
20  Optometry's library kept copies of senior papers?
21   A. I don't know for sure.
22   Q. When you were doing research for this senior

Page 59

1    A. No. Not that I remember.
2    Q. When did you start your optometry practice?
3    A. 1976.
4    Q. Did you use the test as part of your optometry
5  practice?
6    A. Yes.
7    Q. Do you recall when you started using the
8  King-Devick Test?
9    A. Right away.
10   Q. Do you recall around what month that would have
11  been?
12   A. June.
13   Q. June of 1976? How did you use the King-Devick
14  Test in your optometry practice?
15   A. I made copies of the cards and I used them to
16  test students who I thought might be poor readers --
17  patients that I thought might be poor readers.
18   Q. Do you recall how many copies you made of the
19  test when you first started your optometry practice?
20   MR. KLUFT: Objection. Vague as to time
21  period, but go ahead.
22   A. One.

Page 61

Pages 58 to 61

1     Q. When you tested your patients with the
2 King-Devick Test, did you test any other vision tests?
3     A. No.
4     Q. Did you give out any copies of the King-Devick
5 test to any of your patients?
6         MR. KLUFT: Objection. Vague as to time
7 period.
8     A. Not really.
9     Q. Why do you say not really?
10     A. I used a couple maybe over -- before Bernell, I
11 think I might've made a copy to give to a student, maybe
12 two or three times.
13     Q. Do you recall whether that was before 1980?
14     A. It would have definitely been before 1980.
15     Q. And who was the student that you made copies
16 for.
17     A. I have no idea.
18     Q. Was this a student at the Illinois College of
19 Optometry?
20     A. No. These were patients when I was in practice.
21     Q. So you -- you made a copy of the King-Devick
22 Test for a patient at your practice?

Page 62

1     A. Yes.
2     Q. Do you recall -- do you recall why?
3     A. I used that as remediation for a couple of my
4 patients.
5     Q. What do you mean by remediation?
6     A. I had them use the test over and over again and
7 I felt that by using the test over and over again, it
8 would improve their saccadic functions.
9     Q. Did it improve their function?
10     A. Yep.
11         MR. KLUFT: I'm sorry. I just -- I just
12 would impose an objection. I just want to caution that
13 we don't want to get too far into medical histories of
14 individual -- individual patients. And if we do, I want
15 to take a break and think about the question. So if
16 you're going to stop it there, that's fine. But if we're
17 going to get deep into somebody's medical history, I
18 want to think about it and maybe have a discussion off
19 the record.
20     Q. Sure. Did you give any copies of the King-Devick
21 Test to any parents of your patients?
22     A. No.

Page 63

1     Q. Before 1980, did you work with any other
2 optometrists in your optometry practice?
3     A. No.
4     Q. You were a solo practitioner?
5     A. Correct.
6     Q. Did you ever work with Mr. Devick in an
7 optometry practice?
8     A. No.
9     Q. Before 1980 was your optometry practice based in
10 Dickinson, North Dakota?
11     A. No, I was in Langdon, North Dakota.
12     Q. And where is Langdon, North Dakota?
13     A. Northeast corner of the state.
14     Q. When you gave that copy of the King-Devick Test
15 to one of your patients, did you ask for it back?
16     A. I believe I did.
17     Q. Do you recall whether this patient gave you the
18 test back?
19     A. I believe they did.
20     Q. Do you recall around when you asked for the test
21 back?
22     A. No.

Page 64

1     Q. Do you know whether the patient made any copies
2 of the King-Devick Test?
3     A. No.
4     Q. You don't recall?
5     A. I don't know.
6     Q. Do you -- do you know whether he showed anyone
7 his copy or her copy of the King-Devick Test?
8     A. I have no idea.
9     Q. Are you aware of any colleges or universities
10 that taught the King-Devick Test prior to 1980?
11         MR. KLUFT: Objection. Vague. You can
12 answer.
13     A. I have no idea.
14     Q. Just going back to the patient who received a
15 copy of the King-Devick Test before 1980, do you recall
16 this person's name?
17         MR. KLUFT: Objection. You can answer. I'm
18 sorry. I withdraw the objection. I just -- instead, I
19 just want to caution, again, I don't want to get into
20 medical history. If we are going to get into it, I'd
21 like to maybe designate a portion of the transcript as
22 highly confidential and --

Page 65

1     MR. MCCALLION: That's fine. Don't think

2 we're really going to go much farther, but okay.

3     MR. KLUFT: I don't want to be an

4 obstructionist. I also just -- I don't want to create a

5 transcript with somebody's medical information on it

6 because that'll create all kinds of problems.

7     Q. Okay.

8     A. Well, this is over 40 years ago. I couldn't name

9 one patient I had in 1976.

10     Q. Okay. Do you know whether your faculty advisor,

11 Professor Slangy taught any other students about the

12 King-Devick Test?

13     A. I have no idea.

14     Q. Do you recall that when we spoke on the phone on

15 August 30th, you had mentioned that Professor Slangy had

16 started teaching the test to his students at the

17 Illinois College of Optometry after you submitted the

18 paper?

19     A. I'd heard that. I don't know that firsthand.

20     Q. Who did you hear that from?

21     A. I don't remember.

22     Q. Do you recall whether it was a fellow classmate?

1     A. I don't think so. I think it was a student that

2 was behind me, graduated after me.

3     Q. Do you recall when you spoke to this student who

4 graduated after you?

5     A. No.

6     Q. Do you recall whether it was more than three

7 years after you graduated?

8     A. I believe it was less.

9     Q. How did you find out that this student learned

10 about the King-Devick Test?

11     A. You know, I don't remember.

12     Q. Was this person a friend of yours from school?

13     A. Yes, I think.

14     Q. Do you recall whether this student had received

15 a copy of the King-Devick Test?

16     A. I don't believe so.

17     Q. Do you recall what class the test was taught in?

18     A. No.

19     Q. Do you recall whether the student knew about the

20 senior paper or just the King-Devick Test?

21     A. I'm not sure either. Again, I'm not sure.

22     Q. Did you discuss the King-Devick Test with the

1 student?

2     MR. KLUFT: Objection. Vague as to --

3     A. Yeah, what did I discuss. I don't know.

4     Q. Did you discuss the use of the test with the

5 student when you found out that or when you heard that

6 he or she had learned about the King-Devick Test in

7 class?

8     A. I don't think so.

9     Q. Do you recall anything else from your

10 conversation with this person?

11     A. I don't.

12     Q. Was there ever a time when you gave the Illinois

13 College of Optometry any restrictions on how they could

14 use this senior paper?

15     MR. KLUFT: Objection. Foundation. You can

16 answer.

17     A. Will you repeat the question, please?

18     Q. Sure Was there ever a time when you gave the

19 Illinois College of Optometry any restrictions on how

20 the college could use the senior paper?

21     A. Not directly, I didn't. When I heard that they

22 were using it, I called Steve and Steve talked to them.

1     Q. Around when was that?

2     A. Probably right after we graduated. Shortly after

3 we graduated.

4     Q. And when you say that you had heard the college

5 was using the paper, was that -- or the King-Devick

6 Test, was that from that same student we just discussed?

7     A. Yes.

8     Q. Do you know what Mr. Devick did after you told

9 him?

10     A. I really don't know. He said he took care of it.

11     Q. Other than to the one patient we have already

12 discussed. Did you give out any copies of the

13 King-Devick Test to any other researchers or

14 optometrists?

15     A. No.

16     Q. Have you heard of the King-Devick Test being

17 referred to as the NYSOA K-D Test?

18     A. Yes.

19     Q. Do you know what the NYSOA is?

20     A. No.

21     Q. What is the NYSOA K-D Test?

22     A. It's what we had when -- we were under contract

1 with Bernell. They named it that, and I'm not sure why.

2     Q. What is Bernell?

3     A. Bernell is a corporation that manufactured the

4 King-Devick Test and marketed it for us.

5     Q. Do you recall when Bernell started marketing and

6 manufacturing the King-Devick Test?

7     A. It was in the early eighties. I'm not exactly

8 positive when exactly it was.

9     Q. Dr. King, I'm handing you what's marked as

10 exhibit four, and this is a document that I'll represent

11 your counsel produced on your behalf, bearing bates

12 number KDT0298388. Take a look at the document and let me

13 know if you know what it is?

14     A. I do know what this is.

15     Q. What is it?

16     A. It's the King-Devick Test that Bernell

17 manufactured and marketed for us.

18     Q. Just looking through this document, is this the

19 same King-Devick Test as the King-Devick Test shown in

20 your senior paper?

21     A. Yes.

22     Q. And looking specifically at the page ending in

Page 70

1 bates number two, nine, eight, three, eight, nine where

2 it says instructions. You see that?

3     A. Yes.

4     Q. Who wrote these instructions?

5     A. I don't recall. Either Steve or me.

6     Q. Do you recall when these instructions would have

7 been written?

8     A. We wrote these instructions when we wrote the

9 test.

10     Q. So these instructions would have been written

11 around 1975 or 1976?

12     A. Yes.

13     Q. Do you recall whether these were the

14 instructions that you had provided to the other students

15 that helped you test the King-Devick Test in that

16 Chicago Public School?

17     A. I don't recall.

18     Q. Are these instructions part of your senior

19 paper?

20     MR. KLUFT: Objection. Vague. But you can

21 answer if you know.

22     A. I'm not sure if we have it in here or not. I

Page 71

1 haven't looked at this in 42 years.

2     Q. Flipping to the page ending in bates number two

3 nine, eight, three, nine, four. What is shown on this

4 page?

5     A. That's our score sheet.

6     Q. Do you recall who wrote this score sheet?

7     A. We did.

8     Q. And when you say we, you mean --

9     A. Steve and I.

10     Q. Do you recall when you wrote the score sheet?

11     A. It's part of our research project. The end

12 result of our research project.

13     Q. And so you would have created this around 1975

14 or 76?

15     A. Yes.

16     Q. Do you recall whether you used the score sheet

17 when you tested the students at the Chicago Public

18 School?

19     A. We did not. This is a result of what we tested

20 with the students.

21     Q. So you created this test after you completed the

22 testing of those students?

Page 72

1     MR. KLUFT: Object to the form. Vague. You

2 can answer.

3     A. This isn't a test. This is a score sheet and we

4 established norms and standard deviations as you can see

5 by the age. So if they take this test, we can find out

6 where they are as far as what age they are at and how

7 many seconds it takes to do the tests and how many

8 mistakes they made and it gives them a pass or fail on

9 this.

10     Q. When would you use this score sheet?

11     A. Every time you take the test.

12     Q. Did you use this score sheet when you used the

13 KD Test in your optometry practice in the 1970s?

14     A. I still do.

15     Q. You still use the King-Devick Test as part of

16 your optometry practice?

17     A. I do.

18     Q. Do you still use this score sheet that's shown

19 on two, nine, eight, three, nine, four?

20     A. I do.

21     Q. How do you use it?

22     A. I don't understand your question.

Page 73

Pages 70 to 73

**Page 74**

1    Q. Do you use it to diagnose poor reading?

2    A. Yes.

3    Q. When you gave your patient a copy of the

4  King-Devick Test sometime prior to 1980, did you also

5  give your patient a copy of the score sheet?

6    A. No.

7    Q. You can put this document aside. How did

8  Bernell come to market and manufacturer the King-Devick

9  Test?

10    A. You'd have to ask Dr. Devick because I wasn't

11  involved in that.

12    Q. Do you recall whether there was a contract?

13    A. Yes.

14    Q. Do you recall whether you signed that contract?

15    A. I did sign the contract.

16    Q. Do you recall what the terms where for that

17  contract?

18    A. What do you mean by what terms?

19    Q. Do you recall what Bernell had agreed to do for

20  the King-Devick Test?

21    A. Vaguely.

22    Q. What is your recollection?

**Page 75**

1    A. We were -- we got royalties for the number of

2  tests that they sold. We got the royalty. I believe

3  five dollars per unit, I believe.

4    Q. Do you recall how long the term was for that

5  Contract? How many years?

6    A. I don't remember how long we did it. I don't.

7    Q. Do you recall whether it was less than five

8  years or more?

9    MR. KLUFT: Object. Asked and answered.

10  You can answer.

11    A. I don't remember. It might've been -- I don't

12  really remember.

13    Q. So you mentioned that you received royalties for

14  sales of the King-Devick Test; is that right?

15    A. Sort of.

16    Q. Why do you say sort of?

17    A. Well, we didn't get much money.

18    Q. When you received the royalties, who did the

19  money come from?

20    A. From Bernell.

21    Q. Would you receive a check from Bernell?

22    A. Yes.

**Page 76**

1    Q. Do you recall when you first started getting

2  those checks from Bernell?

3    A. About a year after we signed the contract.

4    Q. And do you still receive royalties from Bernell?

5    A. No.

6    Q. Do you recall around when you stopped receiving

7  royalties from Bernell?

8    A. When we ended our relationship with them.

9    Q. Do you recall the approximate year?

10    A. I don't.

11    Q. Do you recall how the contract ended?

12    A. I do not.

13    Q. Were you involved still with the business when

14  the contract ended?

15    MR. KLUFT: Objection. Lack of foundation.

16  But you can answer.

17    A. No.

18    Q. Dr. King, handing you what's marked as exhibit

19  five. And this is a document bearing bates number KDT

20  three, zero, four, eight, one, eight. Please take a look

21  and let me know if you know what this is? And looking at

22  the page with the bates number ending three, zero, four,

**Page 77**

1  eight, two, zero. Is that your signature on the bottom

2  right?

3    A. Yes.

4    Q. Do you recall whether there were any amendments

5  to this contract?

6    A. I do not recall.

7    Q. Do you recall whether there was a renewal of

8  this contract?

9    A. I do not recall.

10    Q. You can set this document aside. I'm handing you

11  a document marked as exhibit six and this is a document

12  bearing bates numbers KDT zero, zero three, two, three,

13  three, five. Please take a look at the document and let

14  me know if you recognize it?

15    MR. KLUFT: Can I ask a question? There's

16  a front page that actually says exhibit six. Is that

17  part of the exhibit or is that sort of superfluous?

18    Q. That is part of the document as it was produced

19  by KDT.

20    MR. KLUFT: Okay.

21    Q. Just is a coincidence that it's also exhibit

22  six.

Pages 74 to 77

1   A. And what was your question?

2   Q. Do you recognize what this document is?

3   A. Nope.

4   Q. So I'll represent that this is a copy of an

5   article that was published in the Journal of the

6   American Optometric Association in July of 1983. If you

7   can please turn to page ending in bates number three,

8   two, three, four, zero. And just looking at the two

9   cards that are shown in figure one and figure two, what

10  are those figures showing just without looking at any

11  documents?

12  A. Well, it looks like it's the demonstration card

13  in the first card of our -- the King-Devick Test.

14  Q. And looking at the next page at the bates

15  number, ending three, two, three, four, one and looking

16  at figure three, do you recognize what that is?

17  A. It looks like our second sheet of our test.

18  Q. And then looking down at figure four?

19  A. Looks like the third one.

20  Q. And then looking down at figure five, do you

21  recognize what that is?

22  A. Well, it looks like it's part of our scoring

1   sheet with.

2   Q. And is this part of the scoring sheet that you

3   wrote when you were writing the senior paper?

4   MR. KLUFT: Objection. You can answer if

5   you know.

6   A. It looks like it. I can't tell you for sure.

7   Q. So if you turn to the page that's ending on --

8   so the same page three, two, three, four, one. You see

9   at the last full paragraph on the right-hand side of

10  the document, it says in 1979 the NYSOA conducted a

11  pre-pilot study on a school screening battery. Do you

12  see that sentence?

13  A. Yes.

14  Q. Do you recall a pre-pilot study that used the

15  King-Devick Test?

16  MR. KLUFT: Objection. You can answer if

17  you know.

18  A. I don't recall.

19  Q. And then turning to the page of this document

20  ending in bates number three, two, three, three, nine.

21  A. Yes.

22  Q. Do you see the three authors names underneath

1   NYSOA KD Test?

2   A. Yes.

3   Q. Do you recognize any of those names?

4   A. I do not.

5   Q. You don't know any of these three authors?

6   A. No.

7   Q. Do you know how the authors of this paper would

8   have received a copy of -- how they would have received

9   a copy of the KD test in 1979?

10  MR. KLUFT: Objection. Foundation. You can

11  answer if you know.

12  A. I do not know.

13  Q. Do you know how the authors of this paper may

14  have seen a copy of your senior paper in 1979?

15  MR. KLUFT: Objection. Foundation. You can

16  answer.

17  A. I don't.

18  Q. You can set the document aside. Are you aware

19  that there's a copyright registration for the

20  King-Devick Test?

21  A. Yes.

22  Q. And how do you know that?

1   A. Dr. Devick.

2   Q. Were you involved in applying for that copyright

3   registration?

4   A. Don't remember.

5   Q. Do you recall discussing the copyright

6   application with Mr. Devick?

7   A. Yes.

8   Q. Do you recall around when that was?

9   A. I do not.

10  Q. Do you recall whether that was after you

11  graduated from the Illinois College of Optometry?

12  A. I really don't recall any of it.

13  Q. Do you recall when Mr. Devick told you that

14  there was a registration for the King-Devick Test?

15  MR. KLUFT: Objection. Foundation. You can

16  answer.

17  A. Don't recall.

18  Q. Do you still own any rights to the King-Devick

19  Test today?

20  A. I'm a stockholder, yes.

21  Q. You're a stockholder of what company?

22  A. King-Devick Test -- I don't even know what

1   A. No.

2   Q. Do you see that there are numbers that goes

3 straight vertically on the far left side of digit card

4 three in exhibit eight?

5   A. Yes.

6   Q. Do you see in exhibit three that there are

7 numbers in a straight line vertically on the far left on

8 test card three?

9   A. Yes.

10   Q. Is that a similarity between the two test cards?

11     MR. KLUFT: Objection, argumentative. You

12 can answer.

13   A. I guess it would be.

14   Q. Now, looking at these two test cards, are there

15 any other similarities that you see?

16     MR. KLUFT: Objection. Asked and answered.

17   A. Again, no. The spacing is different. Everything

18 is different.

19   Q. Now, looking just at exhibit eight on the digit

20 card three, if you were to read the numbers from left to

21 right on this card, would that test saccadic function?

22     MR. KLUFT: Objection. You can answer.

Page 94

1   A. Again, i have not done any research on this

2 card. I have no idea.

3   Q. Without doing research, would you be able to

4 tell whether it tests saccades or not?

5   A. No.

6   Q. So turning back to the digit card one on the

7 page prior, you'd mentioned that you would think that

8 this digit card one would not be able to test saccadic

9 function. Is that right?

10     MR. KLUFT: Objection. Mischaracterizes

11 his testimony. You can answer.

12   A. Again, I haven't done any research on this. I

13 have no idea.

14   Q. Well, you had previously said definitely not?

15   A. Well, that's because of the equal spacing in the

16 first two lines. It doesn't test saccades.

17   Q. So you're not able to look at digit card three

18 on the next page and the spacing and see whether or not

19 it tests saccades?

20   A. No.

21   Q. You would need to do research on these cards to

22 be able to tell that?

Page 95

1     MR. KLUFT: Objection. Asked and answered.

2   A. I would.

3   Q. I think that's all I have.

4     MR. KLUFT: I have a couple questions and

5 it'll be a minute.

6   BY MR. KLUFT            CROSS EXAMINATION

7   Q. Dr. King, again, my name is Dave Kluft. I

8 represented you in this deposition. I also represent

9 King-Devick. I just had a couple of questions. The town

10 that you first moved to after graduating, what was the

11 name of it?

12   A. Langdon.

13   Q. And how do you spell that?

14   A. L-a-n-g-d-o-n?

15   Q. And you said that's in the northeast corner of

16 Montana -- North Dakota?

17   A. North Dakota.

18   Q. Abutting Canada?

19   A. It's 12 miles from Canada and 20 miles from

20 Minnesota.

21   Q. And what was the population approximately of

22 Langdon when you moved there?

Page 96

1   A. About 2,000.

2   Q. Did they have a copy shop?

3   A. I don't think so.

4   Q. That's all I have. We're done. Great.

5     VIDEOGRAPHER: This concludes the

6 deposition. We are going off the record at 4:05 p.m.

7   (This deposition concluded at 4:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 97

Pages 94 to 97

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

KING-DEVICK TEST, INC.,

                Plaintiff,

        v.

NYU LANGONE HOSPITALS,

NEW YORK UNIVERSITY,

STEVEN L. GALETTA and

LAURA J. BALCER,


                Defendants.


---------------------------------------x

Civil Action No. 17-CV-09307-JPO

---------------------------------------x

            *** CONFIDENTIAL ***

                      October 30, 2018

                      9:00 a.m.

        CONFIDENTIAL video deposition of

STEVEN D. DEVICK, VOLUME I, taken by Defendants,

pursuant to Notice, dated October, 30, 2018, at

the offices of Fish and Richardson P.C., 601

Lexington Avenue, 52nd Floor, New York, New

York, before Brandon Rainoff, a Federal

Certified Realtime Reporter and Notary Public of

the State of New York.

_____

           DIGITAL EVIDENCE GROUP

       1730 M Street, NW, Suite 812

        Washington, D.C. 20036

          (202) 232-0646

1          Now, again, with the Neurology®
2    publication, I know that with all the papers,
3    they -- as long as it's the abstract they're
4    quoting, you can use their abstract.  And
5    that's -- that's what we were told.
6        Q.   Okay.  You went to the Illinois
7    College of Optometry.
8         Is that right?
9        A.   Yes.
10       Q.   Did you graduate?
11       A.   Yes.
12       Q.   When?
13       A.   1976.
14       Q.   What degree did you get?
15       A.   An O.D.
16       Q.   Are you still involved in that
17   Illinois College of Optometry?
18       A.   No.
19       Q.   You are not on the board of directors?
20       A.   No.
21       Q.   When was the last time you were
22   involved with the Illinois College of Optometry?

Page 102

1        A.   I think it's been -- I'm going to
2    guess, 10 years ago I was on the board.
3        Q.   Okay.  Has your involvement since your
4    graduated with the Illinois College of Optometry
5    been anything other than board membership?
6        A.   I think I've spoken there a few times
7    at their request.
8        Q.   To their students?
9         Or professors?
10        Or what?
11       A.   Both.
12       Q.   Okay.
13        Anything else?
14       A.   I can't specifically -- I'm not -- I
15   guess I'm not thinking of anything other than I
16   know Len Messner, who is the director of eye
17   clinic, and I talk to him very often.
18       Q.   He's an investor in your company?
19       A.   Yes -- actually, his wife is.
20       Q.   He's not personally?
21       A.   No -- well, the shares were bought in
22   his wife's name.  So I don't know if that was

Page 103

1    part of his money or not.
2        Q.   How much of the company does his wife
3    own?
4        A.   A miniscule amount.
5        Q.   When did you first meet Alan King?
6        A.   1972.
7        Q.   At school?
8        A.   Yes.
9        Q.   How did that come about?
10        How did you meet him?
11       A.   He was in my class.
12       Q.   Were you guys roommates?
13       A.   No, I -- this wasn't a school that you
14   stayed at, you know.  He had an apartment.  I
15   had an apartment out in the suburbs.
16       Q.   So what was the first class had you
17   together?
18       A.   I have no idea.
19       Q.   Did you have all your classes
20   together?
21       A.   Yes.
22       Q.   Is it the situation where the entire

Page 104

1    class all took the same classes?
2        A.   Yes.
3        Q.   I see.
4         How many classes per semester?
5        A.   I don't know.
6        Q.   Because you don't remember?
7        A.   I don't remember.
8        Q.   Okay.  That's a fair answer.  You
9    understand I have to ask these questions.
10       A.   This was 1976.
11       Q.   And did you do any research with Mr.
12   King other than what's in your senior paper?
13       A.   Not that I recall.
14       Q.   Okay.  I'm going to show you the paper
15   in a minute, but just some -- was it for a
16   particular class?
17       A.   No.  It was for -- you had to do an
18   original research a paper to graduate, to get
19   your O.D. degree.
20       Q.   There is a professor on the front of
21   it -- Schlange?
22       A.   Yeah.

Page 105

Q. Is that how you say it?

A. Schlange -- that's what I say.

Q. Schlange?

And who was he?

A. He was just a teacher down there -- a professor down there.

Q. Did you have classes with him?

A. I'm sure we did.

Q. But he was also sort of a supervisor for the research?

A. He didn't play an active role very much, I don't think, but, yes. That's -- he was assigned to us.

Q. Do you recall any of the classes that you took with Professor Schlange?

A. No.

(Pause)

Q. Do you recall the name of any of the courses that you took while you were at the Illinois College of Optometry?

A. Specifically, the name, like, you know, geometrical optics?

Page 106

Or physiological optics?

Or --

Q. Right.

A. -- neurology?

Or -- I mean, is that what you are looking for?

Q. Right.

A. Well, there is three.

Q. Any others?

A. I'd be -- I'm sure that if I thought a lot -- I mean, probably ethology, ocular pathology -- you know, all kind of things like that -- whatever you think an optometrist would take, we took it.

Q. In what class did you first -- were you first exposed to the Pierce test?

A. I don't recall.

Q. Whose idea was it between you and Mr. King to do the research together?

A. It was our mutual idea.

Q. Do you recall how it came about, in terms of whose idea it was to do the test,

Page 107

versus the writing, and who would do things?

A. I don't recall how it was broken up. We were both involved.

Q. What is a saccade?

A. It's a micro eye movement, rapid eye movement.

Q. What is saccadic fixation?

A. I think it really probably refers to a saccade landing on a fixation. That would be -- then going on to the next one.

Q. Did you do research on any other eye movement test before you conducted your -- before doing your paper?

A. We didn't do research on any other eye movement test, no.

Q. But you refer, of course, to the Pierce and the Vincett tests in your paper?

A. Yes.

Q. So you didn't do research on those beforehand?

A. We thought we recognized some obvious flaws with the products, and that's how the

Page 108

King-Devick test came to be.

Q. Doctor Schlange -- you first met him at school, I presume?

A. Yes.

Q. You don't remember the first class you had with him?

A. I don't.

Q. Did you talk to him after you graduated?

A. I'm not sure that -- maybe I've said hello to him. I've never had any in-depth conversation with him about anything.

Q. What is the last time you spoke with him?

A. Could be 30 years.

Q. I may have asked you this: How did you first learn about the Pierce saccade test?

A. I'm sure in a class.

Q. Do you remember which one?

A. I don't.

Q. Do you remember if it was in a textbook?

Page 109

Pages 106 to 109

1   A.   I don't.
2   Q.   Or a professor?
3   A.   I don't.
4   Q.   Did you ever personally meet Dr.
5   Pierce?
6   A.   Yeah, I saw him speak and I thought he
7   was a good speaker.
8   Q.   When did you see him speak?
9   A.   Sometime in 1975 and at, I believe, a
10   conference in Minnesota -- central conference.
11   Q.   So I think Dr. King mentioned that at
12   his deposition as well.
13   You were there for that, right?
14   A.   I was there at least once with him,
15   and he talked about twice.
16   I can't remember if I was there the
17   second time.
18   Q.   I'm sorry.  That was a bad question.
19   You were at Dr. King's deposition,
20   correct?
21   A.   I was.
22   Q.   Do you remember him mentioning that he

1   met Dr. Pierce after graduation -- right after
2   graduation?
3   Do you remember that?
4   A.   I do.
5   Q.   Is that -- you think you were there
6   for that one?
7   A.   I was at the conference.  I wasn't
8   standing right next to him, no.
9   Q.   So this was a conference that was in,
10   I think, Minneapolis is that correct?
11   A.   That's what Al said.
12   I'd be guessing as well.
13   Q.   So tell me why you were at that
14   conference?
15   A.   Go to continuing education kind of
16   things.  And if it was drive-able from Chicago,
17   that would be a reason that we would go to one
18   of those, rather than fly somewhere.
19   Q.   Who "we" were you referring to in your
20   answer?
21   A.   Well, you know, in the case of Al King
22   for one.

1   I can't remember who else was in the
2   car or anything about it.
3   Q.   Were you presenting at this
4   conference?
5   A.   No, I was a student.
6   Q.   This is --
7   A.   Oh, the first time I met him -- I saw
8   him -- was a student.
9   Then afterwards, we weren't
10   presenting.  We were just there.  You have to
11   get continuing education.
12   Q.   I see.
13   So the first time you met Dr. Pierce
14   was as a student?
15   A.   Yeah, I saw him talk.  He wouldn't
16   remember me, but I see saw him talk.
17   Q.   Where was that?
18   A.   I think it was in the Minnesota.  I
19   think it was the same thing.
20   Q.   Because I had understood Dr. King to
21   be saying that was after graduation.
22   But you think it's before?

1   A.   There was before and after.
2   Q.   So you were at both?
3   Or just the before?
4   A.   I was at the second one, but I
5   didn't -- I wasn't everything the conversation
6   with Al had.
7   Q.   Okay.  Fine.
8   So let's just back up.  So I just want
9   to make sure I've got it.
10   So the first time you met Dr. Pierce
11   was before you graduated.
12   Is that right?
13   A.   I heard him speak.  It's not like we
14   sat down and had lunch.
15   Q.   I understand.
16   Did you have any interaction with him
17   at all at that first meeting?
18   Do you remember?
19   A.   I don't.
20   Q.   Where did you hear him speak?
21   A.   Like I said, I think it was the
22   conference in Minnesota.

Q.   As a student, you went?

A.   Yes.

Q.   Why were you going to that conference?

A.   Because they encouraged students to go to all those things, you know, basically just -- it was continuing education.

Q.   So you weren't presenting at that conference?

A.   No.

Q.   Were any students presenting?

A.   I don't know.

Q.   Then the second time you met Dr. Pierce was when?

A.   Like I said, I wasn't involved in the conversation that Al had with Pierce the second time he -- as he described in his deposition.

Q.   Okay.  That was also in Minnesota, right?

A.   I think so --

Q.   Okay.  But you --

A.   -- that's the one we commonly went to, because it was driving distance and it was a big

conference.

But I can't verify for sure that's where it was.

Q.   No, I understand.

So do you recall talking with Dr. King about his interaction with Dr. Pierce?

A.   I do.

Q.   What do you recall about that?

A.   He said that it was -- that Dr. Pierce was cordial, and said that -- something along the lines of:  He wished he had thought of that, because his was certainly a very different kind of product.

Q.   I mean that's sort of a neat statement to hear from Dr. Pierce at the time, right?

You are pretty young.

A.   Yeah -- I mean, I didn't -- yeah, that was -- I thought it was great.

Q.   How did Dr. Pierce know about the test?

Do you know?

A.   Well, because when we -- I sent it to

him, actually coincidental with turning it in.

We -- we made some improvements -- we thought vast improvements -- on a saccadic function test.  And he was kind of a guy that we wanted onboard with us.

But he got the package and I verified that he got the package -- this was in March of '76 -- but he never returned our call.

And then Al saw him after that.

Q.   Gotcha.

You sent the test to some other folks around that time as well, right?

A.   Yeah.  We -- actually, it was a product that people -- not a whole lot of people -- after we -- after we turned it in, would -- made it a product that people could buy that I manufactured myself and -- by making copies and laminating it.  And wasn't a lot of people, but some did.

Q.   Okay.  And I saw some reference to that in some of the documents, so I'll show you that in a little bit.

Tell me about -- did you form a company at the time?

Or you were just doing it as yourself?

A.   We did it as -- like, when we had money, we split up the expenses and split up the revenue.  But it was never more than a few hundred dollars -- $500, maybe, each -- until 1993.

And when we -- the major paper -- the American Optometry -- American Optometric Association Journal published it -- we provided.

(Pause)

Q.   You say "we."

That was you and Dr. King, I guess?

A.   Well, I was doing all of it, as he testified at his deposition.  I was close to Chicago.  He was out in North Dakota, deep in North Dakota.

MR. GOETZ:  Let me just mark the senior paper at this point.  Mark as Devick Exhibit 8 document bearing production numbers KDT000001 through 84.

Page 118

```
1        (Exhibit Devick 8, Document Bates
2   stamped KDT0000001 through 84, multipage
3   document entitled: The Proposed King-Devick
4   Saccade Test and its Relation to the Pierce
5   Saccade Test and Reading Levels, dated March,
6   1976, marked for identification)
7   BY MR. GOETZ:
8        Q.  Ask you what that is?
9        A.  This is the senior research project
10  that we turned in in March of 1976.
11       Q.  Okay.  And so this is the project --
12  this is the paper that you and Dr. King
13  submitted.
14       Is that right?
15       A.  Yes.
16       Q.  Who wrote the words of the actual
17  report?
18       A.  We were both involved in the aspects
19  of it.  I think he said that he was more
20  involved in the test.
21       I don't remember it that way.  I think
22  we were both equally involved in the whole
```

Page 120

```
1        A.  I don't know.  I was involved in it,
2   without a doubt.
3        Q.  So if I go through each section and
4   ask you who specifically wrote the words, are
5   you going to give me basically the same answer
6   each time?
7        A.  Yes.
8        Q.  And that answer is what?
9        A.  I'm not sure which one of us did.  We
10  were both equally involved in this -- you know,
11  this project.
12       Q.  It was either one of you, or the
13  other?
14       It was no one else?
15       A.  Right.
16       Q.  Okay.  Do you recall who did the
17  little graphs in the paper?
18       A.  We both did.
19       Q.  Same answer, basically?
20       A.  Same answer.
21       Q.  Okay.  Fine.
22       You agree that the words in this
```

Page 119

```
1   thing.
2        Q.  Fair enough.
3        Turn to Exhibit -- this is Exhibit
4   8 -- Exhibit 8, page 3 the abstract.
5        Did you write the abstract?
6        Or did he?
7        Do you remember?
8        A.  I don't.
9        Q.  But it was one of you, right?
10       A.  It was by both of us.
11       Q.  Okay.  Fair enough.
12       Who decided to name it King-Devick
13  test?
14       A.  Well, we flipped a coin.  There was Al
15  King and Steve Devick, so we flipped a coin.
16       Q.  King won?
17       A.  King won.
18       Q.  The coin flip would be to see who was
19  the first-named guy?
20       A.  Yes.
21       Q.  What about the table of contents?
22       Did you write the table of content?
```

Page 121

```
1   report are true and accurate when you submitted
2   it, right?
3        A.  I assumed that they were true and
4   accurate as we submitted it.  I don't remember
5   in any way falsifying anything.
6        Q.  There is nothing -- you haven't over
7   the years gone back and said, "Oh, gosh, I would
8   like to change something I said in this report,"
9   have you?
10       A.  Yeah -- I haven't seen this in a long
11  time.
12       Q.  When is the last time you saw this
13  document?
14       A.  I saw it at Al King's deposition.
15       Q.  When was the last time you saw it
16  before that?
17       A.  I have a dusty copy somewhere in my
18  office, and the library at the optometry school
19  sent me a copy.
20       They said -- I didn't know they had
21  four copies, but they sent me one and -- they
22  sent me several, actually.  But --
```

1    Q.   Okay. Fair enough.

2       You don't peruse it every once in a

3   while, just reminisce about it?

4    A.   I think that the one thing that the

5   point of this, as compared to Pierce, was that

6   we thought that Pierce -- you know, we wanted to

7   eliminate the habituation and the anticipation

8   of a saccade test; in other words, make it a

9   true eye movement test, rather than something

10   you get -- anticipate or habituate.

11       And his was not like that at all.

12    Q.   Fair enough.

13       Do you agree with Dr. King's testimony

14   about who contributed to what in terms of the

15   test itself?

16    A.   No.

17    Q.   Tell me why you disagree.

18    A.   Because we both worked on all of it.

19    Q.   So Dr. King seemed to be saying that

20   he thought of a lot of it.

21    A.   He did.

22    Q.   You agree with that -- that that was

Page 122

---

1       We wanted to have five numbers on a

2   line, unlike Pierce, who had two.

3       He also had -- there were such

4   separation in his test that it wasn't really a

5   reading-related saccade in our mind, because you

6   never move eight, 12 inches in a reading

7   saccade.

8       And we also said that we wanted to

9   have a test that we could do potentially in

10   around a minute and it had progressively harder

11   cards; key thing being that it was randomly

12   spaced but not too wide a space that wouldn't be

13   the act of reading.

14       And we liked starting and stopping at

15   the same point, more or less. He did that, but

16   he had no numbers on the line. So, again, it

17   was --

18    Q.   Who "he"?

19    A.   Dr. Pierce's test.

20    Q.   Okay. Fine.

21    A.   And so, you know, we -- we think

22   that -- we were excited to tell him how we'd

Page 124

---

1   the sense of his testimony?

2    A.   He testified to the point that he said

3   that he thought he put together the test numbers

4   in the sequence.

5       And I don't remember it that way, but

6   it's possible.

7       We talked about every aspect of this

8   all the time.

9    Q.   How do you remember it?

10    A.   I remember working together with him

11   on the whole thing.

12    Q.   So in your -- what's your testimony

13   about who thought about the spacing?

14       Whose idea was that?

15    A.   We both did.

16    Q.   What's your testimony about who

17   thought about the numbers to use?

18    A.   Well, I mean, again, we -- I can't

19   remember who picked out what number in what

20   order.

21       But we knew that we wanted to have

22   three things.

Page 123

---

1   fixed a lot of things about his initial

2   thoughts, we thought, with a test of saccades

3   because we didn't even think his test really

4   measured reading-related saccades.

5    Q.   If I asked, "What did you contribute

6   do the actual test itself?" what would you say?

7    A.   I would say what I have said the last

8   three or four questions -- that we equally

9   contributed.

10    Q.   What did Dr. King contribute to the

11   test itself?

12    A.   Again, as I said before, just

13   answered.

14    Q.   Okay. How long did it take you to

15   develop the King-Devick test itself?

16    A.   I don't recall.

17    Q.   Let me be clear.

18       So Appendix 2's is the test itself,

19   right?

20       (Pause)

21    Q.   Actually, I take that back.

22       Appendix 2 is the test itself, and

Page 125

1  matched by his age.
2     Q.  How long did it take you to develop
3  with Dr. King the King-Devick test itself?
4     A.  It took a while.  We -- you know,
5  it's -- I think that we did good work on it.
6  And it wasn't overnight.  And we did a sampling
7  of a -- you know, we did a good research project
8  and double-blind study.
9       And, you know, again, it became pretty
10  known very early.
11     Q.  I want to talk about that in a second.
12       But do you think it took, like, weeks
13  to put together?
14       Or months?
15     A.  I think it took months.
16     Q.  Months.  Okay.
17       Is it fair to say that the test itself
18  is an attempt to improve on the Pierce test?
19     A.  Well, it's nothing like the Pierce
20  test.  So --
21     Q.  But you think it's better though,
22  right?

1     A.  Well, if you mean -- well, I think
2  whether I think it's better than the Pierce test
3  is whether I thought it would improve.
4       I mean, there is nothing like -- he
5  doesn't have numbers outside of the edges of a
6  piece of typing paper.  I mean, you know,
7  he's -- there is no -- I would call what he
8  does -- did -- and, you know we wanted -- he, I
9  think, he agreed with us is his test wasn't for
10  reading-related saccades.
11     Q.  But your test was an attempt to
12  improve on what he had done.
13       Is that fair?
14     A.  Our test was to make a test for
15  reading-related saccades.
16       His were not reading-related saccades
17  because they were too far apart.
18       I mean, you don't read from here to
19  here.  That's all he tested -- here to here.
20       And he also had habituation and
21  anticipation, because you went to the same spot
22  every time you moved your eyes.

1     Q.  Did you make any changes when
2  developing the test itself?
3     A.  I'm not sure what that means.
4     Q.  Did you have an initial draft of the
5  test that had different spacing, for example, or
6  different numbers?
7     A.  I don't think that we did.
8       We toyed around with the idea of
9  having a circular motion of a test, which was a
10  smooth pursuit -- different kind of eye
11  movement.
12       But we ended up sticking with
13  saccades.
14     Q.  Other than that, do you recall making
15  any changes to the test itself during the
16  development?
17     A.  During the development?  I really
18  don't recall.  This was -- that would be 1975.
19     Q.  I understand.
20       Did you have any input from anyone
21  other than Dr. King when developing the test
22  itself?

1     A.  No.
2     Q.  Do you know approximately just looking
3  at the date of the document and your memory,
4  when did you arrive at the test in the form
5  shown in Appendix 2 -- approximately what date?
6     A.  It was the fall of 1975, because we
7  did the research at a school in the fall of
8  1975.
9     Q.  Do you agree it doesn't matter what
10  numbers you use for the King-Devick test?
11     A.  As long as there is single digits and
12  that we -- all our validation studies related to
13  this kind of spacing.
14     Q.  And they can't be consecutively
15  numbered.
16       Is that right?
17     A.  Absolutely not.
18     Q.  Tell me why you react in that way?
19     A.  Because here is my King-Devick test
20  consecutive number:  One, two, three, four,
21  five, six, seven, eight, nine, ten.
22       How did I do?

1     Q.   Why is that?
2          Why does that defeat the purpose of
3     the test?
4     A.   Because you don't even need to look at
5     the numbers.
6     Q.   Did the King-Devick test -- does the
7     King-Devick test have anything to do with ocular
8     motor efficiency?
9     A.   I think it does.
10    Q.   What is -- for the record here, so we
11    have it, what is ocular motor efficiency?
12    A.   I think it's a term related --
13    typically described as it relates to reading --
14    but it can be just in general -- where you are
15    efficient at going from one -- in the case of
16    this test -- one fixation target to the next as
17    fast and as accurately as you can without making
18    mistakes.
19    Q.   When did you first come across the
20    notion of ocular motor efficiency?
21    A.   I think that was the basis of this
22    test from the start, as it related to reading.

Page 134

1     better than the Pierce test; and really, in
2     reality, we were a lot better than the Pierce
3     test.
4          But we sent it to him.  And we wanted
5     to be -- honestly, I think -- I would have liked
6     to collaborate with him.  But he never got back
7     to us.
8          And we verified he got the product and
9     the paper.  But he never accounted to us on it
10    until Al saw him a year or later.
11    Q.   I want to talk more about that.
12         But I want to go to page 3 of Exhibit
13    8 here where you say, "We designed the test,
14    which was a modification of the Pierce and
15    Vincett tests" right in the middle there.
16         Do you see those words?
17    A.   Yeah -- it was probably a poor choice
18    of words.
19         But we looked at the Vincett test --
20    which was equally-spaced letters.
21         Now, in Al King's deposition, you saw
22    that he had equally-spaced numbers -- I never

Page 136

1     Q.   Okay.  And is that -- this notion of
2     ocular motor efficiency -- something you learned
3     in school, I take it?
4     A.   We learned the word "ocular motor" in
5     school.
6          I'm not sure where the efficiency part
7     came.
8          But -- and again, I'm not -- you know,
9     that's ocular motor efficiency is like -- this
10    is what it is.  "Ocular motor" is the movements
11    of your eyes.  "Efficiency" would mean that you
12    can land on a target that you were aiming for in
13    a fairly accurate way.
14    Q.   Do you agree your test was a modified
15    version of the Pierce test?
16    A.   I don't know that I do.  I mean, we --
17    our -- it really isn't.
18         I know it says that in the -- we were
19    hoping that Dr. Pierce would like this and
20    perhaps incorporate it into his products.
21         And he was -- we were kinder to him in
22    this paper, relative to saying we were a little

Page 135

1     saw that -- and as Pierce, you know had wide
2     non-reading-related saccades.
3          So perhaps we shouldn't have put
4     "modified" because it was a completely different
5     test in the way it tested your eye movements.
6          But, in fact, that's what it did say.
7     Q.   So we agree it says that your test was
8     a modification of the Pierce and Vincett test,
9     right?
10    A.   Well, it says that it says.
11    Q.   Right.
12         But you disagree with that now.
13         Is that fair?
14    A.   Well, it's really -- again, we were --
15    it's somewhat, I think, patronizing to Jeff
16    Pierce, because we wanted him to like our test.
17    And he was -- and maybe use him -- you know,
18    with us, or modify his to do it.
19         So the bottom line is is that that's
20    what it says.
21    Q.   Sitting here today, do you think that
22    the King-Devick test is a modification of the

Page 137

Pages 134 to 137

1   Pierce test?
2     A.  I guess that it's a -- it doesn't test
3   any of the same things that Pierce tests,
4   knowing what I know now.
5     The demonstration -- there is no
6   numbers in the -- I mean, I guess it's -- I'm
7   not sure that I would ever say that if I was
8   specifically saying, "We want to modify
9   something to perform the same function that the
10   prior thing -- prior test functioned."
11     It says that I said that back then.  I
12   don't necessarily agree with that now, but
13   that's what it says in my 1976 paper.
14   Q.  Fair enough.
15     So sounds like you don't agree with
16   that today?
17     Fair?
18     A.  Well, I don't -- yeah -- I wouldn't
19   say that it wasn't something that we factored
20   in, for sure.
21     It was -- it was -- when you look at
22   it from the demo card and the fact that the

1     MR. SULLIVAN:  Sorry.  I'm having
2   trouble following --
3     THE WITNESS:  It is right down here.
4     MR. GOETZ:  Page 13.
5     MR. SULLIVAN:  What's the Bates No.?
6     MR. GOETZ:  Thirteen.
7     MR. SULLIVAN:  Oh, that's the problem.
8   There are numbers on top that say 13.
9     MR. GOETZ:  KDT00000 --
10     MR. SULLIVAN:  I was looking at the
11   top numbers.  Go ahead.
12     MR. GOETZ:  No problem.
13     A.  So the part of the Pierce test that it
14   -- there was no part of it that -- the most
15   important part of our test is the fact that
16   there is randomly-spaced numbers between the
17   outside edges.
18     Pierce only had the outside edges.
19     We also made it such that there was
20   no -- we had the same amount of numbers on a
21   line -- five -- so there was -- we tried to make
22   the distances varying degrees of separate, but

1   arrows, it looks like -- so I don't know what
2   I'd say about it.
3     I always gave -- we always gave as
4   much credit as we could to Pierce.  And I
5   think -- I think he liked our stuff.
6     (Pause)
7   Q.  If you turn to page 13 of Exhibit 8,
8   it says -- I'm reading from the last --
9   second-to-last sentence in the second full
10   paragraph.
11     It says:  Our test follows the same
12   basic format as the Pierce saccade test.
13     Do you see those words?
14     A.  How far down is it?
15     Q.  It's the second-to-last sentence in
16   the second full paragraph on page 13.
17     A.  I see that.
18     Q.  You see those words?
19     A.  I do.
20     Q.  Do you agree with that?
21     A.  As I did a poor job of answering
22   before --

1   not too separate to be called a reading saccade.
2     Pierce did none of that.
3     So I don't know how quite how to
4   answer that.
5     Q.  Let's just go back because it was a
6   little -- just so it's clear.
7     You see the words:  Our test follows
8   the same basic format as the Pierce saccade
9   test.
10     Right?
11     A.  That's what it says.
12     Q.  Do you disagree with that today?
13     A.  Except for the things I just
14   mentioned.
15     I just clarified that they -- the
16   format being three or four cards -- that has --
17   if that's the format, ours is now obviously not
18   on flip charts.  It's an iPad.
19     But it did at one point have the same
20   number of cards that Pierce had.
21     Q.  So to that extent, you agree with that
22   statement still.

1    Fair?
2    A.   Yes.
3         (Pause)
4    Q.   You didn't get a license from Cook to
5    use the Pierce test in your study.
6    Is that right?
7    A.   No, we actually had -- Al testified
8    that we had copies of the Pierce test.  We had
9    checked out actual Pierce tests from the
10   Illinois Eye Institute, where we were -- provide
11   us the equipment.
12   Q.   So you didn't need a license to --
13   A.   We didn't need a license.
14   We had original version of the Pierce
15   test to do our test, and we had two original
16   versions.
17   Q.   I think you've mentioned this in
18   response to other questions.
19   But let me just ask you:  How is the
20   King-Devick test different than the Pierce
21   saccade test?
22   A.   Pierce saccade -- first of all, it's

Page 142

1    not a reading-related saccade test, as we know
2    it, because the spacing between the two fixation
3    targets in the Pierce are not anything like
4    you'd see in normal reading.  They are eight or
5    10 inches apart.
6    And so I wouldn't call it a saccade
7    test relative to reading.
8    So otherwise, ours has five
9    randomly-spaced numbers between the two --
10   between the two end point targets.  They aren't
11   too far apart, such that it wouldn't be like the
12   act of reading.
13   We looked -- and actually looked -- Al
14   and I, while we decided the distance, were
15   actually measuring things, fixation targets in a
16   book, as far as how apart they would be.
17   It's wider than ours.
18   Again, in retrospect, this probably
19   has nothing to do with reading -- these wide
20   saccades.
21   And I think ultimately he agreed that
22   our test was much better test, in fact -- did

Page 143

1    test saccades related to reading.
2    Q.   You say Dr. Pierce sort of wished he
3    thought of that --
4    A.   That's what Al King said he said to
5    him.
6    Q.   Do you remember Al King saying that to
7    you at the time?
8    A.   I do.
9    Q.   Tell me exactly what you remember
10   about that conversation between you and Al.
11   A.   I just thought it was great that Al
12   had said that he had -- ran into Pierce and said
13   he knew who he was, and something along the
14   lines of "I wish I would have -- that -- you
15   know, that was good improvements," or whatever.
16   I wasn't there, but that's what Al
17   said.
18   Q.   Now, you said you were measuring
19   fixation targets in a book.
20   Tell me what you meant by that.
21   A.   Well, before we designed the test, we
22   tried to predict, you know, groups of words and

Page 144

1    books and come up with the varying distances
2    that we came up with.
3    And we found that the key would be
4    that they would be different, not random,
5    equally-spaced numbers; key being that they
6    would have to be different:  Some shorter, some
7    longer --
8    Q.   The fixation targets, you mean?
9    A.   That's right.
10   And in Pierce's, they were all --
11   there weren't any central fixation targets.  It
12   was just one side or the other.
13   Q.   So what is the purpose of the spacing
14   in the King-Devick test of the numbers?
15   A.   To simulate the physical act of
16   reading.
17   Q.   In a way that's different than the
18   Pierce test?
19   A.   We don't think the Pierce test at all
20   simulates the physical act of reading.
21   Q.   Because the numbers are too far apart?
22   A.   That's right.  It has habituation and

Page 145

Pages 142 to 145

1    anticipation, things that we tried to avoid.
2        (Pause)
3        Q.   Now, you gave a copy of the test to
4    Pierce.
5        And so, what was the -- Appendix 2.
6    You just made copies of this.
7        And did you put them on cards?
8        A.   No, we just sent him a copy of the
9    paper.
10       Q.   You sent him a copy of the paper?
11       A.   This paper.
12       Q.   When did you send that to Pierce?
13       A.   Pretty much coincidentally as to when
14   we turned it in.
15       Q.   You said earlier that you are sure he
16   got it.
17       How are you so sure?
18       A.   Because he didn't get back to us.  And
19   I called his office and they said the he had got
20   it.
21       Q.   At the time?
22       A.   At the time.

Page 146

1        Q.   Did he pay you any money for the test?
2        A.   Did he?
3        Q.   Yeah.
4        A.   No.
5        Q.   Was it just sort of a donation?
6        A.   Just sent him the paper.  We just sent
7    him this paper.
8        Q.   Okay.
9        Did you send the paper itself out to
10   anyone else like that?
11       A.   Not that I recall.
12       (Pause)
13   BY MR. GOETZ:
14       Q.   Just try that one again.
15       Did you send your paper -- right after
16   you submitted you it to the school -- to anyone
17   other than Dr. Pierce?
18       A.   Not that I recall.
19       Q.   You mentioned earlier that you -- you
20   had said:  We started to commercialize a product
21   sort of right away.
22       Is that correct?

Page 148

1        Q.   So you sent it to his office, wherever
2    he was working at the time?
3        A.   That's right.
4        Q.   Was that in Alabama?
5        A.   I think so.
6        Q.   You talked to someone there?
7        A.   It is not -- I didn't to talk to him.
8    I talked to --
9        Q.   Secretary --
10       A.   -- somebody in his office:  Did you
11   get the package?
12       She said:  Yes.
13       Q.   Did you send him anything other than,
14   you know, the paper, which is Exhibit 8?
15       A.   Well, we sent him a note saying that,
16   you know:  Check this out, and whatever.
17       I can't remember specifically what it
18   schedules, but it was a very nice note and meant
19   to be cordial and -- in hopes that he respond.
20       Q.   Did you -- do you still have that
21   note?
22       A.   No.

Page 147

1        A.   In that case, I was the one that was
2    putting together the copies, putting on our
3    copyright language, and sending them out.
4        We actually sold a few for $20 plus
5    shipping, which was 25.
6        Q.   The "we" there is you and Dr. King?
7        A.   Well, he was -- at this point he was
8    pretty much out the door in North Dakota.  So I
9    was in charge.
10       And he had testified to that.
11       And all of the, you know,
12   manufacturing, putting together the products,
13   anything like that -- that was me.  Always has
14   been.
15       Q.   And when did that start? --
16       A.   In March of -- the first one we sent
17   was in March of 1976.
18       Q.   And so that was basically co-incident
19   with when you submitted it?
20       A.   That's right.
21       Q.   Who did you send it to?
22       A.   I think that the first one was Floyd

Page 149

Pages 146 to 149

| 1 | Mizener. And he's a 96-year-old. He's still |
| 2 | around today. And he was my, kind of, mentor |
| 3 | and my own optometrist when I was a kid. So he |
| 4 | was the first one, I believe. |
| 5 | Q. Who else did you send it to initially? |
| 6 | A. We -- we -- what would happen is that |
| 7 | people -- the library -- the head master -- the |
| 8 | librarian at the library was Peter Weil. |
| 9 | He would say people wanted to copy it, |
| 10 | because they kept a copy in the library. |
| 11 | Actually, Al King told me to check on |
| 12 | that once. |
| 13 | And he said: You just send them to |
| 14 | me. |
| 15 | So whenever somebody wanted a copy of |
| 16 | it, we would sell him one and it had the |
| 17 | copyright language on it. So that's how it |
| 18 | worked. |
| 19 | Also Dr. Mizener was proud of the |
| 20 | paper. And he was a good friend. And he |
| 21 | referred it to a lot of others as well. It |
| 22 | became a fairly well-known test right away. |

Page 150

| 1 | Q. So this -- let me start with this. |
| 2 | Do you remember anyone specifically by |
| 3 | name, other than Floyd Mizener, that you sent |
| 4 | the test to? -- initially? |
| 5 | A. That's been a long time ago. |
| 6 | Q. I understand. |
| 7 | A. And I would get names from the |
| 8 | librarian mostly, and from Floyd, and send them |
| 9 | out. |
| 10 | I don't right, as we sit here, |
| 11 | specifically remember another individual's name. |
| 12 | Q. Fine. |
| 13 | Do you have any documents that reflect |
| 14 | those sales -- those early sales -- today? |
| 15 | A. No. I don't. |
| 16 | As a matter of fact, we didn't file a |
| 17 | separate tax return for them. We filed as |
| 18 | income on our individual returns, and it wasn't |
| 19 | much. It was less than -- I'm sure it was less |
| 20 | than $600 per -- each of us. |
| 21 | Q. Did you look for documents reflecting |
| 22 | these very initial sales and -- for purposes of |

Page 151

| 1 | this litigation that we are sitting in today? |
| 2 | A. I did. |
| 3 | Q. You couldn't find them? |
| 4 | A. There is nothing. |
| 5 | Q. Where did you look? |
| 6 | A. I looked in where I keep all my tax |
| 7 | stuff. |
| 8 | Q. No tax records or anything? |
| 9 | A. Nothing. |
| 10 | Q. Where were you -- did you have a |
| 11 | manufacturing facility? |
| 12 | Or what were you doing? |
| 13 | A. No. I had the -- I went to the |
| 14 | Chicago Public Library; used their copy machine; |
| 15 | put laminates in between; put it in a folder. |
| 16 | As you all saw who were at the Al King |
| 17 | deposition -- saw the way it looked. And -- |
| 18 | Q. So what are you referring to -- "saw |
| 19 | the way it looked"? |
| 20 | A. It was in a -- it was in a -- not |
| 21 | this, because it wasn't quite hardcover, but one |
| 22 | of those things. |

Page 152

| 1 | I mean, they had the four pages, and |
| 2 | the score card of King-Devick. |
| 3 | The one that he had was the paper |
| 4 | itself. We didn't include the paper. It was |
| 5 | just the test and scorecards. |
| 6 | Q. So I want to get that exhibit and |
| 7 | we'll take a look at it. |
| 8 | A. All he had was the paper itself in the |
| 9 | binder that we -- all I'm talking about with the |
| 10 | binder was the same -- what kind of looking |
| 11 | thing. |
| 12 | He had the actual paper he turned in. |
| 13 | Q. Oh, like this, just like -- |
| 14 | A. Yeah, right. |
| 15 | Q. -- I see. |
| 16 | A. What I made was four sheets, |
| 17 | laminated, copied, with a title page, and a |
| 18 | score sheet -- and which later became the NYSOA |
| 19 | package. |
| 20 | Q. I want to talk about that in a minute. |
| 21 | So I want to understand what exactly |
| 22 | what you did in March of 1976. |

Page 153

Pages 150 to 153

```
1        So you went to the New York -- I'm
2   sorry -- the Chicago Public Library and you put
3   on the Xerox machine Appendix 2 --
4        A.   Well --
5        Q.   -- demonstration card?
6        A.   Well, after we had done it and we
7   added a our copyright language to it.  And as --
8        Q.   So what copyright language did you
9   add?
10       A.   We added:  Copyright© -- with a © --
11  1976 by Steve Devick and Al King/King-Devick
12  Test All Rights Reserved.
13       And later that same copyright language
14  is what we insisted that Bernell put into our
15  deal with them, although we added "O.D." to our
16  name, which I hadn't done before.
17       Q.   When is the last time you saw one of
18  those very, very first, you know, tests that you
19  sent out?
20       A.   I haven't seen them for years.
21       Q.   So you don't have an old set around --
22       A.   Well, when we did our deal with
```

Page 154

```
1   Bernell, they made them in a high-gloss vinyl,
2   and it was a much better product.
3        And no, I don't have any of the old
4   ones.
5        Q.   How did you laminate them?
6        Just with --
7        A.   Stuck them in those laminated sheets
8   that you can buy.  We didn't do it in a machine.
9   It was --
10       Q.   So not heat sealed?
11       A.   Not heat sealed.
12       Q.   I understand.
13       So I want to get as much detail as I
14  can to understand exactly how you made this --
15  the laminated sheet.
16       So did you photocopy Appendix 2?
17       A.   No.  Because --
18       Q.   So, what did you do?
19       A.   Well, we made a new Appendix 2, which
20  wasn't a photocopy, because that's a photocopy
21  of something else; and of the copyright
22  language -- as did Pierce -- if you noticed, and
```

Page 155

```
1   that's what brought us to do it -- on his and
2   the same with the Vincett -- all had copyright
3   language.  We did the same.
4        And we ran those off at the Chicago
5   Public Library -- I ran them off at the Chicago
6   Public Library; put them in the laminated thing;
7   put them in a flip chart notebook with the name
8   on it and with some score sheets.
9        Q.   Okay.
10       And where did you put the copyright
11  notice?
12       A.   We put it on the front, and then on
13  the bottom.  At that point, we put it on every
14  page, because those guys can that.  And --
15       Q.   What guys did what?
16       A.   Well, Pierce put it on every page.
17       I'm not sure in retrospect that was
18  necessary, but I don't know.
19       Q.   Okay.
20       A.   Anyway, we put '76.
21       I got -- my uncles' friend was an IP
22  lawyer.  He told us what to say, and that's what
```

Page 156

```
1   we did.
2        Q.   When was the last time you saw one of
3   those early laminated, sort of, packets with the
4   binder?
5        A.   Here is the way my -- it's been -- I
6   just said that it's been a long, long time.
7        Q.   Listen to my question.
8        When is the last time you saw one?
9        A.   I can't say, but it's been before the
10  Pierce.  When we came out with Bernell, we
11  never -- with no longer did homemade tests to
12  pass out.
13       Q.   We'll talk about that in a minute.
14       But approximately when was that?
15       A.   The deal -- not Pierce.
16       When we did our deal with Bernell, it
17  was 1983.
18       Q.   Okay.  So until that time you were
19  doing the laminated sheets, making the copies,
20  and putting them together, and sending them out
21  that way.
22       Is that fair?
```

Page 157

Pages 154 to 157

```
 1      A.  Yes.  And not a whole huge volume of
 2  them, but, yes.
 3      Q.  Fair enough.
 4          But you did actually sell some of
 5  those in 1976.
 6          Is that correct?
 7      A.  Yes, and the sales were either from --
 8  typically from either Dr. Mizener referred them
 9  or Peter Weil, who is the head librarian
10  referred them.
11      Q.  Do you recall anything about any of
12  those sales in 1976?
13          Anything?
14          Who they were to?
15          How much you made?
16          Anything?
17      A.  We made more than -- more than -- our
18  costs were very low.
19          So I don't have any records of the
20  exact names of those people.
21          As a matter of fact, when the New York
22  did the testing, I don't know if they had gotten
```

```
 1  a hold of one from -- by copying something out
 2  of the library or whatever, when they did their
 3  follow-up study; or whether somebody from New
 4  York had bought them.
 5          There was a guy from New York that had
 6  bought them.  And his name was Len Press -- Dr.
 7  Len Press.  And he might have been the second
 8  person.
 9          And he -- these are both -- he was
10  young then, but Dr. Mizener was a very, very
11  established and well-known O.D.  And he was
12  proud of the test.  He talked about it a lot.
13      Q.  Dr. Mizener was?
14      A.  Yes.
15      Q.  And Len Press -- you think you might
16  have sold him some of the tests in 1976?
17      A.  It's possible.
18      Q.  You just don't remember?
19      A.  I know he was an early user.
20      Q.  Okay.  Fine.
21          Do you think it could have been, you
22  know, '77?
```

```
 1          Not sure?
 2      A.  Absolutely could have been '77.
 3      Q.  Okay.  But there is no doubt in your
 4  mind that, in 1976, you made sales of the test.
 5          Fair?
 6      A.  That's right, and they had the
 7  copyright language on them.
 8      Q.  In 1977?
 9      A.  All those years.
10      Q.  So in 1978?
11      A.  Yes.
12      Q.  Do you have any sense for how many
13  sales in terms of dollar value you did in 1976?
14      A.  Well, not many.
15          I mean it was a $25 -- and I don't
16  think -- for sure, we didn't have -- I don't
17  think we made -- maybe $500 each, Al and I.
18      Q.  Between you and Al?
19      A.  Hm-hmm.
20      Q.  In 1976?
21      A.  I'm guessing.  It may not have been
22  even that much.  And it was all very low.
```

```
 1          So when the Bernell deal came along,
 2  we thought it was great.
 3      Q.  I understand.
 4          1976 -- I'm sorry -- 1977 -- was it
 5  more than the first year?
 6      A.  I don't recall.  Wasn't much.
 7      Q.  1978, was it more?
 8          Do you recall?
 9      A.  I don't.
10          But they all had copyright language on
11  them.
12      Q.  Now, the paper itself was also
13  available in your library -- right? -- the ICO
14  library?
15      A.  It was available to look at.  They
16  didn't let you make copies out of it.  And
17  again -- copies of it.
18          And again, I remember the librarian's
19  name, because he was kind of a guy that was --
20  didn't want people to copy that and use the
21  test.  He referred them to me.
22      Q.  Did you remember that actually
```

**Page 162**

1  happening?
2      A.  Absolutely.
3      Q.  Tell me about -- tell me about a
4  specific recollection that you have about that.
5      A.  Peter Weil was the guy's name.  And he
6  would call me when anybody ever wanted one.
7  But --
8      Q.  What happened in the specific instance
9  you are thinking of?
10     When was it?
11     A.  Well, right away, after the -- whoever
12  wanted to try to copy the paper, he would say:
13  You could talk to Dr. Devick and he will, you
14  know, get one to you.
15     There may have been others that copied
16  it without him catching them.
17     But as far as -- I mean, the school
18  didn't own a copyright to those -- that product.
19     Q.  How many times did that happen?
20     A.  I'm going to say maybe 10 times a
21  year.
22     Q.  Starting in 1976?

**Page 163**

1      A.  Yes.
2      Q.  So how often when that happened would
3  the person ultimately buy it from you?
4      A.  I just -- every time.
5      Q.  I see.
6      Do you have any specific recollection
7  of any person where that happened, sitting here
8  today?
9      A.  I'm not sure how I met Len Press,
10  but -- Dr. Press might have been one.  It became
11  a word of mouth, well-known test and that's what
12  happened.  We didn't expect it, but it did.
13     Q.  So I understand that.
14     My question is just:  Do you have,
15  sitting here today, a specific recollection of
16  any name of a person that went to the library,
17  tried to get a copy, and was referred to you,
18  and bought it?
19     That's the question pending right now.
20     A.  I don't.
21     Q.  Okay.  Fine.
22     When you submitted the paper to the

**Page 164**

1  school, you knew it was going to the library,
2  right?
3      A.  I didn't.
4      Q.  You didn't?
5      A.  No, I didn't know that was part of it.
6      They told us later that "we keep a
7  copy of all the papers in the library," which
8  made sense to me.
9      Q.  Did you object to that?
10     A.  Why would I object?
11     Q.  I don't know.
12     Did you?
13     A.  No.
14     Q.  Okay.
15     Did your professor or your faculty
16  advisor use your test in his classes after you
17  graduated?
18     A.  Not with our permission.
19     Q.  So let's start with just the basic
20  question:  Did he do it -- yes or no?
21     A.  I don't know.
22     Q.  Okay.

**Page 165**

1      You had heard that he did it? --
2      A.  I had not.
3      Q.  So why did you just say in response to
4  my question:  Not with our permission?
5      A.  What I was saying is Al King testified
6  that he had heard that he had.
7      Q.  You never heard that?
8      A.  I never heard that.
9      Q.  Al said that you took care of it.
10     A.  He heard that they were copying it out
11  of the library.
12     Q.  Oh, he heard that?
13     A.  And I talked to Peter Weil and did
14  take care of it.
15     Q.  So that was the "take care of it"
16  thing?
17     A.  That's what I -- that's -- that's
18  exactly why I went to see Peter Weil.
19     And he may remember, if he's still
20  alive, this.
21     But the point being is is that how it
22  happened -- that's how it happened.

**Pages 162 to 165**

Q.   Do you know if he's still alive?

A.   I don't.  I rather doubt it, honestly.

Q.   He was -- he would be older?

A.   Well, it was -- I mean, I'm old and, you know, I was 24 back then.

MR. SULLIVAN:  Take a breath.  You are all just -- poor Brad, okay?

MR. GOETZ:  Doing the best he can.

MR. SULLIVAN:  Doing the best he can.

BY MR. GOETZ:

Q.   So I see, so the "you'll take care of it" exchange at the King deposition was about the librarian, Peter Weil.

Is that correct?

A.   That's my recollection.

It wasn't specifically about Peter Weil.

It was about people that wanted to copy it out of the library.

Q.   Al had heard about that?

A.   Yes.

Q.   How did he hear about that?

A.   I have -- he testified along those lines.

I don't recall how he heard about it.

But I did talk to the librarian and he was more than happy to say:  I'll refer him to you.

Q.   So forget the deposition.

Take me back to at the time.

What do you remember between you and Al on this topic?

Did you have a conversation?

Did he call you up and say:  Hey, people are copying it?

How did it come about?

A.   I think that he called me and said that he'd heard somebody was trying to copy it out of the library.

Q.   Did he tell you how he had heard that?

A.   He may have been more well connected the with the school than I was.

Q.   Well, then, why do you say that?

A.   Well he was -- he -- you know, he --

he might have had a better relationship with Schlange, or any of the others down there.

I kind of graduated and that was it.

Q.   So you don't really know how he heard?

A.   I'm not sure.

Q.   So he called and said:  Hey, I heard people are copying it out of the library.

And what did you say?

A.   Said:  I'll go talk to them.

Q.   Did you say you'll take care of that?

A.   I said "I'll talk to them" because I knew they couldn't do that.

And they were more than gracious about not letting it happen.

Q.   So you did talk to them?

A.   And I don't even know if it actually ever happened.

I know that people had wanted to copy it out of the library, but I'm going to guess that might have been happened.

Q.   Who did you talk -- you said -- but you did talk to the library?

A.   Talked to the librarian -- the head librarian.

Q.   Peter Weil?

A.   Right.

I think so.  I think that's his name --

Q.   And what did you tell him?

A.   -- that's either his name, or something close to that.

Q.   And what did you tell him?

A.   I said:  You can't copy those.

He said:  I know.

He said:  So, should I just have them call you?

I said:  Yeah.

Q.   You gave him a phone number?

A.   Yes.

Q.   No, it was e-mail back then, right?

A.   No, it wasn't.  There wasn't even internet.

Q.   Right.  Okay.

Now, other libraries had a copy of your paper.

1    original paper, right?
2       A.  It looks like they were, although I
3    never sent these to any dictionary.
4       Q.  So what's your understanding of how
5    the dictionary got copies of your cards?
6       A.  I have no idea.
7       (Pause)
8       Q.  The dictionaries never asked you for
9    permission to reference your test, right?
10      A.  No.
11      Q.  Or publish your cards, right?
12      A.  Never heard anything from them.
13      Q.  Okay.  The first time you remember
14    seeing the test in a medical dictionary yourself
15    with your own two eyes was in the '80s?
16      A.  I believe so.
17      Q.  Have you or -- have you asked any of
18    your -- anyone to look in the medical
19    dictionaries in 1976 to see what exactly is
20    disclosed with respect to the King-Devick Test?
21      A.  I haven't.
22      Q.  You have not.  Okay.  Fine.

Page 194

1       (Pause)
2      Q.  Do you know who Luther C. Gilbert is?
3      A.  I saw his product at Al King's
4    deposition.  I didn't know anything about it
5    before then.
6      MR. GOETZ:  I'm going to mark it here,
7    which I think is the same, which is a nightmare
8    for my paralegal, but I'm going to do it anyway.
9    The Exhibit marked Devick 10 is a document
10    bearing production Nos. NYU00471095 through
11    1136.
12      (Exhibit Devick 10,  Document Bates
13    stamped NYU00471095 through 471136, multipage
14    document entitled: Functional Motor Efficiency
15    of the Eyes and its Relation to Reading, dated
16    1953, marked for identification)
17      MR. GOETZ:  I think this is the same
18    thing that you saw last week.  I have been told
19    it is.
20      So let me just ask the question.
21    BY MR. GOETZ:
22      Q.  When was the first time you ever saw

Page 195

1    this document?
2      A.  Last week.
3      Q.  How certain are you that you didn't
4    see this during your time at the Illinois
5    College of Optometry?
6      A.  I am certain.
7      Q.  How certain?
8      A.  Well, I just don't remember seeing it.
9    We talked about the Vincett and the
10    Pierce.  If I had seen that, we might have
11    talked about this, but I don't think so.
12      Q.  Is that surprising to you -- seeing
13    that today -- that you never saw this before?
14      A.  There was no internet in 1976.
15      Q.  I know, but there was a library.
16      A.  I never saw it before.
17      Q.  I mean, did you read it last week?
18      A.  I looked at the cards and I heard what
19    your associate was asking Al King about it.
20      Q.  Do you understand that this article
21    uses the term "ocular motor efficiency"?
22      A.  I don't think that they invented the

Page 196

1    term, any more than we did.
2      Q.  You don't think you invented that
3    term, do you?
4      A.  No.
5      Q.  Do you think that you first heard that
6    term from this reference?
7      A.  Absolutely not.
8      Q.  Why are you so certain of that?
9      A.  Because it's a commonly-used term in
10    optometry school.
11      Q.  Do you remember where you first heard
12    "ocular motor efficiency"?
13      A.  I would guess the first day I went to
14    optometry school, but I'm not sure if it was the
15    first day.
16      Q.  You agree that Digit Card 3 on page
17    104 of Exhibit 10 is very similar to your
18    King-Devick Test, right?
19      A.  Well, I don't.
20      Because again, we had five specific --
21    I thought you were going to ask about the first
22    two cards, because one, two, three, four, five,

Page 197

```
1    do it accurately.
2         That's your point, right?
3         A.  Well, my point is that there is a lot
4    of other reasons as well.
5         Q.  But isn't the point you just made that
6    you may not even be able to do it because the
7    scale might be off?
8         Wasn't that the point you just made?
9         A.  Said that.
10        My point was that it wouldn't matter,
11   because there are so many other things.
12        Q.  How long did it take you to decide
13   that the King-Devick test is better than the
14   Gilbert test?
15        It sounds like, basically,
16   instantaneously, but I would like to hear what
17   your answer is.
18        A.  Instantaneously.
19        Q.  Okay.  Fair enough.
20        MR. GOETZ:  Okay, I'm going to mark a
21   document as Devick 11, which is a document in
22   this case.
```

```
1         (Exhibit Devick 11,  Document Bates
2    stamped NYU00469222 through 469251, multipage
3    document entitled: Optometric Perceptual Testing
4    and Training Manual, dated 1975, marked for
5    identification)
6         THE WITNESS:  Would you mind me
7    correcting one thing? --
8         MR. GOETZ:  Of course.  Go ahead.
9         THE WITNESS:  -- different than the
10   King-Devick Test.
11        I don't know what the studies show in
12   the Gilbert.  It's certainly not like the
13   King-Devick Test.  I didn't want to -- just
14   clarify that.
15        MR. GOETZ:  I don't understand what
16   your point is.  Help me understand.  Your point
17   is --
18        MR. SULLIVAN:  You said:  Better.
19        THE WITNESS:  You said:  Better.
20        MR. GOETZ:  Okay.  Different?
21        THE WITNESS:  Right.
22        MR. GOETZ:  You don't know whether
```

```
1    it's better or not?
2         THE WITNESS:  As you pointed out, I
3    haven't done any tests.
4         MR. GOETZ:  But it's different.
5    That's your point?
6         THE WITNESS:  Yes.
7         MR. GOETZ:  Okay.
8    BY MR. GOETZ:
9         Q.  So Devick 11 is a document bearing
10   production numbers NYU0046922 through 251.
11        This is -- you recognize this, right?
12        A.  Just from Dr. King's deposition.
13        Q.  So you hadn't seen this before the
14   deposition last week?
15        A.  No.
16        Q.  So how did you see the Vincett test?
17        I don't know if I'm saying that right.
18        A.  No, I think that is right.
19        Actually, I had seen it in class.  And
20   it was -- the version that I -- the only version
21   I saw was letters were equally spaced on lines,
22   and that's in here.
```

```
1         Q.  You see that here on, like, what? --
2         A.  And I described it in the paper as a
3    test of equidistant letters, not numbers.
4         Q.  You see that there is numbers too,
5    though, now?
6         A.  I didn't have any idea.
7         But it wouldn't matter anyway because,
8    again, relative to the habituation and
9    participation, they are all equally spaced.
10        Q.  You see there is numbers in here now,
11   though, right?
12        A.  I saw that when I -- when I had the --
13   was at the Al King deposition.
14        The only version I had ever seen was
15   the one with letters.  And I guess that's
16   missing from this one now, but it's not in the
17   copy I got from Al King.
18        Q.  No, there is letters.  Take a look at
19   page 247.
20        A.  Oh, well, they were together in front
21   in the last one, I think -- but, whatever.
22        Yeah -- the only one that I had ever
```

1  seen was the letters and equidistant.

2      But it wouldn't matter anyway because,

3  again, these are equally-spaced numbers.

4    Q.  So let me just make sure I have it

5  right.

6      So you saw the Vincett test when you

7  were in school before you did your paper.

8      Fair?

9    A.  I did.

10    Q.  And you saw it in a class, you think?

11    A.  I don't recall.

12    Q.  But you didn't see this particular

13  paper -- Exhibit 11.

14      You don't remember seeing that, right?

15    A.  No, and it's possible I never saw the

16  Vincett test.

17      It's just that I heard it was

18  equally-spaced letters, which is how I describe

19  it in our paper.

20    Q.  Okay.

21    A.  It not -- it's possible that I never

22  even saw it and just heard that -- because that

1  is so profoundly not what we were doing, that

2  we'd eliminate that as a possible alternative to

3  our test.

4    Q.  Okay.  So you just don't remember one

5  way or another how you first came about the

6  Vincett test.

7      Is that fair?

8    A.  I am sure that I heard about it in

9  optometry school.

10      But I don't know that I ever

11  physically held one, or looked at it, other than

12  in a book.

13      (Pause)

14    Q.  What are the differences between the

15  Vincett and a King-Devick Test?

16    A.  Well, the main difference is back to

17  what we always talk about:  The habituation and

18  the anticipation; not to mention the fact that

19  letters are learned later and not as -- there is

20  not as much automaticity in letters, especially

21  for younger kids.

22      So again, using letters at the time --

1  which is all I ever saw -- would be one thing.

2      The other is that they are equally

3  spaced.  And, in my opinion, it is way too busy.

4      But at any rate, we mentioned it in

5  the paper, and that's what it is.

6      (Pause)

7    Q.  When you did your paper, why did you

8  actually decide to do a test on the King-Devick

9  Test and the Pierce test?

10    A.  Well, because we knew about the Pierce

11  test.  I actually liked listening to Jeff

12  Pierce.  And we were hoping that he'd look at

13  our results, if ours came out better.  We

14  thought that our concept was much better -- and,

15  in fact, it was.

16    Q.  I mean, didn't you choose Pierce over

17  Vincett because you were closer to Pierce than

18  Vincett?

19    A.  No.  I didn't.  I didn't have a

20  relationship with any of them.

21      I thought the Vincett test was not a

22  test that we -- we dismissed it out of the box,

1  if nothing more for it than the fact that when

2  you give a first grader letters to read, they

3  don't know them.

4    Q.  So the Pierce test is better than

5  Vincett?

6    A.  I don't know that it's better because

7  it doesn't have any -- it's only got a 10-inch

8  saccade distance.  I don't know if it's better.

9      But again, this one, we couldn't even

10  administer to first graders.

11    Q.  Is it customary to test two tests

12  together? -- in this field?

13    A.  I think that when we have done

14  concussion testing, a lot of time they compared

15  one test to the other -- not necessarily testing

16  the same thing, but -- and I think that's what

17  we did in this case, because I don't think

18  Pierce tested reading-related saccades, because

19  of -- just too far apart.

20    Q.  Did you personally conduct the tests

21  on the students for your paper?

22    A.  Yes.

```
 1    '77, '78, right?
 2        A.   This was updated with the NYSOA
 3    results.
 4        Q.   So what data was it originally when
 5    you were sending it out in 1977 -- '76, '77,
 6    '78?
 7        A.   As described in this published paper,
 8    similar -- but that's listed in our paper.
 9        Q.   So just different data?
10        A.   Very similar, but, yes, different.
11        Q.   Okay.
12            (Pause)
13        Q.   So that data is from this paper that
14    was by Lieberman, Cohen, and Rubin.
15            Is that right?
16        A.   Yes.
17        Q.   Do you know those gentlemen?
18        A.   I have met at least two of them.
19        Q.   When?
20        A.   In the last 10 years.
21        Q.   In what context?
22        A.   They are still professors at SUNY --
```

Page 250

```
 1    cards.
 2        Q.   Are you saying that they used Exhibit
 3    13?
 4        A.   Exhibit 13.
 5            You mean the Bernell one?
 6            No, that didn't exist yet.
 7        Q.   Okay, so which ones did they use?
 8        A.   They used the ones that I used to mail
 9    out.
10        Q.   Okay, so you sold them the test?
11        A.   I'm not sure that I did.
12        Q.   You may have donated them?
13        A.   I don't know that I -- I honestly
14    never confirmed with them where they got it.
15            Most likely, they got it from me
16    selling it to them.
17            But again, I guess it's possible they
18    could have made a copy somewhere, but I don't
19    know.
20        Q.   You just don't know sitting here
21    today?
22        A.   I don't know.
```

Page 252

```
 1    one of them was.  Cohen was still professor at
 2    SUNY.
 3            MR. GOETZ:  I'm going to hand to you a
 4    document that I marked as Exhibit 14, bearing
 5    production Nos. KDT0032335 through 345.
 6            (Exhibit Devick 14, Document Bates
 7    stamped KDT0032355 through 32345, multipage
 8    document bearing heading on first page: Exhibit
 9    6, marked for identification)
10    BY MR. GOETZ:
11        Q.   That's the paper, right?
12        A.   Did you ask me a question?
13        Q.   Yeah.
14            That's the paper that generated -- or
15    that reported the data that's reflected in the
16    last page of Exhibit 13.
17            Is that correct?
18        A.   I believe so.
19        Q.   What King-Devick cards were used in
20    this test?
21        A.   The ones that we've always used.  We
22    only had one set back then of the physical test
```

Page 251

```
 1        Q.   Okay.
 2            You never talked with Lieberman or
 3    Cohen or Rubin about their recollection of how
 4    they got the test?
 5        A.   I never did.
 6        Q.   I guess it's not really surprising to
 7    you that they got the test.
 8            It was pretty widespread, you know, in
 9    terms of the community by this time -- in
10    1978 -- right?
11        A.   Yes, people were interested in it, for
12    sure, from the very first.
13        Q.   Have you ever read this paper?
14        A.   Yes, I've read it.
15            This paper?
16        Q.   Yeah.
17        A.   Sure.
18        Q.   When is the last time you read this
19    paper?
20        A.   It's been a while.
21        Q.   How long?
22            Did you read it yesterday?
```

Page 253

Pages 250 to 253

1    A.   No.
2    Q.   Okay.
3         You see how they say that:  The
4    King-Devick Test is a modification of the Pierce
5    Saccade Test?
6         Page 340 in the upper left-hand
7    corner?
8         (Pause)
9    A.   Yes.
10   Q.   You disagree with that?
11   A.   As we discussed before, there are
12   certain aspects of it that are modified -- but
13   overall, it's a different test.
14   Q.   Then they also say this test -- the
15   King-Devick Test is -- quote:  "Very similar --
16   I'm sorry.
17        Withdrawn.  Strike that.  Try it
18   again.
19        In the middle column at the bottom
20   here, they say -- describing the test, they say:
21   Which is very similar to the K-D Test was first
22   described by Gilbert.

Page 254

1    Q.   What's the most number of tests that
2    you shipped out in '77, '78, '79 -- '76, '77,
3    '78?
4    A.   I don't recall sending more than one
5    to one party.
6    Q.   One per unit.
7         You don't recall boxing up a bunch and
8    sending a whole box out?
9    A.   I don't recall that.
10   Q.   So the use of your test, as I think
11   you testified, by 1979 is pretty widespread.
12        Is that fair?
13   A.   I don't know if it was widespread, but
14   it was well known.
15   Q.   Okay.
16        MR. GOETZ:  I have the book here,
17   which I can mark as an exhibit.
18        But do you want to mark it?
19        MR. SULLIVAN:  Do you want to mark the
20   whole book?
21        MR. GOETZ:  I don't care.  I just want
22   to ask some questions about it.

Page 256

1         Do you see those words?
2    A.   I do.
3    Q.   You said you disagree with the
4    similarity -- comparison between K-D test and
5    Gilbert.
6         Is that right?
7    A.   The first time I ever saw Gilbert was
8    at Al Kings deposition.  So -- and I've
9    described how I don't agree that it's anything
10   like King-Devick.
11   Q.   When you first saw this paper, you
12   didn't read that and go look at Gilbert?
13   A.   I didn't.
14   Q.   Okay.  I mean, how many tests do you
15   think it took them to collect data on 1,200
16   students?
17        Do you have any sense for that?
18   A.   Well, I'm guessing they weren't all in
19   the same location, so they probably went from
20   school to school t school with a few tests.
21   Q.   So, like, five or ten?
22   A.   I don't even know how to guess.

Page 255

1         MR. SULLIVAN:  Mark it.  We can make
2    it an excerpt after the fact.
3         MR. GOETZ:  That's fine.
4         So Devick Exhibit 15 is a book here.
5         (Exhibit Devick 15,  Book entitled:
6    Binocular Anomalies Procedure for Vision
7    Therapy, by John R. Griffin, O.D., Second
8    Edition (no Bates Nos.), marked for
9    identification)
10   BY MR. GOETZ:
11   Q.   Do you recognize that book?
12   A.   No.
13   Q.   You don't recall ever seeing that
14   book?
15   A.   I don't.
16   Q.   That's okay.
17        So I've put some tabs on -- there is a
18   little description of the King-Devick test in
19   there, and jus flip to the tab -- the purple
20   tab.
21        Let's me know if you recognize that
22   reference to your test.

Page 257

Pages 254 to 257

1    Q.   Oh, I see.  Those numbers look like
2  they came out of your paper.  I mean, we could
3  check.
4    A.   You got to check.
5    Q.   Okay.  Do you know either of the
6  authors on this paper?
7    A.   No.
8    Q.   Do you know the authors on Exhibit 18,
9  which is the paper that cited to this Bond
10 paper?
11   A.   Eighteen.  Oh, I don't know them, but
12 I've seen the article before.
13   Q.   But you never met them in person?
14   A.   I never met them, not that I'm aware
15 of.
16       (Pause)
17   Q.   So it's fair to say that we've seen
18 references, you know, here that there is a lot
19 of people that had access to your senior paper
20 after you finished it.
21       Is that fair?
22   A.   I don't know that there is a lot.

1    Fair?
2    A.   I don't know whether I shipped them to
3  them, or they got them to -- somehow illegally,
4  but that would be the two options.
5    Q.   During the course of your work on your
6  senior paper, did you actually look at previous
7  senior papers at your library?
8    A.   I don't think so.
9    Q.   You just don't remember?
10   A.   I don't think I did.
11   Q.   But you are uncertain.
12       Why?
13   A.   I am uncertain because it was 44 years
14 ago.
15   Q.   Because you don't remember.
16       Is that right?
17   A.   It doesn't sound like something I'd
18 do -- but, no.
19   Q.   How many original copies of your paper
20 were there?
21       Just one?
22   A.   Well, I have one, and Al had one, and

1        We've seen or three or four.
2    Q.   They are all referencing, you know,
3  your senior paper.  One of them even says it's
4  available at the library.
5        You don't know how any of them got it,
6  though.
7        Fair?
8    A.   Well, perhaps they meant it was
9  available to read at the library -- and, in
10 fact, it was.
11   Q.   Yeah, but you don't know how they got
12 it, or what they did, or --
13   A.   Well --
14   Q.   -- is that --
15   A.   -- well, unless I made it and shipped
16 it to them.  That would be the likely way they
17 would get it.
18   Q.   Okay.  Understand.
19       But you are just not -- you just don't
20 know one way or the other whether you did that
21 with respect to any of these papers that are
22 referencing your test right now.

1  we left one with -- I don't know if Dr. Schlange
2  kept one or not.  So we -- there was two, at
3  least two.
4    Q.   At least two?
5    A.   Well, we don't know whether he copied
6  it or not.  I'm guessing he did because it ended
7  up in the library, and we didn't know that was
8  going to happen.
9    Q.   And the products you were shipping in
10 '76, and '77, and '78 -- did those products
11 reference your senior paper at all?
12       Or no?
13   A.   No.
14   Q.   Just the test?
15   A.   Just the test.
16   Q.   In 1976, was the public allowed to go
17 into the library and view senior papers?
18       Or do you know?
19   A.   I think so, but you probably have to
20 have some kind of credentials to get into that
21 library.
22   Q.   I see.

1          But your view is that they weren't
2     allowed -- people weren't allowed to make
3     copies.
4          Is that right?
5     A.   That's right.
6     Q.   And the librarian told you that at the
7     time.
8          Is that right?
9     A.   I told him that if somebody wanted a
10    copy, that he'd refer them to me, which he did
11    quite often.
12         (Pause)
13    Q.   So there are originally, you said, at
14    least two copies of your senior paper.
15         But there might have been three?
16    A.   Well, we each got a copy.  Al King and
17    I each got a copy.  And evidently, Dr. Schlange
18    kept a copy, too.
19    Q.   Was any photocopy made originally?
20         In other words, did you have one
21    master, then you made a copy and gave it to
22    King, and then you made another copy and gave it

                                      Page 298

1     to the professor?
2          Or you don't remember?
3     A.   Well, I'm sure we didn't re-type it
4     twice.  So when it was done, we more than likely
5     made a copy of it for each of us.
6          (Pause)
7     Q.   But you don't remember whether it was
8     two or three?
9     A.   I know it was at least two.
10    Q.   So you don't remember whether it was
11    more than two, I guess.
12         Is that right?
13    A.   Any more than two weren't authorized
14    by us.
15    Q.   Okay.  But come to find out that at
16    least four were made, right?
17    A.   Unless I shipped them to them.
18    Q.   Well, I mean, the library has four --
19    or at least they had four a few months ago,
20    right?
21    A.   Those were copies of the whole
22    research paper.

                                      Page 299

1     Q.   So let's talk about that.
2          MR. GOETZ:  So Devick Exhibit 20 is a
3     document bearing production No. NYU00469252.
4          (Exhibit Devick 20,  Document Bates
5     stamped NYU00469252, single-page document
6     bearing heading: Details for The proposed
7     King-Devick saccade test and its relation to the
8     Pierce saccade test and reading levels, marked
9     for identification)
10    BY MR. GOETZ:
11    Q.   Do you recognize that document, sir?
12    A.   Let me take a look.
13         (Pause)
14    A.   Yeah -- it's nothing I've ever seen
15    before.
16    Q.   Okay.  You see how it's entitled --
17    that's the title of your senior paper, right?
18    A.   Yes.
19    Q.   And it says -- it's a -- Material Type
20    is a Senior Project.
21         You see that? -- in the column of the
22    chart at the bottom of the document?

                                      Page 300

1     A.   Oh, yeah.
2     Q.   You see that?
3     A.   Yes.
4     Q.   Different bar codes for each one.
5     There is four copies.
6          Do you see that?
7     A.   I do, but it doesn't say when these
8     copies were made.
9     Q.   That was my next question.
10         What do you know about when those
11    copies were made?
12         Sounds like nothing?
13    A.   I've never seen this before.
14    Q.   There were four copies in the library
15    just a few months ago, correct?
16    A.   They sent me four copies, so, yes.
17    Q.   What do you know about when those
18    copies were made, if anything?
19    A.   Nothing.
20         (Pause)
21    Q.   You see where it says:  Publication
22    Date: 1976?

                                      Page 301

                              Pages 298 to 301

| | |
|---|---|
| 1 Do you see that? | 1 e-mail chain, top e-mail From: Valarie Conrad, |
| 2 A. Yes. | 2 To: Christine Weber and others, Subject: RE: |
| 3 Q. I mean, that's consistent with your | 3 Agenda Item King Devick books, Sent: April 24, |
| 4 testimony today of you selling the product in | 4 2018, marked for identification) |
| 5 1976, right? | 5 BY MR. GOETZ: |
| 6 A. Well, up until a while ago -- | 6 Q. Have you seen that before, sir? |
| 7 recently -- I didn't know that publication date | 7 A. I haven't. |
| 8 was a legal term. So we started selling those | 8 Q. It's an e-mail string about your -- |
| 9 in 1976. | 9 about your papers. |
| 10 Q. That was a publication, right? | 10 Second page in the middle, there is an |
| 11 A. Well, I wasn't aware of that, not | 11 e-mail from Stephanie Messner. |
| 12 being a lawyer as we've discussed. So I thought | 12 Do you recognize her as being Len |
| 13 we were making up copies of our copywritten | 13 Messner's wife? |
| 14 product and selling them. | 14 A. Well, his wife is named Stephanie, so, |
| 15 I thought the publication date, when | 15 yeah. |
| 16 asked, to me, was the date when the | 16 Q. Why would she be involved in a |
| 17 peer-reviewed paper was published -- | 17 discussion about your papers at the library? |
| 18 Q. I see. | 18 Do you have any idea? |
| 19 A. -- which was 1983. | 19 A. She's the dean. |
| 20 But that's just I was ignorant of | 20 Q. Dean of what? |
| 21 legal terminology for "published date." | 21 A. The school. |
| 22 Q. When you say the peer-reviewed paper | 22 Q. I see. |
| Page 302 | Page 304 |

| | |
|---|---|
| 1 was published, what are you talking about? | 1 Did you ever talk with Ms. Messner |
| 2 A. This one, the first paper. | 2 about your papers? |
| 3 Q. Oh, the NYSOA paper? | 3 A. No, not that I recall. I mean, she |
| 4 A. Right. | 4 knew the origin of the test, but -- |
| 5 Q. Gotcha. | 5 (Pause) |
| 6 Do you know Stephanie Messner? | 6 A. It says it was their policy not to |
| 7 A. Yes. | 7 ever lend them out or photocopy them. |
| 8 Q. Is that Len Messner's daughter? | 8 Q. On page 2 at the bottom, there is a |
| 9 A. It's his wife. | 9 sentence that says -- well, from Weber, |
| 10 Q. Is she -- she is -- she has a stake in | 10 Christine. |
| 11 your company? | 11 Do you know who that is? |
| 12 A. She's the dean. And between the two | 12 A. No -- actually, she might be a |
| 13 of them, they have a very small amount of stock. | 13 librarian now. |
| 14 Q. Do you know what "a very small amount" | 14 Q. Did you ever talk with her? |
| 15 is in this context? | 15 A. Someone -- and it might have been |
| 16 A. I don't know specifically, but not a | 16 her -- called me to say they are going to send |
| 17 large dollar amount. | 17 my tests back to me. |
| 18 MR. GOETZ: I'm going to hand to you a | 18 Q. She says at the bottom here: In the |
| 19 document, Devick 21, which is a document bearing | 19 meantime, Dr. Devick called me and asked me not |
| 20 production Nos. ICO KDTest 000009 through 11. | 20 to lend them. |
| 21 (Exhibit Devick 21, Document Bates | 21 Do you see that? |
| 22 stamped ICO KDTest 000009 through 11, three-page | 22 A. I -- yes, I do. |
| Page 303 | Page 305 |

1   And it says -- and they -- the policy
2   in the prior sentence is they never lend them
3   out or photocopy them.
4   Q.   Did you call her and tell her not to
5   lend them?
6   A.   No, what I did was I called someone at
7   the library -- and I can't identify for sure --
8   and I said:  Why don't you just send the copies
9   back?
10   Q.   Did you tell the person not to lend
11   them?
12   A.   Their policy was not to lend them.
13   Q.   Did you tell the person not to lend
14   them?
15   A.   Not that I recall.
16   Q.   Does Dr. Schlange have his own
17   personal copy?
18   Do you know?
19   A.   I don't.
20   Q.   Did he keep two copies?
21   Do you know?
22   A.   I don't know.

1   But it says on the next paragraph he
2   has his own personal copy.
3   Q.   You don't have any reason to doubt
4   that, do you?
5   A.   I haven't talked to him for year --
6   decades.
7   (Pause)
8   Q.   So as of right now, though, you don't
9   care whether they are in the library or not.
10   Was that what your testimony was
11   earlier?
12   A.   Well, if they are being copied as
13   certainly -- even if illegally -- I certainly
14   don't want them in the library.
15   (Pause)
16   Q.   Okay.  There finally came a time when
17   you decided to file for a copyright application
18   on your paper, right?
19   A.   The copyright registration was filed
20   in 1983.
21   Q.   Why did you file on the whole paper
22   and not just the test?

1   A.   I'm not sure.
2   Q.   What was your -- well, who decided to
3   file the copyright application?
4   A.   When Bernell and King-Devick were
5   negotiating, about to be distributed, that's
6   when someone on our end suggested we file the
7   registration, and not just have the copyright
8   language on.
9   Q.   Do you remember who?
10   A.   I don't.
11   Q.   Who was your lawyer that you used to
12   file the copyright application?
13   A.   We used a local guy named Herbert
14   Bell, I believe.
15   Q.   Was this the same intellectual
16   property attorney that you mentioned earlier
17   today?
18   A.   No.
19   Q.   Who was that?
20   A.   This was a friend of my uncle's
21   back -- early days -- in -- I don't remember his
22   name.

1   But Herbert bell was a local lawyer.
2   Q.   How did you get introduced to him?
3   A.   It was just local.  He wasn't an
4   expert perhaps, but he was a nice guy.
5   Q.   "Wasn't an expert perhaps" -- what do
6   you mean by that?
7   A.   Well, he didn't specifically practice
8   copyright law.  He was a general lawyer.
9   And I guess I shouldn't have said
10   "expert."
11   He wasn't a specialist is what I
12   should have said.  I don't think he was.
13   Q.   It sounds like you are worried he did
14   something wrong.
15   Do you think he did something wrong?
16   A.   I don't think he did anything wrong,
17   no.
18   Q.   How did you come to meet Mr. Bell?
19   A.   I don't recall.  He was -- he lived in
20   Downers Grove.  My practice has been in Downers
21   Grove.
22   Q.   You just said a word that the court

1  reporter didn't get.
2       Was that a town?
3       A.   Oh, yeah -- my practice was in Downers
4  Grove, Illinois.  And that's where Mr. Bell
5  or -- I think Bell -- had his practice.
6       Q.   Did you ever use Mr. Bell for anything
7  else?
8       A.   Not that I remember.
9       Q.   Okay.  So tell me what you can
10  remember about the application process in 1983.
11       What did you do?
12       A.   We had him use the language that we --
13  we requested the language that we had used that
14  Bernell put in part of his -- he handled the
15  contract for us, too -- which is one of these
16  exhibits.
17       And that's all I remember, other than
18  the copyright was registered then, too.
19       Q.   So Bell worked on the contract as
20  well?
21       A.   Yes.
22       Q.   Then he filed the 1983 registration.

Page 310

1       Is that correct?
2       A.   Yes.
3       Q.   Did he do any other work for you that
4  can recall sitting here today?
5       A.   I can't recall any other work today.
6       Q.   Why didn't you file your copyright
7  registration before the Bernell agreement?
8       A.   I was told -- I understood that it
9  wasn't necessary; so long as we had the language
10  on it, that we were fine without registering it.
11       Q.   Did Bell tell you that?
12       Or that you heard from your uncle's
13  friend?
14       A.   From the original lawyer.
15       Q.   Who is that?
16       Your uncle's friend?
17       A.   Yeah.
18       Q.   You don't remember his name?
19       A.   I don't.
20       MR. GOETZ:  Mark as Exhibit 22 a
21  document bearing production Nos. KDT0031757
22  through 802.

Page 311

1       (Exhibit Devick 22,  Document Bates
2  stamped KDT0031757 through 31802, multipage
3  document entitled: King-Devick Saccade Test in
4  the Copyright Office of the United States,
5  marked for identification)
6  BY MR. GOETZ:
7       Q.   You recognize Exhibit 22?
8       A.   It looks like the original paper
9  without the Pierce test in it.
10       Q.   Right.  There is some other missing
11  things, too.
12       Let me just ask this:  How did the
13  lawyer Bell get a copy of your paper?
14       Did you give him a full copy of the
15  paper?
16       A.   I gave him my copy.
17       Q.   You just gave him your copy of the
18  senior paper?
19       A.   I gave him my copy, yes.

Page 312

1       Q.   Was it bound -- that copy of your
2  senior paper?
3       A.   The one that -- yeah, this is similar
4  to what Al King had.  That was the original
5  paper.  That's how we got all this stuff.
6       And it might have come from Al, too,
7  because he was in on this, but I think it was
8  mine.
9       Q.   Okay.  How was it bound? -- just so
10  the record is clear.
11       A.   With a -- what was used for notebook
12  covers back then.  It wasn't --
13       Q.   Okay.  Then do you agree that Exhibit
14  22 looks like a photocopy of some of the pages,
15  given how some of the pages are sort of askew?
16       A.   Could be.
17       Q.   What's your understanding of what Mr.
18  Bell did with the paper?
19       A.   I think he filed -- registered a
20  copyright for it and the test along with it.
21       Q.   What's your understanding of how he
22  created Exhibit 22?

Page 313

1   A.   I don't have -- I don't know.
2   Q.   You have no idea, okay.
3   A.   Well, he somehow put together the
4   product -- the paper and test that I gave him.
5   Q.   I mean, it looks like he decided to
6   take some information out, or not copy some
7   information, right?
8   A.   I haven't examined it closely enough
9   to see what we may or may not have taken out.
10      It doesn't have the abstract or the
11   title page, perhaps.  Doesn't have the -- yeah,
12   it doesn't have the Pierce paper in there.  So,
13   there were some decisions made as to leave those
14   out, evidently.
15   Q.   Who made those decisions?
16   A.   Al King and I and this lawyer were
17   involved in giving him the information to file,
18   so a combination of one of the three of us.
19   Q.   Do you recall sitting here today whose
20   idea it was to not submit the Pierce test to the
21   Copyright Office?
22   A.   I don't.

Page 314

1   But I think that it's a copyrighted
2   test.  So it probably -- you know, maybe that
3   had something standards with it.
4      I really don't know.
5   Q.   You are not a lawyer, I thought.
6   A.   I'm not a lawyer.
7   Q.   Okay.  So sitting here --
8   A.   I wish I was, though.
9   Q.   No, you don't.
10      Sitting here today, you don't recall
11   who made the decision not to include the Pierce
12   test in your deposit.
13      Is that correct?
14   A.   Well, ultimately the lawyer -- we
15   didn't override any legal advice that he gave
16   us.  So I would guess it was mostly, ultimately,
17   him.
18   Q.   But you don't remember for sure?
19   A.   Well, I would say that's for listening
20   to a lawyer.  And so I am sure that he made the
21   ultimate decision for that.
22   Q.   I see.

Page 315

1      THE WITNESS:  Can I take a break at
2   some point pretty soon? --
3      MR. GOETZ:  We can take a break right
4   now.
5      (Pause)
6      THE VIDEOGRAPHER:  We're going off the
7   record at 2:37 p.m.
8      (Recess from 2:37 p.m. to 2:52 p.m.)
9      THE VIDEOGRAPHER:  We are back on the
10   record at 2:52 p.m.
11   BY MR. GOETZ:
12   Q.   I want to go back to the Bernell
13   agreement for one second?
14      MR. GOETZ:  And I'm going to hand to
15   you a document marked as Devick 23, bearing
16   production Nos. KDT0154890 and 891.
17      (Exhibit Devick 23, Document Bates
18   stamped KDT0154890 through 154891, two-page
19   letter from Richard W. Paulen to Jeffrey S.
20   Beardsley, dated March 2, 1983, marked for
21   identification)
22   BY MR. GOETZ:

Page 316

1   Q.   That is a modification of the Bernell
2   agreement.
3      Is that correct, sir?
4   A.   Yes, this is the actually the
5   paragraph I was referencing before.  I knew I
6   had seen it somewhere.
7   Q.   When was this signed?
8   A.   Looks like around the same time, March
9   of -- no, 30th of June, 1983.
10      (Pause)
11   Q.   Where do you see that?
12   A.   Right before the -- oh, no, no.
13   That's breaching an agreement with SUNY.  I'm
14   sorry.  That's the last sentence above where we
15   signed, sorry.
16      It should be March 2nd, 1983.
17   Q.   Looks like there is one date under the
18   first signature the last page:  March 16, 1983?
19   A.   That's right.  Same date as this.
20   Q.   But this is an amendment to the
21   agreement, I guess that everyone agreed to.
22      Is that your understanding?

Page 317

Pages 314 to 317

1      A.   I have forgotten -- I think it
2    extended an opportunity, if they didn't reach an
3    agreement with SUNY, that I could -- that I
4    could deal with SUNY myself.
5          I think is what it says.  That's what
6    I remember about this.
7      Q.   Okay.  You can put that back.
8        (Pause)
9      Q.   Where we left off on the copyright
10    deposit -- you don't know who decided to remove
11    the abstract, the index, the bibliography, and
12    the Pierce test, right?
13      A.   It had to be our lawyer, because we
14    wouldn't have expressed any authority over on
15    what to put into a filing on a copyright
16    registration.
17      Q.   Well, your lawyer, I guess, could have
18    said that's okay, but it could have been your
19    idea.
20      A.   That -- I don't remember that.
21      Q.   Do you remember one way or another
22    whose idea it was?

1      A.   I would suggest it's almost certain it
2    was the lawyer's idea.
3      Q.   Why do you think the lawyer wanted to
4    remove the Pierce test?
5      A.   Well, it was already copywritten.  It
6    had a registered copyright on it.
7      Q.   I mean, don't you think that the
8    Copyright Office would want to know that, you
9    know, the Pierce test was out there?
10      A.   The results of the Pierce test were
11    filed with this paper.  They had tables
12    including the Pierce test, and they just have
13    the test itself.
14      Q.   I mean, you say in your paper that,
15    you know, that your test is a modification of
16    the Pierce test.
17          You know you say that, right?
18      A.   That's what it said --
19      Q.   In the abstract.
20      A.   Which is not in this now.
21      Q.   Right.
22      A.   Well, because -- as we discussed

1    earlier, I'm not sure that's accurate -- but
2    whatever.  That's what we put in the original
3    paper.
4      Q.   Okay.
5          Do you have any -- any information
6    about whether the Copyright Office would want to
7    know about the Pierce test and the fact that the
8    authors of the paper said that their test was a
9    modification of the Pierce test?
10          Do you have any --
11      A.   I'm not a lawyer.
12      Q.   So you don't know whether the
13    Copyright Office cares about that or not.
14          Is that right?
15      A.   I don't know.  I'm not a lawyer, so --
16      Q.   You don't know whether the Copyright
17    Office's ability to judge whether your test was
18    worthy of a copyright was diminished by the
19    removal of the piece test in the abstract,
20    right?
21          You just don't know one way or the
22    other?

1      A.   I haven't looked at this closely
2    enough to see if the Pierce -- I saw some Pierce
3    tables in the back.  So those are still in
4    there.  And I'm going to guess that the whole
5    results of Pierce are in there as well, and the
6    comparison.
7          But I haven't looked at it enough.
8      Q.   My question is not -- it's different.
9          My question is:  Do you know whether
10    the Copyright Office cares about the fact that
11    the abstract was removed where the author said
12    that the test was a modification of the Pierce
13    test?
14          You just don't know whether the
15    Copyright Office may care about that?
16      A.   I'm not a copyright lawyer, so I don't
17    know.
18      Q.   And you don't know whether the
19    Copyright Office would care about the fact that
20    the Pierce test itself in the appendix was
21    removed either.  You just don't know.
22          Fair?

1    A.  I'm not a lawyer.

2    Q.  So you don't know as a result, right?

3    A.  I -- lots of things I don't know today

4  because I'm not a lawyer.

5    Q.  Right.

6    But is this one of them, sir?

7    A.  Yes.  We followed a lawyer's advice.

8  And we certainly didn't try to talk him into or

9  out of anything.

10    Q.  Okay.

11    MR. GOETZ:  I'll mark as Exhibit 24 a

12  document bearing production number KDT0031754

13  through 56.

14    (Exhibit Devick 24, Document Bates

15  stamped KDT0031754 through 31756, three-page

16  document entitled: Additional Certificate of

17  Registration of a Claim to Copyright , marked

18  for identification)

19  BY MR. GOETZ:

20    Q.  Do recognize this?

21    A.  It's a certification of registration

22  for a claim of copyright.

1    Q.  And your lawyer signed it, right? --

2  Herbert Bell?

3    A.  Yes.

4    Q.  Do you recognize the signature?

5    A.  No.

6    Q.  How do you know that's his signature?

7    A.  I guess I don't, but he apparently

8  signed it.

9    Q.  Okay.  Were you involved in preparing

10  this form?

11    A.  No.

12    Q.  Did the lawyer ask you about any

13  questions that relates to the information on

14  this form?

15    A.  We told him what's happening with this

16  copyright application.

17    And, as I said, as far as no

18  publication in line 3 there, we didn't know the

19  publication -- I thought the publication was

20  that 1983 when the American Optometric

21  Association wrote the publication about it.

22    Q.  Did you tell your lawyer about all the

1  sales in '76, '77, '78?

2    A.  I told him that we had been selling

3  it, yes, with a copyright.  He duplicated the

4  copyright language on his contract.  That's what

5  was on there:  Copyright care of Steven D. --

6  except without the O.D.  That's what we

7  discussed earlier.

8    Q.  You are talking about on the agreement

9  with Bernell?

10    A.  Yes, that -- it was part of that as

11  well.

12    Q.  You see in box 6 on the second page,

13  it says:  Preexisting Material:  None, Material

14  Added to this Work:  None?

15    Do you see that?

16    A.  The material was --

17    Q.  The question is:  Do you see it?

18    A.  Yes, I see it.

19    Q.  Okay.  It sounds like what you are

20  saying is that it was the attorney that removed

21  from the deposit the Pierce test and put "none:

22  here.

1    Is that right?

2    A.  He removed the Pierce test, but as he

3  put "none" in the -- that -- this article this

4  paper that he registered for had never been

5  copywritten before.  Only the test itself had

6  been sold.

7    Q.  And the agreement with Bernell was

8  before this, right?

9    A.  It says it was a month -- it's --

10  according to this, it was a month before it --

11  or two -- August instead of June or July, we

12  just read.

13    Q.  Who was this guy Beardsley on Exhibit

14  23?

15    A.  This was the Bernell outside counsel,

16  I think.  Maybe it was inside counsel.

17    Q.  Not your lawyer though?

18    A.  Not our lawyer.

19    Q.  Who is Chester and Paulen?

20    A.  Again, their lawyers.

21    Q.  So you think this is a letter from

22  Bernell Corporation's lawyers to each other?

1    A.   Outside counsel to inside counsel, I'm
2  going to guess.
3        In case -- I'm not even positive just
4  Beardsley was a lawyer.  He might have been an
5  officer of the company.
6        But they both reside in either South
7  Bend or Elkhart, Indiana, which is where Bernell
8  is -- so, yes.
9        (Pause)
10   Q.   In any event, Chester and Paulen is
11  not your lawyer.
12        Is that what you are saying?
13   A.   That's right.
14   Q.   So how come Bell is not copied on
15  here, if he was your lawyer?
16   A.   I don't know.
17   Q.   Do you think he saw this -- this
18  draft, Exhibit 23, this document?
19   A.   I think so, but I'm not sure.  I would
20  guess he did.
21   Q.   Do you have any understanding as to
22  why given that -- your testimony that Bell was

1  involved in the Bernell agreements, he put
2  "Manufacturers and Locations:  None" in item 7?
3    A.   Well, he was involved with it.
4        I don't know why he put that.
5    Q.   That doesn't seem right, does it?
6    A.   I don't know.
7        Let me see.  I didn't know what
8  "published" meant.  So let's see what
9  manufacturing -- maybe he was referring to the
10  fact I was making these.
11   Q.   You think he was?
12   A.   I don't know.  He may have been.
13   Q.   Where do you see that?
14        I just don't see that.
15   A.   It says -- says:  Manufacturing
16  Locations.
17        Well, I was manufacturing -- I was
18  putting them together ourselves.  Probably what
19  he meant.
20   Q.   I see.
21        But you haven't talked to Mr. Bell in
22  the past five years, have you?

1    A.   No.
2    Q.   So are you sure you didn't fill out
3  this form?
4    A.   The copyright form?
5    Q.   Yeah.
6    A.   Absolutely.
7    Q.   Why are you so certain of that?
8    A.   Because I wouldn't fill out a
9  copyright form.
10   Q.   Why not?
11   A.   Because, as we've testified, I'm not a
12  lawyer.
13   Q.   I know.  But you want to be.
14   A.   I really do, yes.
15        MR. SULLIVAN:  All right.
16        The smiles don't get caught from both
17  sides with only one video.
18        THE WITNESS:  Okay.
19        Let me just restate that:  I don't
20  want to be.
21        MR. GOETZ:  Okay.
22  BY MR. GOETZ:

1    Q.   Do you have any recollection sitting
2  here today of a specific conversation with your
3  lawyer about this registration form -- yes or
4  no?
5    A.   No.
6    Q.   When did you find out that the
7  copyright registration was granted?
8    A.   I don't know.
9    Q.   Did you have any communications of any
10  kind -- written or phone -- with the Copyright
11  Office or its staff during this registration
12  process?
13   A.   I don't believe so.
14   Q.   Why did you register the whole paper
15  and not just the test?
16   A.   I'm not sure.  It was the advice of
17  our lawyer, I'm sure.
18        (Pause)
19   Q.   So back to item box 3 on this page 755
20  of Exhibit 24.
21        It says:  No Publication.
22        But of course, the NYSOA paper had

# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

KING-DEVICK TEST INC.,        )

                                 )

             Plaintiff,        )

                                 )

v.                              ) No. 1:17-cv-09307(JPO)

                                 )

NYU LANGONE HOSPITALS,        )

NEW YORK UNIVERSITY,          )

STEVEN L. GALETTA, and        )

LAURA J. BALCER,              )

                                 )

             Defendants.       )

_____)

 

 

Video-recorded deposition of DARRELL G.
SCHLANGE, O.D., taken at Illinois College of
Optometry, 3241 South Michigan Avenue,
Chicago, Illinois, before Donna M. Kazaitis,
IL-CSR, RPR, and CRR, commencing at the hour
of 1:54 p.m. on Wednesday, November 28, 2018.

 

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

1      THE VIDEOGRAPHER:  This is Tape Number
2  1 to the videotaped deposition of Darrell Schlange
3  being taken by Fish & Richardson PC in the matter
4  of King-Devick Test, Incorporated vs. New York
5  Langone Hospitals, et al., in the U.S. District
6  Court for the Southern District of New York, Case
7  Number 17-CV-09307.
8      This deposition is being held at
9  3241 South Michigan Avenue in Chicago, Illinois,
10  on November 28, 2018.  The time on the video
11  monitor is 1:54 p.m.
12      My name is Marvin Oltman.  I'm the
13  legal videographer.  The court reporter is Donna
14  Kazaitis.  We are both in association with Digital
15  Evidence Group.
16      Will counsel please introduce
17  themselves for the video record beginning with the
18  party noticing the proceeding.
19      MS. McCALLION:  Hello.  My name is
20  Kristen McCallion from the law firm of Fish &
21  Richardson.  We represent the defendants in this
22  case.  And with me is my associate, Vivian Cheng,

Page 6

---

1  also from Fish & Richardson.
2      MR. KLUFT:  Good afternoon again,
3  Dr. Schlange.  My name is David Kluft.  I'm from
4  the law firm of Foley Hoag in Boston, and I
5  represent King-Devick Test.  And with me is Steven
6  Devick.
7      MR. PERKINS:  For the record, Floyd
8  Perkins from Nixon Peabody representing the
9  Illinois College of Optometry and the deponent.
10      THE VIDEOGRAPHER:  Will the court
11  reporter please swear in the witness.
12  (Witness sworn.)
13      DARRELL SCHLANGE, O.D.,
14  having been first duly sworn, was examined and
15  testified as follows:
16      EXAMINATION
17  BY MS. McCALLION:
18      Q.  Good afternoon, Professor.  So as I
19  said, my name is Kristen McCallion, and I'm going
20  to be asking you a few questions this afternoon.
21      Would you mind stating your name
22  for the record, please.

Page 7

---

1      A.  Yes, Darrell Schlange.
2      Q.  Have you been deposed before?
3      A.  Yes.
4      Q.  When was that?
5      A.  Several years ago as an expert
6  witness.
7      Q.  Okay.  What were you an expert on?
8      A.  It was an ocular health condition that
9  somebody -- I think I represented the defendant,
10  or was testifying in support of the defendant.
11      Q.  Do you remember what year it was?
12      A.  Probably 15 years ago.
13      Q.  Okay.  So you've been deposed before.
14  You probably know a lot of the ground rules.
15      A.  Uh-huh.
16      Q.  But I'm going to ask you a question,
17  to which you will reply.  The court reporter has
18  to write everything down.
19      A.  Sure.
20      Q.  So verbal responses are required.
21  Shaking of the head, body language won't be picked
22  up.  If you don't understand something, please ask

Page 8

---

1  me to clarify it.  I'm happy to do so.  If you
2  don't ask me to clarify, I'm just going to assume
3  that you've understood what I've asked.
4      Is there any reason why you can't
5  give full and accurate testimony this afternoon?
6      A.  No.
7      Q.  Okay.  So how long -- you are a
8  professor currently at ICO; right?
9      A.  Yes.
10      Q.  When did you start here?
11      A.  I graduated in 1964.  I did a one-year
12  residency which involved some association being
13  with the faculty but it wasn't in the official
14  faculty position but it was sort of a residency
15  program.  That was from '64 to '65.  In '65 I
16  became full time to the faculty and I've been that
17  way 53 years.
18      Q.  So your first year of teaching here,
19  that was in 1965?
20      A.  Officially that's what the college
21  refers to, even though when I had the residency I
22  was in charge of a vision clinic.  At that time it

Page 9

Pages 6 to 9

1  have good, what we call saccades and fixation
2  ability.  And here everything compresses closer
3  together.  So it makes it even more difficult in
4  Card 3.
5        So in our discussion we had, you
6  know, those children would often do very poorly on
7  this.  So the question was, you know, they made a
8  tremendous number of mistakes in going from here
9  to there.  And with eye movement and recordings we
10 know today that that's a real tough task for a
11 beginning reader with an immature visual system to
12 make that large movement from eight inches or so.
13       So a lot of the kids have issues
14 with that, and that's why when they're reading a
15 regular book they kind of go to the end of one
16 line and get lost or skip lines or words and so
17 on.
18       So in our discussion it became, you
19 know, maybe we need to do something a little
20 differently where it's more like not eight inches
21 saccade eye movement, but something that resembles
22 a little bit more reading, the actual reading,

1  which we know involves these little eye movements
2  that go across the page and so began to play
3  around with that idea.
4        Again, this was a very, from an
5  instructor, this is a very positive kind of an
6  interaction.  I'm sure you had it in law school
7  where you had certain professors that things
8  clicked, or if you taught, that you had certain
9  students where you get the sense that, yeah, they
10 get it.  You know, you can see the mind going
11 into, yeah, this is the problem and these are
12 options, and you can just see the whole discerning
13 process underway.
14       So with the different students in
15 that office area in the back of the lab, we
16 explored a lot of different things.  There were
17 obviously with five or six students other points
18 of discussion, but these were very refreshing to
19 me.  And it was like, you know, you just observe
20 this and you kind of help them along but you see
21 that they're starting to come up with something
22 creative and something new and something

1  different.
2        So the thought was, hey, let's try
3  something different.  So would mock up something
4  like this and then try it on a patient.  The kid
5  seemed to do better.  You know, we don't have any
6  norms, no set instructions, but it was that
7  process of enlightenment from the student side as
8  well as hey, you know, maybe this will work.
9        So Alan King and Devick, or King
10 and Devick, kind of wanted to take this on as a
11 project.
12   Q.  Right.
13   A.  Okay.  We saw the problems with what
14 we had.  We saw the patients that had these
15 problems that were hard to diagnose or to identify
16 as to what's wrong.  And we found that, you
17 know -- because on these second and third cards
18 they just couldn't do it as well.
19       So we found that there seemed to be
20 some benefit in making these numbers on the
21 King-Devick here more random-like but not just
22 left-right, left-right, but make it more like a

1  reading situation.
2        So here we had these eight
3  different lines and five on each.  So here you had
4  40 different numbers that they had to read.  So it
5  kind of clicked with them and here you had 30, you
6  know, 15 and 15.
7        So you had more stimuli that the
8  patient had to read more numbers.  So you had a
9  larger sampling of their reading ability.  And
10 they started to kind of play around with the
11 format of this and try it on their patients.
12       So at this point it was just, you
13 know, hey, this is an idea I have and the back and
14 forth of discussion, it was very rich.
15   Q.  So did you work with King and/or
16 Devick to create the King-Devick Test?
17   A.  I would say that, you know, in this
18 case in the format of students interacting on
19 cases they've seen, the discussion really started
20 with them, you know.
21   Q.  With them.
22   A.  With them and their patients.  So they

1  came up with some of these ideas and looking at
2  what are the options available at that time. This
3  was pretty much it or just doing, you know, taking
4  a pencil and seeing how the patient does that
5  movement.
6          So a lot of the creativity really
7  was generated at their level. We would have some
8  discussions and maybe modify it and so on. But a
9  lot of the basic concepts, the creativity, you
10  know, we bounced these ideas around among each
11  other and I would say as a mentoring on my part it
12  was more to keep them focused on it and to, you
13  know, work out a plan as to how we could really
14  test this out.
15          Q.  So is it fair to say that the
16  King-Devick Test is based on the Pierce test?
17          A.  In terms of a major -- that was one of
18  the major problems that the Pierce test had is
19  that it had these large saccades.
20          A second problem was that the score
21  that you got at the end had just a mean, an
22  average score, and there were no standard

1  deviations for that data.
2          A standard deviation in many of
3  these tests, even today, gives you a criteria for
4  success or failure. So if on a test like this you
5  have a mean and you have a standard deviation, and
6  the performance goes outside of that standard
7  deviation, that is a common criteria that we use
8  in many tests, perceptual tests as well as a
9  failing score.
10          So if you have that data and you
11  have this standard deviation and if the score the
12  child gets is below that, they fail that score.
13  Pierce did not have that.
14          So it was kind of like, you know,
15  we got numbers here. But, you know, and Pierce
16  also just looked at -- came up with one score. He
17  would factor in the time it took to complete this
18  test and do a formula to take into consideration
19  errors, mistakes that they made, but it would be
20  one score that was the result of the test.
21          With the King-Devick, and still
22  today, there was looking at the time it takes to

1  complete that as well as a separate set of data,
2  the errors.
3          So it was generated by patients
4  that we had, a lot of discussion we had, ideas
5  that floated around, and looking at some of the
6  problems with the Pierce in its construction and
7  in its evaluation of the data and how do you
8  relate that to patient care.
9          That was a huge problem. The
10  concept of, you know, let's have something that we
11  can get a number on, a score on, not just look at
12  the eyes, but something we can get a score on, but
13  it fell short in those two major areas.
14          So the development of the
15  King-Devick worked around those and tried to
16  accommodate those errors by changing the pattern
17  of the saccades and the number of, what constitute
18  a failing and a passing score, determining
19  standard deviations on those different scores for
20  kids at different age levels.
21          In their study they also went back
22  to do that for Pierce using Pierce's data to come

1  up with standard deviations which gave that test a
2  great improvement. But the Pierce, when this
3  started going, the Pierce test pretty much, you
4  know, didn't last very long.
5          Q.  Do you think the King-Devick Test is
6  an improvement upon the Pierce test?
7          A.  Huge. But, again, looking at 50
8  years, I have worked with a lot of students and a
9  lot of different projects, it's just what, you
10  know, it's what a teacher would like, the students
11  are connecting and going that extra mile and
12  they're letting their creativity just sort of go
13  off, and sometimes you have to kind of reign them
14  in a little bit. But it was a good experience,
15  which is why it's still very vivid in my memory.
16          Q.  Okay. Just looking at the King-Devick
17  Test. I know you have your own copy. We can use
18  the copy of the King-Devick Test that's in that
19  paper that I gave to you.
20          A.  Sure. This one?
21          Q.  Right, you have that Exhibit 4. And
22  you got to flip to the end a little bit. There's

1  numbers on the bottom right.  Do you see those?
2  The number I'm looking at is 298340.
3        MR. PERKINS:  These little numbers
4  right here, 340.
5        THE WITNESS:  Yes, okay.
6  BY MS. McCALLION:
7     Q.  So I'm just looking at the spacing of
8  the numbers on this test card.
9     A.  Uh-huh.
10    Q.  Right?  You have this in front of you,
11 the 298340?
12    A.  Yeah.
13    Q.  Did you work with Mr. Devick and
14 Mr. King --
15    A.  Uh-huh.
16    Q.  -- on designing this particular card?
17    A.  Yeah, there were several different
18 editions to that, as I recall.  Eventually the key
19 thing was to be random but the numbers close
20 enough to where it would simulate typical reading
21 ability, reading eye movements.
22        So we had different editions that

1  they would come up with and maybe try it on a
2  patient, just kind of like testing it out in a
3  preliminary way to see, you know, how does this
4  work.
5     Q.  Okay.
6     A.  Yeah, that was kind of try something,
7  what's our impression, let's modify it, and it was
8  that kind of a process.
9     Q.  So the spacing there serves an
10 important function; right?
11    A.  Yes.
12    Q.  And it's because it better measures
13 how people read?
14    A.  The eye movements involved are closer
15 to what reading eye movements are.  More so than
16 the example of where it's eight inches,
17 left-right, left-right.
18        So in that respect it was
19 constructed to be more similar to reading eye
20 movements as we would measure.
21    Q.  And do you recall around the same time
22 when you were working with Mr. King and Devick

1  also teaching something called the Vinset Test?
2     A.  No.  I mean it was there.  It used
3  letters, I think, instead of numbers.  The
4  clinical situation we were dealing with is those
5  that often were referred in for academic issues,
6  and these might be first grader, second.  And it
7  was a real issue because they didn't want to read,
8  you know, you get the whole, the whole global
9  thing of, you know, a child begins to have
10 behavioral issues if they can't function in a
11 classroom.
12        So many of those kids had poor
13 recognition skills.  So letters, even though it
14 seems simple, were difficult.  And there's a thing
15 called visual verbal processing and it's a
16 perceptual motor kind of a thing.  When the child
17 looks at it, they have to interpret and then they
18 have to verbalize it, and that whole process,
19 visual-verbal, is delayed in children that have
20 these learning related problems.
21        So that was more difficult for them
22 when there were letters instead of numbers.

1  Numbers were easier for them to understand.
2        So that's why that test was
3  available, but we didn't really focus much on it.
4     Q.  Do you remember teaching anything
5  called the Gilbert Test?
6     A.  I was not familiar with the Gilbert
7  Test until a couple of the papers that came out
8  after the New York study was done that made
9  reference to the Gilbert Test.  But we did not
10 discuss the Gilbert at that time.
11    Q.  Do you remember the year of the
12 New York study you just referred to?
13    A.  I think it was, the paper was '83
14 possibly, something like that.  Somewhere in my
15 piles here I have the date of that.  I was at that
16 point, the Gilbert was not in any academic
17 importance to us.
18    Q.  Okay.
19    A.  Just on that point.  Since going back
20 to the Gilbert Test, after hearing about it and
21 knowing that it is mentioned in the subpoena --
22 did I teach it?  It's quite dramatic what was

and Mr. Devick handed you the final senior paper.

A.  Uh-huh.

Q.  And that's what we have in front of us, I believe.

A.  Sure.

Q.  Do you remember your impression of it at the time?

A.  The whole idea of the project was very excellent and positive and, you know, brought something new to the profession that we didn't have before.

Q.  Do you remember what grade you gave them?

A.  I don't.  I hear that it was a B. I've heard that for years.

Q.  You don't remember.

A.  I know it was a recognized paper.  You know, having taught for many years and having this experience where, you know, maybe the student doesn't feel they got the grade they deserved or whatever, and, you know, years later we'll see them at a meeting and we'll laugh about it and

maybe go have a drink and it's history.

This, you know, I never imagined -- I know that this has been mentioned numerous times that it was a B.  And, again, I have no record that it was a B, but it has been an issue and I never imagined that I would have to discuss this in a subpoena in federal court.

Q.  I can imagine.

A.  I do want to mention that it isn't just one criteria.  A basic purpose of this course is to help the student understand the scientific method so they're better able to discern what's a good study, what's bad, for the benefit of their patients.  Not that they're going to do research in their practice, their clinical practice, but that they know what to look for, what's good publication, what's good research, what isn't.

At that time I know we had the same criteria.  Today we have criteria, because today our students still do this, today we use six points.  I think there might have been five at that point.

One was thoroughness of research; efficiency and ability to meet deadlines; 3, ability to work independently; 4, quality and organization of writing; 5, grammar, spelling, punctuation, follow the syllabus guidelines; and 6, completeness of referencing.

Just looking at, you know, not to make any judgments at this point, but there were more references that we did look at at that time than what are listed here in the final document.

Q.  Do you recall what those references were?

A.  Well, some of the work of like Helen Robinson, people like that.

Q.  So Helen Robinson --

A.  You know, other people, even Pierce. So I don't want -- I'm not certain that it was a B.  I have always viewed this as an excellent paper.  We don't just look at the outcome of the study and what all the work is involved, these other parameters involved.  But the word is that I gave them a B.  I do not recall that.

Q.  Okay.  Well, we'll --

A.  It wasn't just based on one factor. It was based on other things because, again, we wanted them a learning experience in the whole field of doing research and putting it together for a publication.

Q.  You said a little bit earlier that this paper, their senior paper, was a recognized paper.  What do you mean by that?

A.  What I mean by that is that even though at that time it was kind of at meetings would be spread by kind of word of mouth and, you know, at some meetings it might be focused on child care, reading and vision, you know.  It used to start to come forth that hey, you know, those guys had an interesting idea.

So at that point it was basically at meetings, check this out, you know, and people would check it out and like it.

Q.  Were these meetings before they handed in the final paper to you?

A.  No.

1      Q.   Okay.  It was meetings after they had
2    handed in the final paper.
3      A.   Yeah.
4      Q.   Do you know how people learned of it?
5      A.   A lot that, and when it was done,
6    included in the battery of tests that New York
7    did.
8      Q.   When was that?
9      A.   I think that was in the early '80s.
10      Q.   Okay.  So just going back to when
11    Mr. King and Mr. Devick handed you this paper, was
12    there a policy at the time at the school to give
13    senior papers to the library?
14         MR. KLUFT:  Objection, foundation.
15    BY MS. McCALLION:
16      Q.   You can answer.
17      A.   We would do that with all of them.
18      Q.   You did that with all of them.
19      A.   They were put in a special place,
20    special cabinet.  I tried to keep copies of any of
21    those that I was involved with.  But they were
22    kept in the library.  Most of them just collected

1    dust.  And when the college went through
2    remodeling, they had to eliminate those.
3      Q.   Right, we heard about that.
4      A.   So many of them were returned to the
5    original author, the student author.
6      Q.   So was it a policy at the time to give
7    the student papers to the library?
8         MR. KLUFT:  Objection, foundation.
9         THE WITNESS:  No, I don't think it was
10    a formal policy.  I think, you know, at that time
11    when maybe -- you know, today that might
12    immediately thereafter lead to a publication.  At
13    that time the students, they graduated, they left.
14    But some of the work was really good, including
15    this.
16         So we wanted this to be somewhere
17    that if another student, like the one that I
18    mentioned, Blashill, the one where we did the
19    modification --
20    BY MS. McCALLION:
21      Q.   Yes.
22      A.   -- you know, he could go and see what

1    the original King-Devick was like and just kind of
2    tweak it around a little bit.
3         So it was like for an internal
4    thing that students, maybe some faculty would go
5    in and sort that out.  But the way it spread
6    outside of the institution was more by at a
7    meeting and just, you know, word of mouth.
8      Q.   Okay.  So do you recall having a copy
9    of their senior paper and physically giving it to
10    the library?
11      A.   I don't know how that happened.  I
12    just know that the library somehow ended up
13    getting copies of all the papers.
14      Q.   Do you know when the library first got
15    the copy of the King-Devick paper?
16      A.   I don't.  I assume shortly after it
17    was done.
18      Q.   In 1976.
19      A.   Yeah.
20      Q.   Did you retain a copy of their final
21    paper?
22      A.   I did.

1      Q.   Did you start to use that final paper
2    in your teachings in the lab here or in the clinic
3    or in your classes?
4      A.   No.
5      Q.   What did you do with it?
6      A.   Well, we didn't -- at that time we
7    didn't start on a regular basis of using that in
8    the clinic.  That came about a little later.  As
9    it became more formalized, you know, with the test
10    plates and the like.
11         So to make those kinds of changes
12    in the curriculum and incorporate in the clinic,
13    you need something like this, you need something,
14    some sort of norms that you can quickly look at.
15    And that came but we didn't have that at first.
16         We had all the numbers and
17    everything, but to have this in the form in which
18    a clinician could say in short time, yeah, this
19    child failed, this child didn't, that was a
20    process of transitioning it into the profession.
21      Q.   I see.
22         MR. KLUFT:  Can I just state for the

1  for bringing that.
2          (Deposition Exhibit 7 was marked
3          for identification.)
4          MS. McCALLION:  And let's just mark as
5  Exhibit 8.
6          MR. PERKINS:  There's two sets of
7  those.
8          MS. McCALLION:  Yeah.
9          MR. PERKINS:  That was the stuff he
10  was talking about Reading Plus and --
11          MS. McCALLION:  Taylor.
12          MR. PERKINS:  -- Taylor.
13          (Deposition Exhibit 8 was marked
14          for identification.)
15  BY MS. McCALLION:
16      Q.  So Exhibit 8 references the testimony
17  you gave prior to the break about Taylor and the
18  Taylor test.
19          MR. PERKINS:  You got to have a verbal
20  answer.
21          THE WITNESS:  Yes, specifically the
22  eye movement recording system they had.

Page 86

1          MR. KLUFT:  This is the Reading Plus.
2          MS. McCALLION:  Yes.
3          MR. KLUFT:  And does it include these
4  pages as well?  It looks like a separate document.
5          MR. PERKINS:  Well, that goes with the
6  Taylor pages.
7          MS. McCALLION:  Yeah.
8          MR. KLUFT:  Okay.
9          MS. McCALLION:  Let's do one, two,
10  three, four, five pages total.
11          THE WITNESS:  And the comment about
12  Taylor, again, is that concurrent with all this
13  other stuff going on, he and his company developed
14  the eye movement recording systems that today is
15  still used.
16  BY MS. McCALLION:
17      Q.  You mentioned before the break, I
18  think you mentioned, correct me if I'm wrong,
19  please, the NYSOA?
20      A.  Uh-huh.
21          MR. KLUFT:  I'll just object.  I don't
22  recall that, but if the witness says it is...

Page 87

1  BY MS. McCALLION:
2      Q.  I thought you said that.  I think you
3  made a reference to New York.  Maybe that's what
4  it was.
5          Are you familiar with the NYSOA?
6      A.  Yes.
7      Q.  Okay.  What is the NYSOA?
8      A.  In New York they developed or wanted
9  to do a battery of tests for children in the
10  New York public school system and they wanted to
11  have a quick and effective way to look at eye
12  movements.
13          So they selected the King-Devick as
14  the part of their battery to use.  And they had
15  other alternatives or other choices like the
16  Pierce and some recording systems that were very
17  cumbersome.  But they included the King-Devick in
18  their battery of tests for these large sample of
19  public school children in New York City.
20      Q.  How do you know about this test, the
21  NYSOA test?
22      A.  Well, they put their name on it after

Page 88

1  they used it.  Somewhere there's a publication.  I
2  have it somewhere here.
3      Q.  That's okay.
4      A.  That they made after the procedure was
5  done, after they had done all the data, and their
6  conclusion was that it was an effective screening
7  method.
8      Q.  So you found out about the NYSOA
9  testing once their publication came out.
10      A.  Yeah.
11      Q.  You were not involved --
12      A.  No.
13      Q.  -- in the NYSOA testing.
14      A.  No.  So they put their name on it.
15      Q.  The NYSOA put their name on it.
16      A.  Yeah.
17      Q.  On the test.
18      A.  Yeah, on the test, based on their use
19  of it in this huge screening project they did in
20  New York City.
21      Q.  Did anyone from the NYSOA contact you
22  at any point in time about this particular test?

Page 89

Pages 86 to 89

1      A.  No.  That was part of the word of
2  mouth thing that was growing about this test, like
3  hey, you know, check this out, this is good.
4      Q.  How do you know that?
5      A.  Because I went to meetings and I know
6  this was the nature of a lot of communication.
7      Q.  So what meetings are you referring to
8  there?
9      A.  They could be -- at that time it would
10  be the Academy of Optometry, American Academy of
11  Optometry, American Optometric Association, it
12  would be the Optometric Extension Program, OEP.
13      At that time there were a lot of
14  local networking systems or groups that would
15  meet, for example, in Chicago every year and
16  basically speakers and participants were from this
17  metropolitan area.  So a lot of the format of
18  those was not just lecture but a lot of time just
19  to mingle and say, you know, hey, this worked for
20  me, check it out.
21      Q.  And when you said before meetings at
22  that time, are we talking about 1976, 1977?

Page 90

1      A.  Probably '60s, '70s.
2      Q.  '70s.
3      A.  Yeah, into the '80s.
4      Q.  Late '70s?
5      A.  I suppose, sure.
6      Q.  At some of these meetings the
7  King-Devick Test was being discussed.  Is that
8  your recollection?
9      A.  Not from the podium.
10      Q.  Not from the podium.  But in the
11  mingling of --
12      A.  Yeah.
13      Q.  -- the attendees?
14      A.  Yeah.  Yes.
15      Q.  Were you part of that discussion
16  during this mingling?
17      A.  I would be.
18      MR. KLUFT:  I'm just going to object
19  to the form, vague.
20  BY MS. McCALLION:
21      Q.  Do you recall the people having the
22  test at these meetings?

Page 91

1      A.  No, just that -- you mean that it
2  would be sold there or something or what?
3      Q.  No, they just had a copy.
4      A.  Yeah, no, it just was, you know, hey,
5  look, we don't have a lot of options when it comes
6  to eye movements that's quick and effective, you
7  know, you got the elaborate stuff with the
8  recording systems and technology, but to actually
9  have something that would be a few minutes
10  screening test, that was new and very positive
11  reception of people.
12      Q.  So if you could help me understand the
13  process.  Mr. King and Mr. Devick were students,
14  they completed the senior project, they handed the
15  paper in to you.  You graded it.  We're not going
16  to go into that.  And then at some point in time a
17  copy of that paper was given here to the library
18  at ICO?
19      MR. KLUFT:  Objection.  You can
20  answer.
21      THE WITNESS:  It probably was just
22  within that year.

Page 92

1  BY MS. McCALLION:
2      Q.  Within the year.
3      A.  You know, because all the senior
4  papers had to be turned in at about the same time.
5  So that's my recollection is that just to have a
6  place where people could, fellow students could
7  look at it and see it.
8      Q.  So what's your understanding of how
9  people outside of ICO found out about this
10  King-Devick project?
11      MR. KLUFT:  Objection, foundation.
12      THE WITNESS:  Probably -- you know,
13  this is the publication I was looking for, and
14  this I think is even mentioned in one of the
15  countersuit things.  But this was the results of
16  their study.
17  BY MS. McCALLION:
18      Q.  The NYSOA.
19      A.  Yeah.
20      Q.  Okay.  Well, we'll probably --
21      A.  That's a group --
22      Q.  Let's just leave this hear for now.

Page 93

Pages 90 to 93

1     A.   The publisher.
2     Q.   Okay.
3     A.   From the point when it's submitted for
4  publication and when it's actually published.
5     Q.   Right.
6          So I'd like to ask you about what
7  was happening here at ICO around 1976, perhaps
8  1977.  So you received a copy of the King and
9  Devick paper.  I think we've established that the
10  library received a copy.  You're just not
11  necessarily sure how the library got the copy.
12     A.   Just that we did that to all student
13  papers so that -- because there was interest in,
14  some students had interest in looking at what
15  their colleagues did.
16     Q.   Okay.  In your recollection did the
17  students at that time know that their senior
18  projects would be given to the library?
19          MR. KLUFT:  Objection, foundation.
20          THE WITNESS:  Uh-huh, I don't know if
21  they knew that or not.  It's just that I know many
22  of them did end up in a file cabinet.

Page 98

1  BY MS. McCALLION:
2     Q.   Well, did you talk to Mr. King or
3  Mr. Devick about the fact that their paper would
4  be given to the library?
5     A.   No.
6     Q.   So you don't know if they knew or if
7  they did not know that the copy of the paper was
8  in the library?
9     A.   That's correct.
10     Q.   Okay.
11     A.   I assume they probably did not know.
12     Q.   Did not know.
13     A.   Yeah.
14     Q.   Why do you assume that?
15     A.   This is usually in the spring of the
16  year, you know, graduation, people wanting to move
17  on.  So there's other issues that they're dealing
18  with, finding a place to practice, establishing a
19  new home.  And so some of these things, even
20  though they were significant, kind of get pushed
21  to a lower priority.
22          And it's the same for us on the

Page 99

1  faculty.  You know, it's the end of a year and
2  suddenly you ramp up for another year.  So there
3  isn't a lot of time to develop, you know, in that
4  period of time to, you know, get it to a point
5  where it could be used in a large scale basis.
6     Q.   So there came a point in time I
7  believe when you added the King-Devick senior
8  paper to your reserve list; is that correct?
9     A.   I think it was not listed in our
10  syllabus.  Somehow, I'm not sure how it worked
11  out, that it was on a reserve list.
12          We do have, when we teach a course,
13  we have a syllabus that lists the periodicals or
14  the journals or textbooks that are on reserve and
15  those that are recommended.  This, I don't
16  remember including that in that.  Because it was
17  never required, you know, as a reference.
18          We did probably about the time of
19  this or later '80s there was a book that did go
20  into eye movement issues for children, eye
21  movement, it was by Kirfreda at SUNY, State
22  University of New York.  And he made reference to

Page 100

1  the King-Devick.
2          So when these things began to
3  evolve, like this publication, now people could
4  see this, and Kirfreda would note it in his
5  textbook and talk about the good things about it.
6  So we would reference his textbook.  I don't
7  remember specifically referencing the senior
8  project.
9          I think what, and I don't know,
10  they may have just somehow always connected my
11  name to the paper.
12     Q.   Who connected your name to the paper?
13     A.   Whatever documentation here, that
14  sometimes the papers would be identified by the
15  student and also by the faculty.
16     Q.   I see.  So you can't recall a
17  particular point in time when you told the library
18  to ensure that the King and Devick paper was on
19  the reserve list for one of your classes?
20     A.   I did not do that, no.
21     Q.   But it was on the reserve list for one
22  of your classes?

Page 101

Pages 98 to 101

1  were -- I'm not understanding what you're saying.
2      In this document here you have here
3  listed what appear to be some of the student
4  scores.
5      Q.  Uh-huh.
6      A.  Okay.  That's not in here.
7      Q.  Why not?
8      A.  I didn't copy it.
9      Q.  I see.  But also what's not in your
10  copy -- well, we can go through it.  I'm trying to
11  make sense of what's not in the copy you gave us.
12      So it looks like what's not in the
13  copy that you gave us is -- and you can compare it
14  to the spiral bound -- is the Pierce saccade test
15  and the actual Pierce saccade test itself.
16      MR. KLUFT:  I'm sorry, Counsel.  Just
17  because "spiral bound" is sort of a term of art in
18  this case, can you just identify the exhibit
19  number you're talking about.
20      MS. McCALLION:  Do you have that?
21  Yeah --
22      MR. KLUFT:  Which is 4 I think?

1      MS. McCALLION:  It's 4.
2      THE WITNESS:  Yeah.
3  BY MS. McCALLION:
4      Q.  So based on my review, and you can
5  correct me if you think I'm wrong, your personal
6  copy of the paper does not have the Pierce saccade
7  test and test data.
8      A.  Right.
9      Q.  Is that right?
10      A.  That's correct, yeah.
11      Q.  Do you know why that is?
12      A.  No.
13      Q.  Okay.
14      A.  I didn't copy it.  I mean somebody
15  copied it for me.
16      Q.  And I don't believe your actual copy
17  of the paper that you gave us has the King-Devick
18  Test in it either.
19      A.  It may not.  I think the interest at
20  that time was to try to get the data of the two
21  because the actual, what the cards look like, you
22  know, we already knew what that was.

1      So I think what we attempted to
2  retrieve was the data and comparing the two tests
3  and the text of the article, I mean the text of
4  the paper.  Not all of the exhibits like the
5  Pierce test.
6      Q.  So your personal copy of the paper,
7  which is Exhibit 9, is this the copy you've had
8  since 1976?
9      A.  No, because I don't know when I got
10  it.  My recollection is that when we completed it,
11  we graded it, it went to administration.  Somehow
12  it got into a file cabinet in the library, and
13  subsequent to that I requested a copy of the
14  paper.
15      Q.  From who?
16      A.  My TA, to go and make a copy of it.
17      Q.  From the library?
18      A.  Uh-huh.
19      Q.  Okay.
20      A.  From the stacks.
21      Q.  I see.
22      A.  Because I always want to have a copy

1  of whatever I've participated in.
2      Q.  And the copy that you graded was given
3  back to Mr. King or Mr. Devick; is that right?
4      A.  Or to the administration I think for
5  recording.  But then ultimately they got the
6  paper, yes.
7      Q.  Right.  Who was your TA that you asked
8  to get a copy?  Do you recall?
9      A.  No.
10      Q.  Do you recall when it was, what year?
11      A.  It was probably that summer or
12  something like that.
13      Q.  Okay.  So did there come a point in
14  time where you were using the King-Devick Test in
15  your classes here at ICO?
16      A.  Say that again.  You mean when did I
17  start?
18      Q.  When did you start?  When did you
19  start using the King-Devick Test in your classes
20  here at ICO?
21      A.  I don't know.  We started using it in
22  lab probably, you know, 20 years ago, that's just

1  an estimation, as a procedure to do.  But it was
2  starting to then show up in other courses too,
3  mentioning let's say some of the courses on child
4  development for example.  I'm just throwing that
5  one out as an example.
6          You know, it began to be mentioned,
7  not that we sit down and learn how to do the test,
8  but it's mentioned as something that has some
9  clinical value.
10     Q.  And were you talking to Mr. Devick at
11 that time?
12     A.  No.
13     Q.  Have you ever used the King-Devick
14 Test in your private practice?
15     A.  I have.
16     Q.  When did you start doing that?
17     A.  I've done it rarely.  Sometimes if we
18 have a patient that has some kind of an oculomotor
19 problem, I would do that, yes.
20     Q.  Do you remember when you first did
21 that?
22     A.  No.

1          patients have unusual eye movement problems, it
2  could be concussion related, it could be academic
3  or grade related.  I have a clinic period where I
4  deal with these special testing cases.  We call it
5  special testing.
6          So a key part of that is the eye
7  movement recordings, which is really, you know,
8  the King-Devick and the developmental eye movement
9  test, they're more subjective, you need a response
10 from the patient.  And a key part of an assessment
11 of any eye movement problem, to really do a fine
12 diagnosis, get fine detail, is with eye movement
13 recordings.  So that's been my real focus.
14     Q.  Do you recall when the first time you
15 saw the King-Devick Test cards in, I guess in an
16 usable format as you might say?  And I think
17 you're talking about --
18     MS. McCALLION:  We need to change
19 these numbers.  Did we make copies of these?
20     MR. PERKINS:  No, we didn't.
21     MR. KLUFT:  Do you want to use one of
22 the pre-marked ones?

1      Q.  Do you think it could have been around
2  the late '70s?
3      A.  No, it wouldn't have been then.
4      Q.  Why not?
5      A.  Just because it wasn't available.
6      Q.  Even though you had a copy of the
7  paper --
8      A.  Yeah.
9      Q.  -- with the test cards in it?
10     A.  I was more into -- my whole direction
11 and research and clinical practice, even today, is
12 eye movement recording.  So that's my real focus.
13         So when I would see a patient,
14 whether it was private or here, the emphasis of
15 the analysis was eye movement recordings.
16         We would also currently, and that's
17 one of the documents that you have that shows how
18 I use it today, there were two case examples that
19 somewhere are in -- I think they were discussed
20 earlier -- that shows by example how we use it, or
21 I use it today.
22         We have in clinic, if certain

1          MS. McCALLION:  They're a little
2  different.
3          MR. KLUFT:  All right, sorry.  I'm
4  just trying to help.
5  BY MS. McCALLION:
6      Q.  So I think, and I don't want to put
7  words in your mouth, so you can correct me if I'm
8  wrong, but you said that the test wasn't usable
9  but then at some point in time it became usable;
10 right?
11     A.  Uh-huh.
12     Q.  So how did it become usable in your
13 opinion?
14     A.  When it was in that format.
15     Q.  Okay.  When it was in like a
16 spiral-bound, hard copy format?
17     A.  When you had the flip charts, yeah.
18     Q.  When's the first time you saw it in
19 this type of format?
20     A.  I don't know.
21     Q.  Any estimation on years?
22     A.  We include that in the lab manual that

we had previously sent to you, you have a copy of
it right in front of you there, in your right
hand.
        MS. McCALLION:  We can mark the lab
manual as a exhibit.
        MR. KLUFT:  Sounds like a good idea.
        MS. McCALLION:  So this will be 10 --
        THE WITNESS:  So I would say during
the last ten years possibly.
BY MS. McCALLION:
    Q.  The last ten years is the first time
you saw the King-Devick Test in the --
    A.  No, first time we included it in the
lab.
    Q.  I see.
        MS. McCALLION:  Let's take a breather
for a second and we'll mark this as 10, Exhibit
10, the lab manual, and then we can talk about it.
        (Deposition Exhibit 10 was marked
        for identification.)
BY MS. McCALLION:
    Q.  So aside from the lab manual, do you

experiments, and we've kind of moved it more into
a clinical perspective and more relevant to
patient care today.  So that's done more with me.
        But the other two authors,
Alexander and Lee, one is at a different
institution, I think he's retired, and Dr. Lee is
from here, and he retired a couple years ago.
        So it's been a transition to move
this lab more into clinical relevance with case
examples.  And that's why, you know, at the very
end we have an example of how we used some of
these procedures.  The format of each lab is to --
format of each lab is to have a discussion at the
end, the two-hour period, you know, gives these --
currently these are second year students.
        So clinic is there.  They observe,
they do some things in clinic, but it seems so far
away.  So to give some significance to the lab, we
use a lot of case examples so they can connect the
two.  And, in fact, one of the powers, it's called
laboratory 4.
    Q.  What page are you on, if there are

recall when in your view the King-Devick Test was
in a form that it was testable?
    A.  No.
    Q.  So I think you just said that -- so
you have the lab manual in front of you; right?
    A.  Uh-huh.
    Q.  This is Exhibit 10.  And this is
something that you produced to us; right?
    A.  Uh-huh.
    Q.  And is this lab manual a document that
you're using currently?
    A.  This is from the previous year, yes.
    Q.  Okay.
    A.  Similar to now.
    Q.  Did you create this document?
    A.  There's three authors.  The bottom two
are retired, haven't been here for years.  So it
started as a document with three different
authors.  Common is to keep some of the
originating authors on the document.
        So this goes back to when it was
more just visual science types of activities and

page numbers.
    A.  I don't know.  They're not numbered.
It looks like this, laboratory 4.
        We've done this the last six or
eight years where students in small groups have to
do a presentation on a topic.  It can be something
related to ocular motility.  It could be, you
know, the eye movement complications with multiple
sclerosis for example or Alzheimer's.
        So they have to do a presentation,
four or five at the max, with a PowerPoint and
period of discussion.  So we give them some ideas
on topics, but they have to do this as a part of
their lab effort.  And they do it, it can be two
people sometimes, and can use five or six
people -- well, no, five is the max, four or five
people.  They do a good job.  And they have to,
you know, start from scratch.
    Q.  In 1976 when Mr. King and Mr. Devick
handed in their senior project to you, did they
have to present it to their classmates?
    A.  No.

BY MS. McCALLION:

Q. Do you recall when you got these flip charts, what years?

A. Those, probably two or three years ago, the top one.

Q. 11 and 12 --

A. Yeah.

Q. -- a few years ago?

A. Yeah.

Q. And then 13 is older?

A. Definitely. Probably 10 years. And some of those, you know, kind of were used in the clinic at one point. The clinic has made a complete transition to no longer flip charts, but it's all digital.

Q. Do you administer the King-Devick Test on an iPad currently in the lab?

A. No.

Q. No.

A. We will, we will. But at this point this is what we have. But they will do that in the clinic when they get to the clinic, which will

be some of third year and their last year, the fourth year, yeah, because that's -- the clinic almost exclusively uses the digital and the iPad.

Q. The King-Devick Test is in the clinic now --

A. Yes.

Q. -- in an electronic form.

A. Yes.

Q. Got it.

A. And we have a new enormous renovation and expansion of our pediatric and binocular vision clinic where this is done and this is going to be all high-tech and state of the art. So we still deal with this in the lab sometimes.

Q. Are the people in the lab also, they're administering other types of tests; right?

A. Yes.

Q. It's not limited to the King-Devick Test.

A. Exactly.

Q. What other types of tests do they use?

A. Developmental eye movement tests.

Those are pretty much in the manual there.

Q. Okay.

A. Yeah. So you try to give exposure to what's clinically relevant today and by case examples to make it meaningful so that they can see a patient behind it, that there might be a patient that they would use this test on. So they make that connection. And that's the purpose at this point.

Q. Right. It makes sense.

MS. McCALLION: Well, I think we might be done.

MR. KLUFT: Could we take a five-minute break?

MS. McCALLION: Of course.

MR. KLUFT: I just want to use the restroom, and we may have one or two questions.

MS. McCALLION: Okay.

MR. KLUFT: And we may have no questions but I just want to think through it.

MS. McCALLION: Yeah, I want to do the same with Vivian. So we'll reconvene in five

minutes.

THE VIDEOGRAPHER: We are now going off the record at 4:42 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now going back on the record at 4:52 p.m.

BY MS. McCALLION:

Q. Okay. Professor, we just have a few more questions. I think we're going to be done very soon.

Have you ever heard of a company called the Illinois College of Optometry Press?

A. It's not a company.

Q. What is it?

A. ICO Press?

Q. Yes.

A. That refers to things that have been printed in the prints room --

Q. Okay.

A. -- our printing department downstairs where we print all the lab manuals, the syllabi. And it used to refer to, like even the lab manual,

1    as ICO Press, which was not for public
2    distribution but it was more for stuff that was
3    done internally, for internal use.
4        Q.  And so it wasn't a separate company?
5    It was just a division of the school?
6        A.  We have a print room where we have --
7    it's a combination of printing and a mailroom and
8    stuff like that.  And so we have always had a way
9    to produce documents or manuals or syllabi, things
10   like that.  And for a period of time we would, or
11   the institution would say ICO Press, meaning it
12   was done internally.  It's not an external place.
13   It's just our copying system.  And it was
14   basically for manuals, syllabi, you know, any
15   documents that we as faculty might have that we
16   want to distribute to the students.  It was mainly
17   a method of designating stuff that was done on
18   site and would be provided for or available to our
19   student body.
20       Q.  In copies?
21       A.  Well, there it would be, you know,
22   mimeographed or whatever.  What do you mean

1    copied?
2        Q.  So I guess I'm wondering what the --
3        A.  So let's say if you wanted 150
4    manuals, they would make 150 manuals.
5        Q.  I see.  So as a faculty member here
6    you would ask the press for copies of a certain
7    document, you would give them a certain number of
8    copies you wanted, and they would make you those
9    copies?
10       A.  Assuming it was for a larger amount
11   than just a few.  If it was just a few, you could
12   have your teaching assistant or you do it
13   yourself --
14       Q.  Right.
15       A.  -- in the faculty office area.
16           So it wouldn't have to go through
17   the print room because then you have to, you know,
18   charge it to an account, you have to follow the
19   paperwork.  And so many times if it's a small
20   number of copies that we want of something, we'll
21   just do it ourselves.
22       Q.  Okay.  So I want to show you this

1    document.  It's something that we used earlier.
2    It's already marked.  You don't have to mark it.
3    I'm just going to give you this copy of the
4    original, it's ICO 5.
5            I'll show you where I'm looking.
6    So the title, part of the title of the document is
7    I think the title of the senior paper; right?  It
8    says "The proposed King-Devick" -- I'll use this
9    one and give you that one.  (Document tendered to
10   the witness.)
11           So we pulled this, I'll represent
12   to you, we went on to the ICO library website and
13   we did a search for "King-Devick" and this is what
14   appeared.  It has the title of the paper.  Do you
15   see that title at the top, "The proposed"?
16       A.  Uh-huh, yeah.
17       Q.  And then a couple lines below it has
18   publication information, Illinois College of
19   Optometry Press.  That's why I was asking you what
20   the press is or what it did.
21       A.  Yeah.
22       Q.  Do you know why the paper is

1    affiliated with the press on this document?
2        MR. KLUFT:  Objection, foundation.
3        THE WITNESS:  Yeah, that, again, was
4    their way of designating that it was done
5    internally and it was done at the time that the
6    paper was apparently put into the stacks of the
7    library, as other senior projects were.
8            So there has never been an ICO
9    Press.  It's just a way of designating us doing
10   internal printing or duplication or whatever for
11   student use.
12   BY MS. McCALLION:
13       Q.  So does this indicate to you that the
14   senior paper was duplicated for third party use
15   or --
16       A.  No.
17       Q.  -- student use?  No?
18       A.  Because it was not published, you
19   know, there was no publication or notice
20   profession-wise that this paper has been
21   published.
22           It was internal use.  I think in

1 publications a key part of that has to do that
2 it's made available for public use, for possible
3 sale, or some other form of use, and that was
4 never the intent of this ICO Press.
5         So in the current I think the legal
6 definition of publication, that would be a
7 misnomer. That wouldn't mean that it was
8 published in the legal definition, as I understand
9 it.
10        Q. What's your understanding of the legal
11 definition?
12        A. That it's -- "publication" has a
13 technical meaning to copyright law. According to
14 the statute, publication is the distribution of
15 copies of a work to the public by sale or other
16 transfer of ownership or by rental, lease, or
17 lending. It was none of those.
18        Q. If I was a student here at the school
19 in 1977 and I went to the library and asked for a
20 copy of the King-Devick senior paper, could I have
21 gotten a copy?
22        MR. KLUFT: Objection, foundation.

1        THE WITNESS: Most likely, no.
2 BY MS. McCALLION:
3        Q. Why not?
4        A. Because photocopying at that time was
5 very specific and mainly in the administrative
6 office.
7        Q. Did the administrative office have
8 photocopiers then?
9        A. Slow operating ones, yeah. But it
10 wasn't like, you know, you got a copier out here
11 that you've been using, you go there. And
12 sometimes students will do that. Actually in the
13 library they pay something for it. But there's
14 copiers like in administrative areas where, you
15 know, I can make a copy of something, as you did
16 today in our faculty area.
17        But at that time it was a big deal
18 for students to copy something out of the library
19 because it would be, you know, one sheet at a time
20 and you had to pay for it. For the most part it
21 was they would look at it. If they wanted to make
22 notes or whatever, they could do that.

1        Q. So at the time --
2        A. From my experience, that didn't
3 happen.
4        Q. Just going back to the hypothetical I
5 was giving you earlier. So if I was a student
6 here in 1977 and I went to the library and asked
7 to see the King-Devick Test, I could have seen it
8 with my eyes.
9        A. Uh-huh.
10        MR. KLUFT: Objection, foundation.
11        THE REPORTER: Can you answer out
12 loud?
13        THE WITNESS: Yes. I'm not sure that
14 that happened.
15 BY MS. McCALLION:
16        Q. Right. Well, I also wasn't a student
17 here. And I was very young in 1977.
18        Do you know that the ICO library
19 had four copies of the King-Devick senior paper?
20        A. I've heard that statement. I have no
21 basis to say that it's correct or not. I just
22 heard in some of this discussion here and so forth

1 that there were four copies. I'm not aware of
2 that.
3        Q. Okay. So you don't know when --
4        A. I don't know.
5        Q. -- the four copies were made?
6        A. No.
7        Q. Okay. I have I think one last
8 question for you, which is with respect to
9 something that you brought today, which is --
10        A. You know, like here, this monogram
11 that we talked about before, it says the
12 University of Chicago Press and this one here I
13 think is Berkeley Press or something. That's
14 something that some institutions have done when
15 they have something that they present like this
16 that you can buy or that you can arrange for
17 copies.
18        Here at this institution, not
19 currently being used, but in the past it was
20 anything that was made internally was ICO Press.
21        Q. Got it.
22        A. So that's different than what many

1  MR. KLUFT: Okay.

2  MS. McCALLION: And, in particular, it

3  came from reliability study of the Pierce and

4  King-Devick saccade tests, which looks like it's

5  from 1986.

6  MR. KLUFT: Okay.

7  MS. McCALLION: But I'll just put

8  these two articles together in the last exhibit.

9  The second article is the NYSOA K-D Test article

10  that we were talking about earlier, which we all

11  have any way, but just for purposes of clarity.

12  (Deposition Exhibit 15 was marked

13  for identification.)

14  MS. McCALLION: And then I believe

15  we're done.

16  MR. KLUFT: I have a couple questions

17  but not much.

18  MS. McCALLION: Okay. Thank you very

19  much, Professor.

20  THE WITNESS: Thank you.

21

22

Page 146

---

1  office and in the mailroom, yeah.

2  Q. Okay. One other question. I think

3  you testified when Ms. McCallion asked you if you

4  knew when the first time you used the King-Devick

5  Test as part of your lab classes. I think you

6  testified that you didn't remember when was the

7  first time you did that --

8  A. Uh-huh.

9  Q. -- correct?

10  A. Yes.

11  Q. Is it fair to say that it was at least

12  sometime after the first version of the flip

13  charts became available?

14  A. Yes.

15  MR. KLUFT: That's all I have.

16  MS. McCALLION: Okay. Thank you.

17  MR. KLUFT: Thank you very much.

18  THE VIDEOGRAPHER: This concludes

19  today's deposition. We're now going off the

20  record at 5:09 p.m.

21  (Said deposition was so concluded

22  at 5:09 p.m.)

Page 148

---

1  EXAMINATION

2  BY MR. KLUFT:

3  Q. Professor Schlange, again, my name is

4  David Kluft, and I represent Steve Devick and

5  King-Devick Test. I just have a couple questions

6  before we let you go today.

7  The Illinois College of Optometry

8  Press, which we were talking about, I understand

9  that those documents were produced in copy

10  machines, at copy machines in the mailroom; is

11  that correct?

12  A. Say that again.

13  Q. Well, let me put it another way. Is

14  it fair to say the term "Illinois College of

15  Optometry Press" is a term used internally to

16  identify documents that were created on the copy

17  machines in the mailroom?

18  A. Yes, it would be in the mailroom,

19  yeah. Normally it's, you know, mass production,

20  but they don't do that anymore because of the

21  accessibility of a lot of copiers. But at that

22  time copiers were maybe in the administrative

Page 147

---

1  STATE OF ILLINOIS )

2  COUNTY OF C O O K )

3  I, Donna M. Kazaitis, CRR, RPR, IL-CSR
   No. 084-003145, do hereby certify:

4  That the foregoing deposition of DARRELL G.
   SCHLANGE, O.D. was taken before me at the time and

5  place therein set forth, at which time the witness
   was put under oath by me;

6  That the testimony of the witness and all
   objections made at the time of the examination

7  were recorded stenographically by me, were
   thereafter transcribed under my direction and

8  supervision and that the foregoing is a true
   record of same.

9  I further certify that I am neither counsel
   for nor related to any party to said action, nor

10  in any way interested in the outcome thereof.

11  IN WITNESS WHEREOF, I have subscribed my name
   this 10th day of December, 2018.

12

13

14

15

16

17

18

19  _____

20  DONNA M. KAZAITIS, IL-CSR, RPR, CRR

21  Registered Professional Reporter

22  Certified Realtime Reporter

Page 149

Pages 146 to 149

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

KING-DEVICK TEST INC.,          )
                                )
            Plaintiff,          )
                                )
v.                              ) No. 1:17-cv-09307(JPO)
                                )
NYU LANGONE HOSPITALS,          )
NEW YORK UNIVERSITY,            )
STEVEN L. GALETTA, and          )
LAURA J. BALCER,                )
                                )
            Defendants.         )
_____    )


Video-recorded deposition of CHRISTINE WEBER,
taken at Illinois College of Optometry, 3241
South Michigan Avenue, Chicago, Illinois,
before Donna M. Kazaitis, IL-CSR, RPR, and
CRR, commencing at the hour of 9:30 a.m. on
Wednesday, November 28, 2018.

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

University, Steven Galetta, and Laura Balcer. And
also here is Kristen McCallion.

MR. KLUFT: Good morning, Ms. Weber.
My name is David Kluft. And I'm from the law firm
of Foley Hoag in Boston, and I represent the
King-Devick Test, Inc. and Steve Devick. And
Dr. Devick is here with me today.

THE VIDEOGRAPHER: Will the court
reporter please swear in the witness.

MR. PERKINS: Floyd Perkins for
Illinois College of Optometry and the deponent.
(Witness sworn.)

CHRISTINE WEBER,
having been first duly sworn, was examined and
testified as follows:

EXAMINATION

BY MS. CHENG:

Q. Please state your name for the record.

A. My name is Christine Weber.

Q. Have you ever had your deposition
taken before?

A. No.

Q. So I'll just go through a few ground
rules so you can get a sense of what's going to
happen today.

I'm going to ask you a series of
questions, and unless your attorney instructs you
you have to answer and give me a full, complete
answer. Will you do that?

A. Yes.

Q. And you understand that there's a
stenographer here and she is going to take down
everything that you say. So when I ask you
questions, I need a verbal response.

A. Okay.

Q. She can't record a shake of your head.

A. Okay.

Q. I'd just ask that you wait for me to
finish asking the question before you begin to
answer. Will you do that?

A. Yes.

Q. We can take breaks whenever you like.
This probably won't be very long. But, you know,
if you want to take a break once an hour or

something like that, just let us know. I'd just
ask that you don't ask for a break while a
question is pending. Okay?

A. Yes.

Q. If I ask you a question that you think
is unclear, will you let me know?

A. Yes.

Q. Because otherwise I will assume that
you've understood the question; is that fair?

A. Yes.

Q. Do you understand that you're under
oath today?

A. Yes.

Q. Is there any reason why you can't give
me full, complete answers and testify truthfully
today?

A. No.

Q. So I just want to go through some of
your background. So you are employed by the
Illinois College of Optometry; is that right?

A. Yes.

Q. What is your position here?

A. I'm a senior director.

Q. What does a senior director do?

A. I have the library under me, so that's
my position.

Q. Do you --

A. Director of the library.

Q. Do you work exclusively for the
library or also for the college itself?

A. I work for the college but I am the
library director.

Q. And how --

A. My position title is senior director.

Q. And how long have you worked at the
library?

A. Six and a half years.

Q. And were you senior director for all
of those six and a half years?

A. No.

Q. So before you became a senior
director, what was your title before then?

A. Director.

Q. And when did you become a director?

you know, it varies. We have between probably 130
to 160 in each of the classes. It depends on the
year and the enrollment for that particular year.

Q. Do you know how many students attended
ICO in the late '70s or early '80s for one year
about?

A. I have no idea.

Q. Is the library on campus?

A. Yes. It's directly underneath us.

Q. How big is the library?

A. I can't tell you the exact square
footage, but there's a second floor which is right
behind us and then a downstairs area.

Q. So it's two floors?

A. Yes.

Q. And what type of resource materials
are available in the library?

A. Basic optometry and ophthalmology,
some medical materials.

Q. What are those materials? Like
textbooks, journals?

A. Both.

Q. What else is in the library other than
textbooks and journals?

A. That's pretty much it. I mean we
offer a wide suite of electronic resources. So
there are also things available via the library
website which are electronic, digital resources.

Q. So who has access to the library
website to get those materials?

A. Just our students, faculty, and staff.

Q. So you have to be an enrolled student?

A. Correct, or a faculty or staff member.

Q. Who has access to the library
generally?

A. It's a closed facility. So only our
students, faculty, and staff.

Q. Has it always been a closed facility?

A. Yes.

Q. So if someone from the general
public couldn't just walk in and --

A. No, they can't. If they need to come
in and do some research, they can make a request
to us, and then that generally comes through me.

If they need access, they're certainly welcome to
come in.

We also belong to a consortia
called CARLI, C-A-R-L-I, which is the Consortia of
Academic and Research Libraries of Illinois. So
as a member of that consortia, we are obligated to
open our doors to any CARLI member who chooses to
come in. But they still have to go through us and
through security to make sure that they can come
in through the doors.

Q. So who are the other members of CARLI?
Are they other colleges in Illinois?

A. Yes, colleges and universities.

Q. Do you know which colleges and
universities those are?

A. There are 92 of them, so I really
can't name them all.

Q. So if anyone from any of those 92
colleges or universities requested access to the
library, you would be the one to give them access?

A. Yes. It's very rare. We hardly ever
have anyone come in.

Q. Are there records of those requests?

A. No.

Q. Do you know when ICO joined the CARLI,
that consortium?

A. I don't.

Q. Is that something you can find out?

A. That predated me. I can call them and
find out, but I don't know.

Q. Can anyone who's say, for example, a
researcher from outside of Illinois not part of
this consortium, could they ask you for access to
the library?

A. Yes.

Q. And would you generally grant that
access?

A. It would depend on who it was.

Q. What would it depend on?

A. It would depend on the kind of
research that they're doing and whether it's
optometry and ophthalmology related.

But I mean, again, I can probably
count on less than two fingers how many requests

1  we've had for people to come in since I've been
2  here.
3      Q.  Have you ever denied a request --
4      A.  No.
5      Q.  -- for access?
6      A.  Because, again, it's rare.
7          And generally it's our alumni who
8  request access.  You know, they still have to
9  request to come in and use the material because we
10  don't open -- we don't borrow, allow things -- we
11  don't allow our alumni to borrow things just
12  willie-nillie.  You know, they've got to come in
13  and make a request to us.
14      Q.  So let's talk about the borrowing
15  policies.  Is there a policy for who can borrow
16  materials out of the library?
17      A.  Yes.
18      Q.  What is that policy?
19      A.  Faculty, staff, and students.
20      Q.  How long can they take materials out
21  for?
22      A.  Two weeks, unless it's a reserve.  If

Page 38

1  it's a reserve, it's three hours.
2      Q.  And can they take the reserve
3  materials out of the library within those three
4  hours?
5      A.  Yes, they can.
6          We also have interlibrary loans,
7  which I mentioned that Sandra does.  So if people
8  request to borrow something through interlibrary
9  loan, then we will send it out and have the
10  borrower return it to us.
11      Q.  What is the interlibrary loan program?
12      A.  It's through a consortia called RAILS,
13  R-A-I-L-S, and it's a document delivery service.
14  We belong to the consortia.  People request
15  things.  If there's something that we feel is okay
16  to lend out, then we'll lend it to people and have
17  them send it back to us when they're done.
18      Q.  Do you know how long the college has
19  been part of this RAILS service?
20      A.  Forever.  I mean a long time.  It's
21  been around for a long time.  It was formerly
22  South Suburban Library System I believe was the

Page 39

1  name of the organization.
2      Q.  Was it around in the late '70s, early
3  '80s?
4      A.  Not as RAILS, but yes, it was.
5      Q.  What was it called back then?
6      A.  As I mentioned, South Suburban Library
7  System.
8      Q.  Is there a librarian who is in charge
9  of taking care of the interlibrary loans?
10      A.  Yes.  As I mentioned, Sandra Engram.
11      Q.  Do you know who that was in the '70s,
12  early '80s?
13      A.  I don't.  I don't think Sandra was
14  here at that time.
15      Q.  Do you know someone who could help you
16  find out who was in charge of the interlibrary
17  loans?
18      A.  Probably Gerry would know.  I'm not
19  sure though if he was even here then.  I mean all
20  of this is predating me, so I just don't have that
21  information.
22      Q.  Do you know how many other

Page 40

1  organizations are part of that RAILS consortium?
2      A.  Most of the public and academic
3  libraries in the Chicagoland area.
4      Q.  So when requests are made for
5  materials from nonstudents and nonfaculty, someone
6  from outside the college, how long can they borrow
7  the material for?
8      A.  Via interlibrary loan?
9      Q.  Yes.
10      A.  I think it depends on the
11  organization.  We have reciprocal borrowing with
12  some of the organizations and not with others.  So
13  I'm not really sure what Sandra's rules are for
14  those.  I mean she does that; I don't.  She would
15  know more than I.
16      Q.  Is there a written policy on how long
17  certain schools could --
18      A.  Yes.
19      Q.  -- take them out for?
20      A.  Yes.
21      Q.  Do you have that written policy in
22  some of the library's files?

Page 41

Pages 38 to 41

1    A.  Yes.

2    Q.  Would you be able to get that for us?

3    A.  Yes.

4         But we don't lend our reserve

5    materials out.  Just to qualify that.  So anything

6    that's on reserve we don't lend, because it's

7    really generally there for her students to use.

8    Q.  So if a book or a paper were on

9    reserve, that would mean that you can't then check

10   it out of the library, you can only use it for

11   three hours within the library?

12   A.  The students can take it out of the

13   library, the faculty could take it out of the

14   library, but we do not interlibrary loan those

15   materials.

16   Q.  What if there's more than one copy of

17   the material, say it's an article and there's five

18   copies of it, would you be able to interlibrary

19   loan one of those copies even though it's on

20   reserve?

21   A.  No.  Again, we don't lend those out if

22   they're on reserve.  We don't lend them out

Page 42

1    outside of the college.

2    Q.  So if someone from outside the college

3    wanted to just take a look at something that's on

4    reserve, they would have to come to the library to

5    look at it?

6         MR. KLUFT:  Object to --

7         THE WITNESS:  Yeah, but I mean that's

8    not something we would generally do.

9    BY MS. CHENG:

10   Q.  Why is that?

11   A.  Because I don't -- people just don't

12   do that.  I mean they don't come in here for that

13   reason.  It's really a closed facility.

14        As I mentioned, there's probably

15   two requests that I've had that I've been here the

16   past six and a half years for people to come in

17   and take a look at what we have.  And usually they

18   were alumni who were doing research on

19   ophthalmology or optometry.

20   Q.  So the students and faculty at the

21   college, are they allowed to make photocopies of

22   the materials in the library?

Page 43

1    A.  Yes.

2         MR. KLUFT:  Object -- I'm sorry.

3    Register my objection to the form only as to lack

4    of a time period.

5    BY MS. CHENG:

6    Q.  Do you know when the library first had

7    a photocopy machine?

8    A.  I do not.

9    Q.  Do you know whether there was a

10   photocopy machine in the late '70s, early '80s?

11   A.  I do not.

12   Q.  Who would know that?

13   A.  Again, you know, the previous director

14   died who was here at that time.  I don't know if

15   Gerry was here then or not.

16   Q.  Does the library currently have a

17   policy about making photocopies?

18   A.  The students have a card that they

19   use, and they can make copies of anything that

20   they want as long as it falls within the copyright

21   guidelines.

22        We don't dictate that.  I mean we

Page 44

1    don't stand over the copier and see what they're

2    actually photocopying, but they have so much money

3    that's loaded onto their card and then they just

4    do what they need to do for classes.

5    Q.  Is the --

6    A.  I generally do tell them that we like

7    them to keep copies limited to less than 10 in the

8    library.

9    Q.  The copyright guidelines, is that a

10   document?

11   A.  No.  We do not have -- we just have

12   links on our website to copyright policies which

13   are the Copyright Clearinghouse and things like

14   that.  I'm not the copyright police in the

15   library.

16   Q.  Do you know how long those copyright

17   guidelines have been online on the website?

18   A.  We brought a new website up in 2016,

19   so ever since that period of time.

20   Q.  So before there was this new website,

21   were prior policies saved somewhere in the library

22   or with the administration?

Page 45

Pages 42 to 45

1 were in a big microfilm, or a big cabinet, and
2 those were the ones that were shredded.
3     Q. And this was in the old library before
4 2014 --
5     A. Yes, uh-huh.
6     Q. -- that they were in a specific
7 cabinet?
8     A. Yes.
9     Q. Was that the equivalent of being, you
10 know, behind the circulation desk like you
11 mentioned, the papers being on reserve?
12     MR. KLUFT: Objection. Object to the
13 form as vague, but you can answer.
14     THE WITNESS: I'm sorry. Would you
15 restate that question?
16     MS. CHENG: Sure.
17 BY MS. CHENG:
18     Q. You mentioned that the senior projects
19 were kept in a cabinet in the old library prior to
20 2014.
21     A. Uh-huh.
22     Q. What was that -- why were they kept in

1 a cabinet?
2     A. Because when I came, they were in a
3 cabinet. They were in a cabinet. The cabinet was
4 locked. You know, if people wanted them, we got
5 them out.
6     But, to my knowledge, no one ever
7 checked any of them out, and they were just kind
8 of sitting there. And they had been there for
9 years and years and years.
10     I mean we went through a really
11 judicious process when we moved because we lost 25
12 percent of our space. So we had to think about
13 what we were keeping, what we were weeding, what
14 was taking up space that we didn't have anymore.
15 And that was one thing that we were told to get
16 rid of, so we did.
17     Q. Before the library moved in 2014, was
18 there a library catalog of all the materials that
19 were in the library then?
20     A. Yes, it's the same catalog.
21     Q. Same catalog. So were those senior
22 projects that were locked in the cabinet, were

1 those also cataloged in the library's materials?
2     A. They were. When we moved, we
3 discarded them. We removed them from the catalog
4 and we sent everything that we discarded to our
5 business office, so that they could add that to
6 the assets list of things that were discarded. So
7 the business office should have a list of
8 everything that we discarded from the library.
9     Q. Are there old records of the library
10 catalog before the move? So would you have
11 records of what was in the library in a certain
12 year?
13     A. What we would have is the current
14 catalog which is what we have right now. Anything
15 that was discarded is out of the catalog.
16     Q. I understand. So --
17     A. But we did provide that list to the
18 business office of things we discarded.
19     Every time we discard -- for
20 instance, we just discarded all of our CDs and
21 DVDs because we don't use them anymore. When we
22 do that, they're not in the current catalog and

1 the business office has a list of those things. I
2 send them to the business office every time we
3 discard things.
4     Q. Is there a particular contact in the
5 business office that you have?
6     A. The person I usually send them to is
7 Mary Ryberg, R-Y-B-E-R-G.
8     Q. Why does the library -- or, why did
9 the library keep senior projects?
10     A. I don't know.
11     Q. Do you know who would know?
12     A. I don't know how long -- you know,
13 again they're discarded. So I don't know if they
14 were from 1929 and 1930 or 1970. You know, I have
15 no idea. So I don't know why they were kept or
16 why they were in the cabinet. I mean I don't have
17 any idea. They were just here when I arrived.
18 And, again, I've only been year six and a half
19 years.
20     Q. So currently does the library keep any
21 copies of student papers?
22     A. No. I don't even know that students

write papers anymore. I'm not really sure. I
know they do a Capstone project in their fourth
year, but I don't know where they live or where
they are.

    MS. CHENG: I'm going to mark this as
ICO 3.

    (Deposition Exhibit 3 was marked
    for identification.)

BY MS. CHENG:

    Q. Please take a look at ICO 3 and let me
know if you know what this is. (Document tendered
to the witness.)

    A. Uh-huh, I do know what it is.

    Q. What is it?

    A. It's a reserve list that I provided to
Dr. Conrad when she asked for it.

    Q. So how was this reserve list
generated? Is it a database?

    A. I think I mentioned that we flag the
reserve materials in our integrated library
system. This is a report from the reserve list.
It's a report of the reserve list.

Page 54

    Q. So I see that there are some years
here. Summer 2014. Is that the -- that's the
semester for that, you know, on the first page for
that reserve list?

    A. Yes.

    Q. And just flipping through the back --
and you can go through each page if you'd like --
I see there is dates for 2014, 2016, and 2017.

    A. Yes.

    Q. Is there a reason why there's no
record for 2015?

    A. I don't really know. I asked Grahm to
run the list for me and I don't know why 2015
isn't in there. It wasn't an oversight -- I mean
it was probably just an oversight on our part and
I apologize for that. There's no particular
reason that 2015 isn't in there.

    It may have been that that's when
we, right after we moved and, you know, maybe
things just got a little chaotic during that
period of time.

    Q. Do you remember what month the move

Page 55

was in 2014?

    A. Well, it went on for six months, so it
was most of the year. We spent two years
preparing for the move. We were weeding, we were
moving, you know, getting rid of furniture. It
was a lot. We were pretty overwhelmed, as you can
imagine.

    Q. Sure.

    So looking at ISO 3, just looking
at the very top of the page where it says "Reserve
Usage Stats."

    A. Uh-huh.

    Q. What are reserve usage stats?

    A. That's how many times that particular
material was checked out, by anyone, by students,
faculty. So if it says 0, it was never checked
out.

    Q. So you're looking at the far right
column?

    A. Correct.

    Q. So if it says 0, this would mean, for
example, just the first one, "The Massachusetts

Page 56

Eye and Ear," this was a book or something that
the professor put on the list but 0 means that no
students checked it out?

    A. Right.

    So if you look down at the bottom
of that column, you'll see that the "Clinical
management of" I think binocular vision, is what
the title is that was checked out twice.

    Q. And that's just for that one semester,
the summer of --

    A. Right.

    Q. -- 2014 semester?

    A. Right.

    Q. Then the numbers in the far left
column, what are those numbers?

    A. That's the call number. That's how we
identify the book. It's a label that's on the
bottom of the spine of the book and it's how the
students and whoever is checking out the book is
able to identify that particular book. So it
corresponds to the call number which is --

    Q. So you're pointing to ICO 2?

Page 57

Pages 54 to 57

1  to photocopy them and send them on. So if someone
2  asks for an article request, we would do that.
3  But we would never photocopy an entire book and
4  send it on to someone.
5      MS. CHENG: Can we mark this as ICO 5.
6      (Deposition Exhibit 5 was marked
7       for identification.)
8  BY MS. CHENG:
9      Q. So I've handed you what's been marked
10  as ICO 5. (Document tendered to the witness.)
11     A. Uh-huh.
12     Q. Let me know if you recognize this.
13     MR. KLUFT: Can I ask a question off
14  the record for a second?
15     (Brief pause.)
16     THE WITNESS: This is the record that
17  we would have had in our catalog prior to
18  withdrawing it.
19     So if you see the top half of the
20  page, it's the bibliographic record that's
21  attached to, that's actually in our integrated
22  library system. And then the bottom part are the

Page 66

1  the bibliographic record, it says "Senior Project
2  1976."
3      Q. So do you see under "Publication
4  Information" a couple lines up it says "Illinois
5  College of Optometry Press 1976"?
6      A. I do see that.
7      Q. What is the Illinois College of
8  Optometry Press?
9      A. I have no idea.
10     Q. Had you ever heard of it before today?
11     A. I have not. Again, this is 1976. I
12  mean we have a print room downstairs. This isn't
13  the University of Chicago where we have the
14  University of Chicago Press. I mean we don't have
15  anything like that in the institution that I'm
16  aware of. So I don't really know what that means.
17  And I didn't put this record in the database, so I
18  have no idea. It was probably put in in 1976.
19     Q. So this computerized database you
20  think was around in 1976 or some form of it?
21     A. As I mentioned, it was this VALPAL
22  system.

Page 68

1  item records which are the four copies that we had
2  in the collection under the reserve list. And
3  these have all been withdrawn from the collection.
4      So if we go into the catalog right
5  now, this would not be here because it's been
6  discarded.
7      Q. Were the copies discarded or were
8  they --
9      A. Well, they were discarded from our
10  collection, but they were given to Dr. Devick per
11  his request.
12     Q. Do you remember when that was?
13  Approximately. It doesn't need to be an exact
14  date.
15     A. I'm not sure I have that information.
16  Whenever he asked me for it. Let's see if I can
17  find it. May of 2018. And we sent this via UPS
18  to his office.
19     Q. Okay. So looking at ICO 5, is this
20  the King and Devick senior paper that we've been
21  talking about today?
22     A. Yes. If you look at general note on

Page 67

1      Q. Right.
2      A. I mean the '70s didn't have automated
3  integrated library systems. It was card catalogs.
4  So whoever cataloged this, it was probably in the
5  card catalog cataloged that way and then it was
6  just transferred into the integrated library
7  systems. Integrated library systems didn't come
8  in until the mid '80s, so it was all the card
9  catalog.
10     Q. Sure. So do you know whether the
11  library kept any old card catalogs in its archives
12  or anything like that?
13     A. No. Those have all been tossed away
14  is my understanding. We use those cards now as
15  scrap paper.
16     Q. I've seen that before.
17     A. That's how our students scribble their
18  notes and things. I mean it's -- no one has card
19  catalogs anymore.
20     MS. McCALLION: The Dewey decimal
21  system.
22

Page 69

Pages 66 to 69

BY MS. CHENG:

Q. So you mentioned before the University of Chicago Press, you understood that that was a --

A. It's a physical entity.

Q. Right. And so here you're not aware of the Illinois College of Optometry Press has something similar to that?

A. No. I'm not aware of anything like that, no. We have a print room downstairs. You can see this is a one-building standalone campus. I mean it's not the University of Chicago.

So whoever cataloged this, that's how they cataloged it. I didn't do this and I don't know why it was done this way, unless that's how they did all the student projects at the time.

Q. So just looking at the second half of ICO 5, what are the item bar codes?

A. That's how we check out books. We put a bar code in the back of the book, and our automated system checks the books out using that bar code. So the bar code is connected to the

Page 70

patron ID and that's how the system recognizes the fact that a patron has something checked out.

Q. So the patron ID would match up with a student's name or --

A. Correct.

Q. -- faculty?

A. Correct.

And that's why people don't check things out anywhere else. That's why people other than staff and faculty and students don't check things out because they don't have an ID with a bar code on it, with the exception of the interlibrary loan.

Q. So it looks like this record is showing there are four copies of this senior project; is that right?

A. There were four copies, yes, on reserve.

Q. And each of the four copies had their own bar code.

A. Correct, because each of the individual items has to have its own individual

Page 71

bar code.

Q. Do you know when the library first got this first copy? I think bar code number 113745?

A. I have no idea.

Q. Do you know when the library got these additional three copies underneath?

A. I have no idea.

Q. Did you see any of these four copies recently?

MR. KLUFT: Object to the form.

THE WITNESS: In 2018 May, yes, because I personally had them discarded from our library system and had them UPS'd to Dr. Devick per his request.

BY MS. CHENG:

Q. Did all four copies look the same?

A. Yes.

Q. What did they look like?

A. They were just paper student copies. I mean they were kind of -- I don't know. I don't even remember if they were spiral bound or, you know, what, but they were just paper copies of the

Page 72

projects.

Q. Was there a cover on them --

A. It wasn't a hard -- a soft cover, yes.

Q. It was a soft cover?

A. Yes. It wasn't a hardbound book or anything like that. If I remember correctly, and I might be misremembering this, I think the covers were blue, but I'm not sure.

Q. Can you remember in the last three years who has requested copies of this senior paper?

MR. KLUFT: Object to the form. You can answer.

THE WITNESS: Based on this statistics, no one.

BY MS. CHENG:

Q. You're saying no one has actually gotten a copy of each of these four papers?

A. Correct, no one's checked them out.

Q. Do you recall anyone requesting to see a copy of this paper?

A. We had several law firms requesting

Page 73

1          If you look in Exhibit 5 where it
2    says "Staff View," I would be able to go into that
3    and see potentially in the past few years how much
4    the book costs and when it was acquired.
5          In this particular one I'm not
6    seeing that. So I'm thinking that this is
7    something that's coming from EBSCO, which is one
8    of our electronic aggregators. And I think that
9    this is probably something that we got from them
10   somehow. I'm not sure.
11      Q. So it would be an electronic record.
12      A. Maybe.
13          MS. CHENG: Why don't we go off the
14   record for a moment.
15          THE VIDEOGRAPHER: We are going off
16   the record at 10:59 a.m.
17          (Brief pause.)
18          THE VIDEOGRAPHER: We are now going
19   back on the record at 11:00 a.m.
20          MS. CHENG: No further questions from
21   us.
22

1      A. It hasn't been happening since I've
2    been here.
3      Q. And you have no record, isn't it true,
4    of anyone ever taking the copy of the King-Devick
5    Test from that filing cabinet and borrowing it or
6    looking at it; is that correct?
7      A. No, because they would have had to go
8    through us to do that because it was a locked
9    cabinet. So we would have had to open the cabinet
10   and give it to them.
11      Q. And you have no record of that
12   occurring before your time even; correct?
13      A. No, I mean how would I know that?
14      Q. And you mentioned the copies on
15   reserve. I think you indicated that the copies
16   were, four copies, were already on reserve when
17   you arrived; correct?
18      A. Correct.
19      Q. And you don't know when they were put
20   on reserve; is that right?
21      A. I do not.
22      Q. And you don't know who put them on

1              EXAMINATION
2    BY MR. KLUFT:
3      Q. Ms. Weber, I have a couple questions
4    to ask you. Again, my name is David Kluft, and I
5    represent King-Devick Test in this litigation.
6          When you got here to the ICO and
7    took up your position in 2012, do you know how
8    many copies of the King-Devick student paper were
9    in the library?
10      A. I believe there were four on reserve
11   and one in the student projects file.
12      Q. And the student projects file, you
13   described that as a locked filing cabinet?
14      A. Correct.
15      Q. And your understanding was that the
16   school collected as a matter of course all student
17   papers; is that right?
18      A. In the past. I don't --
19      Q. In the past.
20      A. -- believe that's been happening
21   recently.
22      Q. Okay.

1    reserve except based on your -- well, withdraw the
2    question.
3          Your understanding is that
4    Dr. Schlange put them on reserve; correct?
5      A. Correct.
6      Q. Okay.
7      A. I would assume that. I mean he's
8    teaching that class, the BVS 244. So I would
9    assume that since that was associated, that
10   King-Devick was associated with that class, it
11   would be that he put them on reserve, but I don't
12   know for a fact.
13      Q. And you mentioned a couple of
14   interlibrary loan systems that you're a part of.
15   One is called RAILS?
16      A. That's our document delivery system.
17      Q. Document delivery system.
18      A. Uh-huh.
19      Q. And you said that -- and that
20   became -- that was formerly something called the
21   South Suburban System?
22      A. Correct.

is 1976, that it would have been converted in 1999
but I don't know that for a fact.
          Q.   Okay.  And you don't actually know
whether or not this paper was published by an
entity called the Illinois College of Optometry
Press?
          A.   No idea.
          Q.   And you don't even know if there ever
was such an entity called the Illinois College of
Optometry --
          A.   No idea --
          Q.   -- Press; isn't that correct?
          A.   This is knowledge --
          Q.   Sorry.  Let me just repeat it again
and make sure the record is clear.
               You don't know, in fact, whether
there ever was an entity called the Illinois
College of Optometry Press; is that correct?
          A.   That's correct.
          Q.   Did you have something else to say
about that?
          A.   This is the first time I've even ever

seen this.
          Q.   Do you have an understanding of the
Illinois College of Optometry's policy on the
ownership of student papers currently?
          A.   My understanding from Dr. Conrad at
the time that we were shredding the papers was
that intellectual property policy -- the ICO
intellectual property policy wasn't implemented
until 2009, and after 2009 the intellectual
property is owned by the college.  That's my
understanding from speaking with her, but I've
never seen the policy.
          Q.   And is it, in fact, your understanding
that student papers from before 2009, say from
1976, are owned by the students; is that correct?
          A.   That's my understanding.
          MR. KLUFT:  I'm going to ask that we
mark an exhibit -- ICO 6 I think it's going to be?
          THE REPORTER:  7.
          MR. KLUFT:  Oh, I'm sorry.
          (Deposition Exhibit 7 was marked
          for identification.)

          THE WITNESS:  We were actually
thinking about digitizing the student papers to
save space, and that's where we got into the
intellectual property decision and were told by
Dr. Conrad that that wasn't possible unless we
went back to every single student and received
their permission to digitize that material.  So we
didn't.
BY MR. KLUFT:
          Q.   And, in fact, up to that time in 2009,
as far as you know, you didn't have the
permissions of the individual students who wrote
those papers; correct?
          A.   We did not, which is why we didn't
digitize them.
          Q.   And that included the King-Devick
student paper; correct?
          A.   If that was part of the student
papers, yes.
          Q.   I'm showing you a document that's been
labeled ICO 7.  It is a document that was produced
by your attorney in this case.  (Document tendered

to the witness.)
               I'm just going to ask you to take a
quick look at it.  It's an email, so it probably
makes sense to start from the back and then read
from the first email towards the front of the
document.
          A.   Uh-huh.  That's all true that I wrote
all of that.
          Q.   You've anticipated my question.  So
why don't you finish reading the document and
here's my question I'm going to ask you so we can
get a clear record of it:  Is there anything you
wrote in this email that is not true or that you
have learned is not true since writing it?
          A.   Nope.  We sent the four copies back.
That's the only thing that I would state.
          Q.   And you mentioned that Dr. Devick
asked you for four copies.  It indicates here
that -- well, did he initially ask for all four
copies or did he initially only ask for two?
          A.   He asked for two.
          Q.   Okay.  And then why was it that you

1  ultimately gave him four?
2      A.  Because we just didn't want to deal
3  with it.  I mean it was --
4      Q.  Because lawyers were involved;
5  correct?
6      A.  It was complicated and we wanted him
7  to have what he wanted, so we sent them back.
8      Q.  So Dr. Devick, in fact, did not ask
9  for all copies from the library; he only --
10     A.  Correct, he asked for two.
11         MR. KLUFT:  Did you get that?  Let me
12 ask one more time just in case.
13 BY MR. KLUFT:
14     Q.  So Dr. Devick did not ask for all of
15 the copies in the library; he only asked for two
16 of the four; is that correct?
17     A.  That's correct.
18         When he initially asked us for the
19 two copies, we shadowed this from the collection
20 so that it wasn't available to be loaned to
21 anyone.  We didn't want anyone coming in --
22 because we were getting calls from law firms

Page 90

1  everywhere asking us for the information, and so
2  we shadowed it from our collection.
3      Q.  Understood.  Can you explain the word
4  "shadow"?
5      A.  It doesn't show up in the catalog.  We
6  still have it in our database but it's shadowed so
7  that it's not available for people to see in the
8  public.
9      Q.  Okay.  Now, one of the things you
10 mentioned before was, we were looking at the
11 electronic records in Exhibits ICO 5 and 6 and you
12 indicated that these records are available to the
13 public; is that right?
14     A.  They're available for the public to
15 see, yes.
16     Q.  And that is my question.  But that
17 does not mean that the materials that the record
18 indicates you own or you possess are available for
19 the public to see; correct -- let me ask a better
20 question.
21         The public is only able to see the
22 fact that you have this in your collection.

Page 91

1      A.  Correct.
2      Q.  The public is not able to get these
3  materials out of the library.
4      A.  To borrow the materials, correct.
5      Q.  We looked at some information today
6  about the King-Devick student paper on ICO 3, if
7  you take a look at that.
8      A.  Uh-huh.
9      Q.  And if you take a look at the second
10 page of ICO, which is Bates stamped at the bottom
11 ICO KDTest 000022?
12     A.  Uh-huh.
13     Q.  You'll see that about a quarter of the
14 way down the page there's a listing for the
15 proposed King-Devick test; correct?
16     A.  Correct.
17     Q.  And it indicates that there's been 0
18 circulations?
19     A.  That's correct.
20     Q.  Sitting here today as the senior
21 director of -- sitting here today as the senior
22 director of the library, does the library have any

Page 92

1  record that the King-Devick copies put on reserve
2  were ever lent out?
3      A.  The 2015 is missing.  I don't have
4  that information.  But based on the rest of these,
5  it has not been checked out.
6      Q.  And this record, you'll agree, only
7  goes back to 2014; correct?
8      A.  Correct.
9      Q.  Do you have any record that the
10 reserve copies were ever lent out or taken out by
11 a student prior to 2014?
12     A.  I don't.
13         And we cannot connect checkouts to
14 a specific patron.  No integrated library system
15 allows you to do that.  So, in other words, if the
16 FBI comes in and says someone's about to blow up a
17 building and we need to know if they checked out
18 this book, we cannot do that.
19     Q.  Okay.
20     A.  We cannot connect the patron to the
21 checkout.
22     Q.  Let me just ask the question again.  I

Page 93

Pages 90 to 93

1   want to make sure.
2          With that understanding, and I'm
3   not asking about any specific patrons, do you have
4   any record that any patron of the library has ever
5   checked out the reserve copies of the King-Devick
6   test?
7       A.  I can't answer that question.  I only
8   have it based on these reserve statistics.
9       Q.  Do you have any other records that
10  would answer that question?
11      A.  At the present time, no.
12      Q.  So the answer to the question is is it
13  correct to say that you have no records stating
14  that anybody ever checked out the King-Devick test
15  from the library?
16      A.  That's correct.
17          MS. CHENG:  Objection.
18  BY MR. KLUFT:
19      Q.  Just to follow up on that question.
20  And that includes reserves; correct?  You don't
21  have any record of anyone actually taking out the
22  reserve copy and looking at it?

Page 94

1       A.  I do not have, right, that's correct.
2          MR. KLUFT:  Do you want to take a
3   little break and then we can see if either one of
4   us has any more questions?
5          MS. McCALLION:  Yeah, sure.
6          THE VIDEOGRAPHER:  We are now going
7   off the record at 11:15 a.m.
8          (A recess was taken.)
9          MR. KLUFT:  I have no further
10  questions.  Thank you very much.
11         THE WITNESS:  You're welcome.
12         MS. CHENG:  We have no further
13  questions either.  Thank you.
14         THE WITNESS:  Okay.
15         (Said deposition was so concluded
16         at 11:17 a.m.)
17
18
19
20
21
22

Page 95

1       STATE OF ILLINOIS )
2       COUNTY OF C O O K )
3           I, Donna M. Kazaitis, CRR, RPR, IL-CSR
    No. 084-003145, do hereby certify:
4           That the foregoing deposition of CHRISTINE
    WEBER was taken before me at the time and place
5   therein set forth, at which time the witness was
    put under oath by me;
6           That the testimony of the witness and all
    objections made at the time of the examination
7   were recorded stenographically by me, were
    thereafter transcribed under my direction and
8   supervision and that the foregoing is a true
    record of same.
9           I further certify that I am neither counsel
    for nor related to any party to said action, nor
10  in any way interested in the outcome thereof.
11          IN WITNESS WHEREOF, I have subscribed my name
    this 8th day of December, 2018.
12
13
14
15
16
17
18
19
20      _____
        DONNA M. KAZAITIS, IL-CSR, RPR, CRR
21      Registered Professional Reporter
22      Certified Realtime Reporter

Page 96

1   Christine Weber c/o
2   NIXON PEABODY LLP
3   70 West Madison Street, Suite 3500
4   Chicago, Illinois 60602
5
6   Case: King-Devick Test, Inc., v. NYU Langone Hospitals, et al.
7   Date of deposition: November 28, 2018
8   Deponent: Christine Weber
9
10  Please be advised that the transcript in the above
11  referenced matter is now complete and ready for signature.
12  The deponent may come to this office to sign the transcript,
13  a copy may be purchased for the witness to review and sign,
14  or the deponent and/or counsel may waive the option of
15  signing. Please advise us of the option selected.
16  Please forward the errata sheet and the original signed
17  signature page to counsel noticing the deposition, noting the
    applicable time period allowed for such by the governing
18  Rules of Procedure. If you have any questions, please do
    not hesitate to call our office at (202)-232-0646.
19
20  Sincerely,
    Digital Evidence Group
21  Copyright 2018 Digital Evidence Group
    Copying is forbidden, including electronically, absent
22  express written consent.

Page 97

Pages 94 to 97

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KING-DEVICK TEST INC., <br><br> Plaintiff, <br><br> vs. <br><br> NYU LANGONE HOSPITALS, STEVEN L. GALETTA, and LAURA J. BALCER <br><br> Defendants. | Civil Action No. 17-cv-9307 <br><br> Honorable J. Paul Oetken, U.S.D.J <br><br> Honorable Debra C. Freeman, U.S.M.J |

## SUPPLEMENTAL DECLARATION OF ALLEN H. COHEN, O.D.

I, Allen H. Cohen, hereby declare as follows:

1. I am a licensed optometrist and a professor of clinical optometry at the SUNY College of Optometry. In the 1970's, I was an active member of the New York State Optometric Association ("NYSOA") and was part of a project team formed to develop an NYSOA Vision Screening Battery.

2. I submitted a declaration in this matter dated December 6, 2018. This is a supplement to that declaration.

3. In my earlier declaration, I stated that, as early as 1978, and in connection with my work on the NYSOA Vision Screening Battery, I obtained a document containing a copy of the King-Devick Test, which was part of a paper authored by Alan King and Steve Devick.

4. I no longer have that document.

5. I do not recall whether that document had a copyright notice on it.

6. I do not recall where I obtained that document or who provided it to me.

B4930816.1

KDT0312203

7. I do not recall whether I communicated with the authors of the King-Devick Test or someone else in order to obtain that document. Nor do I have any knowledge whether anyone else associated with the NYSOA Vision Screening Battery communicated with the authors.

8. As I stated in my earlier declaration, as early as 1979, copies of the King-Devick Test were made by the NYSOA in the process of studying the test for the NYSOA Vision Screening Battery.

9. I no longer have those copies.

10. During this period, I do not recall that I had any communications with the authors of the test regarding NYSOA's study of the test.

11. I have no knowledge whether or not the authors of the King-Devick Test knew that NYSOA was studying the King Devick Test or creating these copies.

12. As far as I can recall, the first time I met one of the authors of the King-Devick was recently, in or about the 2010's.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __12/28/2018_____ in New York, NY

*Allen H Cohen OD*
Allen H. Cohen OD
Allen H. Cohen

KDT0312204