UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KING-DEVICK TEST INC.,

                              Plaintiff,

              -v-

NYU LANGONE HOSPITALS, et al.,

                              Defendants.

17-CV-9307 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff and Counterclaim-Defendant King-Devick Test Inc. ("King-Devick") alleges in this suit that Defendants and Counter Claimants New York University ("NYU"), NYU Langone Hospitals, Steven L. Galetta, and Laura J. Balcer (collectively, "Defendants") have, among other things, infringed King-Devick's registered copyright in the King-Devick Test (the "K-D Test"), a reading test that can be used to detect eye-movement impairments linked to dyslexia and other disabilities. (Dkt. No. 41 ("SAC") ¶¶ 10, 88–97.) Defendants respond, in relevant part, that King-Devick's copyright registration is invalid because it was granted on the basis of an application that "intentionally withh[eld] material information from the Copyright Office." (Dkt. No. 52 ("CC") ¶ 79.) The parties have now completed fact discovery and non-expert depositions (*see* Dkt. No. 58 at 2) and are preparing to file motions for summary judgment (*see* Dkt. No. 80 at 16).

Presently before the Court are (1) all parties' motions for leave to file amended pleadings (Dkt. Nos. 69, 77) and (2) Defendants' motion for this Court to ask the Register of Copyrights (the "Register") to advise the Court as to whether the supposed misstatements and omissions in the copyright application for the K-D Test would have been material to the Copyright Office's decision to grant the application (Dkt. No. 72). For the reasons that follow, King-Devick's

motion for leave to file an amended complaint is granted in part and denied in part, Defendants'

motion for leave to file an amended answer and counterclaims is denied as moot, and

Defendants' motion for the issuance of a request to the Register is granted.

## I.       Background

The Court presumes the reader's familiarity with its prior opinion in this case,

*King-Devick Test Inc. v. NYU Langone Hosps.*, No. 17 Civ. 9307, 2019 WL 78986 (S.D.N.Y.

Jan. 2, 2019), and recounts here only the background that is relevant to the present motions.

King-Devick initiated this suit on November 28, 2017 (Dkt. No. 1) and filed the operative

Second Amended Complaint on May 2, 2018 (Dkt. No. 41).  According to that complaint, Alan

King and Steven Devick developed the K-D Test in 1976, and a copyright in the test was first

registered with the U.S. Copyright Office on August 23, 1983.  (SAC ¶¶ 9, 11.)  King-Devick, a

company headed by Devick, currently holds all rights in the K-D Test.  (SAC ¶¶ 1, 11, 14.)

The complaint maintains that Defendants violated King-Devick's rights during the course

of a "research collaboration" that began in 2010.  (SAC ¶ 23.)  Pursuant to that collaboration,

Defendants Steven L. Galetta and Laura J. Balcer, both now employees of Defendants NYU and

NYU Langone Hospitals, agreed to work with King-Devick "to evaluate and validate the use of

[the K-D Test] as a screening tool for concussions."  (SAC ¶ 22; *see also id.* ¶¶ 4–5.)  In return,

King-Devick granted Galetta and Balcer complimentary access to copies of the K-D Test and

other materials, supposedly "with an understanding between the parties that they would be used

solely in connection with testing to evaluate and validate [the K-D Test] and not for any other

purpose."  (SAC ¶ 24; *see also id.* ¶¶ 23, 25–29.)  But, the complaint alleges, Defendants have in

fact used these materials, as well as confidential information King-Devick has disclosed to them,

"in connection with developing a competing test known as the 'MULES' test" (SAC ¶ 45), and

have thereby "exceeded the scope of their limited license" (SAC ¶ 60).

Accordingly, King-Devick filed this lawsuit "to stop Defendants from further use of [King-Devick's] trade secrets, copyrights and trademarks in connection with developing and offering a competing test." (SAC ¶ 66.) The operative complaint asserts eight counts against Defendants: (1) misappropriation of trade secrets; (2) copyright infringement; (3) trademark infringement; (4) false designation of origin; (5) unfair competition under the common law; (6) violation of the Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998); (7) breach of contract; and (8) conversion. (SAC ¶¶ 74–130.)

On May 31, 2018, Defendants answered the operative complaint and asserted counterclaims against King-Devick. (Dkt. No. 52.) In their counterclaims, Defendants maintain that King and Devick based the K-D Test on earlier eye-movement tests, including the Pierce Saccade Test (CC ¶ 3), and that the K-D Test is ultimately a "mere copy, which does not embody any additional copyrightable authorship of King or Devick" (CC ¶ 24). In addition, Defendants allege that the K-D Test had been published prior to its 1983 copyright registration, both by virtue of its deposit in the library of the Illinois College of Optometry in 1976 and as part of a 1983 *Journal of American Optometric Association* article that reported the results of a research study that employed the K-D Test. (CC ¶¶ 27–28, 31, 33; *see also* Dkt. No. 52-7 at 632–33.) But in applying to register a copyright in the K-D Test, Defendants go on, King and Devick "intentionally concealed from the Copyright Office" the K-D Test's prior publication and "knowingly failed to disclaim" any elements of the K-D Test that had been copied from earlier eye-movement tests. (CC ¶ 38.) Based on these allegations, Defendants, as relevant, seek a declaration that King-Devick's registered copyright in the K-D Test is invalid.[1] (CC ¶¶ 73–85.)

---

[1] Defendants also assert two other counterclaims against King-Devick. First, Defendants seek a declaration that they have not infringed any valid copyright King-Devick might hold in the K-D Test and related materials. (CC ¶¶ 86–91.) Second, Defendants seek a declaration that

Fact discovery on King-Devick's claims and Defendants' counterclaims ended on December 7, 2018, and non-expert depositions concluded one month later.[2]  (Dkt. No. 58 at 2.) Soon thereafter, Defendants filed a motion for leave to amend their answer and counterclaims in order to, among other things, add two affirmative defenses.  (Dkt. No. 69.)  While that motion was pending, however, King-Devick indicated that it would seek leave to amend its complaint to remove certain claims and to add new allegations, and the Court accordingly agreed to defer resolution of Defendants' motion.  (Dkt. No. 68.)  King-Devick filed its motion to amend on January 29, 2019 (Dkt. No. 77), and that motion has been fully briefed (Dkt. Nos. 77, 85, 92).

Around the same time, Defendants filed a motion asking that this Court request the views of the Register as to whether King and Devick's failure to disclose the K-D Test's prior publication and predecessor tests in their application for copyright registration would have been material to the Copyright Office's decision to grant the application.  (Dkt. No. 72.)  That motion, too, has been briefed (Dkt. Nos. 73, 82, 91), and the Court now addresses all pending motions.

## II.    Motions to Amend

### A.    Legal Standard

Defendants' and King-Devick's motions to amend were filed, respectively, on January 11 and 29, 2019 (Dkt. Nos. 69, 77), well after the May 2, 2018 deadline imposed by the scheduling order governing discovery (*see* Dkt. No. 34).  But Federal Rule of Civil Procedure 16(b)(4) provides that a court may modify a scheduling order "for good cause."  Fed. R. Civ. P. 16(b)(4). Accordingly, each moving party "is required to show good cause for [the] failure to propose . . .

---

they have not infringed any of King-Devick's trademarks.  (CC ¶¶ 92–96.)  These two counterclaims are not presently at issue.

[2] In the meantime, King-Devick moved to dismiss the counterclaim in which Defendants sought to invalidate its copyright registration.  (Dkt. No. 35.)  This Court denied the motion on January 2, 2019 (Dkt. No. 65), and King-Devick has yet to answer Defendants' counterclaims.

amendment earlier in the proceedings." *Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) (summary order).  In determining whether a party has established good cause, "the primary consideration is whether the moving party can demonstrate diligence." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).  Beyond that, a court "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice" the non-moving party. *Id.*

Typically, "[a] party fails to show good cause when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'" *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05 Civ. 3749, 2009 WL 2524611, at *8 (S.D.N.Y. Aug. 14, 2009)).  And even if a movant does show good cause for the belated filing of a motion for leave to amend, a court retains its usual discretion to deny leave for reasons such as bad faith or futility. *See Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 200 n.3 (S.D.N.Y. 2014).

### B.    Discussion

As noted, both King-Devick and Defendants move to amend their pleadings.  (Dkt. Nos. 69, 77.)  The Court first addresses King-Devick's motion to amend its complaint before turning to Defendants' motion to amend their answer and counterclaims.

### 1.    King-Devick's Motion to Amend Its Complaint

King-Devick seeks to amend its complaint in order to: (1) eliminate the counts of misappropriation of trade secrets, trademark infringement, and false designation of origin, as well as the count of unfair competition to the extent that it relies on a theory of brand confusion (*see* Dkt. No. 77 at 29–36); (2) add allegations about Defendants' use and distribution of the K-D Test for clinical purposes and incorporate those allegations into the copyright infringement claim (*see* Dkt. No. 77 at 22, 32–33); and (3) add allegations about supposedly dishonest efforts

5

Defendants have made to promote MULES at the expense of the K-D Test and incorporate those allegations of "commercial immorality" into the unfair competition claim (*see* Dkt. No. 77 at 20, 37).  The Court addresses each category of proposed amendments in turn.

### a.    Elimination of Certain Claims

As for the first category of proposed amendments, Defendants raise no objection.  (*See* Dkt. No. 77 at 1; Dkt. No. 85 at 5.)  Because these amendments seek to eliminate three causes of action and one theory of liability embedded within a fourth cause of action, they will "narrow the issues that the Court will have to consider at . . . trial" without prejudicing Defendants.  *Hahnel v. United States*, 782 F. Supp. 2d 20, 31 (W.D.N.Y. 2011).  The Court therefore finds good cause to allow them, and so grants King-Devick leave to make these unopposed amendments.

### b.    New Allegations of Improper Usage of the K-D Test

The Court next considers the second category of proposed amendments, *i.e.*, the addition of factual allegations regarding Defendants' use of the K-D Test "for purposes of assessment, diagnosis, and treatment of patients and students of Defendants outside the scope of the license," as well as Defendants' distribution of the K-D Test to third parties.  (Dkt. No. 77 at 25.)  These allegedly unauthorized uses, the proposed amended complaint maintains, provide an additional basis for copyright infringement liability above and beyond Defendants' development of the MULES test, which forms the basis of King-Devick's presently operative copyright claim.  (Dkt. No. 77 at 32–33.)  Because King-Devick supposedly had no basis for discovering these newly alleged uses until after the December 18, 2018 depositions of two NYU employees, King-Devick urges the Court to find good cause to allow the belated amendments.  (Dkt. No. 77 at 2–3.)

Defendants, though, oppose these amendments on grounds of undue delay, prejudice, and futility.  (Dkt. No. 85 at 1–4.)  They argue that King-Devick was aware as early as 2013 that

Defendants were using the K-D Test in connection with their concussion patients and providing copies of the test to other medical researchers.  (Dkt. No. 85 at 2–3.)  Further, they claim that expanding the scope of King-Devick's copyright claim to include the new allegations will require fresh discovery into "thousands of patient visits" that took place "over several years," and into the amount of any corresponding damages (Dkt. No. 85 at 3), given that King-Devick's infringement theory to date has been "based entirely on Defendants' alleged use of [King-Devick's] copyrights *with MULES*" (Dkt. No. 85 at 4).  Finally, Defendants argue that the amendments would be futile because they are too conclusory to state a viable claim and because any claim grounded in the new allegations would sound in contract rather than copyright.  (*Id.*)

The Court concludes that King-Devick has failed to establish good cause for its delay in proposing these amendments.[3]  Most importantly, email correspondence between King-Devick's employees and NYU personnel dating back as far as 2013 reflects King-Devick's awareness that Defendants were disseminating the K-D Test and using it to assess patients at NYU.  (*See, e.g.*, Dkt. No. 86-1 at 4 (September 2013 email from Balcer to Devick requesting copies of the K-D Test for the NYU Concussion Center because "the providers are all using the test as part of [their] assessments"); Dkt. No. 86-5 at 2 (July 2014 email exchange in which King-Devick agreed to provide copies of the K-D Test to an NYU researcher for distribution to the residents in NYU's Rehabilitation Medicine Department for purposes of "explor[ing] implementation of the K-D [Test]"); Dkt. No. 86-6 at 2 (March 2015 email from NYU professor to King-Devick employee mentioning that "in [NYU's] sports division, [they] have [K-D Tests] for each new patient and at every follow-up visit thereafter"); Dkt. No. 86-7 at 2 (March 2015 email from King-Devick employee expressing "interest to retrospectively examine the utility of [the K-D

---

[3] The Court therefore need not decide whether the proposed amendments would be futile.

Test] in a clinical setting" based on data gathered "from patients seen through the NYU concussion clinic"); Dkt. No. 86-9 at 2 (May 2015 email from King-Devick employee indicating her awareness that NYU's Concussion Center was using the K-D Test "for every patient at every visit to help monitor recovery"); Dkt. No. 86-10 at 2 (September 2016 email from King-Devick employee listing "NYU Langone Concussion Clinic" among the clinics using the K-D Test).[4])

But despite its long awareness of the clinical uses that it presently hopes to challenge as infringing, King-Devick has up to now elected to ground its copyright claim in Defendants' use of the K-D Test and related materials "as part of [a] program to develop a competing test." (SAC ¶ 90; *see also id.* ¶ 66 ("The instant lawsuit seeks to stop Defendants from further use of [King-Devick's] trade secrets, copyrights and trademarks in connection with developing and offering a competing test.").) And Devick's deposition testimony has confirmed that "as a general matter, [King-Devick] brought this case because of the MULES test." (Dkt. No. 86-14 at 7; *see also id.* at 25 ("I guess the infringement would be related to developing a competing product . . . ."), 27 ("[T]his whole case is about using our product to develop a competing product that's very similar."), 29 (expressing the view that Defendants have infringed certain copyrights "[o]nly to the extent that they used [King-Devick's] research and procedures to develop a competing product").) Defendants would be prejudiced were this Court to redirect the course of this action, long after discovery has closed, by allowing the late-stage addition of a new theory of liability that King-Devick could have asserted years ago.

---

[4] Where the Court relies on documents that have been filed under seal, the Court has concluded that the parties' interests in continued sealing of the portions quoted in this Opinion and Order are insufficient to overcome the presumption of public access to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

King-Devick, of course, denies that it could have proposed these amendments earlier. (Dkt. No. 92 at 2–3.)  While King-Devick accepts that it has long "kn[own] the Defendants were using the [K-D Test] at the [Concussion] Center," it maintains that, prior to December 2018, it did not know the *scope* of this use and, in particular, that it did not know that Defendants had "instruct[ed] physicians to use [the test] with every paying patient" or "incorporat[ed] it into the business model of the NYU Langone Concussion Center."  (Dkt. No. 92 at 2.)  But King-Devick clearly *did* know as early as May 2015 that NYU's Concussion Center was using the K-D Test "for every patient at every visit."  (Dkt. No. 86-9 at 2.)  And even if King-Devick is correct that discovery enabled it to learn some new details about how Defendants were using the K-D Test with their patients and about Defendants' relationships with other clinicians, King-Devick points to no specific details that are so far afield from what was known to King-Devick long before it filed this suit that they justify the belated introduction of an entirely new theory of liability.

To be sure, King-Devick finds it "hyperbol[ic]" to describe the challenged amendments as raising a new theory of liability.  (Dkt. No. 92 at 1.)  Instead, King-Devick maintains, the new allegations simply elaborate upon the existing claim that "[King-Devick] granted Defendants a license to use the [K-D Test] for research, and . . . Defendants violated the terms of the license by making unauthorized use of the [K-D Test] outside the scope of that license."  (*Id.*)  Here too, though, the Court is unpersuaded.  Making "unauthorized use" of copyrighted material is the gravamen of *any* infringement claim.  As the Court has already explained, the *particular* claim King-Devick has up to now pressed in this litigation is predicated on Defendants' allegedly unauthorized use of King-Devick's copyrighted materials "in connection with developing and offering [MULES]."  (SAC ¶ 66.)  The new allegations would indisputably expand the copyright claim beyond its present scope and would thus require fresh discovery and corresponding delay.

9

In sum, then, the Court concludes that King-Devick has not demonstrated good cause for this Court to allow it to amend its complaint to add new allegations regarding Defendants' use or distribution of the K-D Test.  Leave to make such amendments is therefore denied.

### c.   New Allegations of Commercial Immorality

Finally, King-Devick seeks to introduce new allegations of Defendants' "commercial immorality" into the complaint in connection with its common-law claim of unfair competition. (Dkt. No. 77 at 36–37.)  These allegations charge that Defendants have, among other things, claimed without justification that MULES, unlike the K-D Test, will be distributed for free; promoted MULES without disclosing their personal interest in the test; and misrepresented the degree to which MULES's efficacy has been clinically validated.  (*Id.*)  And according to King-Devick, there is good cause to allow these amendments because they "merely flesh out th[e] [unfair-competition] count with information that could not have been known to [King-Devick] at the outset of this case, that by its nature is in the sole possession of Defendants, and therefore that should not give rise to further discovery."  (Dkt. No. 77 at 5.)

Defendants offer four responses.  First, they argue that King-Devick had access to the materials upon which these new allegations are based months before it moved to amend the complaint.  (Dkt. No. 85 at 4.)  Second, they argue that the new allegations expand the scope of King-Devick's unfair competition claim and so will require the Court to reopen discovery.  (Dkt. No. 85 at 4–5.)  Third, they argue that amendment would be futile because the new allegations are insufficient to state a plausible claim of unfair competition.  (Dkt. No. 85 at 5.)  And fourth, they argue that the new allegations distort the underlying record evidence.  (*Id.*)

To the extent that King-Devick seeks to include these newly alleged "acts of commercial immorality" (Dkt. No. 77 at 37) as new, independent bases of liability, the Court is skeptical that

amendment is warranted.  After all, inclusion of such claims would substantially expand the

scope of the unfair-competition count, which presently rests in relevant part on King-Devick's

allegation that "Defendants misappropriated [King-Devick's] proprietary information, and used

the fruits of the company's labor and expenditure, to establish a competing test that would be

controlled through NYU" (SAC ¶ 110).  And any prejudice caused by such an enlargement may

not be worth the candle, given that Defendants have offered reason to think that any attempt to

hinge liability on the newly alleged acts would be legally futile.  (*See* Dkt. No. 85 at 5 & n.23.)

Ultimately, however, the Court need not decide whether King-Devick has shown good

cause to permit such an enlargement—or whether such an enlargement would be futile—because

King-Devick has disclaimed any attempt to expand the scope of its existing unfair-competition

claim.  Instead, King-Devick maintains that the new allegations aim to "flesh out" the preexisting

claim (Dkt. No. 77 at 5) by "includ[ing] specific allegations" that bolster the presently operative

complaint's contention that Defendants' alleged misappropriation of King-Devick's proprietary

information was performed in "bad faith" (Dkt. No. 92 at 3; *see also* SAC ¶ 112).  Indeed, it is

precisely because the proposed amendments aim to exemplify, rather than supplement, the

existing unfair-competition claim, King-Devick argues, that the amendments would cause no

prejudice to Defendants.  (Dkt. No. 77 at 5.)

Holding King-Devick to its representations, the Court concludes that King-Devick has

failed to show good cause to allow the post-discovery introduction of new allegations that, in its

own account, would have no bearing on the scope of the issues in the case.  Presumably, it will

virtually *always* be the case that, during the course of discovery, a plaintiff unearths evidence in

support of its existing claims.  That, after all, is the purpose of discovery.  But once a plaintiff

has filed a complaint that includes sufficient factual allegations to "give the defendant fair notice

of what the . . . claim[s] [are] and the grounds upon which [they] rest[]," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), the factual viability of any legally cognizable claim asserted in the complaint thereafter rests on the force of the evidence turned up in discovery and not on the sufficiency of the pleadings.  Defendants have never challenged the sufficiency of the presently operative complaint's factual allegations, and this case has by now moved well past the pleading stage.  At this point, then, the appropriate place for King-Devick to build up an evidentiary case in support of its claims is at trial or in a motion for summary judgment, and not through the further embroidery of a complaint that has long since served its function of directing the course of discovery by setting out King-Devick's theory of the case.

The Court therefore concludes that King-Devick has failed to demonstrate good cause for this Court to allow it to amend its complaint to add new allegations related to Defendants' acts of supposed commercial immorality.  To the extent that otherwise admissible evidence of these acts is relevant to proving King-Devick's presently operative unfair-competition claim, however, King-Devick will of course remain able to introduce any such evidence in support of a motion for summary judgment or at trial.

### 2.      Defendants' Motion to Amend Their Answer and Counterclaims

The Court's disposition of King-Devick's motion to amend its complaint means that little need be said about Defendants' motion to amend their answer and counterclaims.  Specifically, because the Court has concluded that King-Devick's motion to amend its complaint shall be granted in part, Defendants "will have the opportunity as a matter of course to serve an answer and . . . counterclaims in response to [King-Devick's] newest pleading."  *Chen v. New Trend Apparel, Inc.*, No. 11 Civ. 324, 2012 WL 612478, at *2 (S.D.N.Y. Feb. 23, 2012) (report and

recommendation), *adopted*, 2012 WL 1592233 (S.D.N.Y. May 4, 2012).  As a result, Defendants' motion to amend their answer and counterclaims is denied as moot.  *See id.*

That said, the Court acknowledges that King-Devick may yet have legitimate objections to material that Defendants intend to introduce into their responsive pleading.  Accordingly, the Court makes clear that King-Devick shall have the ability to move pursuant to Federal Rule of Civil Procedure 12(f) to strike any new material Defendants incorporate into the answer and counterclaims they file in response to Plaintiff's newest complaint.  *See GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir. 2019) (approving this practice).  In assessing any such motion, the Court will consider, among other things, the timeliness and prejudicial effect of any new affirmative defenses Defendants seek to raise.  *See id.*

## III.   Motion for Issuance of a Request to the Register of Copyrights

### A.   Legal Standard

Under the Copyright Act, 17 U.S.C. § 101 *et seq.*, a party purporting to hold a copyright must typically register that copyright with the U.S. Copyright Office, or at least attempt to do so, before filing an infringement suit, *see id.* § 411(a); *see also Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019) ("[R]egistration is akin to an administrative exhaustion requirement that the [copyright] owner must satisfy before suing to enforce ownership rights . . . .").  And the Act further provides that a certificate of registration from the Copyright Office typically satisfies this precondition to suit, even if "the certificate contains any inaccurate information."  17 U.S.C. § 411(b)(1).  But an exception applies.  Specifically, a certificate of registration containing inaccurate information is insufficient to satisfy the Act's registration requirement if (1) "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate" *and* (2) "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  *Id.*

Congress has made clear, however, that a court may not hold that this exception applies without first seeking input from the Copyright Office.  Rather, the statute provides that "[i]n any case in which inaccurate information" that purportedly satisfies the exception "is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration," *id.* § 411(b)(2).  This provision "has been rarely invoked in general," but "courts are in agreement that the provision is mandatory in nature, requiring district courts to solicit the advice of the Copyright Office when the statutory conditions are satisfied."  *Palmer/Kane LLC v. Rosen Book Works LLC*, 188 F. Supp. 3d 347, 348 (S.D.N.Y. 2016).  That said, since "the referral procedure is vulnerable to abuse," *id.*, "a district court may," prior to referral, "require a litigant to 'demonstrate that (1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office,'" *id.* at 349 (quoting *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013)).

**B.     Discussion**

Defendants have moved for this Court to ask the Register to weigh in on the materiality of two alleged inaccuracies that, Defendants claim, Devick knowingly included in his application for copyright registration of the K-D Test and an associated paper (the "Paper").[5]  (Dkt. No. 72.)

First, Defendants note that the application states "No Publication" in the space for "Date and Nation of First Publication."  (Dkt. No. 74-11 at 3.)  According to Defendants, this statement is inaccurate because the K-D Test had been published many times prior to the August 23, 1983 application.  (Dkt. No. 73 at 12–15.)  Under the Copyright Act, a work is "published" if copies

---

[5] King is also listed on the application as a copyright claimant.  (*See* Dkt. No. 74-11 at 3.) For the sake of brevity, the Court refers to Devick alone in connection with the application.

have been distributed "to the public by sale or other transfer of ownership, or by rental, lease, or lending," or if copies have been offered "to a group of persons for purposes of further distribution."  17 U.S.C. § 101.  And here, by the time Devick claimed that the K-D Test had not yet been published, Devick had sent the K-D Test and Paper to an author of the Pierce Saccade Test in the hopes that he "would like [it] and perhaps incorporate it into his products" (Dkt. No. 83 at 32; *see also id.* at 35); the Illinois College of Optometry had made the K-D Test and Paper available for public viewing (Dkt. No. 83 at 38); Devick had sold copies of the K-D Test to people referred to him by the library (Dkt. No. 83 at 36–39); King had given copies of the K-D Test to at least one of his patients (Dkt. No. 83 at 17); a group of third-party researchers had printed the K-D Test in the *Journal of the American Optometric Association* (Dkt. No. 74-10); and King and Devick had entered into a licensing agreement with a company that wished to distribute the K-D Test (Dkt. No. 83 at 19–20, 50).  In Defendants' view, then, Devick—who had been involved in many of these instances of supposed publication—must have known that his "No Publication" statement was inaccurate when he made it.[6]  (*See* Dkt. No. 73 at 14–15.)

Second, Defendants point out that Devick wrote "None" when asked to "[i]dentify any preexisting work or works that [the K-D Test] [was] based on or incorporate[d]" in a section of the application for "Compilation[s] or Derivative Work[s]."  (Dkt. No. 74-11 at 4.)  The Paper's own abstract, though, described the K-D Test as "a modification of the Pierce [Saccade Test]" and another earlier eye-movement test (Dkt. No. 74-4 at 4; *see also* Dkt. No. 73 at 15–20) and, as this Court has observed, "the visual layout" of parts of the K-D Test "bears a strong resemblance

---

[6] Defendants further note that the title page of the Paper—which was the only page that referenced the Paper's 1976 date of authorship—had been removed from the copy that Devick deposited with the Copyright Office.  (*Compare* Dkt. No. 74-4, *with* Dkt. No. 74-12.)  This omission, Defendants argue, is further evidence that Devick was attempting to hide from the Copyright Office the fact that the K-D Test had previously been published.  (Dkt. No. 73 at 14.)

to the layout of the Pierce Saccade Test's counterpart[]" components, *King-Devick*, 2019 WL 78986, at *4.  According to Defendants, the application's failure to acknowledge the creative debt the K-D Test owed to its predecessor tests was no innocent oversight.  After all, Defendants explain, when Devick deposited a copy of the Paper with the Copyright Office, he excluded the abstract—and, with it, the Paper's acknowledgment that the K-D Test was a "modification" of the Pierce Saccade Test (Dkt. No. 74-4 at 4)—as well as an appendix that contained the Pierce Saccade Test itself (*compare* Dkt. No. 74-4, *with* Dkt. No. 74-12; *see also* Dkt. No. 73 at 17–20).

In the end, Defendants contend, "it is clear that Devick knowingly provided inaccurate information to the Copyright Office," and this Court must now seek the views of the Register as to whether these inaccuracies were material.  (Dkt. No. 73 at 12.)

Needless to say, King-Devick does not agree that matters are clear.  In King-Devick's view, Defendants "have failed to show that there is no genuine issue of material fact as to the . . . inaccuracy" of the answers Devick supplied on his registration application, or as to Devick's "fraudulent intent" in supplying them.  (Dkt. No. 82 at 12.)  And until Defendants have made such a showing, King-Devick goes on, referral would be "premature."  (Dkt. No. 82 at 1.)

As for the application's failure to note the K-D Test's prior dissemination, King-Devick argues that even if the omission rendered the application inaccurate, Defendants have not shown fraudulent intent.  (Dkt. No. 82 at 20–24.)  After all, King-Devick contends, Devick would have had no motive to hide any prior publication that did not threaten the success of his application.  (Dkt. No. 82 at 20.)  And, King-Devick goes on, the supposed publications Defendants invoke here would have posed no threat because, with one purportedly irrelevant exception, Defendants have not established that any of the publications were both (1) authorized by King or Devick and (2) made without a printed copyright notice (Dkt. No. 82 at 20–22), such that they might have

16

jeopardized the K-D Test and Paper's eligibility for registration, *see King-Devick*, 2019 WL 78986, at \*5 (noting that certain authorized publications made without notice of copyright may bring a work into the public domain and thereby render it ineligible for Copyright Act protection).  Given this doubt as to whether Devick had any motive to hide any past publication, King-Devick concludes, "Defendants have not met their burden of showing that there is no dispute of material fact as to whether fraudulent intent was present."[7]  (Dkt. No. 82 at 22.)

And as for Devick's failure to note the K-D Test's relationship with the Pierce Saccade and other predecessor tests in the application's "Compilation or Derivative Work" section (Dkt. No. 74-11 at 4), King-Devick argues that the application was not inaccurate because the K-D Test represented a meaningful departure from its forebears and so was not a "derivative work." (Dkt. No. 82 at 12–17.)  In addition, King-Devick contends that Defendants have here, too, failed to show that Devick fraudulently intended to hide anything from the Copyright Office.  (Dkt. No. 82 at 17–19.)  According to King-Devick, the copy of the Paper that Devick submitted to the Copyright Office referenced the K-D Test's predecessors multiple times.  (Dkt. No. 82 at 17.) And, King-Devick goes on, the fact that *some* portions of the Paper that referenced or reproduced the Pierce Saccade Test were omitted should cause the Court no concern, given that Devick, acting through counsel, may simply have wished to submit only those portions of the Paper that represented his and King's own copyrightable work.  (Dkt. No. 82 at 18–19.)

---

[7] Moreover, King-Devick argues, the fact that Devick had been aware of the K-D Test's prior dissemination at the time he submitted his registration application is insufficient in itself to establish that he knew that his statement of "No Publication" was inaccurate—if, indeed, it was inaccurate at all.  (Dkt. No. 82 at 23–24.)  First, King-Devick points out that Devick may have been referring to the fact that the *Paper*—which formed part of Devick's submission to the Copyright Office—had supposedly not previously been published, even if the *K-D Test* had been.  (Dkt. No. 82 at 23.)  Second, King-Devick maintains that Devick may have been referring to the fact that neither the K-D Test nor the Paper had appeared in a peer-reviewed journal.  (Dkt. No. 82 at 23–24.)

Ultimately, the parties' lengthy discussions of their competing views of the evidence shed little light on the question that is central to the resolution of Defendants' motion for a referral. No party, after all, has yet moved for summary judgment, and so it would be premature for this Court to decide what, if any, genuine factual disputes the present evidentiary record leaves open. Rather, the narrow question now before the Court is a question of timing: Should this Court refer the issue of materiality to the Register *before* it is conclusively determined whether Devick's application contained inaccuracies and whether those inaccuracies were knowingly introduced?

To the extent that the parties do address the legal standards that govern the timing of a referral, they take differing views. King-Devick claims that referral must wait until Defendants "can establish . . . []inaccurate information and fraudulent intent[] in a manner that forecloses genuine disputes of fact." (Dkt. No. 82 at 1.) Defendants, though, believe that referral can take place as soon as "a factual record" has been "'developed' through affidavits or discovery," and that no predicate "judicial determination" of the facts is required. (Dkt. No. 91 at 5 (emphasis omitted).)

The Court easily rejects any suggestion that it *must* await a determination that Devick knowingly submitted inaccurate information to the Copyright Office before it may refer the question of materiality to the Register. To the contrary, the Copyright Act calls for referral "[i]n any case in which" the knowing submission of materially "inaccurate information . . . *is alleged*." 17 U.S.C. § 411(b)(2) (emphasis added). Even if this language does not require that the Register's "input . . . be sought *immediately* after a party" claims the invalidity of a registered copyright, *see DeliverMed*, 734 F.3d at 625 (emphasis added), neither does it require that the Court await any evidentiary showing at all, let alone an evidentiary showing that forecloses any

issues of material fact, prior to referral, *see Ronaldo Designer Jewelry, Inc. v. Cox*, No. 17 Civ. 02, 2019 WL 1795935, at *3 (N.D. Miss. Apr. 24, 2019) ("Congress' use of the word 'alleged' reflects an intent to eschew an evidentiary requirement.").

Of course, the Court acknowledges that it *may* await further factual development at the summary-judgment stage or at trial before issuing a referral. *See Chic Home Design, LLC v. New Journey Grp. Ltd.*, No. 15 Civ. 9468, 2017 WL 3738775, at *4 n.2 (S.D.N.Y. Aug. 30, 2017) (concluding that referral was "not appropriate or required" in light of ongoing factual disputes); *Palmer/Kane LLC v. Gareth Stevens Publ'g*, No 15 Civ. 7404, 2016 WL 6238612, at *4 (S.D.N.Y. Oct. 24, 2016) (recognizing the district court's "discretion . . . with respect to the appropriate timing of a [referral] request"). As the Copyright Office has itself explained, "[a] court retains the power to delay [a referral] request until a factual record has been developed." *See* Response of the Register of Copyrights ("Response of the Register"), *Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09 Civ. 23494 (S.D. Fla. Oct. 14, 2010), Dkt. No. 209 at 11. And it will often be prudent for a court to delay referral pending a factual determination that a challenged copyright application does indeed contain inaccuracies that have been knowingly introduced. *See Chic Home Design*, 2017 WL 3738775, at *4 n.2.

Here, though, the Court will exercise its discretion to seek the Register's views on the question of materiality on the existing record. The Court views its present task as determining whether the delay that referral might occasion is outweighed by the utility that an opinion from the Register might serve in clarifying the issues in this litigation. While the Court declines at this stage to make any definitive rulings on the weight of the evidence, Defendants have put forward meaningful "factual support" for their theories of invalidity. *Schenck v. Orosz*, 105 F. Supp. 3d 812, 819 (M.D. Tenn. 2015). And the majority of the parties' disputes over whether those

19

theories will ultimately carry the day turn not on questions about what occurred as a matter of objective fact in the 1976–1983 period relevant here, but rather on questions about what facts an applicant for copyright registration during that period was expected to disclose.  Given the Copyright Office's view that the "prudent practice" is for a court to issue a referral where the contested issues "depend[] even in part on interpretation or understanding of the Copyright Office's registration practices," Response of the Register at 12 n.5, this is the sort of case in which referral at this stage of the litigation is likely to do more good than harm.

After all, an understanding of the Copyright Office's registration practices will be of assistance in resolving the disputed issues in this case.  On the issue of publication, Defendants have presented evidence that the K-D Test was distributed to third parties on several instances prior to Devick's registration application and that Devick, despite knowing of these instances, disclaimed any prior publication.  Devick's principal response, in essence, is that the Court need not infer fraudulent intent because these instances of supposed publication would not have influenced the Copyright Office's treatment of the application—a response that, in large part, presupposes an answer to the very materiality question that referral is designed to address.[8]  And on the issue of the K-D Test's relationship with earlier eye tests, Defendants have presented evidence that Devick stated on the registration application that the K-D Test was not based on any preexisting material despite knowing that it derived from the Pierce Saccade Test.  While King-Devick argues that the application did not require disclosure of these influences, this

---

[8] Incidentally, the Court doubts that Defendants must establish Devick's "fraudulent intent" in order to secure invalidation of his registered copyright, as long as Defendants are able to show that Devick knowingly made a materially inaccurate statement on his application.  *See Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 231 (S.D.N.Y. 2012).  For present purposes, however, the Court need not resolve this point.

response, too, calls for an "interpretation or understanding of the Copyright Office's registration practices," such that referral represents the "prudent practice." *Id.*

In sum, the Court concludes that "a [sufficient] factual record has been developed" to make referral to the Register fruitful at this stage. *Id.* at 11; *see also Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09 Civ. 23494, 2010 WL 3505100, at *2–3 (S.D. Fla. Sept. 3, 2010) (referring questions to the Register prior to ruling on a motion for summary judgment). And although the Court is mindful of "the risk that parties [c]ould use [referral] as a delay tactic," *DeliverMed*, 734 F.3d at 625, the Copyright Act does not "require courts to stay proceedings while a court's request for an advisory opinion is pending," *Rosen Book Works LLC*, 188 F. Supp. 3d at 349. The Court will therefore seek the parties' input as to what aspects of this case might proceed while the Court and the parties await the Register's input.

**IV.     Conclusion**

For the foregoing reasons, King-Devick's motion to amend is GRANTED in part and DENIED in part. Defendants' motion to amend is DENIED as moot. Defendants' motion for issuance of a referral to the Register is GRANTED. Within twenty-one days of the date of this order, King-Devick shall file its Third Amended Complaint, which shall be consistent with this opinion, and the parties shall file a joint letter of no more than five pages, setting out (1) the questions each party proposes for submission to the Register; and (2) the parties' proposed schedules for further proceedings in this case.

The Clerk of Court is directed to close the motions at Docket Numbers 69, 72, and 77.

SO ORDERED.

Dated: July 15, 2019
       New York, New York

_____
        J. PAUL OETKEN
     United States District Judge